```
1   HANA HILSENRATH
    OLIVER HILSENRATH
2   822 Eastbrook Court
    Danville, CA 94506
3   Telephone: 925 212 6299
    Facsimile: 925 736 7571
4   ohlx@sbcglobal.net

5   PLAINTIFFS IN PRO PER
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| HANA HILSENRATH AND OLIVER HILSENRATH, | Case No. |
|---|---|
| Plaintiffs, | |
| v. | EXHIBIT C1 AND C2: |
| EQUITY TRUST (JERSEY) LIMITED, CANDOVER INVESTMENTS PLC, INSINGER DE BEAUFORT SA, JARDINE MATHESON HOLDINGS LIMITED, GRANT BROWN, MELVYN KALMAN, JOHN PERKINS, CAROLINE BOUGEARD, AND DOES 1-10, | EXCERPTS OF INTERVIEW OF JOHN PERKINS |
| Defendants. | |

## C1-INTRODUCTION

A significant documented event in the investigation of the conspiracy between Janvrin et al (owned by Equity Trust) and Nixon Peabody – took place at the depositions held by the US government in July of 2005 in the setting of the court of her majesty the Queen in St. Helier, Jersey.

Excerpts of the above transcript annexed in Exhibit C.2

HILSENRATH V. CANDOVER, EQUITY ET AL.

1  John Perkins, Nixon's main co-conspirator in the theft of the
2  extortion-records stands a two days interview.
3
4  The interviewers were Ms. Laurel Beeler, for the US attorney
5  in San Francisco, and Mr. Bob Breakstone, for Oliver
   Hilsenrath.
6
7  John Perkins was relaxed. He knew what everybody else was just
8  guessing in July 2005: He knew that Equity Trust and Nixon
9  Peabody had carefully destroyed all records leading to their
10 conspiracy to extort millions from Hilsenrath and US Wireless.
11
12 As the depositions were about documents supplied by Equity
13 Trust (Janvrin's owner) themselves, Perkins had nothing to
14 worry about: the traces of the conspiracy were lost forever in
   the shredder and in the past.
15
16 Unbeknownst to Perkins, fortunately, part of the records of
17 the Janvrin-Nixon conspiracy were uncovered through other
   sources.
18
19 Those documents were in the hands of the interviewers – Ms.
20 Beeler and Mr. Breakstone – both suspecting Perkins of a
21 cover-up.
22
23 At the end of two full days of Q&A, when the tiring process
24 was almost over, Breakstone asked him about the November 2000
   meeting in London.
25
26 Perkins remembers. He was there, he remembers that Kalman was
27 there, Westreich was there, and Benzur was there.
28

Perkins remembers the subject being how to obtain more stock from US Wireless – nothing else.

Breakstone asks Perkins "did you pass any personal information about the Hilsenrath's assets at that meeting?"

Perkins, knowing that they thoroughly cleaned house, lied with confidence: he does not recall passing Hilsenrath records.

Breakstone insists "did you pass any information about Hilsenrath himself at the meeting".

Perkins has no reason to suspect and lies again confidently: "that was not the subject of the meeting".
The package that Breakstone laid next in front of Perkins was about to end Perkins's relaxed demeanor.

There were the private records stolen by Janvrin and Nixon personnel from the Hilsenrath trust and transferred from Jersey to the San Francisco office of Nixon Peabody by express mail through a middleman: Amos Benzur from Israel.

The package, carefully shredded by the Janvrin/Nixon co-conspirators in their offices, was there - intact.

Including tens of pages of records of assets of the Hilsenraths.

Breakstone is patiently asking Perkins to review the package and read page-by-page its contents into the televised and transcribed record and to explain how those records ended up in Benzur's and Westreich's hands – attorneys for Janvrin.

HILSENRATH V. CANDOVER, EQUITY ET AL.                -3-

Only when Perkins's voice grew faint asking: "Do you want me to keep going?" did Breakstone let him stop and asked him:

"What is going on here?"

Perkins incoherently explains: it was not him…, it was Kalman (his superior at Equity) and he had no idea that this was the subject at the 5 days' meeting (at which he participated on his own recollection and at the recollection of 8 others).

Breakstone, unimpressed presses on and asks about Equity Trust's integrity and fiduciary duty to the Hilsenrath's.

At that point, Viscount Substitute Matthews - the Jersey presiding judiciary officer for the Queen - stood up and stopped the proceedings to prevent Perkins from incriminating his former employer Equity Trust (owners and operators of Janvrin) and Nixon Peabody's co-conspirators.

This was the end of the depositions in Jersey.

A few months later the US attorney in San Francisco, through diplomatic channels, sent an official letter to Ms. Rebecca Boxall of the Jersey Attorney General asking why Equity Trust (Janvrin owners) did not produce certain documents, pertinent to that inquiry.

After numerous letters from the US to the Jersey authorities, back and forth, and almost two years later, in April 2007 - Equity trust ultimately admitted with resignation: we could not locate those documents in our files.

**C2 – EXCERPTS/TRANSCRIPT OF INTERVIEW WITH PERKINS IN JERSEY/UK, JULY-AUGUST 2005**

```
 1     Q.   And Dahan and Haruvi, they signed as CEO and
 2   president of Pelican Securities & Investments and
 3   Pelican Consulting; is that correct?
 4     A.   Yes.
 5     Q.   So apparently Matheson had been taking legal
 6   action against one of its own clients since at least
 7   2001; isn't that correct?
 8     A.   Yes.
 9     Q.   And through that entire time it was acting as a
10   trustee over Mr. Hilsenrath's trust; isn't that correct?
11     A.   I believe that was the case, yes.
12     Q.   How can that be?
13     A.   Well, the only thing I would say is that -- and
14   again, it's not trying to pass the buck, but by that
15   time Mr. Kalman had taken primary responsibility for the
16   relationship.  We'd indicated previously there was a
17   conflict of interest.  And initially we, if you like,
18   came down on the side of continuing to act for Mr. Dahan
19   and Mr. Haruvi once realizing there was a conflict.
20     Q.   And I think we've established that the attorney
21   representing the plaintiffs was Mr. Glen Westreich; is
22   that correct?
23     A.   Yes.
24     Q.   I think we've established that you met Mr. Glen
25   Westreich in early 2000 at a meeting in London, in which
```

468

```
 1   yourself and certainly Mr. Kalman on the Matheson side
 2   were present, and Mr. Dahan and Mr. Haruvi, they were
 3   also present; isn't that right?
 4        A.   That's correct.
 5        Q.   And Mr. Hilsenrath did not attend that meeting.
 6        A.   He did not.
 7        Q.   Doesn't it appear that Insinger had a conflict
 8   in that it was supporting legal action by some of its
 9   clients against other of its clients?
10        A.   The way I see it, we didn't have much choice in
11   the matter.  We -- we were requested by clients to take
12   action.  They -- they, I believe, gave us sufficient
13   proof that they -- that they had a litigious action to
14   bring, and so we -- because we administered the
15   companies on their behalf, which owned the shares which
16   were the subject of the dispute, under legal advice we
17   felt we had to proceed with the action.
18        Q.   Did Matheson ever provide information to Dahan
19   or Haruvi or Westreich in relation to Oliver Hilsenrath
20   or any of his entities?
21        A.   Well, that's quite a sweeping question, any
22   information.  I don't think we gave -- I don't recall
23   giving specific information, such as has been referred
24   to before as in specific, you know, entire assets of
25   Aida Holdings.  For example, I don't think we would have
```

```
 1   discussed anything in detail.
 2        Q.   Was information about Oliver Hilsenrath
 3   provided?
 4        A.   I don't recall any -- anything specific.  I
 5   don't really think that was the -- the subject of the
 6   discussions.  The discussion was either how to recover
 7   stock or options or perhaps proceeds which Mr. Dahan and
 8   Mr. Haruvi thought they were entitled to.  So it was
 9   really in that context.
10        Q.   Were any records relating to Oliver Hilsenrath
11   or his entities provided to any of those who attended
12   the meeting?
13        A.   Not to my recollection, no.
14        Q.   Just off the record for a second.
15             Back on the record.
16             I hand you what has been previously marked as
17   Defense Exhibit 212, which appears to be a fax to Amos
18   Bentzur, B-e-n-t-z-u-r, Attorney at Law, from Linda
19   de la Cour, Insinger de Beaufort; the subject is Aida
20   Holdings, and the date is 6 November 2000.
21        A.   Correct.
22        Q.   What does this refer to?  What attached -- what
23   attached documents are being provided to Mr. Amos
24   Bentzur?
25        A.   It says it's going to fax the attached
```

470

1  documents in respect of the power of attorney in
2  relation to Aida Holdings Limited.  And it goes on to
3  say that a courier package is being forwarded to
4  Mr. Bentzur in respect to the litigation.  And attached
5  are documents relating to Telecom Associates, which are
6  from the Matheson or the Equity records, stating that
7  Mr. Hilsenrath is the client, and giving the registered
8  and administration addresses, details of the officers,
9  and giving the financial year-end.  Just showing the
10 issued share capital, one share of Telecom Associates.
11         Then there's a -- internal ledger print showing
12 the various nominal accounts with some balances on.
13         It looks like similar information with respect
14 to Star Anise Limited.  There's a Morgan Stanley Dean
15 Witter statement for the month ending 30th April 2000 in
16 regard to Star Anise, showing holdings and daily
17 activity.
18         There's some statements in relation to Borazon
19 Limited, showing basic company information and also
20 internal nominal ledger prints with balances on.
21 There's a statement for Borazon Limited, showing
22 relationships in regard to other entities, including
23 Aida Holdings Limited, showing the -- the bankers being
24 Matheson Bank International, and also brokerage accounts
25 with Morgan Stanley, Stuart Coleman, and Spear Leeds

471

```
 1   Kellog.
 2           Do you want me to keep going?
 3      Q.   No, that's all right.
 4           Going back to the first page, Amos Bentzur,
 5   wasn't he the attorney representing Dahan?
 6      A.   Well, he -- he was known to David Dahan and he
 7   was certainly present at the meeting in London.
 8      Q.   So although the caption says it's Aida Holdings
 9   Limited, and the paragraph that refers what's being
10   forwarded seems to indicate that "Kalman has asked me to
11   fax documents relating to a power of attorney on the
12   above company," would you agree with me that much of the
13   information that is being conveyed concern other
14   entities other than Aida Holdings?
15      A.   Yes, it does.
16      Q.   And also we have seen previously numerous --
17   numerous instructions from Mr. Hilsenrath to various
18   Matheson/Insinger trust people not to disclose
19   information to Mr. Dahan.  Isn't that an accurate
20   statement?
21      A.   Yes.
22      Q.   What is going on here?
23      A.   Well, all I can say is that I did not send that
24   fax, it was Linda de la Cour, and she sent it apparently
25   on the instructions of Mr. Melvyn Kalman.  I don't
```

472

```
 1   recall having seen any of this documentation before, so
 2   I wasn't aware of it.
 3       Q.   You have worked in and on behalf of Matheson,
 4   Insinger de Beaufort, and -- and Equity for how many
 5   years, sir?
 6       A.   Sixteen and a half.
 7       Q.   You were aware of what the responsibilities and
 8   fiduciary obligations are of trust companies --
 9       A.   Yes.
10       Q.   -- isn't that correct?
11            Based upon your experience and your
12   professional dealings with many clients and trust
13   companies, do you believe that your employer had a
14   conflict of interest with Mr. Hilsenrath and breached
15   its fiduciary obligations as a result of the information
16   we have shown you here today?
17       VISCOUNT SUBSTITUTE MATTHEWS:  Could I just
18   interrupt at this point.  It seems to me -- I want to
19   find out the relevance of this in relation to these
20   particular criminal proceedings, and it seems to me that
21   you're asking this client to incriminate his former
22   employer.
23       MR. BREAKSTONE:  I'll be happy to discuss this with
24   you, but it's not a relevant objection.
25            Mr. Dahan and Mr. Haruvi were primary investors
```

473