1    HANA HILSENRATH
     OLIVER HILSENRATH
2    822 Eastbrook Court
     Danville, CA 94506
3    Telephone: 925 212 6299
     Facsimile: 925 736 7571
4    ohlx@sbcglobal.net

5    PLAINTIFFS *IN PRO PER*

6

7

8                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
9

10   **HANA HILSENRATH AND OLIVER**          **Case No. 3:07-cv-3312 CW**
     **HILSENRATH,**
11                          **Plaintiffs,**
                                  **v.**                  **OPPOSITION TO ALL DEFENDANTS'**
12                                              **MOTIONS TO DISMISS ON GROUNDS**
     **EQUITY TRUST (JERSEY) LIMITED,**         **OF INSUFFICIENT SERVICE, LACK OF**
13   **CANDOVER INVESTMENTS PLC,**             **JURISDICTION, VENUE, AND FORUM**
     **INSINGER DE BEAUFORT SA,**             **NON CONVENIENS**
14   **JARDINE MATHESON HOLDINGS**
     **LIMITED, GRANT BROWN, MELVYN**         **Date: September 27, 2007**
15   **KALMAN, JOHN PERKINS, CAROLINE**       **Time: 2:00 PM**
     **BOUGEARD, AND DOES 1-10,**             **Place: Courtroom 2**
16                          **Defendants.**    **Judge: Hon. Claudia Wilken**

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**I. INTRODUCTION – pp 5**

**II. LEGAL AND FACTUAL NATURE OF HARBORING – pp 7**

      Jurisdiction and Harboring

      Harboring Concept since 9/11/2001

**III. PROPER SERVICE – pp 9**

**IV. JURISDICTION – PRELIMINARY DISCUSSION – pp 11**

    A.  This litigation would not have occurred had defendants not interacted with plaintiffs:

    B.  This litigation is the result of several transactions involving stock issuances in the forum state with an expectation to financial gains to the foreign corporations:

    C.  Connection with the United States <u>at large</u> make jurisdiction possible in any district-important citation:

    D.  An out of state act having an effect within the forum is sufficient to constitute purposeful availment:

    E.  For purpose of establishing jurisdiction the reference to "transacting business" does not require that the defendant have engaged in commercial activity.

**V. JURISDICTION – THE FACTS – pp 14**

      <u>SPECIFIC PERSONAL AND GENERAL JURISDICTION – KALMAN, PERKINS</u>

      <u>SPECIFIC PERSONAL JURISDICTION – BROWN, BOUGEARD</u>

      <u>SPECIFIC PERSONAL JURISDICTION –</u>
      <u>EQUITY TRUST, INSINGER DE BEAUFORT, JARDINE MATHESON</u>

      <u>SPECIFIC PERSONAL JURISDICTION – CANDOVER AND INSINGER</u>

      <u>GENERAL JURISDICTION – OVERVIEW: EQUITY, CANDOVER, INSINGER, JARDINE</u>

      <u>EQUITY TRUST – GENERAL JURISDICTION</u>

      <u>CANDOVER – GENERAL JURISDICTION</u>

<u>JARDINE MATHESON – GENERAL JURISDICTION</u>

<u>INSINGER DE BEAUFORT – GENERAL JURISDICTION</u>

**VI. JURISDICTION: THE LAW – pp 27**

1. <u>The Long Arm Statute – a conspiracy to commit an overt act targeted to the forum.</u>

2. <u>One conspirator committing an overt act in the forum hales all other co-conspirators in the forum</u>

3. <u>Single act of tort statute</u>

4. <u>One co-conspirator is a California resident</u>

5. <u>Hiring of counsel in the forum in the original[1] action means availing to the forum</u>

6. <u>Settlement activities are purposeful availment</u>

7. <u>Acts of an agent may be attributed to the principal for purpose of jurisdiction.</u>

8. <u>Jurisdiction on Holding Company – No shield for liability of holding company:</u>

9. <u>No shield for torturous acts for jurisdiction purposes</u>

10. <u>Personal jurisdiction over corporate officer</u>

11. <u>Forum of federal courts is the entire US</u>

12. <u>RICO – nationwide federal jurisdiction</u>

13. <u>Securities fraud – nationwide federal jurisdiction</u>

14. <u>Pendant personal jurisdiction</u>

15. <u>General personal jurisdiction – national and local contacts</u>

16. <u>Reliance on US federal law to conduct business</u>

17. <u>Commercial banking as basis for jurisdiction</u>

18. <u>Foreign defendants with national contacts</u>

19. <u>Modern technology access to forum for jurisdiction</u>

---

[1] with expectation for enrichment and adjudication in forum state

20. <u>Jurisdiction subsequent to judgment. As explained in Wright, Miller & Marcus, 12 Federal Practice and Procedure, § 3013, pp. 158-159 (1997):</u>

21. <u>California state public interest</u>

## VII. FORUM NON-CONVENIENS – pp 41

No other forum available

The issue of the Hilsenraths' double citizenship.

Miscellaneous formation agreements.

## VIII. SUMMARY – pp 43

# I. INTRODUCTION

The Court should deny defendants' motions to dismiss on grounds of improper jurisdiction, venue, service or forum non-conveniens.

Matters of jurisdiction, venue and service are quintessential elements in the alleged harboring of a conspiracy and in the operation of the alleged international racketeering operation.

Plaintiffs' opposition is based on a number of fundamental legal considerations:

1. Service is a matter of notice not a matter of form. Notice is to be given to senior management. Plaintiffs acted accordingly. See ***Nanya Tech. Corp. v. Fujitsu, Ltd., 2007 U.S. Dist. LEXIS 5754.*** The complex stricture of this organization is part of the scheme to avoid facing the law in any jurisdiction.

2. The "long arm" doctrine hales to this jurisdiction conspirators that targeted plaintiffs in this same jurisdiction. It is enough that one conspirator targeted plaintiffs in this jurisdiction in order to hale them all. Defendants concocted and harbored a conspiracy against the Hilsenraths in this jurisdiction[2]. See ***Mackey v. Compass Mktg., 391 Md. 117.*** [*The Mackey* ruling is brought in its entirety in Exhibit 53.] The very fact that a conspiracy occurred was established in Federal Court in Case *4:02-cv-01068-CW, BZ Janvrin Holdings Limited et al v. Hilsenrath et al.* [R&R -Exhibit 1].

3. The use of US legal system to advance one's interests and business is a two way street: It also avails the same party to the US legal system when it is detrimental to its interests. The Federal law disfavors hypocritical use of its long arm. All parties have relied substantially on the US legal system to promote their interests. They should not be allowed to evade justice in the same system when it could work against them. See ***Mackey v. Compass Mktg., 391 Md. 117.***

4. Forum Non Conveniens. All defendants are large corporations and employees of the same, with legal expenses covered by their firms. Plaintiffs are *pro se* litigants invoking the special

---

[2] The underlying facts of this case were already adjudicated and concluded in Federal Court in this jurisdiction, a jurisdiction selected by the defendants themselves in this case: Three foreign corporations: Janvrin, Ryburn and Crossgar, formed and managed by Equity Trust, were ordered by the federal court to pay in excess of $8,000,000 to plaintiffs for having extorted, cashed in and further maliciously litigated against plaintiffs in this jurisdiction and venue.

right of self-representation of the United States' Constitution. See ***AMG Indus. Corp. v. Lyon, 2005 U.S. Dist. LEXIS 28164***

In this case: to deny jurisdiction is to deny justice.

In this present case, where the principal allegations involve a racketeering organization spread over multiple countries in abuse of the principles of corporate veil, matters of jurisdiction and ability to serve judicial documents could be very well resolved only at the very end of the litigation.

> **Jurisdictional issue may require trial on merits:** Occasionally, the court must postpone determination of its jurisdiction until a trial on the merits. For example, a federal statute may provide jurisdiction to hear claims arising from certain activities "affecting interstate commerce." A dispute as to whether the activity in question "affects interstate commerce" impacts *both* the claim for relief and the court's subject matter jurisdiction. In such cases, the court has jurisdiction to proceed to trial on the merits, if necessary, to resolve the dispute. (A motion to dismiss for lack of subject matter jurisdiction might be proper, however, if the allegations of the complaint are "frivolous') [See **Thornhill Publishing Co. v. General Tel. & Electronics (9t h Ci r. 1 979) 594 F2d 730,734-735**]

1

2

## *II. LEGAL AND FACTUAL NATURE OF HARBORING*

3

**Jurisdiction and Harboring**

4    An attempt by defendants to dismiss litigations on grounds of jurisdiction is a customary first

5    step in a federal case.

6    In this present case the denial of US federal jurisdiction is not only a customary first step but

7    rather a quintessential defense of an organization designed and operated to harbor unlawful acts; an

organization targeted to harm remote persons in remote jurisdictions.

8    It is factored into the *modus operandi* of such organization that the jurisdictional argument

9    shall be the ultimate defense should the tortfeasors be brought to justice.

10    As will be shown in this document, all persons and organizations have strong ties to the

11    United States by virtue of the *Janvrin et al* conspiracy but also independently.

12    However, even if the availment of defendants to the United States were limited, or weak or

13    even non existent, the harboring of a conspiracy that inflicted damage onto US persons in the State of

California is sufficient to establish jurisdiction (see *Mackey et al.*).

14

15    **The Concept of Harboring since 9/11/2001**

16    Since 9/11 the law in the US took a fresh look at "crimes by remote control". Globalization,

17    international trade and transportation, the information highways and the Internet have opened new

18    opportunities for business and also for crimes.

19    It became clear that the law needs to deal with cases such as harboring an organization in the

'jurisdiction' of Tora-Bora that can collapse the World Trade Center in the Eastern District of New

20    York, or with cases of harboring a terrorist training facility in the 'jurisdiction' of Teheran that

21    ultimately brought to the death of *Greenbaum* of the District of California.[3]

22    In both cases the law agreed that federal jurisdiction is appropriate.

23

24

25    _____

[3] **Greenbaum v. Islamic Republic of Iran, 451 F. Supp. 2d 90, 2006 U.S. Dist. LEXIS 57432**

26    **(D.D.C., August 10, 2006, Decided)**:  "Civil conspiracy under California law consists of formation
and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in

27    furtherance of the common design. It is not a cause of action, but a legal doctrine that imposes
liability on persons who, although not actually committing a tort themselves, share with the

28    immediate tortfeasors a common plan or design in its perpetration actionable.*"

1

2    In order to harbor a criminal organization that inflicts damage onto the target jurisdiction, in
our case the northern district of California, there is no need for a California bank account, for a

3    California office or frequent travel to California.

4        *Mackey* and other newer cases are unequivocally establishing jurisdiction over a harborer at
the location of the damage.

5

6        An argument of *forum non-conveniens* to hail adjudication to the Tora-Bora or Teheran has
never been contemplated.

7

8        Neither should a similar argument hail this adjudication to Jersey, Luxemburg or the
Bahamans.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# III. PROPER SERVICE

Service on all parties was properly, efficiently and timely accomplished according to Rule 4 and according to the Hague convention[4] for the UK and territories, and for the Netherlands.

The service included a valid summons of the clerk and a complaint.

As each of the corporations are spread all over the world, service was effected to the chief management of each corporation [see Exhibits 36, 47] by means of Federal Express that allows tracing, timely delivery of documents and proof of arrival and receipt of documents[5].

**Jimena v. UBS AG Bank, Inc., 2007 U.S. Dist. LEXIS 44067**  Under the Federal **Rules,** a business entity may be served by delivering a copy of the summons and complaint to: 1. an officer; 2. a managing or **general agent,** 3. any other **agent** authorized by appointment or by law to receive service of process. Fed. R. Civ. P. 4(h)(1). Under California law a corporation may be served by delivering copies of the summons and complaint to

1. the president "or other head of the corporation," a vice-president, secretary or assistant secretary, a treasurer or assistant treasurer, **general** manager or other persons authorized by the corporation to receive service of process; or

2. the person designated by the corporation as its statutory **agent** for service; or

3. the Secretary of State.

It should be noted that service is above all about notice: substance, not form. In this present case all parties have received timely notice of the complaint and summons.

**Nanya Tech. Corp. v. Fujitsu, Ltd., 2007 U.S. Dist. LEXIS 5754** We should not lose sight of what **service of process** is about, it is about giving a party notice of the pendency of an action and the opportunity to respond. *Rio Props., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1017 (9th Cir. 2002). All that is required under Rule 4(f)(3) is that service be "directed by the

---

[4] The Hague convention rules of service for all defendants' home jurisdictions allow service by mail as method of serving legal documents [Article 10(a) of The Hague Convention re Service of process.]

[5] In a case with structured organizations like the present case, inefficient service of documents can create unnecessary delays and defeat the objective of timely adjudication. Targeting top management for purpose of service is particularly essential in a case in which the defendants are suspected of allegedly abuse of the elaborate corporate structure to harbor a conspiracy. See identity of top management and their addresses in Exhibits 36, 47.

court" and that the means of service "not be prohibited by international agreement [the Hague Convention]." FED.R.CIV.P. 4(f)(3).

Further, the court should not consider dismissal for insufficient service unless prejudice occurred to the defendant. Clearly, no such prejudice occurred.

This Court has held that "[d]ismissal for insufficient service of process is not warranted . . . where plaintiffs are not culpable and there has been no indication of prejudice to the defendant." *In re Bulk [Extruded] Graphite Prods. Antitrust Litig.,* 2006 U.S. Dist. LEXIS 45762, *13-14 (D.N.J. Apr. 24, 2006) (citing 5A Wright & Miller, Federal Practice & Procedure § 1353 at 342 (3d ed. 2005)).

## IV. JURISDICTION – PRELIMINARY DISCUSSION

The proper jurisdiction and venue for this complaint is the district court in the northern district of California.

Plaintiffs allege the existence of an international racketeering organization who acted unlawfully in this jurisdiction.  Therefore the jurisdiction and venue are appropriate for this action.

Such organization materialized through Janvrin, Ryburn and Crossgar [see Exhibit 1] in this jurisdiction in relation to the following cases:

1) --- Case 4:02-cv-01068-CW Janvrin Holdings Limited et al v. Hilsenrath et al;
and is related to this case as well as to:

2) --- Case 3:07-cv-03193-CW Hilsenrath et al v. Nixon Peabody LLP et al[6];
and 3 additional litigations that preceded them, also brought by defendants in this case:

3)--- 4:00-cv-02334-CW Janvrin Holdings v. U.S. Wireless Corp, Hilsenrath et al;

4)--- 4:00-cv-02336-CW Crossgar Ltd v. U.S. Wireless Corp, Hilsenrath et al;

5)--- 4:00-cv-02346-CW Ryburn Limited v. U.S. Wireless Corp, Hilsenrath et al.

There can be no doubt therefore that this jurisdiction is proper and the venue for this case is here in the Northern District of California.

**A.  This litigation would not have occurred had defendants not interacted with plaintiffs:**

> **Ballard, 65 F.3d at 1500**. "Furthermore, because this lawsuit would not have been brought but for the Defendants' interaction with Klein in connection with Olympic Partners, it is obvious that the claims at issue arise out of their contact with the forum state.
>
> Defendants cannot meet their burden to show that this Court's exercise of jurisdiction would be unreasonable. Although their contacts with California were minimal, their dealings with Klein were not.
>
> Moreover, California clearly has an interest in providing relief to its citizens (or their estates) when they are allegedly owed millions of dollars"

---

[6] Alleged co-conspirators Nixon Peabody LLP, a local California Corporation are likely to be joined to this action shall the Court ratify the 1714 petition submitted by Plaintiffs. Local co-conspirators are in further support of this jurisdiction.

**B.  This litigation is the result of several transactions involving stock issuances in the forum state with an expectation to financial gains to the foreign corporations:**

**Steinberg v. Brennan, 2003 U.S. Dist. LEXIS 19290** "The quality and nature of Brennan's contacts with Texas during the negotiation and execution of the Stock Purchase Agreement suggest far more than a random, fortuitous, attenuated connection to Texas. *See Stuart*, 772 F.2d at 1191 (quoting *Burger King Corp.*, 471 U.S. at 475).  Brennan's contacts with Texas were not simply the result of the unilateral activity of Steinberg. Instead, Brennan's visit to Texas and subsequent contact with Steinberg within the state were active and **purposeful** attempts to derive an economic benefit. Brennan traveled to Texas in a **purposeful** attempt to find an investor who would eventually lead to his own economic profit.

In that way, the instant matter is quite similar to *Michigan Gen. Corp. v. Mod-U-Kraf Homes, Inc.*, 582 S.W.2d 594 (Tex. Civ. App. -- Dallas 1979, writ ref'd n.r.e.). There, a Delaware corporation sued a Virginia corporation in a Texas court for breach of a merger agreement. *Id.* at 594. Mod-U-Kraf's contacts with Texas through its negotiations and ultimate contract with Michigan General Corporation were apparently designed to produce a benefit from a business transaction undertaken in this state. Obviously, Mod-U-Kraf must have believed that it would derive substantial economic benefit from its excursions to Texas. Thus, Mod-U-Kraf's contacts with Texas were by no means minimal or fortuitous, but instead, were active and **purposeful**.

***Under traditional contract analysis, "the place of the contract is the place where the last act necessary to the completion of the contract was done,   [and] that is where the contract first creates a legal obligation." Product Promotions, Inc., 495 F.2d at 495** (citing  WILLISTON ON CONTRACTS § 97, at 356 (3d ed. 1957))".*

**C.  Connection with the United States <u>at large</u> make jurisdiction possible in any district:**

**eMag Solutions, LLC v. Toda Kogyo Corp., 2006 U.S. Dist. LEXIS 94462**:  "The worldwide service-of-process provision of § 12 of the Clayton Act authorizes the exercise of personal jurisdiction over a foreign corporation in any judicial district in the United States, so long as the corporation has sufficient minimum contacts with the United States at large."

**D.  An out-of-state act having an effect within the forum is sufficient to constitute purposeful availment:**

> **Castro v. DS Waters of Am., LP, 2007 U.S. Dist. LEXIS 35172 citing Ballard v. Savage, 65 F.3d 1495:** An exercise of specific jurisdiction is appropriate only if the nonresident defendant has purposefully availed itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. The "purposeful availment" requirement is satisfied if the defendant has taken deliberate action within the forum state or if he has created continuing obligations to forum residents. It is not required that a defendant be physically present within, or have physical contacts with, the forum, provided that his efforts "are purposefully directed" toward forum residents. An out-of-state act having an effect within the forum is sufficient to constitute purposeful availment

**E.  For purpose of establishing jurisdiction the reference to "transacting business" does not require that the defendant have engaged in commercial activity.**

This is of particular significance in this case in which large corporations with large enterprises in the United States are trying to avoid federal jurisdiction behind moot statements: no office in California, no bank account in California etc.

> **Ginsburg v. Dinicola, 2007 U.S. Dist. LEXIS 41418** The statute's reference to "transacting any business" does not require that the defendant have engaged in commercial activity. That language is general and applies to any purposeful acts by an individual, whether personal, private, or commercial. *Ealing Corp. v. Harrods Ltd., 790 F.2d 978, 982 (1st Cir. 1986)* (*quoting Ross v. Ross,* 371 Mass. 439, 441, 358 N.E.2d 437 (1976)).

The attempts by the defendants to carry the adjudication of this case outside the forum (in which the members of this alleged racketeering organization have been proven to have inflicted harm upon plaintiffs) is a further attempt to obstruct justice.

1

2

### *V. JURISDICTION – THE FACTS*

3

**SPECIFIC PERSONAL AND GENERAL JURISDICTION – KALMAN, PERKINS**

4

Kalman and Perkins (1995 to 2003, respectively to 2005) were the directors of Janvrin,

5

Ryburn and Crossgar [Exhibits 6-10, 14-16].

6

Kalman and Perkins, directors of Insinger de Beaufort, participated at a London meeting in

7

December 2000 with 9 other participants. At that meeting the two handed financial records of

8

Insinger de Beaufort belonging to the Hilsenrath family holdings to attorneys of Nixon Peabody.

9

[Exhibits 43, 44].

10

A participant at the London 2000 meeting testified as follows [see Docket, Doc 1 –

11

Complaint]:

12

13

> "The abovementioned confidential Hilsenrath records were handed to the
> Nixon Peabody attorneys with the objective to impeach Hilsenrath with
> his holdings in offshore trusts and get the CEO Hilsenrath fired. Hilsenrath
> was identified as the primary hurdle in the Janvrin litigation."

14

15

Kalman and Perkins completed the delivery of the extortion documents in several mail and

16

fax packages on Insinger de Beaufort letterhead [Exhibits 43, 44].

17

18

While Janvrin, Ryburn and Crossgar were shell corporations – corporations with no

19

employees or operations - Kalman and Perkins (and later Bougeard, Brown and others) were the

20

directors, the *de facto* actors behind the shells. They also controlled the set of *Janvrin v. Hilsenrath*

litigations [Exhibits 12, 12] and were signatories on the blackmail papers.

21

22

> **BB in Tech. Co. v. JAF, LLC, 20 Fla. L. Weekly Fed. D 836:**
> Under Florida law, if an officer, director, or agent commits or participates

23

> in a tort, whether or not his actions are by authority of the corporation or
> in furtherance of the corporate business, that individual will be liable to

24

> third persons injured by his actions, regardless of whether liability attaches
> to the corporation for the tort. In other words, officers, directors, and

25

> agents of a corporation can be personally liable for committing torts when
> the tort is committed within the scope of their corporate employment

26

27

28

As the *Janvrin* tort occurred in the northern district of California, *Mackey et al* extend (see legal analysis) the specific personal jurisdiction of the of the federal court to Kalman and Perkins who were the actors behind *Janvrin et al*.

General jurisdiction also abundantly applies to Kalman and Perkins. Kalman, Perkins and their successors availed themselves to this jurisdiction through:

a. Submitting dozens of IRS filings on behalf of scores of companies in their care. They filed annual tax filings with the US federal authorities [Exhibit 14].

b. They opened dozens of bank accounts in the United States with FDIC - federally regulated financial institutions, including Bank of America in Concord, California [Exhibit 15]

c. They hired attorneys, Nixon Peabody, in the jurisdiction – California - in a related litigation [Exhibit 9] (see also legal analysis)

d. They solicited Plaintiffs' business in the jurisdiction – California [Exhibit 6]

**SPECIFIC PERSONAL JURISDICTION – BROWN, BOUGEARD**

Brown and Bougeard took over from Kalman and Perkins on or about 2003 upon departure of Kalman. Exhibit 11 and the forensic report submitted with the complaint [Docket, Doc 1 Exhibit A] in this case abundantly cover the activities of these two employees of Equity et al.

They signed documents, ordered actions and instructed their co-conspirator attorneys at Nixon Peabody (*Hilsenrath et al. v Nixon Peabody at al*) in furtherance of Janvrin's conspiracy against Plaintiffs.

> "…please confirm that this will not affect our pursuit of the existing claims of Janvrin et al against US Wireless/Oliver Hilsenrath" wrote Bougeard to Janvrin's attorney in California in Exhibit 11.

In her declaration, targeted to evade federal jurisdiction, Bougeard describes herself as a part time working mom spending holidays with her three small children.

The record shows "this part time working mom" launching scores of merciless attacks over the Hilsenraths and their 6 children from her assumed protected locale in Jersey.

Repeatedly, Bougeard and Brown attempted to destitute the Hilsenraths, to maliciously use the legal process in this jurisdiction [Exhibit 4] through *Janvrin v Hilsenrath* and seize the

Hilsenraths savings as further described in *Case 3:07-cv-04162-WHA Hilsenrath v. Equity Trust (Jersey) Limited et al.*

Generally, Brown and Bougeard assumed the same responsibilities as Kalman and Perkins in the operation of *Janvrin et al* and its underlying trusts [Exhibits 10, 13, 42] - therefore the same arguments are applicable in reference to jurisdiction.

Further it seems that Equity Trust extended its own legal representation in this jurisdiction (by the reputable firm of Latham and Watkins LLP) to also cover their present and former employees in this litigation. Therefore no prejudice will occur to these defendants in this jurisdiction.

**SPECIFIC PERSONAL JURISDICTION –**
**EQUITY TRUST, INSINGER DE BEAUFORT, JARDINE MATHESON**

Kalman, Perkins Bougeard and Brown, while exaggerating their juniority and lack of discretion (see declaration Bougeard and Brown), it is reasonable that they acted along the lines of policies of Equity Trust, Insinger de Beaufort and Jardine Matheson, along the 7 years of the *Janvrin* racketeering conspiracy.

In the 2000 time frame Janvrin, Crossgar and Ryburn were owned and operated by Jardine Matheson [Exhibit 35], in the 2001/2 time frame they were operated and owned by Insinger de Beaufort [Exhibit 41 and 42] and since 2003 they are owned and operated by Equity Trust of which Candover (see special Candover section) are an integral part of management [Exhibit 10].

Under Jardine Matheson they negotiated the original securities of Janvrin et al [Exhibits 7].

Under Insinger de Beaufort they transferred the blackmail records to Janvrin's attorneys in California subsequent to the London meeting [Exhibits 41].

Under Equity trust/ Candover they hired Nixon Peabody to obtain a $7 million judgment [Exhibit 4] against the Hilsenraths in *Janvrin et al v. Hilsenrath et al.* Thus availing themselves to the jurisdiction by litigating the matter in this venue, and hiring attorneys to do so. The funds sought in the above litigation were for the sole benefit of Equity and Candover.

The Court ultimately rejected the application for default [Exhibit 5]. The Court stated that Janvrin never really attempted to serve Hilsenrath and, more so, Hilsenrath had no duty to make payments on behalf of US Wireless.

Only upon the Hilsenrath counterclaim in *Janvrin et al v. Hilsenrath et al.*, the Equity Trust harbored plaintiff evaded the federal court and shut down Janvrin, Ryburn and Crossgar in defeat of due process [Exhibits 3].

It is clear from Exhibits 4, 9, and 11, that these corporations contracted, instructed, and financed the attorneys in California to prosecute the Hilsenraths in *Janvrin et al v. Hilsenrath et al.*

By that they availed themselves specifically to the jurisdiction pursuant to (1) *Mackey* and pursuant to the (2) principle of availing through enrollment of attorneys in the jurisdiction in the related case (see also legal analysis).

All individuals operating *Janvrin at al* were at al time employees of the above organizations, operated out of the facilities of Equity, Insinger and Jardine ("Equity House", "Insinger House", "Jardine House", used in-house budgets to effect their conspiracy and a variety of legal services made available in house and on an outsourced basis.

**SPECIFIC PERSONAL JURISDICTION – CANDOVER AND INSINGER**

Since 2003 Candover acted as the *de facto* management of the Jersey Trust Company they renamed Equity Trust after its acquisition from Insinger de Beaufort [Exhibits 19, 20, 46].

Candover define their relationship with Equity Trust in their own words in Exhibit 21:

> "We've earned a reputation for forming close partnerships with management. For many of our investee companies, the successful completion of a deal is just the start. Enabling the next phase of growth, be it geographic expansion or add-on acquisitions of new product lines is fundamental to what we do. We offer both follow-on funds, as well as experienced advice."

Financially they have overwhelming control over Equity Trust's operation, which they control through the consummation of an MBO – a mix of large debt and an equity coupon[7]. This is obvious in Exhibit 20 where Candover accounts, in its books, for the entire value of Equity Trust as announced in their press release in Exhibit 19.

In other words, every Dollar obtained by Equity or expected to be obtained through the Janvrin litigation from the Hilsenraths [exhibit 4] was expected to go to the benefit of Candover to pay for the Euro 198 million in debt secured by Candover in the purchase of Equity from Insinger.

A special note is made to the misleading statements of Insinger that they have no involvement anymore in Equity Trust. Exhibit 46 is an Equity Trust press release attesting to the opposite. In fact

---

[7] In their pleading, Candover are stating that they only own 5% of Equity. This is a purposely misleading statement no accounting for the majority control they exercise over Equity Trust through a debt-instrument rather than equity. This being the natures of an MBO deal. This is particularly obvious in exhibit 20 that shows Candover accounting for the ENTIRE value of Equity Trust in their books and not only 5% as they falsely state.

Insinger is a management partner till this very day. Candover and Insinger are describing their relationship with Equity as follows:

> "Candover will take a majority stake in the equity of the business, investing alongside the management team, with Insinger de Beaufort retaining a significant stake".

The marching orders, corporate culture and the destination of the ultimate benefits from the operation of Equity Trust and its the conspiracy - reside with these conglomerates - which will be shown to be active and proactive in the United States on their own account.

**GENERAL JURISDICTION – OVERVIEW: EQUITY, CANDOVER, INSINGER, JARDINE**

It is hard to find four corporations deeper rooted in American life and business that these four corporations: Equity Trust, Candover, Insinger and Jardine Matheson.

All four significantly benefiting from the American stream of commerce.

All four availing themselves and benefiting from US federal regulated industries, but all four vehemently pleading lack of general federal jurisdiction over their corporations and employees.

In the next several sections plaintiffs will present multiple forms in which each of the four corporations avail themselves to the jurisdiction of the federal court even if it true that they do not have a bank account or a registered office on California.

Plaintiffs will show that:

Equity Trust's operation in new Your City [Exhibits 17,18] advises North Americans on Federal Tax savings strategies and other related services;

Insinger formal endorsement and signature on the Patriot Act such in order to be allowed the use of American inter-bank pipeline to distribute Dollars in its interstate/international commerce [Exhibit 52].

Candover's ownership and operation of $2 Billion worth of business in the United States including grass-roots American businesses such as the Dakota-Minnesota and Eastern Railroads Corporation under the motto "*Serving the Heartland of America*". [Exhibits 22, 34]

Jardine's ownership of the Mandarin Oriental Hotels chain including the name to fame Mandarin hotel of San Francisco, California and New York City [Exhibits 36, 38].

And also Candover's Houston based Vetco Corporation who was guilty of the largest corruption scandal in the history of the Federal Foreign Corruption act. Vetco's guilty plea recites the

Federal government criticism on Candover's lack of commitment to eradicate the corruption in Vetco in spite of the awareness of its existence. [Exhibits 25-31]

## EQUITY TRUST – GENERAL JURISDICTION

Besides Equity's availance to the federal jurisdiction through Special Personal Jurisdiction (as tortfeasors and litigants in *Janvrin v. Hilsenrath* in the District Court of California) Equity Trust has deeply rooted business in the United States:

In their website Equity describe their business as spread throughout the world in most financial centers.

There is a major presence in New York City – the US financial epicenter. Their activity is the same as a decade ago when Jardine Matheson and Perkins solicited the business of the Hilsenraths in California [Exhibit 6]

To leave no doubt as to Equity Trust's commitment to the American client, Equity Trust's website states [Exhibit 17 – Equity trust website]:

> "Equity Trust is the preferred service provider for North American multinationals and medium-sized companies. We offer a one-stop sales office located in New York.
>
> We establish vehicles for North American corporate clients in many Equity Trust jurisdictions including Luxembourg, the Netherlands, the Netherlands Antilles and the Cayman Islands. Additionally we can offer services in Aruba, British Virgin Islands, Hong Kong, Jersey, Argentina, and Switzerland."

Further Equity Trust advertises on the Internet their product tailored specifically for the US clients: "The Efficient Tax Wrapper" whose name and objective speaks for itself [Exhibit 18 – Equity's Tax Wrapper]:

<u>Quote</u>: "***US Tax Efficient Wrappers***

*"For the US persons (i.e. US citizens or one considered a US tax "resident") finding an investment product that meets all of these goals is rather difficult. US persons are subject to income tax on their worldwide income, that is, they must pay tax on all varieties of income items regardless of the geographic source. US persons are required to provide detailed information to the US government concerning their interests in foreign bank accounts and private foreign corporations."*

For those US persons interested in keeping their money in an Equity trust wrapper, Equity trust is directing the US persons not to their New York Office but rather to:

> *"**ENQUIRIES:** Vincent Kwok (2106 g323), Joey Lam (2106 9309), Edith Fok (2106 9319), Brandon Tang (2106 93381, Lisa Cheung (2106 9329) and Irene Chan (2106 9313)*
>
> ***EQ INTERNATIONAL***
> *16/F Standard Chartered Bank Building, **4-4A** Des Voeux Rd Central, Hong Kong; Tel **+852 2525 5090,** Fax **+852 2523 5105,** E-mail: corpsaleshk@asia.equitytrust,com*
>
> *A branch of EQ Corporate Management (HK) Ltd"* <u>End Quote.</u>

Equity Trust's use of its world-wide operations to solicit US Investors into "efficient" tax practices are undertaken at arms-length from the US federal jurisdiction.

Current law however (see also legal analysis) establishes Equity Trust's availance to general US federal jurisdiction by (1) introducing financial services specifically targeted to the US consumer in the "stream of commerce", (2) soliciting clients in the US and specifically in California as well, and (3) focusing their business on a US federally regulated subject: tax.

**<u>CANDOVER – GENERAL JURISDICTION</u>**

It is hard to imagine a corporation more entrenched in American life and business than Candover who claim to "not avail themselves to US federal jurisdiction for not having a bank account or an office in California".

Exhibit 22, a 2007 M&A report, describes Candover as one of the largest Mergers and Acquisitions players in the US arena with current holdings in the range of 2 Billion Dollars.

Over decades Candover proved to both use and abuse US federal laws and federal regulations as part of their business, as will be shown.

Candover are intimate partners of their company top management.

This is a prerogative of Candover's specialty: the MBO – Management (leveraged) Buyouts. By their own description [Exhibits 19, 21] they join top managements of corporations and help them to buy their companies out of the hands of previous owners.

Following a Candover buyout the management, such as Equity Trust's, does not operate other than in full coordination with Candover.

Candover's role in an MBO, such as in the acquisition of Equity Trust in 2003 [Exhibit 19], is to raise a large loan (a debt instrument) to assist management in buying their company out.

Candover takes three financial commitments in return: (1) a secured commitment to return the loan over the years – thus every penny that Equity earns pays the Candover loan – (2) an interest coupon – a pro rated profit earned for loaning the funds to the management – typically higher than the market rate to account for Candover's risk and (3) and equity coupon – a small equity share of the actual business to allow Candover to benefit from the long term gains.

Typically Candover are holding the equity coupon in a different entity that the loan.

The result of that "arrangement" is transparent in the Candover motion to this court: While they report an insignificant equity share of 5% in Equity Trust, they foreshadow the fact that they control all the rest of Equity through a debt instrument held in a different entity.

The above misleading tactic become transparent when looking at Candover's books in which they carry 100% of Equity Trust's value of 198 million Euro as *UNREALIZED* and not only the 5% reported to this court to evade jurisdiction. [See Exhibit 20 – Candover unrealized holdings.]

Earlier in 2007, Candover still owned Vetco Grey: a $700 million property in the business of energy services - headquartered in Houston Texas and operating *inter alia* out of Bakersfield California [Exhibit 25]. Vetco under Candover leadership have pleaded guilty to the largest foreign corruption charge in the history of FCPA - the US federal corruption act [Exhibits 25-31].

Candover's property paid a fine of $26 million to settle the charges.

Candover or Vetco did not need California or Texas bank accounts to pay over $2 million in bribes to Nigerian government employees for an energy contract.

The payment was performed through a modern cash forwarding service concealing the payments.

The federal authorities made special emphasis on the breach of Vetco Grey's owners (Candover and others) and their failure to assure that their company has proper systems that assure lawful working methods. The guilty plea specifically addresses Candover as the foreign owner of Vetco [Exhibit 29]:

> "The Opinion Release[8] required the acquirers to effectively institute and implement a compliance system, internal controls, training, and other procedures sufficient to have deterred and detected violations of the FCPA, among other obligations. The

---

[8] Exhibit 23: **DOJ Opinion Procedure Release 04-02**

corrupt payments underlying today's guilty pleas continued
unabated from the period prior to the acquisition until at least mid-
2005, notwithstanding the acquirer's commitments to the Justice
Department under the Opinion Release."

The same is applicable to Candover's ownership and control of Equity Trust.

As partners of management by their own account Candover bear full responsibility for Equity's management decisions and actions including those related to the established scheme to extort from the Hilsenraths and their company US Wireless and recently to shut down Janvrin et al to defeat the court's judgment [Exhibit 3].

More so, even if they did not concoct themselves the conspiracy against the Hilsenraths, it was their responsibility to assure the existence of internal controls that ascertain lawful practices at Equity Trust.

Below is a selection in summary of the availance of Candover through its US business to Federal Law and regulators:

    i.    The Dakota - Minnesota Eastern Railway regulated by the federal department of transportation [Exhibit 20, 34];

    ii.    The Lombard fund of San Francisco – a "fund of funds" managing some $200 million [Exhibit 33];

    iii.    Aspen Insurance of which Candover is a large investor reporting to the Federal regulator - the Securities and Exchange Commission as having "special influence on the business of the company" [Exhibit 20, 23, 24] – thus operating in the US in reliance and compliance with the SEC;

    iv.    BertelmanSpriger acquired for  $1 billion with special approval of the federal anti-trust watchdog – thus availing itself to doing business subject to federal anti trust regulations [Exhibit 20];

    v.    $700 million in Wood Mackenzie with energy outfits nationwide. [Exhibit 20, 32] similar to Vetco regulated by the Federal Department of Energy;

    vi.    Wellstream (an energy pipeline for the US market) acquired recently for a $136 million from well known Halliburton in Texas [Exhibit 20];

    vii.    Equity Trust – valued at 198 million Euro on Candover books, soliciting US clients to "manage their wealth" with Equity and put their IRS-owed taxes in Equity trust "wrappers";

    viii.    Etc.

Candover avail themselves to Federal Jurisdiction in this current case through (1) their financial and operational control of Equity Trust, (2) their partnership with Equity Trust's management; (3) their responsibility for Equity's proper anti fraud controls as defined in the Vetco Grey case by the US government; (4) by their presence in the US and in California through *inter alia* Lombard, Vetco Gray and Equity Trust themselves, (5) through their intense relationship with the US federal government from the guilty plea of Vetco Grey, through the reliance on federal clearance to purchase US companies and ongoing reporting to federal agencies as to their operations such as Aspen.

There cannot be an entity with stronger jurisdictional ties to this case and to this jurisdiction than Candover.


**JARDINE MATHESON – GENERAL JURISDICTION**

Jardine Matheson was at the time the controlling corporation of what is Equity Trust today. Jardine was the literal launching pad for the extortion scheme against the Hilsenraths.

Jardine Matheson is the original owner of Janvrin Ryburn and Crossgar [Exhibits 35].

It is Jardine Matheson who have filed the original litigations against the Hilsenraths in this jurisdiction thus availing themselves to this jurisdiction:


1)  --- 4:00-cv-02334-CW Janvrin Holdings v. U.S. Wireless Corp, et al;
2)  --- 4:00-cv-02336-CW Crossgar Ltd v. U.S. Wireless Corp, et al;
3)  --- 4:00-cv-02346-CW Ryburn Limited v. U.S. Wireless Corp, et al and
4)  --- 4:02-cv-01068-CW Janvrin Holdings Limited et al. v. Hilsenrath et al.


Jardine Matheson opened dozens of accounts and filed dozens of tax returns for their companies in the US between 1996 and 2000, the relevant timeframe for this conspiracy thus significantly availing themselves to federal law. [Exhibits 14, 15].

It was Jardine Matheson who contracted the stock purchase and subscription agreements with US Wireless on behalf of Janvrin et al in 1996 [Exhibit 7].

Those subscription agreements are the basis for the various Janvrin cases and are regulated by both the SEC and NASDAQ. See legal analysis: contracting with securities with an expectation of gains is availment to the jurisdiction.

In their motion to dismiss on grounds of jurisdiction and service, Jardine argue that they were not properly served in Bermuda where they are headquartered, that Jardine has no ties to California and that the selection of forum in California will be too burdensome for them.

Jardine Matheson, besides being closely tied to the subject matter of this complaint, are a transnational corporation [Exhibit 39]. They avail themselves therefore wherever their transactions have impact. A transnational corporation cannot assume that the incorporation in Bermuda will be acceptable as an argument to be never available to courts.

More so, Jardine have ample presence in the United States and specifically in California, and are reporting around ½ Billion Dollars of revenue in the US [Exhibit 36].

Such for example:

i.    Jardine are the owners of the Mandarin Oriental Hotels chain with an exquisite
       Mandarin Oriental Hotel in San Francisco [Exhibit 36, 37];

ii.   Jardine are the exclusive franchisee of Pizza Hut in Asia; [Exhibit 36]

iii.  Jardine are co owner of the Rothschild bank with facilities in New York and
       Washington DC and regulated by the federal government [Exhibit 38];

iv.   Jardine are the owner of the brand named Jardine Lloyds insurance company with
       offices throughout the world, the nation and specifically in California [Exhibit 36].

v.    Etc.

The incorporation of this financial giant in Bermuda is for reasons closely knit to the allegations in this current case of abuse of multiple jurisdictions to evade the long arm of the law.

Plaintiffs opted to serve the <u>actual</u> senior management of Jardine Matheson located in Hong Kong [Exhibit 36], rather than an immaterial headquarter with no significant management, on a sun-bathed beach in Bermuda.

Such service would have left this complaint forever unanswered. See the case of Janvrin, Ryburn & Crossgar who vanished after 7 years of litigation and were "stricken out" at the discretion of the conspirators, in yet another irrelevant sun-bathed jurisdiction [Exhibit 3].

The forum in California is appropriate for Jardine Matheson.

It is the home forum of US Wireless Corporation and the plaintiffs' who are the victims of Jardine's conduct.

It is further the forum of choice of Jardine themselves who availed themselves to this forum when they instigated their own litigation against the Hilsenraths and their company:

It is finally unreasonable to hail *pro se* litigants to Bermuda where even Jardine has no management presence.

The proper forum is California where, during trial, Jardine Matheson's management would be able to stay at their own hotel: the exquisite Mandarin Oriental of San Francisco; and to dine at their own franchise: Pizza Hut.

## INSINGER DE BEAUFORT – GENERAL JURISDICTION

Insinger's pleading to dismiss for jurisdiction starts with a statement of improper service of the parent company Insinger de Beaufort. It states that the served company, Insinger - the parent, is totally removed from its trust business, formerly known by the same name of Insinger de Beaufort.

Insinger continues to describe a series of companies that gap between Insinger - the trust and Insinger - the parent, who (paraphrased) owns said company B, who is a partner in said company C, who owns company D who in turn owns company E and F, etc - etc.

The argument is disingenuous.

It is sufficient to review the Insinger annual report [Exhibit 47] to establish that Insinger is a quite small company with only one set of management: Mr. Kantor – the CEO and Mr. Mooij – the CFO  - of the entire organization.

Those companies are the fictitious and protective shield of the racketeering organization, conceived to keep Messer Kantor and Mooij out of the reach of laws and justice.

In their own words: Insinger are the ultimate parent company [Exhibit 45].

It is not a matter of coincidence or error that Plaintiff served the complaint on Mr. Kantor - at his material headquarters in Netherlands, rather than some arbitrary and insignificant clerk in yet another sunbathed resort: this time - Luxemburg.

Service was proper and efficient.

Insinger, unlike their incorrect statement in their pleading, are also still co-owners of Equity Trust together with Candover [Exhibit 46, 48].

Insinger's letterhead is marking the entire discovery in this case:

    a.   In the year 2000, the London meeting occurred under the leadership of Insinger de Beaufort

b.   The packages of personal records were delivered on Insinger de Beaufort letterhead to the co conspirators in California – Nixon Peabody [Exhibit 43, 44].

c.   In April 2001, the extorted settlement was signed and delivered by Nixon Peabody to Insinger de Beaufort and signed by Insinger executives then, Kalman and Perkins [Exhibit 41].

d.   The 2002 case *Janvrin et al v. Hilsenrath et al.* was filed and amended on Insinger's letterhead.

Insinger are availing themselves to this jurisdiction through (1) having initiated litigation, (2) having hired counsel in related case, (3) having conspired against plaintiffs in this jurisdiction and (4) having transacted in stock regulated by the SEC and NASDAQ.

On a general jurisdiction aspect, Insinger is also an intensive player in the US federal legal system:

i.    Insinger de Beaufort is a signatory on the US president's Patriot Act to enable the bank to use banking agents in the United States [Exhibit 52]. For that purpose Insinger have a designated office in New York City.

ii.   Insinger de Beaufort is filing regular filings with the SEC [Exhibit 50]

iii.  Insinger de Beaufort is co-managing of a New York based investment fund [Exhibit 49]:

"with sub-manager Advent Capital Management, LLC (**Advent**).
Advent's address is: 1065 Avenue of the Americas, 31st floor, New York, NY 10018, USA. Advent is an investment advisor specializing in convertible bonds and high yield securities and is registered with the Securities and Exchange Commission ("SEC")."

Through its regulatory filings, regulated partnerships and adherence to the Patriot Act, Insinger are availing themselves to the jurisdiction of the federal court.

1
2

# VI. JURISDICTION: THE LAW

3

This court has jurisdiction over the defendants in this current case on the basis of the

4

following legal arguments.

5

Plaintiffs have only a prima facie duty of showing jurisdiction and plaintiffs have satisfied

their burden and beyond.

6

The Court must view evidence in a light most favorable to the plaintiffs regarding jurisdiction.

7

See also **Remmes v. Int'l Flavors & Fragrances, Inc., 389 F. Supp. 2d 1080.**

8

9

## 1.    The Long Arm Statute – a conspiracy to commit an overt act targeted to the forum.

10

11

Janvrin et al committed an overt act  [Exhibits 1, 2]. The act was committed by employees

Kalman, Perkins, Bougeard, Brown and others at the orders of their employer – Equity

12

Trust/Candover, Jardine Matheson Trust and Insinger Trust (Equity in its various incarnations).

13

These latter corporations were the ultimate beneficiaries of the benefits/fees sought as an

14

outcome of the conspiracy.

15

The court in the jurisdiction of the tort has jurisdiction over the conspirators and over <u>all</u> the

16

conspirators.

17

> **Mackey v. Compass Mktg., 391 Md. 117:** In the often cited case of
18
> *Cawley v. Bloch*, 544 F. Supp. 133, 135, (D. Md. 1982), the United States
> District Court for the District of Maryland discussed the conspiracy theory
19
> of jurisdiction. Judge Joseph H. Young explained that the conspiracy
> theory of jurisdiction is based on two principles: (1) that the acts of one
20
> co-conspirator are attributable to all co-conspirators, and (2) that the
> constitutional requirement of minimum contacts between non-resident
21
> defendants and the forum can be met if there is a substantial connection
> between the forum and a conspiracy entered into by such defendants. The
22
> court articulated the theory as follows:
> "Under that doctrine, when
23
> (1) two or more individuals conspire to do something
24
> (2) that they could reasonably expect to lead to consequences in a
> particular
25
> forum, if
> (3) one co-conspirator commits overt acts in furtherance of the conspiracy,
26
> and
> (4) those acts are of a type which, if committed by a non-resident, would
27
> subject the non-resident to personal jurisdiction under the long-arm statute

28

of the forum state, then those overt acts are attributable to the other coconspirators, who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum."

Courts around the country have utilized conspiracy concepts to establish personal jurisdiction.

> *See, e.g., Leasco Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir. 1972). **3** Courts adopting the conspiracy theory of personal jurisdiction have recognized that this use of the fact of a conspiracy to attribute the contacts of one co-conspirator to another co-conspirator for jurisdictional purposes is an extension of the principle that the acts of one civil co-conspirator are attributed to other co-conspirators for purposes of determining the civil liability of the participants in the conspiracy. *See, e.g., Textor v. Board of Regents,* 711 F.2d 1387 at 1392 (noting that "the 'conspiracy theory' of personal jurisdiction is based on the 'time honored notion that the acts of [a] conspirator in furtherance of the conspiracy may be attributed to the other members of the conspiracy.'" (quoting *Gemini Enterprises, Inc. v. WFMY Television Corp.,* 470 F. Supp. 559 at 564) (alterations in original)).

## 2. <u>One conspirator committing an overt act in the forum hales all other co-conspirators in the forum</u>

In the present case, as reflected in Exhibit 1 and 2, *Janvrin et al* represents one conspirator in this jurisdiction. All other co-conspirators are haled into this jurisdiction and they cannot evade the court in which one conspirator faces/faced justice.

The above is applicable to the persons effecting the conspiracy (Kalman, Perkins, Bougeard, Brown and others) as well as the corporations that provided the means, the funds and the corporate umbrella for the conspiracy.

> **Mackey v. Compass Mktg., 391 Md. 117**
> Judge Posner, in *Stauffacher v. Bennett,* 969 F.2d 455 (7th Cir. 1992), echoed this rationale. Finding it difficult to understand why personal jurisdiction should be exempted from the general rule that the acts of co-conspirators are attributed to one another, he concluded that "if through one of its members a conspiracy inflicts an actionable wrong in one jurisdiction, the other members should not be allowed to escape being sued there by hiding in another jurisdiction." *Id.* at 459

> **Mackey v. Compass Mktg., 391 Md. 117:** we see no reason to require that the conspiracy be intended to individually benefit a defendant coconspirator. Appellants argue that this requirement is necessary to ensure that the out-of-state coconspirator is purposefully directing activities at Maryland. In support of this position, appellants cite two Second Circuit cases, *Green v. McCall,* 710 F.2d 29 (2d Cir. 1983), and *Grove Press, Inc. v. Angleton,* 649 F.2d 121 (2d Cir. 1981).

### 3.  Single act of tort statute

Connecting the principle of a single act of tort with the above argument that one conspirator hales all other co-conspirators in the jurisdiction, extends the argument that all defendants in this case are deemed to have been "doing business" in California for the purpose of jurisdiction.

While in this case a series of acts of tort can be established, the one act of tort decided by this court in Exhibit 1 and 2 are sufficient to establish jurisdiction.

> **State ex rel. Caine v. Richardson, 600 S.W.2d 82, ***
> "If a foreign corporation commits a tort . .. in whole or in part in Missouri against a resident or nonresident of Missouri, such act shall be deemed to be doing business in Missouri by the foreign corporation . . . ."

### 4.  One co-conspirator is a California resident

Nixon Peabody LLP and two of its attorneys, Westreich and Mitchell, were the "executive arm" of the conspirators. [See also related *Case 3:07-cv-03193-CW Hilsenrath et al v. Nixon Peabody LLP et al.*]

The Janvrin conspiracy was effected by the attorneys at Nixon Peabody who participated at the London meeting, knowingly carried illegally obtained documents to the US and proceeded to use them for extortion. Nixon Peabody, specifically Westreich and Mitchell were co conspirators and residents of California.

*Caine* establishes Nixon as local conspirators that extend jurisdiction over all participants – defendants in this case.

### 5.  Hiring of counsel in the forum in the original[9] action means availing to the forum

In the Janvrin case, Kalman et al on behalf of Equity et al hired Nixon Peabody and other attorneys in the United States to pursue the Hilsenraths in 4 related cases between 2000 and 2007.

The act of hiring of attorneys in the jurisdiction to prosecute the underlying case of this current case represents availance of them and their organizations to the jurisdiction.

---

[9] with expectation for enrichment and adjudication in forum state

Similarly, the **hiring of local counsel** to advise on local aspects of a case may confer personal jurisdiction over the out-of-state attorney. **[Rodin Properties-Shore Mall, NV v Cushman** & **Wakefield of Penn., Inc.** (D NJ 1999) 49 F.Supp.2d 709,718-nonresident hired local lawyers to assist it in performing loan transaction that was subject to suit; see also **Sydow v. Acheson** & **Go.** (SD **TX** 2000) 81 F.Supp.2d 758,767]

### 6.  Settlement activities are purposeful availment

Perkins and Kalman, on behalf of Insinger [Exhibit 9], settled the original 2000 Janvrin cases at the basis of the 2002 Janvrin litigation [Exhibit 1, 2].

The settlement itself represents purposeful availment to this jurisdiction.

[3:192.3] **Settlement activities:** "Purposeful availment" is shown where a party comes to the forum state to negotiate settlement of potential lawsuits and enters into a settlement agreement there. Local courts may exercise personal jurisdiction in actions to enforce that agreement. *[Minnesota Mining & Mfg. Co. v. Nippon Carbide Indus. Co., Inc.* (8t h Ci r. 1 995) 63 F3d 694,698]

### 7.  Acts of an agent may be attributed to the principal for purpose of jurisdiction.

It was significantly argued in this case that the mere formation of an empty corporate shield can form a natural separation of interest between the individual tortfeasors and her employer; or between a shell corporation, with no operations or employees, and the actual live organization conducting the conspiracy.

The law has recently removed artificial corporate barriers that provide refuge for tortfeasors and conspirators in a growingly connected world.

*Mackey* and others provide a significant and sufficient basis to determine that California federal jurisdiction is appropriate for all conspirators in this case.

**Mackey v. Compass Mktg., 391 Md. 117:** Since the inception of the International Shoe line of jurisprudence, the United States Supreme Court has not expressed any doubt that the acts of corporate agents may be attributed to a corporation for purposes of determining whether personal jurisdiction is proper over the principal.

> The corporate personality is a fiction, whether a corporation's contacts with a forum are sufficient to subject it to suit in that forum is determined by reference to the "activities carried on in its behalf by those who are authorized to act for it."

**8. Jurisdiction on Holding Company – No shield for liability of holding company:**

[CNR Case order brought in its entirety in Exhibit 54]

### Estate of Sumrall v. Ill. Cent. R.R., 2007 U.S. Dist. LEXIS 4890

**January 23, 2007**, Decided

> CNR is a Canadian **corporation** with its principal place of business in Montreal, Quebec, Canada. CNR is not registered or licensed to do business in the State of Mississippi, has no agent for service of process in Mississippi and files no tax returns in the State of Mississippi. According to CNR, it has no employees residing in the State of Mississippi, does not operate as a railroad in the State of Mississippi, and owns no land or track in the State of Mississippi.

> CNR owns all the stock of Grand Trunk **Corporation** ("GTC"), a Delaware **corporation.** GTC is a holding company that does not operate as a railroad in any state and has no employees. GTC, in turn, owns all the stock of Illinois Central **Corporation**   ("ICC"), a Delaware **corporation.** ICC also does not operate as a railroad in any state, nor does it have any employees. ICC is the sole shareholder of defendant Illinois Central Railroad Company   ("ICRR"), the entity that, according to CNR, owns the locomotives involved in the accident at issue in this case and owns and maintains the track and right-of-way where the accident occurred.

> [T]he court notes that as set forth in the documents provided by plaintiff discussed above, CNR engages in substantial business in the **United States** and several thousand employees in the **United States**

The narrative in *CNR* is strikingly similar to the pleadings of Insinger, Candover and Jardine.

They all present themselves as remote and buffered by other corporations (mostly with no substance) from the activities conducted on behalf of *Janvrin et al.*

They are however the recipients of revenue, fees and profit from the trust company, Equity of today.

*CNR*, a recent case, indicates that liability and the jurisdictional considerations should extend to all three.

**9.  No shield for torturous acts for jurisdiction purposes**

[3:82] No "shield" for corporate officers or employees: On the other hand, officer: and employees who are subject to local jurisdiction (e.g., because they committed tortious acts locally are not immune because they acted on behalf o their corporation. I.e., no "fiduciary shield" protect: corporate employees from local jurisdiction in actions in which they are otherwise suable individually [*Davis v. Metro Productions, Inc.,* supra, 885 F2d p 521; *Retail Software Services, Inc. v. Lashlee* (2n(Cir. 1988) 854 F2d 1 8, 22-23; *Balance Dynamic, Corp. v. Schmitd Industries, Inc.* (6th Cir. 2000) 201 F3d 683, 697-698] Moreover, even where the fiduciary-shield doctrine is recognized by state law, it does not prevent jurisdiction over foreign defendants with "national contacts" (FRCP 4(k)(2); *see 3:33.5).* [See *IS/Int'l, Inc v. Borden Ladner Gervais LLP* (7th Cir. 2001) 251 F3d 548, 552]

The individual employees of Equity et al cannot assume protection of corporate shields to prevent jurisdiction given their tortious actions with respect to Plaintiffs as already adjudicated in Janvrin [Exhibits 1, 2].

Nor can they assume lack of jurisdiction for being foreigners given their ample national contacts through soliciting the Hilsenraths business in California  [Exhibits 6], opening bank accounts nationwide  [Exhibits 15], reporting to the IRS  [Exhibits 14] during the entire relevant decade and using electronic means to disseminate the extortion documents to their California attorneys [Exhibits 43, 44].

**10. Personal jurisdiction over corporate officer**

*Schiller-Pfeiffer, Inc. v. Country Home Prods.,* **2004 U.S. Dist. LEXIS 24180:** For purposes of personal jurisdiction over a corporate officer, one commonly recognized exception to the corporate shield doctrine exists when the corporate officer or director was personally involved in tortious conduct. Corporate officers may be individually liable for tortious conduct if they personally took part in the commission of the tort, or if they specifically directed other officers, agents or employees of the corporation to commit the act. Courts in the United States District Court for the Eastern District of Pennsylvania have applied a three-prong test to determine if an officer's corporate contacts should be considered for personal jurisdiction over the officer: (1) the officer's role in the corporate structure; (2) the quality of the officer's contacts; and (3) the nature and extent of the officer's role in the alleged tortious conduct.

And also:

> **BB in Tech. Co. v. JAF, LLC, 20 Fla. L. Weekly Fed. D 836:** Under
> Florida law, if an officer, director, or agent commits or participates in a
> tort, whether or not his actions are by authority of the corporation or in
> furtherance of the corporate business, that individual will be liable to
> third persons injured by his actions, regardless of whether liability
> attaches to the corporation for the tort. In other words, officers, directors,
> and agents of a corporation can be personally liable for committing torts
> when the tort is committed within the scope of their corporate
> employment

In our case Kalman, Perkins, Brown et al had leading roles in the established Janvrin
conspiracy.

They were the directors, the operators of the California attorneys, the signatories of the
settlement agreement, and the disseminators of personal records at the London 2000 meeting
[Exhibits 7-10, 13-16, 41-44, etc].

Their tortuous actions are directly availing them to the jurisdiction of the district court.


## 11. <u>Forum of federal courts is the entire US</u>

> **Heft v. AAI Corp., 355 F. Supp. 2d 757:** For purposes of personal
> jurisdiction, the forum of the federal courts is the entire territory of the
> United States. Regardless of their location, federal courts are components
> of the national government, and exercise a portion of its sovereign powers.
> Those individuals, who have voluntarily associated themselves with the
> United States, whether through citizenship or other minimum contacts,
> have voluntarily associated themselves with the federal judiciary. They
> may be haled into those tribunals without offense to their due process
> rights.

Defendants have established businesses in a variety of location throughout the United States.

Such businesses are the Equity office in New York City, Insinger's broker dealer located in
New Your City, Jardine's hotels in several of the large cities in the US and Candover's Dakota
Minnesota railway or Lombard in California.

They undoubtedly avail themselves to a variety of jurisdictions nationwide.

The venue and jurisdiction in the Northern District of California is appropriate by the
principle that the federal court's forum is nationwide.

1

2

**12. RICO – nationwide federal jurisdiction**

3

4   *§ 1965. Venue and process*
(b) In any action under section 1964 of this chapter [18 USCS § 1964] in

5   any district court of the United States in which it is shown that the ends of
justice require that other parties residing in any other district be brought

6   before the court, the court may cause such parties to be summoned, and
process for that purpose may be served in any judicial district of the

7   United States by the marshal thereof.

8   *§ 1964. Civil remedies*
(c) Any person injured in his business or property by reason of a violation

9   of section 1962 of this chapter [18 USCS § 1962] may sue therefore in any
appropriate United States district court and shall recover threefold the

10  damages he sustains and the cost of the suit, including a reasonable
attorney's fee.

11

12  *§ 1962. Prohibited activities*
(a) It shall be unlawful for any person who has received any income

13  derived, directly or indirectly, from a pattern of racketeering activity or
through collection of an unlawful debt in which such person has

14  participated as a principal within the meaning of section 2, title 18, United
States Code [18 USCS § 2], to use or invest, directly or indirectly, any part

15  of such income, or the proceeds of such income, in acquisition of any
interest in, or the establishment or operation of, any enterprise which is

16  engaged in, or the activities of which affect, interstate or foreign
commerce.

17

18      Plaintiffs' RICO allegation avails defendants to the jurisdiction of the federal court

19  nationwide and also avails the alleged racketeers outside the boundaries of the United States - when

20  sufficient ties to US commerce is established.

21      For the purpose of a RICO allegation the jurisdiction is the federal court nationwide as a

22  racketeering organization is typically structured and spread over a number of locales.

23      It is an integral part of such alleged organization to structure itself purposefully to make

24  service, jurisdiction and identity of tortfeasors difficult to prosecute. Therefore the law allows for

25  special flexibility in the prosecution of such scheme.

26  **13. Securities fraud – nationwide federal jurisdiction**

27  [3:96] National contacts test: Courts look to the defendant's "contacts"

28  with the *nation as a whole* in actions under federal statutes allowing

nationwide service. "Contacts" with the state in which the federal court is located are not required. [*Securities Investor Protection Corp. v. m a n (9 th* Cir. 1985) 764 F2d 1309,131 6; see *Busch* v. *Buchman, Buchman & O'Brien, Law Firm* (5th Cir. 1 994) 11 F3d 1255,1258; *United States Secur.s Exch. Comm'n v. Carrilla* (11th Cir. 1997) 15 F3d 1540, 1543- Costa Rica corporation and its officers subject to personal jurisdiction in any district court in action pursuant to federal securities law authorizing nationwide or worldwide service of process] (a) [3:97]

Rationale: Relaxed jurisdictional standards are necessary when addressing multistate wrongs such as securities fraud. [*Go-Video, lnc. v. Akai Eiec.* Co., *Ltd.* (9th Cir. 1989) 885 F2d 1406, 1414]

The alleged scheme to extort and the harboring thereof involved securities of a public company US Wireless  [Exhibit 41, 4] and *Janvrin v Hilsenrath*  [Exhibits 1, 2] involved an S3 registration with the SEC.

Thus relaxed jurisdiction standards apply and the venue is where the violation occurred – in the Northern District of California.

## 14. Pendant personal jurisdiction

[3:33] **"Pendent personal jurisdiction" as to other claims:** Where a court has nationwide powers (service, it also has power to exercise personal jurisdiction over ***related claims*** under the doctrine of pendent personal jurisdiction: "Pendent personal jurisdiction typically found where one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state or federal claims for which there is not nationwide personal jurisdiction." ***[Action Embroidery Corp. v. Atlantic Embroidery, Inc.*** (9th Cir. 2004) 368 F3d 1174, 1181 ; *see further discussion at* [l3:91 ff]

Pendant personal jurisdiction applies in this case where RICO and securities violations are involved - which have nationwide federal jurisdiction - even if other claims might only have more restrictive jurisdictional considerations.

## 15. General personal jurisdiction – national and local contacts

**State ex rel. Caine v. Richardson, 600 S.W.2d 82, ***
Due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the

forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.

It is clear that such minimum contacts are met by a single act done or a single transaction consummated within the forum state if the cause of action arises from that act or transaction.

It is also clear that if a corporation is in fact conducting business within a state it may be subject to personal jurisdiction in litigation not arising from the business transacted and the exercise of such jurisdiction does not violate the due process clause.

As applied to the current case, it is clear as presented before that the employees as well as Equity, Jardine Matheson and Insinger were directly involved in the Janvrin case and the tort associated with it  [Exhibits 1, 2]. Therefore the minimum contacts are established through their involvement with the related case

Candover and Jardine have significant ties to California through Lombard, Vetco, Mandarin and Jardine Lloyds  [Exhibits 33, 25, 36] thus satisfying also general personal jurisdiction.

## 16. Reliance on US federal law to conduct business

**Mackey v. Compass Mktg., 391 Md. 117**
"With respect to any of the [co-conspirator] defendants, to suggest that it is unfair to require them to respond to an action in this jurisdiction would seem to say that they may rely on our contract law to uphold the terms of lawful agreements but that they may not be required to defend an action based on injury to our citizens as a result of an unlawful agreement."

Jurisdiction is also established through the ample availance of the defendants to federal law in their business.

It is unreasonable to admit that these defendants make such ample use of US federal law but are out of the reach of the federal courts.

Here is a short list of the defendant's ample use of federal law:

a. Perkins and Kalman through IRS reports in Exhibit 14;

b. Bougeard and Brown through managing of attorneys in a securities litigation in Exhibit 11;

c.  Candover in SEC filings for Aspen, the Vetco guilty plea subject to the federal foreign corruption act in Exhibits 23, 24 and 25-31, ownership of a regulated interstate railway business Exhibit 34;

d.  Jardine in owning a US regulated bank in Exhibit 38;

e.  Insinger in being a signatory to the US Patriot Act, owning a US broker-dealer and filing securities reports wit the SEC in Exhibits 49-52;

f.  Equity trust soliciting US customers to use their services to "save" IRS taxes in Exhibits 17, 18.

## 17. Commercial banking as basis for jurisdiction

**First City, Texas-Houston, N.A. v. Rafidain Bank, 281 F.3d 48:**
Rafidain, having participated in commercial banking transactions in the United States, submitted itself to the jurisdiction of the United States courts, as well as to the procedures and legal responsibilities associated with such jurisdiction, to the extent those procedures and responsibilities are related to its commercial activities in the United States. See Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614, 119 L. Ed. 2d 394, 112 S. Ct. 2160 (1992); Texas Trading & Mill. Corp. v. Federal Republic of Nigeria, 647 F.2d 300, 308 (2d Cir. 1981). Rafidain does not contest that it waived immunity under the "commercial activities" exception.

Two of the defendants, Insinger and Jardine, have commercial banking business in the United States:

i.  Insinger through Avnet and their US reference banks (supported by the Patriot Act) and

ii. Jardine through is ownership of the Rothschild bank with facilities in New York and Washington DC.

Both are regulated by the federal government, and therefore available to federal jurisdiction.

More so, commercial banking itself is a basis for jurisdiction of the federal court.

1    18. **Foreign defendants with national contacts**

2

3            [3:33.5] **Foreign defendants with "national contacts'**
             Even in the absence of a federal statute authorizing nationwide service,
4            foreign defendants who are not otherwise subject to jurisdiction in any
             state but who have contacts ***with the nation as a whole*** ("national
5            contacts") are subject to personal jurisdiction on ***claims arising under
             federal tab*** [FRCP 4(k)(2); see ***Pebble Beach*** Co. ***v. Caddy*** (9th Cir. 2006)
6            453 F3d 1 151,11551

7        Foreign defendants like Candover, Jardine, and Equity are quintessential examples of

8    corporations with contacts "with the nation as a whole":

9      i.    A nationwide energy company like Vetco or Wood Mackenzie, a national insurer like Aspen

10            (for Candover);

11     ii.    A nationwide hotels chain like Mandarin Oriental (for Jardine) and

12    iii.    A website soliciting "North American high net worth persons" should be sufficient to

13            establish jurisdiction over those corporations.

14   19. **Modern technology access to forum for jurisdiction**

15

16           **Tech Heads, Inc. v. Desktop Serv. Ctr., 105 F. Supp. 2d 1142**
             Traditional notions of jurisdiction, however, must remain flexible in the
17           context of a constantly changing society where technological innovations
             have transformed the interactions that serve as the basis for personal
18           jurisdiction.

19        Criteria such as a local office or bank account proved to not interfere with Jardine's

20    solicitation of services to the Hilsenrath's in 1996 over telephone and facsimile.

21        Nor was a local bank account necessary for Candover and Vetco to bribe foreign governments

22    over half a decade.

23        Equity are soliciting and gaining clients in the United Stets via a web site with ubiquitous

24    reach.

25        Equity, Jardine and Insinger proved able to participate in a well documented series of tortuous

26    actions via modern electronic media as demonstrated in Exhibits 9, 43, 44.

27

28

20. **Jurisdiction subsequent to judgment.**

As explained in Wright, Miller & Marcus, 12 Federal Practice and Procedure, § 3013, pp. 158-159 (1997):

> The federal court has ancillary or supplemental jurisdiction for supplementary proceedings to enforce its judgment. As the Supreme Court recognized a century and a quarter ago, [p]rocess subsequent to judgment is as essential to jurisdiction as process antecedent to judgment, else the judicial power would be incomplete and entirely inadequate for the purposes for which it was conferred by the Constitution. 'Recently, the Supreme Court has reaffirmed the federal court's inherent power to enforce its judgments, and noted that it has approved the exercise of ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection of federal judgments -- including attachment, mandamus, garnishment, and the prejudgment avoidance of fraudulent conveyances'. But this power is limited to efforts to enforce the federal court's judgment in a case over which it has jurisdiction, and it does not extend to new lawsuits filed to impose related liabilities on others.

This court has issued a judgment in the *Janvrin Ryburn Crossgar v. Hilsenrath* case [Exhibits 1, 2]. Defendants immediately took preemptive actions and dissolved Ryburn and Crossgar to defeat the court's judgment in furtherance of a 7-years-long conspiracy.

Janvrin et al were designed to produce at least $7 million in gains for defendants [Exhibits 4, 5].

Operating as a well-versed organization, defendants dissolved those entities when events took a negative turn [Exhibit 3].

The court has jurisdiction over defendants to assist in executing its own judgment.

21. **California state public interest**

> **Klein v. Gardner, 2007 U.S. Dist. LEXIS 5897** The Ninth Circuit has upheld the exercise of specific jurisdiction in numerous cases where non-**resident** defendants have had limited contacts with the forum state--for example, when there are business communications by mail, fax, telephone, or wire, and sometimes even when these contacts are initiated by other parties. See, e.g., Ballard, 65 F.3d at 1497-99 (finding specific jurisdiction over a foreign bank whose "physical contacts with the United States and California [were] quite limited," but who had nonetheless "created numerous ongoing obligations to U.S. **residents** . . . [had] regularly

mail[ed] account statements to its U.S. customers, and . . . occasionally solicit[ed] new business from them"); Hirsch, 800 F.2d at 1478-79 [*7] (upholding an exercise of personal jurisdiction over an out-of-state insurer that was "not authorized nor licensed to do business in California" and had no direct contact with any entity there, but nonetheless had freely entered into a contract through which it eventually came to insure six employees of Southwest Airlines who lived in California); Haisten, 784 F.2d at 1395, 1397-99 (upholding the exercise of specific jurisdiction over an insurance company that was "carefully and deliberately established to appear to be doing business only in the Cayman Islands" but in effect became the insurer of California hospitals).

Moreover, California clearly has an interest in providing relief to its citizens (or their estates) when they are allegedly owed millions of dollars. Ballard, 65 F.3d at 1500.

The Ninth Circuit has made it clear that the state of California has an interest in providing relief for its citizens.

In our case the plaintiffs are citizens of California and were citizens of California also at the time when they were affected by defendants' actions.

More so the tort occurred in the State of California and in part in the District Court of California.

1
2

## VII. FORUM NON-CONVENIENS

3

Defendants have raised miscellaneous additional jurisdictional arguments.

4

5

**The issue of the Hilsenraths' double citizenship.**

While indeed the Hilsenraths are born/raised in Israel, since 1999/2000 they also adopted US

6

citizenship during a 5-year stay in California from 1996 to 2001.

7

Independent of which of the Hilsenraths' citizenship is predominant, the forum of

8

convenience is the District court in California for the additional following reasons:

9
10

1. The forum is dictated by the conspiracy that occurred in California in connection with a

11

California Corporation: US Wireless Corp.

12

California has a strong interest in providing a forum for its residents and
citizens who are tortiously injured. *See Panavision*, 141 F.3d at 1323.

13

14

2. The events, the witnesses, the documentation and the agents of the US government who will

15

be called to testify are all in California.

16

17

**AMG Indus. Corp. v. Lyon, 2005 U.S. Dist. LEXIS 28164: …**the
convenience of the parties as indicated by their <u>relative physical and
financial condition; the convenience of the witnesses; and the location of
books and records.</u>

18

19
20

3. The present case is related to *Janvrin et al v. Hilsenrath et al* and the additional 3 cases listed

above, all litigated in the California District Court.

21

4. Defendants in this litigation initiated all 4 litigations above; therefore they have already

22

selected this forum as the appropriate forum to adjudicate this matter.

23

5. *4:02-cv-01068-CW* was filed by Insinger de Beaufort (prior incarnation of Equity Trust)

24

while the Hilsenraths were living in Israel. Nevertheless Insinger a.k.a. Equity rejected the

25

Courts in Jerusalem, Jersey, Bermuda etc. as their forum of choice and elected to file suit in

26

the California District Court. While defendant seem to like to sue in Federal Court, they seem

to not like to <u>be sued</u> in Federal Court in the same matter.

27
28

6. Objection to forum and venue is not justified if the objective is solely to shift expenses from plaintiffs to defendants. More so in this case in which the venue and forum are the same as previous litigations initiated by defendants in related cases.

> **Amini Innovation Corp. v. JS Imps., Inc., 2007 U.S. Dist. LEXIS 43758** Generally, the fact that a plaintiff has filed suit in the district where it resides is a sufficient connection to accord its choice of forum deference. A plaintiff's choice of its home forum is given more weight than its choice of a foreign forum
>
> A transfer of venue is generally inappropriate if it merely shifts the costs of litigation from defendants to plaintiff. 28 U.S.C.S. § 1404(a) provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient, and a transfer should not be granted if the effect is simply to shift the inconvenience to the party resisting the transfer

7. All jurisdictional arguments by defendants are brought in bad faith and with the sole objective of evading trial in any jurisdiction.

**Miscellaneous formation agreements.**

Equity Trust brings in their motion photocopies of company formation agreements with the objective to prove that they seem to agree to adjudication of disputes in Jersey.

1. Equity trust's agreements with their other clients are irrelevant. Regardless who the beneficiaries of Janvrin were at any single point in time, Equity Trust, its employees and management were involved in harbouring a crime.

2. If there is a noteworthy element in those agreements it is the very fact that the Jersey directors' indemnifications seem to cease in the face of fraud - as in the case of Kalman, Perkins, Brown and Bougeard that abused their positions, unlawfully traded clients' records and engaged in blackmail.

3. Plaintiffs Hilsenraths in this current case are bringing a case against Equity et al on the basis of harbouring an extortion scheme that targeted them here in California and also targeted a US publicly traded corporation. None of the agreements presented by Equity raise a meaningful argument against California Federal Jurisdiction.

1

2

## VIII. SUMMARY

3

4          The court should deny defendants' motions to dismiss on grounds of insufficient service,

5  jurisdiction or forum non-conveniens.

6          All parties were efficiently and repeatedly served according to the rules.

           Targeted for service were the senior management at their principle offices.

7          Service is about notice and substance more than just form.

8          Evidence proves that Kalman, Perkins, Bougeard and Brown were the hands-on actors in the

9  alleged conspiracy. They were placed at the London 2000 meetings and executed the conspiracy at

10  various times in its unfolding.

11          Equity Trust pays reputable counsel in this jurisdiction to represent its present and past

12  employees.

           Equity Trust in its various incarnations is the employer of the above actors.

13          Equity provided the means, the legal advice, the funding and organization to host the alleged

14  conspiracy.

15          Equity is a pass through organizations with the benefits of their actions going to Jardine,

16  Insinger or Candover at different times in the history of the conspiracy.

17          The corporate guidance and policies arrived from Jardine, Insinger or Candover each in their

18  own time.

           Jardine, Insinger, Candover and Equity avail themselves in multiple ways to the jurisdiction

19  of the US federal Court and to California in particular.

20          This present litigation is related to a mater already litigated in this jurisdiction with all events,

21  documents and witnesses available in this jurisdiction including members of various US government

22  agencies who were involved in investigating this case.

23          The jurisdictional arguments of the defendants are merely a way to avoid litigation and

24  exposure.

           The Court should deny defendants' motions to dismiss on grounds of improper jurisdiction,

25  venue, insufficient service or forum non-conveniens.

26

27

28

Dated: September 4, 2007

      Respectfully submitted,

                        HANA HILSENRATH

                        Plaintiff *PRO SE*

                            /s/ Hana Hilsenrath

                        OLIVER HILSENRATH

                        Plaintiff *PRO SE*

                            /s/ Oliver Hilsenrath