**EXHIBIT 18.**


**Equity Tax Wrapper**

# I N – s i g h t

 **EQUITY TRUST**

| Newsflash | Friday 28 November 2003 | Issue 48 / 2003 |

## US TAX EFFICIENT WRAPPERS

In selecting an investment vehicle, many investors often have several significant priorities. These may include: -

- maintaining a tax-efficient structure
- safety and security of investment capital
- having some control over investment decisions
  confidentiality considerations especially with regard to legitimate but limited disclosure and reporting to the relevant governmental authorities.

For the US persons (i.e. US citizens or one considered a US tax "resident") finding an investment product that meets all of these goals is rather difficult. US persons are subject to income tax on their worldwide income, that is, they must pay tax on all varieties of income items regardless of the geographic source. US persons are required to provide detailed information to the US government concerning their interests in foreign bank accounts and private foreign corporations.

A so-called "insurance wrapper" is a specific insurance fund, which is designed to enable more investment choice, but no mixing of funds.

This concept is illustrated as follows:-

Insurance company opens Investment accounts



Through a tailored "insurance wrapper" package, an investor can, in essence, place his own asset portfolio into a tax-efficient investment structure, without these assets being mixed with others. The assets so transferred constitute the premium paid for the insurance policy. In effect, the investment assets are "paid" to the insurance company as a premium, and the insurer issues an insurance policy to the owner. Income earned on the assets will grow tax-free so long as the assets remain "wrapped" within the insurance policy structure, and providing the right insurance vehicle and asset allocation is used for the relevant country tax benefits. The policy holder may be able to direct investments. The policy may also be able to pay out life insurance proceeds to a beneficiary tax-free. As with other life insurance policies, the policy can have certain flexible features, for example, the investor can borrow against the policy.

**ENQUIRIES:** Vincent Kwok (2106 9323), Joey Lam (2106 9309), Edith Fok (2106 9319), Brandon Tang (2106 9338), Lisa Cheung (2106 9329) and Irene Chan (2106 9313)

**EQ INTERNATIONAL**

16/F Standard Chartered Bank Building, 4-4A Des Voeux Rd Central, Hong Kong
Tel +852 2525 5090, Fax +852 2523 5105, E-mail: corpsaleshk@asia.equitytrust.com

A branch of EQ Corporate Management (HK) Ltd

This publication is of a general nature only and is not intended to be relied upon, nor to be a substitute for professional advice or in formulating any business decisions without first seeking such advice. Accordingly, the material should be viewed as a general guide, and professional advice should be obtained for specific situations. No liability can be accepted by the Equity Trust group in this respect.

© 2003 Equity Trust    All rights reserved.    Printed in Hong Kong

If you do not wish to receive further copies of IN-sight, please kindly mark down your company name and fax number on this sheet and then then return by fax on +852 2523 5105.

# EXHIBITS CANDOVER SPECIFIC

**EXHIBIT 19.**


**Candover buys control**

**of Equity for Euro198m,**

**with Insinger partner/management**



Home | Sitemap | A A A | Print          Search [          ] >

Home » Sector insight » Financial services » Case studies »

Financial services case studies

**Equity Trust**

May 2003

Deal size €198m

**The short version**

In 2003 the market for on and offshore trust services was going through a period of rapid change as smaller local providers found themselves struggling to keep up with the demands of an increasingly global clientele. The opportunity arose to transform Insigner de Beaufort's (IdB) trust business, a leading provider in four local markets, into a truly global player.

**The opportunity**

Insigner de Beaufort, a Dutch private bank, had built up a succesful business setting up and maintaining on and offshore trusts in the Channel Islands, Netherlands, Hong Kong and the British Virgin Islands. It offered a range of associated portfolio administration and wealth-protection services to professional and private investors.

But by 2003 the sector was already going global; a tide of consolidation was taking business towards global players with the scale to manage the ever-growing costs of the compliance and technology, while supporting the needs of international corporates and individuals. The management of IdB's trust business needed capital to catch the wave of consolidation. Candover saw a business with a solid revenue base, operating in a market with considerable organic and acquisitive growth opportunities, which would boost its assets under management.

**The deal**

IdB had fielded a number of approaches by global banks before approaching Candover through an intermediary. Candover's experience in reviewing a similar trust and fiduciary provider twelve months earlier gave us credibility as a partner for IdB. In May 2003 Equity Trust, a new truly global trust company, was created. In July 2005 Equity Trust made its biggest acquisition so far – of ABN Amro's trust business.

**The Candover factor**

It was crucial to understand the opportunity presented by a rapidly developing market. Candover's experience in the sector and an instant rapport with Equity Trust's senior management helped us seize the opportunity. Candover's continuing support for the growing company includes investing additional funds for the ABN Amro acquisition.

Visit Equity Trust website.

## Candover acquires Insinger de Beaufort's trust and fiduciary services business for E182m

30/05/2003. Source: AltAssets.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**European buy-out house Candover has taken over the trust and fiduciary business of Anglo-Dutch private bank, Insinger de Beaufort. The deal is valued at E182m with a further E15m of deferred consideration payable dependent on the future performance of the business. The new business will be known as Equity Trust.**

Candover will take a majority stake in the equity of the business, investing alongside the management team, with Insinger de Beaufort retaining a significant stake.

Equity Trust provides client services, primarily based around the formation and administration of onshore and offshore trusts and companies. It has a global client base comprising both private clients and corporate entities.

'Since inception, the business has grown swiftly through a mix of organic growth and acquisition,' said Charlie Green, a director of Candover. 'The industry is expected to continue to consolidate over the next few years, which will play to the strengths of the larger, independent global service providers. We are backing an excellent management team whose strategy is to lead this consolidation and enhance the company's position as a high quality, leading global service provider.'

This transaction represents Candover's second major deal of the month. The private equity firm joined Cinven in acquiring global academic publisher BertelsmannSpringer for E1bn earlier in May.

Copyright © 2003 AltAssets

# IN–sight


EQUITY TRUST

### CANDOVER AND THE MANAGEMENT TEAM ACQUIRE TRUST & FIDUCIARY SERVICES BUSINESS OF INSINGER DE BEAUFORT

The management team of the trust division supported by Candover*, a leading provider of equity for European buyouts, and Insinger de Beaufort, the Anglo-Dutch Private Bank, have announced that the management and Candover have completed the acquisition of the trust and fiduciary services business of Insinger de Beaufort. Going forward the business will be known as **Equity Trust**.



Candover will take a majority stake in the equity of the business, investing alongside the management team, with Insinger de Beaufort retaining a stake.

Equity Trust provides client services, primarily based around the formation and ongoing administration of onshore and offshore trusts and companies. It has a global customer base comprising both private clients and corporate entities, providing them with solutions to business investment, wealth creation and wealth preservation issues. In addition, the Group maintains strong and long-standing relationships with a large number of intermediaries.

Candover is backing an experienced team led by Peter Woodthorpe, Chief Executive, with two Managing Directors, Floris van der Rhee and Frederik van Tuyll van Serooskerken based in the Netherlands and Hong Kong respectively. As a team they have an average of eighteen years in the industry and have successfully grown the business into one of the very few independent global players with operations in almost all key trust jurisdictions.

Commenting on the transaction, Charlie Green, a Director of Candover, said:

"Since inception, this business has grown swiftly through a mix of organic growth and acquisition. The industry is expected to continue to consolidate over the next few years, which will play to the strengths of the larger, independent global service providers. We are backing an excellent management team whose strategy is to lead this consolidation and enhance the company's position as a high quality, leading global service provider".

Peter Woodthorpe, Chief Executive of Equity Trust commented:

"Equity Trust has grown very successfully with Insinger de Beaufort but we have now reached a size where we can continue to improve client service and accelerate the pace of growth more effectively as an independent operator. The backing of Candover is critical to the next phase of our development."

Ian Kantor, Chief Executive of Insinger de Beaufort said:

"We are delighted that we have been able to simultaneously enhance the value of the Insinger de Beaufort group for shareholders while retaining the opportunity to share in the future success of Equity Trust by investing alongside Candover. With the resultant enhanced capital reserves from this transaction we anticipate continued growth in Insinger de Beaufort's Banking activities".



*Candover means Candover Investments plc and/or Candover Partners Limited as General Partner of the Candover 2001 Fund.

**Notes:**

**Candover**

Candover is a leading provider of equity for large European buyouts. Since its formation in 1980, it has invested in 118 buyouts worth over €23 billion. Investment in deals by Candover is provided in two forms, from Candover Investments plc. a publicly quoted Investment Trust capitalised at €347 million and from funds managed by Candover Partners, a wholly owned subsidiary. Candover closed the Candover 2001 Fund in June 2002, raising €2.7 billion.

Recent deals completed by Candover include the €1 billion buyout of **BertelsmannSpringer**, a global academic publisher, the €141 million MBO of **Wellstream**, a manufacturer of flexible pipeline for the oil and gas industry; the €1.9 billion buyout of Gala, the retail gaming company; the €1 billion buyout of Belgium-based Ontex, a leading European producer of hygiene products for the babycare, feminine hygiene and adult care markets; the €600 million buyout of **Kluwer Academic Publishers**; the €709 million formation of **Aspen Re** (formerly known as **Wellington Re**), one of the largest independent reinsurance vehicles in the UK market; and the €393 million buyout of **Swissport**, a global ground handling business from Swissair.

The Candover Group has three offices in London, Paris and Düsseldorf, and a local advisor in Madrid.

For more information on Candover please visit the website at www.candover.com.

**Equity Trust**

The Trust Group was set up by Insinger in 1986 and has, since then, followed a successful acquisition led expansion programme. This development has resulted in the present day Group which operates out of offices based in the UK (London), Jersey, Guernsey, Hong Kong, Singapore, the Netherlands, the BVI, Luxembourg, Taiwan, Malaysia, New Zealand, Mauritius, Curacao, Switzerland and Bermuda. Through the establishment of this global network the Group has positioned itself as a leader in the international trust and fiduciary services market.

**Insinger de Beaufort**

Insinger de Beaufort is an Anglo Dutch banking group with origins dating back to 1779. The group operates through two main business lines, focussing on Private Banking and Asset Management, centred in Amsterdam and Institutional & Corporate Clients, centred in London. Insinger de Beaufort also has offices in: Geneva, Luxembourg, Jersey, Isle of Man, Rome and Johannesburg. The Private Banking and Asset Management divisions have combined assets under management exceeding €4.6 billion.

Insinger de Beaufort, as an independent group, offers its private clients a broad range of products and services, from integrated private banking, private equity and stockbroking to a full range of manager selection funds. The offering to Institutional clients varies from asset management, research and trade to mid market corporate finance services.

The group operates through Bank Insinger de Beaufort N.V. and its subsidiaries. Insinger de Beaufort Holdings S.A., the ultimate parent company, is listed on the Luxembourg Stock Exchange.

**ENQUIRIES:** Vincent Kwok (2106 9323), Joey Lam (2106 9309), Edith Fok (2106 9319), Brandon Tang (2106 9338), Lisa Cheung (2106 9329) and Irene Chan (2106 9313)

**EQ INTERNATIONAL**

16/F Standard Chartered Bank Building, 4-4A Des Voeux Rd Central, Hong Kong
Tel +852 2525 5090, Fax +852 2523 5105, E-mail: corpsaleshk@asia.equitytrust.com

A branch of EQ Corporate Management (HK) Ltd

This publication is of a general nature only and is not intended to be relied upon as, nor to be a substitute for professional advice in formulating any business decisions without first seeking such advice. Accordingly, the material should be viewed as a general guide, and professional advice should be obtained for specific situations. No liability can be accepted by the Equity Trust group in this respect.

© 2003 Equity Trust    All rights reserved    Printed in Hong Kong

**EXHIBIT 20.**


**Candover unrealized holdings –**

**Equity ownership**

**and US business**





Home | Sitemap | A A A | Print   [Search]   ▶

Home » Sector insight » Done Deals »

## Deal archive

## Select a heading to sort by category type.

| Portfolio company | Date | Value €m | Sector | Status |
|---|---|---|---|---|
| Acertec | Jun-99 | 208.7 | Industrials | Unrealised |
| AH Ball | Aug-84 | 1.4 | Industrials | Realised Jun-89 |
| Air Technology | Dec-99 | 325.9 | Industrials | Realised Jan-03 |
| Albion Automotive | Jul-95 | 28.5 | Industrials | Realised Oct-98 |
| **ALcontrol** | Dec-04 | ND | Support services | Unrealised |
| Allenwest | Dec-84 | 41.3 | Industrials | Realised May-93 |
| Anglian Windows | Dec-90 | 119.6 | Industrials | Realised Jul-92 |
| Ansafone | Mar-81 | 19.9 | Industrials | Realised Jun-86 |
| **Aspen Insurance** | Jun-02 | 709 | Financial services | Unrealised |
| ASW | Jan-99 | 104 | Industrials | Realised Sep-00 |
| Atco Qualcast | Dec-92 | 25.6 | Other | Realised Sep-95 |
| Baxi | Dec-96 | 1024.1 | Industrials | Realised Jan-04 |
| Berkertex | Jun-86 | 32.8 | Other | Realised Sep-92 |
| Bibby & Baron | Feb-95 | 15.7 | Industrials | Realised Mar-96 |
| BIP | Oct-95 | 78.3 | Industrials | Realised Sep-00 |
| Bishopcross | Jun-86 | 2.8 | Support services | Realised Jun-92 |
| Blue Arrow | Jun-91 | 49.9 | Support services | Realised Apr-96 |
| Bourne Leisure | Oct-00 | 1782.8 | Leisure | Realised Feb-04 |
| BPC | Jan-89 | 478.6 | Industrials | Realised Mar-98 |
| BPW Group | Sep-91 | 21.4 | Support services | Realised Apr-97 |
| Bricom | Jul-88 | 576.9 | Support services | Realised Aug-90 |
| **Bureau van Dijk** | Nov-04 | ND | Media | Realised Jul-07 |
| Camden Motors | Nov-96 | 64.1 | Support services | Realised Jul-03 |
| Capital Safety Group | June-07 | 415 | Support Services | Unrealised |
| CC and P | Nov-86 | 2.8 | Financial services | Realised Dec-88 |
| CCIC | Feb-97 | 347.6 | Technology | Realised Mar-01 |
| Centaur Communications | Jun-84 | 5.7 | Media | Realised Mar-04 |
| Claradon | Oct-85 | 94 | Industrials | Realised Jun-87 |
| Claverham | Jan-98 | 89.7 | Industrials | Realised Jan-01 |
| Clondalkin | Nov-99 | 550 | Industrials | Realised Feb-04 |
| Colour Marketing | Feb-84 | 0.6 | Support services | Realised Sep-87 |
| Combined Lease Finance | May-85 | 1.4 | Financial services | Realised May-86 |
| Cork Industries | Jun-96 | 54.1 | Industrials | Realised Sep-00 |
| Crabtree | Oct-86 | 2.8 | Industrials | Realised Apr-90 |
| D.P.C.E | Apr-81 | 2.8 | Support services | Realised Jul-83 |

| | | | | |
|---|---|---|---|---|
| Detica | Jun-97 | 17.1 | Technology | Realised Jun-03 |
| Diamant Boart | Jul-99 | 136.3 | Industrials | Realised May-02 |
| Don Reynolds | Jul-87 | 4.3 | Industrials | Realised Dec-89 |
| Druid | Dec-93 | 4.3 | Technology | Realised Nov-96 |
| Dwek Group/Hillshot | Sep-88 | 52.7 | Other | Realised Aug-95 |
| **DX Group** | Aug-06 | 692 | Support services | Unrealised |
| Earls Court & Olympia | Sep-99 | 248.1 | Media | Realised May-04 |
| Economic Insurance | Dec-93 | 19.9 | Financial services | Realised Jul-96 |
| **Equity Trust** | May-03 | 197.5 | Financial services | Unrealised |
| European Rail Catering | Oct-95 | 21.4 | Support services | Realised Jun-97 |
| **EurotaxGlass** | May-06 | 480 | Media | Unrealised |
| Evenser | May-98 | 121.1 | Media | Realised Jun-04 |
| Eversholt | Feb-96 | 883.1 | Financial services | Realised Mar-97 |
| Expro International | Jul-92 | 82.6 | Other | Realised Mar-95 |
| Fairey | Dec-86 | 72.6 | Industrials | Realised Nov-88 |
| Famous Names | Mar-81 | 11.4 | Other | Realised Sep-85 |
| Fenland Sheepskin | Sep-83 | 1.4 | Other | Realised Dec-05 |
| **Ferretti SpA** | Oct-06 | ND | Leisure | Unrealised |
| First Leisure | Jan-00 | 366.1 | Leisure | Realised May-04 |
| **Gala Group** | Mar-03 | 1869 | Leisure | Unrealised |
| Gardner Merchant | Jan-93 | 576.9 | Support services | Realised Feb-95 |
| Gaymer Group | Feb-92 | 208 | Other | Realised Oct-94 |
| **Get** | Jan-06 | 445 | Technology | Unrealised |
| Golden Key Homes | Apr-88 | 1.4 | Support services | Realised May-95 |
| Gower | Mar-81 | 4.3 | Industrials | Realised Dec-88 |
| Haden | Jul-85 | 85.5 | Industrials | Realised Oct-87 |
| Hays | Nov-87 | 363.2 | Support services | Realised Oct-89 |
| Heidemann | Nov-87 | 27.1 | Industrials | Realised Oct-97 |
| **Hilding Anders** | Oct-06 | 1000 | Industrials | Unrealised |
| HLF Insurance | Aug-97 | 148.1 | Financial services | Realised Jan-04 |
| Humberclyde | Sep-87 | 292 | Financial services | Realised Aug-89 |
| Imry | Oct-86 | ND | Other | Realised Jun-91 |
| **Innovia Films** | Sep-04 | 320 | Industrials | Unrealised |
| Inspec | Sep-92 | 64.1 | Industrials | Realised Mar-94 |
| Intermotor | Oct-94 | 21.4 | Support services | Realised Jul-96 |
| **Inveresk** | Sep-99 | 240.1 | Healthcare | Realised Jul-04 |
| Istel Group | Jun-87 | 37 | Technology | Realised Nov-89 |
| Jarvis Hotels | Jul-90 | 306.2 | Leisure | Realised Jun-96 |
| John E Wiltshier | Aug-88 | 5.7 | Industrials | Realised Nov-95 |
| **Kabel Deutschland** | Jun-03 | 1725 | Technology | Realised Feb-06 |
| Karablue | Nov-85 | 1.4 | Industrials | Realised Aug-95 |
| Keller Group | May-90 | 35.6 | Industrials | Realised May-94 |
| Kenwood | Sep-89 | 94.7 | Other | Realised Jul-92 |
| LCE Holdings | Jun-87 | 7.1 | Support services | Realised Mar-96 |
| Levington | Jul-94 | 71.2 | Industrials | Realised Dec-97 |
| LLG | May-88 | 22.8 | Financial services | Realised Jul-91 |
| Marlyn | Nov-95 | 14.2 | Other | Realised Mar-97 |
| MC International | Jan-97 | 42.7 | Industrials | Realised Jul-99 |

http://www.candover.com/english/sector-insight/done-deals          8/15/2007

| | | | | |
|---|---|---|---|---|
| McBride | Jul-93 | 388.9 | Other | Realised Jul-95 |
| Melville Technology | May-85 | 5.7 | Industrials | Realised Nov-88 |
| MFI | Nov-87 | 1022.7 | Other | Realised Nov-92 |
| Midland Independent | Nov-91 | 190.9 | Media | Realised Mar-94 |
| Midland Mining | Jun-96 | 28.5 | Other | Realised Dec-99 |
| Millbank Publishing | Feb-84 | 1.4 | Media | Realised Dec-86 |
| Motorworld | Jun-88 | 18.5 | Support services | Realised Feb-93 |
| NKF Holdings | Dec-86 | 28.5 | Industrials | Realised May-88 |
| Nutreco | Aug-94 | 521.3 | Industrials | Realised Jul-97 |
| **ONO** | Oct-05 | ND | Technology | Unrealised |
| **Ontex** | Jan-03 | 1040 | Industrials | Unrealised |
| Orion | Jun-92 | 12.8 | Media | Realised Aug-98 |
| Pandrol | Dec-99 | 325.9 | Industrials | Realised Nov-03 |
| **Parques Reunidos** | Jan-07 | ND | Leisure | Unrealised |
| Partco | Jun-86 | 15.7 | Support services | Realised Mar-94 |
| Pavilion Group | Dec-91 | 135.3 | Other | Realised Apr-95 |
| Picard Surgel | Mar-01 | 920 | Other | Realised Oct-04 |
| Pipeline Integrity International | Nov-99 | 264.9 | Support services | Realised Mar-02 |
| **Qioptiq** | Dec-06 | 220 | Industrials | Unrealised |
| Radyne | Dec-82 | 4.8 | Industrials | Realised Jul-91 |
| Rechem | Dec-85 | 2.8 | Industrials | Realised May-88 |
| Regional Independent Media | Feb-98 | 535.6 | Media | Realised Apr-02 |
| Rentco | May-87 | 61.2 | Financial services | Realised Nov-88 |
| RTA | Mar-89 | 5.7 | Industrials | Realised Dec-94 |
| Security Holdings | Jun-83 | 1.4 | Industrials | Realised Sep-86 |
| SG Industries | Jan-89 | 98.3 | Industrials | Realised Aug-95 |
| Shepperton | Jan-95 | 28.5 | Media | Realised Feb-01 |
| Slingsby Aviation | Dec-84 | 2.8 | Industrials | Realised Sep-86 |
| SPA | Nov-96 | ND | Financial services | Realised Dec-02 |
| **Springer** | Sep-03 | 1650 | Media | Unrealised |
| St Regis | Aug-85 | 74.1 | Industrials | Realised Jun-86 |
| Stone International | May-82 | 25.6 | Industrials | Realised Sep-84 |
| Stoves | May-89 | 19.9 | Other | Realised Jun-95 |
| Swan Hunter | Jan-86 | 5.7 | Industrials | Realised Oct-88 |
| **Swissport** | Feb-02 | 393 | Support services | Realised Aug-05 |
| Tallent Holdings | Jan-89 | 18.5 | Industrials | Realised Jan-92 |
| Technology Project Services | Jul-84 | 2.8 | Support services | Realised May-86 |
| Thos Storey | Oct-84 | 5.7 | Industrials | Realised Nov-97 |
| **Thule** | Dec-04 | 465 | Industrial | Realised Jul-07 |
| UIG | Jul-93 | 5.7 | Industrials | Realised Mar-00 |
| UK Paper | Jan-87 | 54.1 | Industrials | Realised Mar-88 |
| United Wine | May-86 | 2.8 | Other | Realised Feb-90 |
| Vero | Apr-94 | 48.4 | Industrials | Realised Nov-95 |
| Vestolit | Dec-99 | 150 | Industrials | Realised Sep-06 |
| **Vetco International** | Jul-04 | 729 | Support services | Realised Jul-07 |
| Vickers Da Costa | Oct-81 | 7.1 | Financial services | Realised Jun-84 |
| **Wellstream** | Mar-03 | 141 | Industrials | Unrealised |
| Westbury Homes | Apr-85 | 25.6 | Industrials | Realised May-86 |



http://www.candover.com/english/sector-insight/done-deals                    8/15/2007

| | | | | |
|---|---|---|---|---|
| Westpark | Dec-80 | 10 | Industrials | Realised Feb-88 |
| William Timpson | Sep-83 | 59.8 | Other | Realised Apr-87 |
| Wohlfarth | Jan-95 | 18.5 | Support services | Realised Nov-00 |
| **Wood Mackenzie** | Jul-05 | ND | Media | Unrealised |



http://www.candover.com/english/sector-insight/done-deals          8/15/2007

# EXHIBIT 21.

## Candover not merely holding co

## - true partners of the management





Home | Sitemap | A A A | Print    Search    ▶

Home » Investment approach » Backing management »

Backing management

### People not businesses

A buyout is a key point in the life of a company and the careers of the people involved. It's a big decision requiring huge commitment and some personal risk; but the rewards can be high.

At Candover we back people, not businesses. We're looking for ambitious, entrepreneurial people whose vision of creating strong medium and long-term value matches our own.

We've earned a reputation for forming close partnerships with management. For many of our investee companies, the successful completion of a deal is just the start. Enabling the next phase of growth, be it geographic expansion or add-on acquisitions of new product lines is fundamental to what we do. We offer both follow-on funds, as well as experienced advice.

When the time is right – with full management support – we seek an exit that rewards all participants fully.




Report and accounts 2006

## Introduction to Candover

Candover organises and invests principally in large European buyouts. We identify and acquire outstanding companies. We work in close partnership with skilled management teams to build substantial businesses with excellent prospects.

Talented management is all-important. We back ambitious, entrepreneurial teams in companies with dynamic growth profiles. We look for cash-generative businesses, which have strong competitive positions in expanding markets.

Within our investee companies we see our role as helping top managers perform at their best. We contribute financial expertise and can support growth plans with follow-on funds as needed. We act as partners to build long-term value for these businesses.

When the time comes to realise investments we seek exits that reward all participants fully for their time, capital and risk.

## Our business objectives

– to achieve above average capital gains from our investments
– to maintain a progressive dividend policy for our shareholders

**Review the shareholder highlights for 2006**







A growing European buyout marketplace

Increasing the size of our investments

Raising larger funds to take advantage of market opportunity

Click here

Click here

Click here




**Company structure**

Candover as an investment trust and a fund manager.

**Status of funds**

Candover has to date raised nine funds with a total value of €8.5bn.

**European market overview**

The buyout market continued to grow strongly in 2006.




**Chairman's statement**

Candover has continued to make excellent progress.



**Operational review**

Our policy is to select high quality investments.

**New investments in 2006**

Read about our latest investments.

# EXHIBIT 22.

## Candover $2 billion holdings in the US – 2007



# Monthly M&A

# Insider

A mergermarket report on global M&A activity



Hilsenrath Exhibits re Jurisdiction

March 2007 Issue

# League Tables

## Activity Table of Private Equity Firms on North American Buyouts

### Ranked by Value

| Y/E 28 Feb 2007 | Company Name | Value $ (m) | No. of Deals |
|---|---|---|---|
| 1 | Goldman Sachs Capital Partners | 51,677 | 4 |
| 2 | Citigroup Venture Capital Equity | 48,134 | 3 |
| 3 | Kohlberg Kravis Roberts & Co | 47,599 | 2 |
| 4= | Lehman Brothers Private Equity | 44,161 | 1 |
| 4= | Morgan Stanley AIP Private Markets Private Equity | 44,161 | 1 |
| 4= | TPG | 44,161 | 1 |
| 7 | Colony Capital | 7,175 | 1 |
| 8 | CCMP Capital Advisors | 5,937 | 1 |
| 9 | Blackstone Group Holdings | 5,460 | 2 |
| 10 | Sterling Partners | 4,508 | 1 |

Source: mergermarket

### Ranked by Volume

| Y/E 28 Feb 2007 | Company Name | Value $ (m) | No. of Deals |
|---|---|---|---|
| 1 | Goldman Sachs Capital Partners | 51,677 | 4 |
| 2 | Citigroup Venture Capital Equity | 48,134 | 3 |
| 3 | The Carlyle Group | 1,480 | 3 |
| 4 | Golden Gate Capital | 19 | 3 |
| 5 | Sun Capital Partners | - | 3 |
| 6 | Kohlberg Kravis Roberts & Co | 47,599 | 2 |
| 7 | Blackstone Group Holdings | 5,460 | 2 |
| 8 | Sterling Partners | 4,508 | 2 |
| 9 | Ares Management | 1,900 | 2 |
| 10 | Oak Hill Capital Partners | 628 | 2 |

Source: mergermarket

The Private Equity buyout activity tables by value and volume are based on privare equity firms advising the bidder on buyout deals where the dominant geography of the target company is North America. The tables by value and volume have been run from 01 January 2007 to 28 February 2007 and exclude lapsed and withdrawn deals.

## Activity Table of Private Equity Firms on North American Exits

### Ranked by Value

| Y/E 28 Feb 2007 | Company Name | Value $ (m) | No. of Deals |
|---|---|---|---|
| 1 | CCMP Capital Advisors | 4,060 | 3 |
| 2= | Bain Capital | 3,500 | 1 |
| 2= | Silver Lake Partners | 3,500 | 1 |
| 2= | Warburg Pincus | 3,500 | 1 |
| 5 | Apollo Management | 2,185 | 2 |
| 6= | C Dean Metropoulos & Co | 2,160 | 1 |
| 6= | J.W. Childs Associates | 2,160 | 1 |
| 8 | 3i Group | 1,900 | 2 |
| 9 | Candover Investments | 1,900 | 1 |
| 10 | TH Lee Putnam Ventures | 564 | 1 |

Source: mergermarket

### Ranked by Volume

| Y/E 28 Feb 2007 | Company Name | Value $ (m) | No. of Deals |
|---|---|---|---|
| 1 | CCMP Capital Advisors | 4,060 | 3 |
| 2 | Intel Capital | 44 | 3 |
| 3 | Apollo Management | 2,185 | 2 |
| 4 | 3i Group | 1,900 | 2 |
| 5 | BlueRun Ventures | 178 | 2 |
| 6 | Bay Partners | 126 | 2 |
| 7= | Apax Partners | 46 | 2 |
| 7= | Pitango Venture Capital | 46 | 2 |
| 9 | H.I.G. Capital | 23 | 2 |
| 10 | Madison Dearborn Partners | - | 2 |

Source: mergermarket

The Private Equity exit activity tables by value and volume are based on privare equity firms advising the vendor on exit deals where the dominant geography of the target company is North America. The tables by value and volume have been run from 01 January 2007 to 28 February 2007 and exclude lapsed and withdrawn deals.

**EXHIBIT 23.**

**Candover Availing through reporting to SEC**

**on key ownership of Aspen Insurance**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, DC 20549

## FORM 8-K

## Current Report
### Pursuant to Section 13 OR 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): November 10, 2006

# ASPEN INSURANCE HOLDINGS LIMITED

(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Bermuda** | **001-31909** | **Not Applicable** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**Maxwell Roberts Building
1 Church Street
Hamilton HM 11
Bermuda**

(Address of principal executive offices)
(Zip Code)

Registrant's telephone number, including area code: ( **441) 295-8201**

**Not Applicable**

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[   ]   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[   ]   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[   ]   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[   ]   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

**Section 7 – Regulation FD**

**Item 7.01 Regulation FD Disclosure**

On November 10, 2006, Aspen Insurance Holdings Limited issued a press release in connection with its offering of $200,000,000 in the aggregate principal amount of its 7.401% Perpetual Non-Cumulative Preference Shares.

**Section 9. Financial Statements and Exhibits**

**Item 9.01- Financial Statements and Exhibits**

(d)   The following exhibit is furnished under Item 7.01 as part of this report:

99.1 Press Release of the Registrant, dated November 10, 2006.

---

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**ASPEN INSURANCE HOLDINGS LIMITED**
(Registrant)

Dated: November 10, 2006                    By:   /s/ Christopher O'Kane
                                            Name:   Christopher O'Kane
                                            Title:    Chief Executive Officer

---

**INDEX TO EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 99.1 | Press Release of the Registrant dated November 10, 2006. |

---

Exhibit 99.1



# Press Release

### Aspen Insurance Holdings Limited Announces
### Pricing of its $200 Million Perpetual Non-Cumulative
### Preference Shares Offering

**Hamilton, BERMUDA, November 10, 2006** — Aspen Insurance Holdings Limited (''Aspen'') (NYSE:AHL; BSX:AHL BH) announced today that it has agreed to sell $200 million of its 7.401% perpetual non-cumulative preference shares with a liquidation preference of $25 per preference share in an underwritten public offering. Aspen has applied to list the perpetual non-cumulative preference shares on the New York Stock Exchange under the symbol ''AHLPRA''.

Aspen expects to use the net proceeds from the sale of its perpetual non-cumulative preference shares for general corporate purposes, including the repurchase of its outstanding ordinary shares.

Lehman Brothers and UBS Investment Bank are acting as joint book-running managers for the perpetual non-cumulative preference shares offering.

The perpetual non-cumulative preference shares are being sold pursuant to an effective shelf registration statement previously filed with the Securities and Exchange Commission (the ''SEC''). A prospectus supplement relating to the perpetual non-cumulative preference shares offering will be filed with the SEC. When available, a written prospectus for the perpetual non-cumulative preference share offering meeting the requirements of Section 10 of the Securities Act of 1933, as amended, may be obtained from Lehman Brothers or UBS Investment Bank by contacting Lehman Brothers, c/o ADP Financial Services, Prospectus Fulfillment, 1155 Long Island Avenue, Edgewood, NY 11717, email: monica_castillo@adp.com, fax: 631-254-7268 or UBS Investment Bank, 677 Washington Boulevard, Stamford, Connecticut 06901, Attention: Syndicate Department, phone: 1 888 722 9555, extension 1088.

This press release shall not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of these securities in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. Any offering of perpetual non-cumulative preference shares will be made only by means of a written prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended.

**About Aspen Insurance Holdings Limited**

Aspen Insurance Holdings Limited was established in June 2002. Aspen is a Bermudian holding company that provides property and casualty reinsurance in the global market, property and liability insurance principally in the United Kingdom and the United States and specialty insurance and reinsurance consisting mainly of marine and energy and aviation worldwide. Aspen's operations are conducted through its wholly-owned subsidiaries located in London, Bermuda and the United States: Aspen Insurance UK Limited, Aspen Insurance Limited and Aspen Specialty Insurance Company. Aspen has four operating segments: property reinsurance, casualty reinsurance, specialty insurance and reinsurance and property and casualty insurance. Aspen's principal existing founding shareholders include The Blackstone Group, Candover Partners Limited and Credit Suisse First Boston Private Equity. For more information about Aspen, please visit the Company's website at www.aspen.bm.

**Application of the Safe Harbor of the Private Securities Litigation Reform Act of 1995**

This press release contains written, and Aspen's officers may make related oral, ''forward-looking statements'' within the meaning of the U.S. federal securities laws regarding the possible repurchase of

Aspen's ordinary shares and the financing of any such repurchases. These statements are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements include all statements that do not relate solely to historical or current facts, and can be identified by the use of words such as ''expect,'' ''intend,'' ''plan,'' ''believe,'' ''project,'' ''anticipate,'' ''seek,'' ''will,'' ''estimate,'' ''may,'' ''continue,'' and similar expressions of a future or forward-looking nature.

All forward-looking statements rely on a number of assumptions concerning future events and are subject to a number of uncertainties and other factors, many of which are outside Aspen's control that could cause actual results to differ materially from such statements. Any ordinary share repurchases by Aspen are subject to rating agency considerations, the market price of its ordinary shares, Aspen's ongoing sources and uses of cash and the liquidity requirements of its insurance and reinsurance business. Any issuance by Aspen of any perpetual preference shares or other security is subject to market conditions for such security, the satisfactory agreement with any underwriters or other purchasers in relation to the terms and price of such security and customary conditions to the completion of any such financing transaction. For a more detailed description of additional uncertainties and other factors that could impact the forward-looking statements in this release, please see the ''Risk Factors'' section in Aspen's Annual Report on Form 10-K for the year ended December 31, 2005, filed with the U.S. Securities and Exchange Commission on March 6, 2006.

**- Ends -**

**Investor Contact :**

**Aspen Insurance Holdings Limited**              **T (441) 297-9382**
Noah Fields, Head of Investor Relations

**European Press Contact :**

**The Maitland Consultancy**                     **T 44 20 7379 5151**
Brian Hudspith

**North American Press Contact :**

**Abernathy MacGregor**                          **T (212) 371-5999**
Eliza Johnson

**EXHIBIT 24.**

**Candover Aspen SEC registration for IPO**

# News Release

Thursday 13 November 2003, 0:32 GMT

**Thursday 13 November 2003** ⟳
**INSURANCE** ⟳
**Aspen Insurance Holdings** ⟳

## Aspen Insurance Holdings Limited Announces Filing of Registration Statement for IPO

HAMILTON, Bermuda, November 13 /PRNewswire/ --

Aspen Insurance Holdings Limited (Aspen) today announced that it has filed a Registration Statement on Form F-1 with the U.S. Securities and Exchange Commission for a proposed underwritten initial public offering of its ordinary shares. Aspen is offering 9,524,000 shares and the underwriters have an option to purchase up to an additional 1,428,600 shares to cover over-allotments. Aspen currently estimates that the initial public offering price per ordinary share will be between US$20 and US$22 for an offering of approximately US$200 million. The final size of the offering will not be determined until after the registration statement becomes effective. Aspen has also applied to have its ordinary shares approved for listing on the New York Stock Exchange under the symbol "AHL".

Aspen plans to use the proceeds from the offering to provide initial or additional capital to its subsidiaries, to repay a portion of the short-term debt under its revolving credit facilities and for other general corporate purposes. No officers, directors or other shareholders plan to sell shares in the offering.

Credit Suisse First Boston and Goldman, Sachs & Co. are acting as joint book- running managers for the offering. A copy of the preliminary prospectus relating to the offering, when available, may be obtained at www.sec.gov or from Credit Suisse First Boston at Prospectus Department, 1 Madison Avenue, New York, N.Y. 10010, or by phone at +1 (212) 325-2580 and Goldman, Sachs & Co. at Prospectus Department, 85 Broad Street, New York, N.Y. 10004, or by phone at +1 (212) 902-1171.

A registration statement relating to these securities has been filed with the U.S. Securities and Exchange Commission but has not yet been declared effective. These securities may not be sold, nor may offers to buy be accepted prior to the time the registration statement becomes effective. This press release shall not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of these securities in any state in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any state. Any offer, if at all, will be made only by means of a prospectus forming a part of the effective registration statement.

About Aspen Insurance Holdings Limited

Aspen Insurance Holdings Limited was established in June 2002. Aspen is a Bermudan holding company that provides property and casualty reinsurance in the global market, property and liability insurance principally in the United Kingdom and surplus lines insurance in the United States. Aspen's operations are conducted through its wholly-owned subsidiaries located in London, Bermuda and the United States: Aspen Insurance UK Limited, formerly Wellington Re, Aspen Insurance Limited and Aspen Specialty Insurance Company. Aspen's reinsurance segment consists of property reinsurance, casualty reinsurance and specialty reinsurance lines of business. Aspen's insurance segment consists of commercial property insurance and commercial liability insurance lines of business. Aspen's principal existing shareholders include The Blackstone Group, Candover Partners Limited, Wellington Underwriting plc and Credit Suisse First Boston Private Equity.

This press release contains, and Aspen may from time to time make, written or oral "forward-looking statements" within the meaning of the U.S. federal securities laws. All forward-looking statements rely on a number of assumptions concerning future events and are subject to a number of uncertainties and other factors, many of which are outside of Aspen's control that could cause actual results to differ

materially from such statements. For a detailed description of these uncertainties and other factors that could cause the actual results to differ, please see the "Risk Factors" section in Aspen's Form F-1 Registration Statement with respect to the ordinary shares, filed with the U.S. Securities and Exchange Commission. SOURCE Aspen Insurance Holdings Limited (Aspen)

*Distributed by PR Newswire on behalf of Aspen Insurance Holdings*

---

**PR Newswire Europe Ltd.**
209 - 215 Blackfriars Road, London, SE1 8NL
Tel :     +44 (0)20 7490 8111
Fax :     +44 (0)20 7490 1255
E-mail : **info@prnewswire.co.uk**

Copyright © 2007 PR Newswire Europe Limited. All rights reserved.
A **United Business Media** Company.
**Terms and conditions of use apply**.

# EXHIBIT 25.

# Candover buys Vetco

# with locations nationwide

# and California



Home | Sitemap | AAA | Print     Search

Home » Sector insight » Support services » Case studies »

Support services case studies

**Vetco International**

July 2004

Deal size €729 million

### The short version

There was strong competition from trade buyers when ABB put its upstream exploration divisions up for sale. A consortium led by Candover navigated a regulatory investigation into the company and a two-year auction to secure the business. Two subsequent repayments were followed in January 2007 by a partial sale of the business.

### The opportunity

Vetco supplies high-tech proprietary products and services to oil producers, including all the major international oil companies and national producers. It manufactures drilling equipment and builds, modifies and services fixed and floating offshore platforms in 31 countries.

With global demand for oil and gas – and the need to find new reserves – growing, the emphasis in exploration is moving offshore, towards larger projects and longer development cycles. Vetco's bias towards subsea platforms presented an opportunity. Owners ABB were experiencing difficulties, creating the possibility of acquiring the business at a discount to quoted rivals.

### The deal

John Kennedy, who worked with Candover on the purchase of Wellstream (becoming its Chairman), corroborated our view of growth in the sector. Negotiations were protracted with strong competition from trade bidders. Candover invited 3i and JP Morgan Capital Partners – experienced investors in the sector – to add weight to the bid as co-investors.

Matters were complicated by a compliance investigation by regulators into bribery claims that rumbled on for almost two years, constantly jeopardising the deal and altering valuations. In the end the Candover consortium outmanoeuvred trade buyers and secured preferred bidder status. Very strong performance enabled two repayments, before one half of the business was sold to GE in January 2007. The residual part of the business Aibel, was sold to Ferd Private Equity in July 2007.

### The Candover factor

This deal was about persistence and persuasion. The opportunity was clear but it took persistence to capture it; and the investigation initially appeared to threaten the deal. At Candover we are used to persuading management and vendors to support our bid. Here we also had to persuade regulators that we could put in place a robust new compliance regime at Vetco, which has also been successful.

Visit Vetco International website.

# VETCO GRAY LOCATIONS IN THE UNITED STATES

## ALASKA

**Anchorage**
(Sales)
**Vetco Gray Inc.**
880 H Street, Suite. 202
Anchorage, Alaska 99501
Tel: .......... +1 907 522 3940
Fax: ......... +1 907 522 3974

**Ves Cash**
Sales Manager
Mob: ........ +1 907 748 2334

**Soldotna**
(Sales, Service)
**Vetco Gray Inc.**
48200 West Poppy Lane
Soldotna, Alaska  99669
Tel: .......... +1 907 262 5606
Fax: ......... +1 907 262 5607

**Mark Jensen**
Service Manager
Mob: ........ +1 907 260 7762

## CALIFORNIA

**Bakersfield**
(Sales, Service)
**Vetco Gray Inc.**
4708 New Horizon Avenue
Bakersfield, California 93313
Tel: .......... +1 661 396 0361
Fax: ......... +1 661 396 0363

**Bobby Comeaux**
Sales Manager
Mob: ........ +1 661 979 3440

**Woodland**
(Sales, Service)
**Vetco Gray Inc.**
1238 Alice Street
Woodland, California  95776
Tel: .......... +1 530 666 6329
Fax: ......... +1 530 666 6421

**John W. Murphy**
Sales
Mob:   +1 530 308 7580

**Brent Frost**
Service
Mob:   +1 530 308 7518

## COLORADO

**Denver**
(Sales)
**Vetco Gray Inc.**
56880 East 37th Place
Strasburg, Colorado 80136
Tel: .......... +1 303 622 4935
Fax: ......... +1 303 622 4936

**Richard White**
Supervisor – Sales and Service
Mob: ........ +1 303 929 6541

## LOUISIANA

**Harvey Operations**
(Manufacturing, Service)
**Vetco Gray Inc.**
3601 Janus Street
Harvey, Louisiana 70058
Tel: .......... +1 504 347 4594
Fax: ......... +1 504 349 5759 – {Building B &C}
(Sales/Service/QC/Machine Shop Purchasing/Accounting)
Fax: ......... +1 504 349 5758 – {Building A}
(Shipping & Receiving/Parts Room, Engrg./T&A)

**Sharon Sprague**
Customer Service Team Leader
Tel: .............. +1 504 349 5735
Mob: ............ +1 504 460 3433

**Lafayette Operations**
(Manufacturing, Sales, Service)
**Vetco Gray Inc.**
1249 Evangeline Thruway
Broussard, Louisiana 70518
Tel: .......... +1 337 365 1261
  ................ +1 337 235 1717
Fax: ......... +1 337 365 1125

**Bobby Roy**
General Manager – Lafayette Operations
DID: ......... +1 337 374 3317
Mob: ........ +1 337 296 6730

**Vetco Gray Controls Inc.**
105-A Balboa Drive
Broussard, LA 70518
Tel: .......... +1 337 837 9832

**New Orleans**
(Administration, Sales)
**Vetco Gray Inc.**
1515 Poydras Street, Suite 1490
New Orleans, Louisiana 70112
Tel: .......... +1 504 522 1522
Fax: ......... +1 504 523 7507

**Larry Clement**
Sales Manager – New Orleans
Mob: ........ +1 281 413 7541

# NEW MEXICO

**Farmington**
(Sales, Service)
**Vetco Gray Inc.**
c/o Big Red Tool Company
2010 San Juan Boulevard
Farmington, New Mexico 87401

**Ken Britton** – President of Big Red Tool
Tel/Cell: ... +1 505 325 5045

**Hobbs**
(Sales, Service)
**Vetco Gray Inc.**
1023 South Leech St.
Hobbs, New Mexico 88240
Tel/Cell: ... +1 505 393-0584

**David Durham**
Sales Manager
Mob: ........ +1 505 631 5465

# NORTH DAKOTA

**Williston**
(Sales, Service)
**Vetco Gray Inc.**
805 East Broadway

Williston, North Dakota 58802
PO Box 1708
Williston, North Dakota 58802-1708
Tel: .......... +1 701 572 3460
Fax: ......... +1 701 572 3463

**Gerry Gregory**
Branch Manager
Mob: ........ +1 701 570 5579

## TEXAS

**Bryan**
(Manufacturing, Sales, Service
**Vetco Gray Inc.**
2870 Harvey Mitchell Parkway, Suite 800
Bryan, Texas 77807
Tel: .......... +1 979 778 4911
Fax: ......... +1 979 778 5599

**Corpus Christi**
(Sales, Service)
**Vetco Gray Inc.**
618 Diamond Cut
Corpus Christi, Texas 78409
Mail to: P.O. Box 4065
Corpus Christi, Texas 78469-4065
Tel: .......... +1 361 289 0933
Fax: ......... +1 361 289 0940

**Kevin Holland**
District Manager
Mob: ........ +1 432 238 7399 *
* cell phone number will change by end of July

**Dallas**
(Sales, Service)
**Vetco Gray Inc.**
3308 Barley Court
Highland Village, Texas 75077
Tel: .......... +1 972 966 0147

**Brian Taylor**
Sales Manager
Mob: ........ +1 214 437 5521

**Houston**
(World Headquarters Marketing/Administration)
**Vetco International**
3010 Briarpark Avenue, Suite 300

Houston, Texas 77042
Mail to: P.O. Box 2291
Houston, Texas 77252-2291
Tel: .......... +1 713 683 2400
Fax: ......... +1 713 683 2421

**Toni Osborne**
Director of Communications
DID: ......... +1 713 458 3671
Mob: ........ +1 832 434 9135

**Houston**
(Subsea Projects)
**Vetco Gray**
3010 Briarpark Avenue, Suite 300
Houston, Texas 77042
Mail to: P.O. Box 2291
Houston, Texas 77252-2291
Tel: .......... +1 713 683 2400
Fax: ......... +1 713 683 2421

**Phil Mason**
Vice President, Vetco Gray Subsea Projects
Tel: .......... +1 713 458 3905
Mob: ........ +1 832 466 6489

**Houston**
(Western Region Administration / Manufacturing,
R&D, Sales, Service)
**Vetco Gray Inc.**
12221 N. Houston Rosslyn Rd.
Houston, Texas 77086
Mail to: P.O. Box 2291
Houston, Texas 77252-2291
Tel: .......... +1 281 448 4410
Fax: ......... +1 281 847 4679

**Terry Scanlon**
Vice President – Sales
DID: ......... +1 281 405 5671
Mobile: .... +1 832 866 4538

**Kilgore**
(Sales, Service)
**Vetco Gray Inc.**
4308 Hwy 42 North
Kilgore, Texas 75662
Tel: .......... +1 903 984 2940
Fax: ......... +1 903 984 4090

**Brian Marcantel**
District Manager
Mob: ........ +1 903 987 2248

**McAllen**
(Sales, Service)
**Vetco Gray Inc.**
124 West Ulex Avenue
McAllen, Texas 78504
Tel: .......... +1 956 682 2587
Fax: ......... +1 956 682 2056

**Hector Escamilla**
Sales and Service
Mob: ........ +1 956 522 1684

**Navasota**
(Aftermarket)
**Vetco Gray Inc.**
9930 Industrial Drive
Navasota, Texas  77868
Tel: .......... +1 936 870 4200
Fax: ......... +1 936 870 4209

**Blake Phillips**
General Manager – Onshore Group
Mob: ........ +1 281 413 6691

**Mark Salmon**
District Manager
DID: ......... +1 936 870 4204
Mobile: .... +1 281 413 6685

**Odessa**
(Sales, Service)
**Vetco Gray Inc.**
2585 West I-20
Odessa, Texas 79766
Mail to: P.O. Box 7559
Odessa, Texas 79760
Tel: .......... +1 432 580 6602
Fax: ......... +1 432 332 1059

**Don Brown**
Customer Service Manager – Onshore
Mob: ........ +1 432-634-0190

# UTAH

**Vernal**
(Sales, Service)
**Vetco Gray Inc.**

399 South 1000 East Unit #5
Vernal, Utah  84078
Mail To: P.O. Box 939
Vernal, UT 84078
Tel: ......... +1 435 789 5220

**Greg Ruge**
Supervisor – Field Service
Mob: ......... +1 435 790 7980

## WYOMING

**Evanston**
(Sales, Service)
**Vetco Gray Inc.**
Sunset Industrial Park
109A Pasture Drive
Evanston, Wyoming 82930
Mail to: P.O. Box 1786
Evanston, Wyoming 82931
Tel: .......... +1 307 789 4220
Fax: ......... +1 307 789 8935

**Terry Burke**
District Manager
Mob: ........ +1 307 679 1532

**Rock Springs**
(Sales, Service)
**Vetco Gray Inc.**
278 Production Drive
Rock Springs, Wyoming 82901
Tel: .......... +1 307 362 7560
Fax: ......... +1 307 362 7564

**Terry Burke**
District Manager
Mob: ........ +1 307 679 1532

**EXHIBIT 26.**

**Candover sells Vetco in 2007**



# Press release archive

## 3i, Candover and JPMorgan Partners sell Vetco Gray for US$1.9bn

08 January 2007

A private equity syndicate comprising Candover*, 3i and JPMorgan Partners** today announce the sale of Vetco Gray to GE's Oil & Gas division for an enterprise value of US$1.9 billion (€1.5 bn) on a debt-free, cash-free basis. Completion of the deal is expected in February 2007.

The sale of Vetco Gray, and the spin out of Vetco Aibel, marks a partial exit from Vetco International for the syndicate, which acquired the business in July 2004 from ABB Oil & Gas.

Vetco Gray, headquartered in Houston, is one of the world's leading suppliers of drilling, completion and production equipment for on and offshore oil and gas fields, including Subsea applications. The business, which is expected to generate over $1.6 billion of sales in 2006, employs 5,000 people worldwide in more than 30 countries.

Candover, 3i and JPMorgan Partners will remain as shareholders in the other operating subsidiary company, Vetco Aibel, a leading provider of upstream oil and gas production facilities, process systems, technology, services and products. From new build to decommission, it maintains, modifies and operates on and offshore oil & gas production facilities. The business operates across 17 countries with over 5,000 professionals. The business will be renamed Aibel.

Commenting on the sale, the private equity syndicate commented:

"Vetco International has performed strongly under our ownership, and generated an impressive return in under three years. Under the leadership of Peter Goode, management have driven tremendous growth in sales and EBITDA. Rising oil and gas prices, and the associated increase in oil and gas drilling and production have further advanced Vetco International's performance.

"We retain Aibel, an exceptional business, and look forward to harnessing and furthering the growth prospects of the company. We have every confidence that both businesses will continue to expand and take advantage of the current market environment, and we wish the management and staff at Vetco Gray every success."

Commenting on the syndicate's continued investment in Aibel, Vetco International CEO Peter Goode said:

"The Vetco International management team has established a strong and successful working relationship with the private equity syndicate over the past two and a half years and we are delighted that this will continue under our extended ownership of Aibel. With the sale of Vetco Gray now agreed, management's focus will be to grow Aibel organically and secure an attractive exit for the private equity syndicate in an appropriate time frame."

*Candover means Candover Investments plc and / or one or more of its subsidiaries, including Candover Partners Limited as General Partner of the Candover 1997 and 2001 Funds and as Manager of the Candover 2005 Fund.

** JPMorgan Partners refers to J.P. Morgan Partners, LLC and its controlled investment vehicles.



Home | Sitemap | A A A | Print    Search

Home » Media centre » Press release » 2007 »

Press release archive

**29/06/2007**

**Candover, 3i and JPMorgan Partners sell Aibel to an investor group led by Ferd Private Equity Fund II for $900m (€670m)**

A private equity syndicate comprising Candover*, 3i and JPMorgan Partners**, today announced the sale of Aibel to an investor group led by Ferd Private Equity Fund II, a leading Norwegian private equity fund, with debt financing provided by ABN AMRO and DnB NOR, for an enterprise value of $900m (€670m). Completion of the deal, expected in August 2007, is subject to competition and regulatory approvals.

The sale of Aibel, coming after the sale earlier this year of Vetco Gray to GE Oil and Gas for $1.9 billion, completes the exit from Vetco International for the syndicate, which acquired the business in July 2004 from ABB Oil & Gas for $925 million.

Aibel is a leading provider of upstream oil and gas production facilities, process systems, technology, services and products. From new build to decommission, it maintains, modifies and operates on and offshore oil & gas production facilities.  The business, which generated approximately US$1.5 billion turnover of sales in 2006, employs more than 7,000 people across 16 countries.

Commenting on the sale, the private equity syndicate said:

"Aibel performed strongly following the exit from sister company Vetco Gray with solid growth in sales and EBITDA. The sale of Aibel and Vetco Gray has generated an impressive return in just under three years.  Aibel is an exceptional business, which should continue to prosper as an independent entity under the leadership of Rasmus Sunde and new owners led by Ferd Private Equity Fund II. We wish the management and staff at Aibel every success."

Peter Goode, Executive Chairman of Aibel, said:

"The sector of the market in which Aibel participates is forecast for continued strong growth. The Company is well positioned in this market and will provide the new owners with a strong platform to participate in this growth. I remain confident of the future for the company and employees."

Advisors were Credit Suisse and DnB Nor Markets (M&A), Clifford Chance (legal) and Deloitte (financial).

The sale of Aibel results in an increase of 16p per share (unaudited) in the net asset value of Candover Investments plc.

Ends.

*Candover means Candover Investments plc and / or one or more of its subsidiaries, including Candover Partners Limited as General Partner of the Candover 1997 and 2001 Funds and as Manager of the Candover 2005 Fund.

** JPMorgan Partners refers to J.P. Morgan Partners, LLC and its controlled investment vehicles. CCMP Capital Advisors, LLC manages investments made by JPMorgan Partners.

*** Ferd Private Equity Fund II means Ferd Private Equity II (Jersey-I) L.P. and Ferd Private Equity II (Jersey-II) L.P. The two partnerships make parallel investments and are jointly referred to as the Ferd

**EXHIBIT 27.**

**Candover buy Vetco**

**and commit to clean up corruption**

an

# O'Melveny Handbook



# Foreign Corrupt Practices Act

### FIFTH EDITION

UPDATES ON RECENT CASES AND ENFORCEMENT PROCEEDINGS

POTENTIAL IMPACT OF SARBANES-OXLEY

WHAT DOES THE ACT PROHIBIT?

WHAT PAYMENTS ARE PERMITTED?

HOW TOUGH ARE THE SANCTIONS?

EXPANDED DUE DILIGENCE SECTIONS

TIPS ON DOING BUSINESS IN THE FOREIGN SECTOR

WHAT ARE RECENT "DEAL" ISSUES RAISED BY THE ACT?

SAMPLE AGENCY AGREEMENT AND COMPLIANCE PROGRAM



O'MELVENY & MYERS LLP

**DOJ Opinion Procedure Release 04-02**

Date: July 12, 2004

The Department has reviewed the FCPA Opinion Procedure request of an investment group consisting of, among others, JPMorgan Partners Global Fund, Candover 2001 Fund, 3i Investments plc, and investment vehicles ("Newcos"), all of which are hereinafter referred to as the "Requestors." The Requestors are acquiring certain companies and assets from ABB Ltd. ("ABB") relating to ABB's upstream oil, gas, and petrochemical businesses ("OGP Upstream Business").

On July 6, 2004, the Department announced guilty pleas to violations of the Foreign Corrupt Practices Act ("FCPA") entered in the United States District Court for the Southern District of Texas by ABB Vetco Gray, Inc. and ABB Vetco Gray (UK) Ltd., two of the entities being acquired by the Requestors. On the same date, the U.S. Securities and Exchange Commission filed a settled enforcement action in the United States District Court for the District of Columbia charging ABB with violating the anti-bribery, books and records, and internal accounting and controls provisions of the FCPA relating to transactions involving business in several foreign countries, including Nigeria.

Previously, after the Requestors and ABB had executed a Preliminary Agreement dated October 16, 2003, relating to the acquisition of the OGP Upstream Business, they agreed to mutually conduct an FCPA compliance review — through separately-engaged counsel — of the OGP Upstream Business for the prior five-year period. ABB and the Requestors separately engaged forensic auditors to assist in the review and analysis of financial information, and ABB provided the Requestors with access to witnesses and records related to its OGP Upstream Business.

A-37

Requestors have represented that the review of OGP Upstream Business involved more than 115 lawyers and over 44,700 man-hours. Requestors conducted a manual review of over 1,600 boxes of printed e-mails and other documents, CD-ROMs, and hard drives of electronic records, amounting to more than 4 million pages. Over 165 interviews of current and former employees and agents of the OGP Upstream Business were conducted. In addition, the forensic accountants visited 21 countries, assigning more than 100 staff members to review and analyze hundreds of thousands of transactions. Counsel for the Requestors also produced 22 analytical reports of OGP Upstream Business operations, with supporting evidence. All documents and witness interview memoranda were provided to the Department and the SEC as they were produced.

The requestors represent that they have taken, and will continue to undertake, a number of precautions to avoid, in the future, a knowing violation of the FCPA. The Requestors have represented and undertake, on behalf of their newly acquired entities, to:

1.   Continue to cooperate with the Department and the SEC in their respective investigations of the past payments and to cooperate with other interested U.S.

government agencies, as well as foreign law enforcement authorities, as may be applicable;

2.  Ensure that any employee or officer of the OGP Upstream Business who continues to be employed by Newco and who is found to have made or authorized unlawful or questionable payments to foreign officials is appropriately disciplined;

3.  Disclose to the Department any additional pre-acquisition payments to foreign officials relating to the OGP Upstream Business made by ABB that it discovers after the acquisition;

4.  Ensure that Newco adopts a system of internal accounting controls and a system designed to ensure the making and keeping of accurate books, records, and accounts; and

5.  Cause Newco to adopt a rigorous anti-corruption compliance code ("Compliance Code"), as described further below, that is designed to detect and deter violations of the FCPA and foreign anti-corruption laws. Newco's anti-bribery Compliance Code will consist of the following elements:

    (A)  A clearly articulated corporate policy against violations of the FCPA and foreign anti-bribery laws and the establishment of compliance standards and procedures to be followed by all directors, officers, employees, and all business partners, including, but not limited to, agents, consultants, representatives, and joint venture partners and teaming partners, involved in business transactions, representation, or business development or retention in a foreign jurisdiction (respectively, "Agents" and "Business Partners") that are reasonably capable of reducing the prospect that the FCPA or any applicable foreign anti-corruption law of Newco's Compliance Code will be violated;

    (B)  The assignment to one or more independent senior Newco corporate officials, who shall report directly to the Compliance Committee of the Audit Committee of the Board of Directors, of responsibility for the implementation and oversight of compliance with policies, standards, and procedures established in accordance with Newco's Compliance Code;

    (C)  The effective communication to all shareholders' representatives directly involved in the oversight of Newco ("Shareholders") and to all directors, officers, employees, Agents, and Business Partners of corporate and compliance policies, standards, and procedures regarding the FCPA and applicable foreign anti-corruption laws, by requiring (i) regular training concerning the requirements of the FCPA and applicable foreign anti-corruption laws on a periodic basis to all Shareholders, directors, officers, employees, Agents, and Business Partners and (ii) annual certifications by all Shareholders, directors,

A-38

officers, employees, including the head of each Newco business or division, Agents, and Business Partners certifying compliance therewith;

(D)  A reporting system, including a "Helpline" for directors, officers, employees, Agents, and Business Partners to report suspected violations of the Compliance Code or suspected criminal conduct;

(E)  Appropriate disciplinary procedure to address matters involving violations or suspected violations of the FCPA, foreign anti-corruption laws, or the Compliance Code;

(F)  Clearly articulated corporate procedures designed to assure that all necessary and prudent precautions are taken to cause Newco to form business relationships with reputable and qualified Business Partners;

(G)  Extensive pre-retention due diligence requirements pertaining to, as well as post-retention oversight of, all Agents and Business Partners, including the maintenance of complete due diligence records at Newco;

(H)  Clearly articulated corporate procedures designed to ensure that Newco exercises due care to assure that substantial discretionary authority is not delegated to individuals whom Newco knows, or should know through the exercise of due diligence, have a propensity to engage in illegal or improper activities;

A-39

(I)  A committee consisting of senior Newco corporate officials to review and to record, in writing, actions relating to (i) the retention of any Agent or subagents thereof, and (ii) all contracts and payments related thereto;

(J)  The inclusion in all agreements, contracts, and renewals thereof with all Agents and Business Partners of provisions:  (i) setting forth anti-corruption representations and undertakings; (ii) relating to compliance with foreign anti-corruption laws and other relevant laws; (iii) allowing for internal and independent audits of the books and records of the Agent or Business Partner to ensure compliance with the foregoing; and (iv) providing for termination of the Agent or Business Partner as a result of any breach of applicable anti-corruption laws and regulations or representations and undertakings related thereto;

(K)  Financial and accounting procedures designed to ensure that Newco maintains a system of internal accounting controls and makes and keeps accurate books, records, and accounts; and

(L)   Independent audits by outside counsel and auditors, at no longer that three-year intervals, to ensure that the Compliance Code, including its anti-corruption provisions, are implemented in an effective manner.

Based upon all the facts and circumstances, as represented by the Requestors, the Department does not presently intend to take an enforcement action against the Requestors or their recently acquired entities, for violations of the FCPA committed prior to their acquisition from ABB.

This opinion is subject to the following caveats:

1.   Although the Department views the Requestors' representations concerning a compliance program to be significant precautions against future violations of the FCPA, the Department's opinion should not be deemed to endorse any specific aspect of the Requestors' program.

2.   The Department's opinion does not speak to any prospective conduct by the Requestors or any of the entities acquired from ABB following the acquisition.

A-40

The FCPA Opinion Letter referred to herein and this release have no binding application to any party which did not join in the request and can be relied upon by the requesting parties only to the extent that the disclosure of facts and the circumstances in their request is accurate and complete and continues to accurately and completely reflect such facts and circumstances.

## DOJ Opinion Procedure Release 04-03

Date: June 14, 2004

The Department has reviewed the FCPA Opinion request of a U.S. law firm that was submitted on April 26, 2004.

The requestor proposes to sponsor a trip to the United States by twelve officials of a ministry (the "Ministry") of the People's Republic of China ("PRC"). The stated purpose of the visit is to provide the Ministry officials an opportunity to meet primarily with U.S. public-sector officials to discuss (1) U.S. regulation of employment issues, labor unions, and workforce safety; and (2) the institutions and procedures through which legal conflicts in the workplace are resolved. The visit will last for ten days and will include stops in three different cities. The requestor has secured commitments from various federal and state government agencies, courts, and academic institutions to meet with the Ministry officials. The requestor intends to pay the travel, lodging, meals, and insurance for the twelve officials and one translator. The requestor has asked for a determination of the Department's present enforcement intention under the FCPA.

The requestor has represented, among other things, that:

1.   it has no business before the entities that may send officials on the visit;

**EXHIBIT 28.**

**Candover commit to clean up Vetco**

**but do not, and continue corruption**

# New Enforcement Actions Include Largest FCPA Criminal Fine to Date   [Excerpts from attached report]

Several critical lessons emerge from the *Vetco* case:

- The case is one of many recent reminders of the importance of FCPA issues in the acquisition context—here, despite being aware of FCPA issues at the time of the acquisition and making specific commitments to the DOJ to remedy them and investigate in other countries, the private equity acquirors apparently did not take sufficient steps to prevent improper conduct similar to the conduct that resulted in the first round of guilty pleas.

- While the FCPA often is perceived as not covering foreign affiliates, jurisdiction may be asserted under 15 U.S.C. §78dd-3 against foreign companies that take actions in the United States, including calling or sending emails to the United States.

- The case emphasizes the importance of adequate due diligence and control of agents. The communications with the shipping agent and the inadequate documentation raised numerous "red flags," yet these clear signs either were not noted or not addressed by managers or internal auditors.

- Although the FCPA is expressly limited to transactions made for the purpose of obtaining or retaining business, the case is a stark example of the broad interpretation of those terms by the enforcement community. Here, payments made to avoid customs restrictions do not appear to relate to the obtaining or retaining of business, yet they were viewed as sufficiently connected to result in a criminal enforcement action. At least one court in a prior case has supported the government's broad view of the statutory language.

- This case is another example of the DOJ's and SEC's insistence on the appointment of a compliance monitor in connection with the resolution of FCPA cases. This relief has apparently become standard, and difficult to avoid.

BRIEFING SERIES | **March 2007**

# Foreign Corrupt Practices Act



## New Enforcement Actions Include Largest FCPA Criminal Fine to Date
## US Attorney General Highlights FCPA Enforcement in Recent Speech

At the American Bar Association White Collar Crime Conference on March 1, 2007, Attorney General Alberto R. Gonzales discussed the US Department of Justice's (DOJ) focus on combating international corruption. First, he observed that the *Vetco Gray* case (discussed below) and the *Schnitzer Steel* and *Statoil* cases (discussed in the November 2006 WilmerHale FCPA Briefing Series)[1] demonstrate that the DOJ has substantially increased its focus and attention on the US Foreign Corrupt Practices Act (FCPA). Second, he noted that the DOJ is also providing training and assistance to foreign law enforcement partners. These remarks suggest both that the FCPA continues to be a high priority for enforcement and that we will likely see a higher level of cooperation between international government regulators than we have in the past, which will be of particular importance for companies facing investigation in more than one jurisdiction.

The *Vetco Gray* case and two other recent cases illustrate the continuing and active enforcement of the FCPA by the DOJ and the Securities and Exchange Commission (SEC).

**First**, on February 6, 2007, Vetco Gray Controls Inc., Vetco Gray UK Ltd. and Vetco Gray Controls Ltd. pleaded guilty to violations of the FCPA's antibribery provisions and conspiracy to violate the FCPA in connection with corrupt payments to Nigerian customs officials that were made through an agent. A fourth Vetco entity, Aibel Group Ltd., entered into a deferred prosecution agreement with the DOJ relating to the same conduct. The total fine assessed against the three convicted Vetco entities—$26 million—is the largest in an FCPA criminal enforcement action to date. The size of the fine is in part a reflection of the fact that this is the second time in three years that Vetco companies have pleaded guilty to FCPA charges.

**Second**, on February 7, 2007, the SEC entered into a settlement with El Paso Corporation for violations of the FCPA's books and records and internal controls provisions. On the same day, the DOJ entered into a non-prosecution agreement with El Paso. These allegations arose from kickbacks paid by El Paso and a predecessor company to the Iraqi regime under the United Nations Oil-for-Food Program (OFFP). The *El Paso* case, one of many OFFP cases currently being investigated by the DOJ and SEC, may be an acknowledgement by the US government that it cannot generally proceed on antibribery grounds in OFFP cases because the corrupt payments were made to the Iraqi government itself, not to individual government officials.

**Third**, on February 13, 2007, the SEC entered into a settlement with Dow Chemical Company for alleged books and records and internal controls violations by a fifth-tier Dow Indian subsidiary. Dow agreed to pay a civil penalty of $325,000. The Indian subsidiary—of which Dow owned 51%–76% over the relevant period—allegedly made corrupt payments to Indian federal and state officials and deliberately falsified books and records in order to disguise the payments. The case demonstrates that US companies will be held responsible for the activities of their foreign subsidiaries under the FCPA's books and records and internal controls provisions even when the parent company had no knowledge of the corrupt activity.

These developments demonstrate the ongoing commitment of the US government to vigorous anti-corruption enforcement, particularly in the acquisition and joint venture context, and that it is necessary for US companies and their affiliates to have strong compliance programs, books and records, and internal controls.

Attorney Advertising

WILMER CUTLER PICKERING HALE AND DORR LLP

## The FCPA's Antibribery and Accounting Provisions

The FCPA's antibribery provisions make it unlawful for any issuer, domestic concern or person acting within the United States to offer or make a payment of anything of value directly or indirectly to a foreign official, international organization official, political party or party official, or any candidate for public office, for the purpose of influencing that official to assist in obtaining or retaining business.[2] A covered company can be held liable for payments made on its behalf by agents or distributors.

The FCPA's accounting provisions require companies with securities listed in US trading markets to keep books, records and accounts that accurately and fairly reflect any transaction and disposition of assets in reasonable detail, and to maintain an adequate system of internal accounting controls.[3] A covered company is responsible for ensuring that its controlled subsidiaries, including foreign subsidiaries, comply with the FCPA's accounting provisions.

### Vetco

The February 6, 2007, plea agreements and deferred prosecution agreement were the second round of FCPA prosecutions against Vetco entities in recent years for improper conduct in Nigeria. Vetco Gray was originally part of ABB Handels-und Verwaltungs AG (ABB). On July 6, 2004, ABB Vetco Gray UK Ltd. and an affiliated company pleaded guilty and paid total criminal fines of $10.5 million, and its Swiss parent company disgorged $5.9 million in allegedly illicit profits in a civil settlement with the SEC after the subsidiaries paid more than $1 million in bribes to Nigerian government officials who evaluated and approved potential bids for work on oil exploration projects.[4] Four former ABB employees later settled civil charges with the SEC relating to the same conduct.[5]

A week after the guilty pleas were entered in 2004, ABB sold its upstream oil and gas businesses and assets to a group of private equity entities. After the sale, ABB Offshore Systems Inc. became Vetco Gray Controls Inc. (Vetco Gray Controls), a company incorporated in Texas (and consequently a "domestic concern" within the meaning of the FCPA).[6] ABB Vetco Gray UK Ltd. became Vetco Gray UK Ltd. (Vetco Gray UK) and was incorporated under the laws of the UK with a principal place of business in Scotland. Vetco Gray UK is a "person" within the meaning of the FCPA.[7] ABB Vetco Gray

Offshore Systems Ltd. became Vetco Gray Controls Ltd., a business incorporated under the laws of the United Kingdom with a principal place of business in Nailsea, England, and offices in Aberdeen, Scotland. Like Vetco Gray UK, Vetco Gray Controls Ltd. is a person within the meaning of the FCPA.

At the time of the sale, the DOJ issued an Opinion Release (No. 2004-02) indicating that it did not intend to take further enforcement action against the acquirors or the acquirees for prior conduct based on, among other things, a commitment by the acquirors to effectively institute and implement in the acquired entities a compliance system, internal controls, training and other procedures sufficient to deter and detect violations of the FCPA, and to conduct internal reviews of the Vetco companies' businesses in a variety of countries.

According to the government's papers, in February 2001, Vetco Gray UK was awarded a contract (the Bonga Contract) in connection with Nigeria's first deep-water oil drilling project. The three convicted Vetco entities supplied goods and engineering services under the Bonga Contract. Vetco Gray Controls in Houston, Texas, was responsible for the transportation and customs clearance of all goods and equipment for the project into Nigeria.

Vetco Gray Controls hired a shipping agent to facilitate shipments of goods to Nigeria, and the agent provided services to all three convicted Vetco subsidiaries. According to the criminal information, the defendants and the agent participated in a conspiracy to make corrupt payments to Nigerian customs officials to induce the officials to provide the Vetco entities with preferential treatment in the customs clearance process, and to secure an improper advantage with respect to the importation of goods and equipment into Nigeria. Vetco Gray Controls, which was based in the United States, communicated with the other Vetco entities and the agent to facilitate the process and the related payments.

The agent provided improper services (referred to as "express courier services," "interventions" and "evacuations") to the Vetco entities. Each of these services assisted Vetco in moving goods through Nigerian customs cheaply and quickly and resolving problems that arose with Nigerian customs officials. In connection with the express courier services, the agent explained that it would be unable to provide the Vetco entities with receipts for the agent's special fee or for payment of customs duties.

When a Vetco Gray Controls logistics coordinator raised questions, the coordinator was told that the express courier service operated pursuant to an "on-the-side," "internal" agreement between the agent and unnamed customs officials. When the coordinator sought further explanations, the coordinator was told that it was "none of [the coordinator's] business how [the agent would] get it done," and that the coordinator did "not want to know" what the agent had to do. Emails and memos cited in the government's papers indicate that communications took place between employees of all three defendant entities discussing the potentially corrupt nature of payments to the agent. The payments to the agent for express courier services were invoiced to the Vetco entities as "local processing fees" or "administrative transport fees." In some cases, these fees were approximately a third of the cost of the legal customs duties.

Between 2002 and 2005 (a period beginning well in advance of the 2004 guilty pleas and acquisition), approximately 378 payments for express courier services were made, totaling over $2 million. In addition, the agent performed at least 19 "interventions" between April 2003 and April 2005, totaling $59,733, and at least 21 "evacuations" at a cost ranging from $1,644 to $32,497 each, for a total of $74,862. The defendants' employees engaged in emails and phone calls to the United States discussing many of these payments, and personnel in the United States approved payments.

The large fines assessed against the Vetco entities in the 2007 action took into account the companies' alleged failure to comply with commitments made to the DOJ in 2004 to implement compliance programs and internal controls. The DOJ stated in its press release that the resolution of the matter resulted, in large part, from Vetco's voluntary disclosure and remediation, seemingly indicating that the fines likely would have been higher absent those factors. In addition to the criminal fines, the plea agreements require the defendants to (1) hire an independent monitor to oversee the creation and maintenance of a robust compliance program; (2) undertake and complete previously committed-to investigations of the companies' conduct in various other countries as originally required under the FCPA Opinion Release; and (3) ensure that, in the event that any of the companies are sold, the sale shall bind any future purchaser to the monitoring and investigating obligations. GE has announced its plans to purchase the Vetco entities and thus will be bound by the requirements of the plea agreements.

Several critical lessons emerge from the *Vetco* case:

- The case is one of many recent reminders of the importance of FCPA issues in the acquisition context—here, despite being aware of FCPA issues at the time of the acquisition and making specific commitments to the DOJ to remedy them and investigate in other countries, the private equity acquirors apparently did not take sufficient steps to prevent improper conduct similar to the conduct that resulted in the first round of guilty pleas.

- While the FCPA often is perceived as not covering foreign affiliates, jurisdiction may be asserted under 15 U.S.C. §78dd-3 against foreign companies that take actions in the United States, including calling or sending emails to the United States.

- The case emphasizes the importance of adequate due diligence and control of agents. The communications with the shipping agent and the inadequate documentation raised numerous "red flags," yet these clear signs either were not noted or not addressed by managers or internal auditors.

- Although the FCPA is expressly limited to transactions made for the purpose of obtaining or retaining business, the case is a stark example of the broad interpretation of those terms by the enforcement community. Here, payments made to avoid customs restrictions do not appear to relate to the obtaining or retaining of business, yet they were viewed as sufficiently connected to result in a criminal enforcement action. At least one court in a prior case has supported the government's broad view of the statutory language.

- This case is another example of the DOJ's and SEC's insistence on the appointment of a compliance monitor in connection with the resolution of FCPA cases. This relief has apparently become standard, and difficult to avoid.

## El Paso

On February 7, 2007, the SEC entered into a settlement with El Paso Corporation (El Paso), a Texas based energy company, for violations of the books and records and internal controls provisions of the FCPA. On the same day, the DOJ entered into a non-prosecution agreement with El Paso relating to the same conduct.

According to the SEC's complaint, from approximately June 2001–June 2002, El Paso indirectly made approximately $5.5 million in illegal surcharge payments in connection with its purchases of crude oil from third parties under the United Nations OFFP. Without admitting or denying the allegations in the SEC's complaint, El Paso consented to the entry of a final judgment permanently enjoining it from future violations of the FCPA's books and records and internal controls provisions and ordering it to disgorge $5,482,363 in profits and pay a civil penalty of $2,250,000. The disgorgement obligation was deemed satisfied by El Paso's forfeiture of $5,482,363 pursuant to the non-prosecution agreement with the US Attorney's Office for the Southern District of New York, which will seek to transfer this money to the Development Fund of Iraq, to be paid as restitution for the benefit of the people of Iraq.

The UN OFFP was established in 1996 as a form of humanitarian relief to the Iraqi population, which faced significant hardship under the 1990–2003 UN sanctions preventing member states from trading in any Iraqi commodities or products. Iraq was permitted to sell oil on the condition that all of its oil proceeds were deposited into an escrow bank account monitored by the United Nations, and the funds could only be used to purchase designated humanitarian goods for the benefit of the Iraqi people. The government of Iraq sold oil through Iraq's State Oil Marketing Organization (SOMO). Under the OFFP, Iraqi government officials had the power to select the companies and individuals who received the rights to purchase Iraqi oil.

According to the SEC's complaint, from approximately August 2000–March 2003, Iraqi government officials conditioned the distribution of allocations of oil under the OFFP on the recipient's agreement to pay kickbacks. The kickbacks usually were paid in the form of a surcharge on each barrel of oil sold and were deposited into Iraqi-controlled bank accounts in Jordan and Lebanon in the names of SOMO officials or other Iraqi individuals. Money from these accounts subsequently was transferred to the Iraqi Central Bank in Baghdad.

In September 2000, the Coastal Corporation, which later was acquired by El Paso, received a surcharge demand from a SOMO official. An El Paso consultant and former Coastal official arranged for a $201,877 surcharge

payment, which was sent to a bank in Jordan on El Paso's behalf. After being notified that all future purchases would include surcharges, El Paso ceased purchasing crude oil directly from Iraq but continued its purchases from third parties, and, according to the SEC's complaint, knew or was reckless in not knowing that illegal surcharges were paid in connection with those purchases and passed back to El Paso in price premiums.

El Paso allegedly entered into 14 additional third-party transactions involving contracts to purchase oil. According to the SEC's complaint, approximately 25–30 cents of every barrel was illegally kicked back to Iraq by third parties. Although El Paso inserted a provision in some of its third-party purchase contracts requiring its contract partners to represent that they had made "no surcharge or other payment to SOMO," the company allegedly did not conduct sufficient due diligence to ensure that any such representations were truthful, and the SEC complaint alleges that recorded conversations prove the company knew the provision was ineffective.

The SEC's complaint also alleges that El Paso failed to maintain a system of internal controls sufficient to ensure that the company's transactions were executed in accordance with management's authorization, and that the transactions would be recorded as necessary to maintain accountability for the company's assets. El Paso allegedly failed to maintain adequate records of its Iraqi crude oil contracts because (1) its contract files did not contain proof that invoices had been paid for at least 13 shipments; (2) there was no process for documenting commercially reasonable prices paid for oil cargos; (3) there was no evidence that documents were reviewed by anyone to ensure propriety and adequacy; and (4) there were inadequate explanations of why documents were missing from files. The SEC also alleged that El Paso violated the accounting provisions by failing to designate what portion of the oil purchase price constituted surcharge payments to Iraq, in violation of UN regulations and US and international trade sanctions.

The DOJ's non-prosecution agreement did not specify the violations engaged in by El Paso, but it referenced the conduct charged in the indictment of Coastal's former chief executive and others, which included, among other things, charges of wire fraud but not charges under the FCPA. The non-prosecution agreement also contained a commitment that the Treasury Department's Office of

Foreign Assets Control would not pursue civil charges against El Paso.

The SEC's accounting-related allegations and the DOJ's apparent focus on wire fraud and trade-related charges, despite what appear to be clear instances of bribery, may be an acknowledgment by the government that FCPA antibribery allegations are not appropriate in the OFFP context because the kickbacks were made to the Iraqi government rather than to Iraqi officials. Nonetheless, as it has in many cases before, the government may charge companies that are engaging in corrupt practices overseas under the accounting provisions and other statutes.

## Dow

On February 13, 2007, the SEC settled a case against Dow Chemical Company (Dow) for violations of the FCPA's books and records and internal controls provisions relating to alleged improper payments made by DE-Nocil Crop Protection Ltd. (DE-Nocil), a fifth-tier subsidiary of Dow doing business in India. Without admitting or denying the allegations in the complaint, Dow settled the action by paying a civil penalty of $325,000.

DE-Nocil was required to obtain government registration for its products at both state and federal levels prior to marketing them in India. The SEC's complaint alleged that, between 1996–2001, DE-Nocil made improper payments through consultants and unrelated companies to Indian government officials in order to register several agro-chemical products slated for marketing in time for India's growing season. DE-Nocil accumulated the funds for the payments to government officials off its books with the cooperation of a contractor who added fictitious "incidental charges" on its bills. The contractor accumulated and segregated these funds and then disbursed the funds to federal and state regulators as directed by DE-Nocil.

DE-Nocil allegedly paid an estimated $200,000 in improper payments and gifts to Indian state and federal officials, which were not accurately reflected in Dow's books and records. The payments were made without knowledge or approval of any Dow employee. Dow conducted an internal investigation of DE-Nocil and then voluntarily approached the SEC staff and presented the results. Dow also took extensive remedial actions, including (1) taking employee disciplinary actions; (2) retaining an independent auditor to conduct a forensic audit of the books and records and internal controls at DE-Nocil; (3) reporting its internal investigation to the Audit Committee of the Board of Directors; (4) providing FCPA compliance training to employees at DE-Nocil, as well as at DE-Nocil's immediate parent; (5) restructuring its global compliance program; (6) expanding FCPA compliance training worldwide; (7) training auditors to recognize FCPA issues; (8) joining a nonprofit association specializing in antibribery due diligence that, among other things, screens potential partners and other third parties that work with multinational corporations; and (9) hiring an independent consultant to review and assess its FCPA compliance program.

The Dow case is another example of a US company being held responsible for the accuracy of books and records of foreign subsidiaries even when the parent company has no knowledge of corrupt activity. Interestingly, all of the conduct alleged in the complaint occurred in 2001 or before, which appears to be outside the FCPA's five-year statute of limitations. It is unclear whether Dow entered into a tolling agreement or whether the SEC viewed the books and records and internal controls conduct as constituting ongoing violations. Dow's extensive remedial actions in this instance may have assisted it in avoiding any disgorgement and in keeping the fine relatively low.

*WilmerHale lawyers regularly speak on legal developments under the Foreign Corrupt Practices Act and related enforcement issues. Below is a listing of recent and upcoming topics and events:*

## Roger Witten, Partner

### Recent
February 21, 2007, New York, NY. PLI Conference on "The Foreign Corrupt Practices Act – Coping with Heightened Enforcement Risks." Roger participated on a panel called "Roundtable of Hypothetical Cases with Enforcement Officials and Defense Counsel."

### Future
March 27–28, 2007, New York, NY. ACI's 17th National Conference on the Foreign Corrupt Practices Act. Roger will participate on a panel called "The Year in Review: Prosecutors Speak on Recent FCPA Investigations and Prosecutions."

May 3–4, 2007, Paris, France. International Bar Association 5th Annual Conference on "The Awakening Giant of Anti-Corruption Enforcement." Roger will participate on a panel called "Prosecutors Forum: Parallel Investigations and Prosecutions, Oil for Food Prosecutions, Sanctions and Penalties, Prosecutorial Priorities."

June 21, 2007, Berlin, Germany. Joint Humboldt University-WilmerHale 12th Annual International Business and Trade Law Conference. Roger will deliver a speech on "Legal Aspects of Corporate Compliance in a Global Economy."

### Kimberly Parker, Partner

*Recent*
January 30–31, 2007, Houston, TX. ACI's FCPA Boot Camp. Kimberly chaired the first day of the conference and participated on panels called "Demystifying the FCPA" and "Conducting FCPA Compliance Reviews."

*Future*
April 10, 2007, Webcast. Foreign Corrupt Practices Act: Charting a Safe Course in the Context of an Acquisition.

Kimberly will be joining Ernst & Young LLP on a panel discussing the FCPA in the context of an acquisition.

June 4–5, 2007, San Francisco, CA. ACI's FCPA Conference. Kimberly will be chairing the first day of the conference and participating on panels called "Demystifying the FCPA" and "Conducting FCPA Compliance Reviews."

### Jay Holtmeier, Counsel

*Future*
April 10, 2007, Webcast. Foreign Corrupt Practices Act: Charting a Safe Course in the Context of an Acquisition. Jay will be joining Ernst & Young LLP on a panel discussing the FCPA in the context of an acquisition.

May 1–2, 2007, New York, NY. ACI's Anti-Corruption for Pharma & Life Sciences – Minimizing Exposure Under Expansive Definitions of Foreign "Government Officials." Jay will participate on a panel called "Averting the 'Purchase' of an FCPA Violation in the New Wave of Pharmaceutical/Life Sciences Mergers and Acquisitions."

**NOTES**

1. *See* November 2006 WilmerHale FCPA Briefing Series at http://www.wilmerhale.com/files/Publication/c2883dfb-debd-46f2-9ec9-b67cd710eae0/Presentation/PublicationAttachment/ec38c5db-0973-4850-8fd7-b761afffc9db/FCPA_Nov2006.pdf.

2. 15 U.S.C. §§78dd-1 to -3.

3. 15 U.S.C. §78m(b).

4. *See* July 27, 2004 WilmerHale FCPA Update at http://www.wilmerhale.com/files/Publication/3e8e537a-af21-4ccd-9009-564f5121db41/Presentation/PublicationAttachment/0fb0137c-9c09-4859-9969-3c408a2da63b/FCPA 07-27-04.pdf.

5. *See* August 2006 WilmerHale FCPA Briefing Series at http://www.wilmerhale.com/files/Publication/d0ed0ebd-5238-4712-a98f-02d33787d24b/Presentation/PublicationAttachment/d16bc193-73d7-445b-891e-07758fb8cab5/FCPAaugustV4.pdf.

6. 15 U.S.C. §78dd-2(h)(1)(B).

7. 15 U.S.C. §78dd-3(f)(1).

FOR MORE INFORMATION ON THIS OR OTHER FCPA MATTERS, PLEASE CONTACT:

Roger Witten    roger.witten@wilmerhale.com    +1 212 230 8850
Kimberly Parker    kimberly.parker@wilmerhale.com    +1 202 663 6987
Jay Holtmeier    jay.holtmeier@wilmerhale.com    +1 212 295 6413

Wilmer Cutler Pickering Hale and Dorr LLP is a Delaware limited liability partnership. Our United Kingdom offices are operated under a separate Delaware limited liability partnership of solicitors and registered foreign lawyers regulated by the Law Society of England and Wales. In Beijing, we are registered to operate as a Foreign Law Firm Representative Office. WilmerHale principal law offices: 60 State Street, Boston, Massachusetts 02109, +1 617 526 6000; 1875 Pennsylvania Avenue, NW, Washington, DC 20006, +1 202 663 6000. Prior results do not guarantee a similar outcome. This material is for general informational purposes only and does not represent our legal advice as to any particular set of facts, nor does it represent any undertaking to keep recipients advised of all relevant legal developments. © 2007 Wilmer Cutler Pickering Hale and Dorr LLP

07_125 WIG 03/07

**EXHIBIT 29.**


**Candover Vetco guilty plea**

*Cardover 2/2007*



# Department of Justice

**FOR IMMEDIATE RELEASE**                                          **CRM**
**TUESDAY, FEBRUARY 6, 2007**                              **(202) 514-2007**
WWW.USDOJ.GOV                                         **TDD (202) 514-1888**

## Three Vetco International Ltd. Subsidiaries Plead Guilty to Foreign Bribery and Agree to Pay $26 Million in Criminal Fines

### *Separate Subsidiary Enters into a Deferred Prosecution Agreement Following Cooperation with Justice Department*

WASHINGTON – Vetco Gray Controls Inc., Vetco Gray Controls Ltd., and Vetco Gray UK Ltd., wholly owned subsidiaries of Vetco International Ltd., have pleaded guilty to violating the anti-bribery provisions of the Foreign Corrupt Practices Act, or FCPA, Deputy Attorney General Paul J. McNulty announced today.

At a hearing today before U.S. District Judge Lynn N. Hughes in the Southern District of Texas, the companies pleaded guilty to violations of the anti-bribery provisions of the FCPA, as well as conspiracy to violate the FCPA. Additionally, Aibel Group Ltd., another wholly owned subsidiary of Vetco International, simultaneously entered into a deferred prosecution agreement with the Justice Department regarding the same underlying conduct. As part of the plea and deferred prosecution agreements, it was agreed that Vetco Gray Controls Inc., Vetco Gray Controls Ltd., and Vetco Gray UK Ltd. would pay criminal fines of $6 million, $8 million, and $12 million, respectively, for a total of $26 million. This total fine amount represents the largest criminal fine to date in a FCPA prosecution by the Justice Department.

In the charging and plea documents, Vetco Gray Controls Inc., Vetco Gray Controls Ltd., and Vetco Gray UK Ltd. admitted that they violated and conspired to violate the FCPA in connection with the payment of approximately $2.1 million in corrupt payments over approximately a two-year period to Nigerian government officials. These corrupt payments were paid through a major international freight forwarding and customs clearance company to employees of the Nigerian Customs Service, and coordinated largely through Vetco Gray Controls Inc.'s offices in Houston. Additionally, Aibel Group Ltd. agreed in its deferred prosecution agreement to accept responsibility for similar conduct by its employees.

As the charging and plea documents reflect, beginning in February 2001, Vetco Gray UK began providing engineering and procurement services and subsea construction equipment for Nigeria's first deepwater oil drilling project, the Bonga Project. Several Vetco Gray UK affiliates, including Aibel Group Ltd., Vetco Gray Controls Inc., and Vetco Gray Controls Ltd., supplied Vetco Gray UK with employees and manufacturing equipment for the project. From at least September 2002 to at least April 2005, each of the defendants engaged the services of a major international freight forwarding and customs clearing company and, collectively, authorized that agent to make at least 378 corrupt payments totaling approximately $2.1 million to Nigerian Customs Service officials to induce those officials to provide the defendants with preferential treatment during the customs process.

"This case represents the largest criminal penalty the Department of Justice has ever sought in a Foreign Corrupt Practices case and confirms our commitment to root out corruption," said Deputy Attorney General McNulty. "The Department of Justice will continue its efforts to assure a level playing field for businesses operating abroad."

This is the second time since July 2004 Vetco Gray UK has pled guilty to violating the FCPA. On July 6, 2004, Vetco Gray UK, previously named ABB Vetco Gray UK Ltd., and an affiliated company pleaded guilty to violating the antibribery provision of the FCPA in connection with the payment of more than $1 million in bribes to officials of NAPIMS, a Nigerian government agency that evaluates and approves potential bidders for contract work on oil exploration projects. ABB Vetco Gray UK Ltd. was renamed Vetco Gray UK Ltd. following an acquisition by a group of private equity entities of the upstream oil and gas businesses and assets of its parent corporation, ABB Handels-und Verwaltungs AG ("ABB"). The July 12, 2004 acquisition included the sale of Vetco Gray UK and the predecessors to the two other Vetco International subsidiaries that pleaded guilty today. In anticipation of the July 12, 2004 acquisition, the private equity acquirers requested and the Justice Department issued an FCPA Opinion Release (No. 2004-02) ( http://www.usdoj.gov/criminal/fraud/fcpa/o0402.htm). The Opinion Release required the acquirers to effectively institute and implement a compliance system, internal controls, training, and other procedures sufficient to have deterred and detected violations of the FCPA, among other obligations. The corrupt payments underlying today's guilty pleas continued unabated from the period prior to the acquisition until at least mid-2005, notwithstanding the acquirer's commitments to the Justice Department under the Opinion Release. The sale to new owners, the prior directives issued by the Department of Justice, and Vetco Gray UK's prior FCPA conviction were all taken into account under the U.S. Sentencing Guidelines in calculating the $12 million criminal fine against Vetco Gray UK Ltd.

The resolution of the criminal investigation of Vetco International and its subsidiaries resulted, in large part, from the actions of Vetco International in voluntarily disclosing the matter to the Justice Department and Vetco International's subsidiaries' agreement to take significant remedial steps. In addition to the criminal fines, the plea agreements also require the defendants to: (1) hire an independent monitor to oversee the creation and maintenance of a robust compliance program; (2) undertake and complete an investigation of the companies' conduct in various other countries as originally required under FCPA Opinion Release No. 2004-02; and (3) ensure that in the event that any of the companies are sold, the sale shall bind any future purchaser to the monitoring and investigating obligations.

The criminal case is being prosecuted by Deputy Chief Mark F. Mendelsohn and Trial Attorney Stacey Luck of the Fraud Section, with assistance from Assistant United States Attorney James R. Buchanan from the United States Attorney's Office for the Southern District of Texas.

### ###

07-075

# EXHIBIT 30.

## Candover Vetco to plea guilty

## in order to sell to GE 2007



## Cads and CC advise on GE-Vetco scandal
· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

General Electric (GE)'s recent acquisition of a Vetco International subsidiary threw up an overseas bribery scandal that had to be cleared up before the deal could be completed, it has emerged.

Clifford Chance and Cadwalader Wickersham & Taft are advising the subsidiary on the investigation by the US Department of Justice (DoJ), which meted out a $26m (£13.2m) penalty to Vetco Gray.

This makes it the biggest criminal penalty in US history under overseas bribery laws.

The fine could have been larger but was mitigated by Vetco Gray voluntarily coming forward with information about paying $2.1m (£1.07m) in bribes to Nigerian officials over a three-year period up to 2005.

As well as overseeing advice on the investigation, Clifford Chance advised the consortium comprising Candover, 3i and JPMorgan Partners on the $1.9bn (£970m) sale of Vetco Gray to Weil Gotshal & Manges' client GE, as reported in The Lawyer (15 January).

GE announced only that resolving the bribery investigation was a pre-condition to the transaction being completed.

It is one of the last deals that private equity partner Ian Bagshaw is working on at Clifford Chance before his move to Linklaters (see The Lawyer, 1 February).

Clifford Chance partner Adam Signy is leading compliance advice while Cadwalader's Washington head and litigation partner Ray Banoun is heading up all US legal aspects.

Although Vetco International is a UK company, Vetco Gray is a Houston-based oil and gas drilling subsidiary. The DoJ has jurisdiction over its employees' actions both in the States and overseas under the Foreign Corrupt Practices Act.

Bagshaw told The Lawyer: "Vetco self-disclosed this to the DoJ. Irrespective of the deal, it was something that was being handled."

| | | | |
|---|---|---|---|
| Section: | Breaking News | Date: | 7-Feb-2007 |
| Author: | 32111 | Source: | The Lawyer |

The Lawyer Group is a division of Centaur Media PLC 2007
TheLawyer.com was built by Sift Group Ltd.

http://www.thelawyer.com/cgi-bin/item.cgi?id=124168&d=pndpr&h=pnhpr&f=pnfpr                    8/3/2007

**EXHIBIT 31.**

**Candover Vetco corruption**

**China News July 2007**

# South China Morning Post

## July 14, 2007 Saturday

Recent corruption cases include one in February when Vetco Gray UK and Vetco Gray Controls pleaded guilty to corrupt payments to Nigerian customs officials that were made through an agent.

A fourth Vetco entity, Aibel Group, entered into a deferred prosecution agreement with the Department of Justice relating to the same conduct. The total fine assessed against the three convicted Vetco entities was US$26million.