**EXHIBIT 48.**

**Insinger partners with Candover**

**in Equity Ownership**

Words speak louder.**Linklaters**

Global

Practices.Industries.People.Locations.News.Publications.Seminars.eBusiness.Community.Careers.

Local

Select a country site

Site search    Go  Advanced search

Latest Deals
Latest News
Hot Topics
Awards
League table news
Press & Media Contacts

## Candover acquires Insinger's trust and fiduciary services business
6 June 2003

Linklaters advised Candover on its Euro 197.5 million acquisition of Insinger de Beaufort's trust and fiduciary services business in the Channel Islands, the Netherlands, the Caribbean and the Far East. The deal became public on 30 May 2003. The purchase price included a Euro 15 million deferred consideration payable dependent on the future performance of the business.

Insinger Trust Holdings Limited and Insinger de Beaufort Holdings (Asia) Limited are minority co-investors in the acquired business, which was purchased by a newly incorporated joint venture company, Equity Trust Holdings SARL.

The Linklaters team was led by Graham White and Olivia McKendrick and included a team from corporate, banking, competition, real estate, pensions, IP, and employment in London, Luxembourg, Hong Kong, Brussels and Frankfurt.

Other advisers to Candover included Smith Hughes, Raworth & McKenzie (British Virgin Islands), Morant du Feu & Jeune (Jersey), Ozannes (Guernsey), De Brauw Blackstone Westbroek (Netherlands and Netherlands Antilles), and Zaid Ibrahim & Co (Malaysia & Labuan).

Insinger was advised by Addleshaw Goddard, and by Harneys (British Virgin Islands) The trust business management team, as co-investors in the joint venture, was advised by Addleshaw Goddard, SY Wong & Co, Sasto & Klinger and Linklaters (on certain aspects).

**Further information**
Gita Bartlett
gita.bartlett@linklaters.com
(44-20) 7456 2391
(44) 7710 654 897

Find News

All Categories
All Practice Areas
All Sectors
All Offices
From    ANY    ANY
To      ANY    ANY
                    Go

**Practice Area**
Corporate / M&A ...

Site map.   Legal notices.   Contact us.   Download plugins.                    ©Linklaters LLP

**EXHIBIT 49.**


**Insinger Avnet NY fund**

**Prospectus-Global-Convertible-ENG**



Insinger de Beaufort Global Convertible Fund
("Fund A") (Share series Fund A)

Supplementary prospectus
May 2006

INSINGER DE BEAUFORT GLOBAL CONVERTIBLE FUND - Supplementary prospectus



I.      Important information

A.      Introduction

This Supplementary Prospectus should be read in conjunction with the Basic Prospectus of Insinger de Beaufort Umbrella Fund N.V. (the "Company"). The Basic Prospectus and its appendices, this Supplementary Prospectus and the other Supplementary Prospectuses together form the Company's overall prospectus. Unless expressly stated to the contrary the terms used in this Supplementary Prospectus have the same meaning as assigned to them in the Basic Prospectus.

B.      General

Following the takeover of GIM Algemeen Vermogensbeheer B.V. by the Insinger de Beaufort group in 1999, the name GIM Umbrella Fund N.V. was changed to Insinger de Beaufort Umbrella Fund N.V. by an amendment to the articles of association on 21 March 2001.

Following a legal merger, the Fund (then called GIM Umbrella Fund N.V.), until the formalisation of the amendment to the articles of association made immediately upon execution of the deed of merger on 20 June 1997, called GIM Global Convertible Fund N.V., acquired the capital of Beleggingsmaatschappij WBO Internationaal N.V., an investment company with a variable capital, under universal title, which company has now ceased to exist.

The holders of ordinary shares in the capital of Beleggingsmaatschappij WBO Internationaal N.V. acquired an equal number of ordinary shares in the capital of GIM Umbrella Fund N.V. These shares were from the Fund B series, representing the Insinger de Beaufort Mix Fund, at that time known as the GIM Mix Fund. For efficiency and commercial reasons, the company's shareholders decided in December 2002 to withdraw the Fund B series of shares; this was effected by an amendment to the articles of association, which also reduced the share capital of the company.

As part of the merger, the Manager redesignated the original ordinary shares in GIM Umbrella Fund N.V. as part of the Fund A series and assigned the capital represented by those shares the name GIM Global Convertible Fund (now Insinger de Beaufort Global Convertible Fund); following the merger, the original shareholders of GIM Umbrella Fund N.V. were therefore entitled to an equal number of Fund A series shares.

On April 1st, 2005, Insinger de Beaufort RentSelect N.V. merged into the Fund. The Board of Directors assigned the original Insinger de Beaufort RentSelect N.V. shares to Fund A, Insinger de Beaufort Global Convertible Fund. The original shareholders of Insinger de Beaufort RentSelect N.V. were entitled to a number of shares in Fund A as determined by a set ratio.



C.    Investment policy and objects

Fund A invests solely in national and international convertible securities including convertible bonds and preferent convertible securities, as well as in warrant loans and, on a short-term basis (not exceeding six months), in shares obtained from convertibles.

A convertible is a debt instrument that has the characteristics of a bond, but can be converted into shares in the issuing company subject to the pre-agreed terms and conditions. The risk profile is higher than for ordinary bonds, but convertibles offer the opportunity to earn a higher rate of return. The return is determined by the price of the underlying shares.

Fund A's capital will be invested with due observance of the policy set out below:
- Investmenst are made in covertible securities and warrant loans, both listed on generally recognised stock exchanges, as well as unlisted and on a short-term basis (not exceeding six months), in shares obtained from convertibles;
- the value of investment in securities issued by one company (after conversion) may not exceed 5% of the outstanding share capital of the issuing company at the time of purchase and may not exceed 10% of the capital of Fund A.
- the minimum size of a loan which is considered suitable for investment is EUR 25 million.
- Fund A can hedge exchange rate risks in its investment portfolio.
- Market risks may be hedged by investing in short positions on shares, options, futures and other derivatives.
- Fund A may take out cash loans not exceeding 20% of the net asset value.

D.    Sub-manager

The sub-manager of Fund A is Advent Capital Management, LLC ("Advent"). Advent's address is: 1065 Avenue of the Americas, 31st floor, New York, NY 10018, USA. Advent is an investment advisor specialising in convertible bonds and high yield securities and is registered with the Securities and Exchange Commission ("SEC").

In the context of the management agreement between Fund A, the Manager and Advent, Advent is authorised to manage the capital of Fund A. That implies that Advent can invest and reinvest capital in Fund A's name and that Advent is responsible for decisions on whether to take certain positions and the portfolio's overall structure.
Advent receives for its services half of the management and performance fee received by the Manager (see paragraph IV, Fees)).

II.    Capital
The Fund's issued capital comprises 2,500,000 ordinary shares (with a nominal value of € 6,250,000) in Fund A of a total of 7,900,000 ordinary shares.

**EXHIBIT 50.**


**Insinger SEC filings**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

**SCHEDULE 13G/A**

**AMENDMENT NO. 3**

**UNDER THE SECURITIES EXCHANGE ACT OF 1934**

# MERRIMAC INDUSTRIES, INC.

(Name of Issuer)

**COMMON STOCK, $.01 PAR VALUE**
(Title of Class of Securities)

590262101
(CUSIP Number)

March 13, 2007
(Date of Event Which Requires Filing of this Statement)

Check the appropriate box to designate the rule pursuant to which this Schedule
is filed:

|_| Rule 13d-1(b)
|X| Rule 13d-1(c)
|_| Rule 13d-1(d)

*The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter the disclosures provided in a prior cover page.

The information required in the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

1. NAME OF REPORTING PERSON S.S. OR I.R.S. IDENTIFICATION NUMBER OF ABOVE PERSON

**RICHARD GROSSMAN**

2. CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP*

(a) |X| (b) |_|

3. SEC USE ONLY

4. CITIZENSHIP OR PLACE OF ORGANIZATION

**UNITED STATES**

5. SOLE VOTING POWER

```
                          0
NUMBER OF       ----------------------------------------------------------------
   SHARES       6.   SHARED VOTING POWER
BENEFICIALLY
 OWNED BY                 0
   EACH         ----------------------------------------------------------------
 REPORTING      7.   SOLE DISPOSITIVE POWER
  PERSON
  WITH:                   0
                ----------------------------------------------------------------
                8.   SHARED DISPOSITIVE POWER

                          0
----------------------------------------------------------------
```

9. AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON.

0

10. CHECK BOX IF THE AGGREGATE AMOUNT IN ROW 9 EXCLUDES CERTAIN SHARES*

|_|

11. PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW 9.

0%

12. TYPE OF REPORTING PERSON*

**IN**

- 2 -

## SCHEDULE 13G

**Item 1(a) Name of Issuer:**

**Merrimac Industries, Inc.**

**Item 1(b) Address of Issuer's Principal Executive Offices:**

41 Fairfield Place, West Caldwell, New Jersey 07006

**Item 2(a) Names of Persons Filing:**

Richard Grossman, Orin Hirschman, Adam Smith Capital Management LLC ("ASCM"), Diamond Capital Management ("DCM"), Adam Smith Investments, Ltd. ("ASI"), Adam Smith Investment Partners, L.P. ("ASIP"), Richard and Ana Grossman JTWROS.

**Item 2(b) Addresses of Principal Business Offices:**

The principal executive offices of ASCM, ASIP and DCM, and the business address of Richard Grossman, are located c/o Richard Grossman, 259 Oakford Street, West Hempstead, NY 11552, and Orin Hirschman, 6006 Berkeley Ave., Baltimore, MD 21209. The principal executive office of ASI is c/o Insinger Trust (BVI) Limited, Tropic Isle Building, P.O. Box 438, Road Town, Tortola, British Virgin Islands.

**Item 2(c) Citizenship:**

ASCM is a New York limited liability company, DCM is a New York corporation, ASI is a British Virgin Islands corporation, and ASIP is a New York limited partnership. Richard Grossman, Ana Grossman, and Orin Hirschman are citizens of the United States.

**Item 2(d) Title of Class of Securities:**

Common Stock (the "Shares").

**Item 2(e) CUSIP Number:**

590262101

**Item 3. Type of Reporting Person:**

N/A

**Item 4. Ownership**

a. Amount Beneficially Owned:

**0 Shares**

- 9 -

b. Percent of class

0%

c. Number of shares as to which such person has:

i. Sole power to vote or to direct the vote

0

ii. Shared power to vote or to direct the vote

0

iii. Sole power to dispose or to direct the disposition of

0

iv. Shared power to dispose or to direct the disposition of

0

**Item 5. Ownership of Five Percent or Less of a Class:**

If this statement is being filed to report the fact that as of the date hereof the reporting person has ceased to be the beneficial owner of more than five percent of the class of securities, check the following. |X|

**Item 6. Ownership of More than Five Percent on behalf of Another Person.**

N/A

**Item 7. Identification and Classification of the Subsidiary Which Acquired the Security Being Reporting on by the Parent Holding Company:**

N/A

**Item 8. Identification and Classification of Members of the Group.**

This Statement is filed by Richard Grossman and Orin Hirschman by virtue of their former beneficial ownership of Shares, directly and indirectly as the owners of each of ASCM and DCM, and as the sole holders of the Common Stock of ASI; by DCM by virtue of being the Investment Manager of ASI; by ASCM, by virtue of being the sole general partner of ASIP; and by ASI and ASIP by virtue of their former direct beneficial ownership of Shares. By virtue of the relationships described above, each of Richard Grossman and Orin Hirschman may have been formerly deemed to possess indirect beneficial ownership of the Shares held by each entity. The directors of ASI are F.M.C. Limited and S.C.S. Limited, which are subsidiaries of Insinger Trust (BVI) Limited, all of which are British Virgin

- 10 -



# FORM SC 13D/A

## ISONICS CORP - ISON

Exhibit:

**Filed: February 17, 2004 (period: )**

An amendment to a SC 13D filing

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## SCHEDULE 13D

**Under the Securities Exchange Act of 1934**

**(Amendment No. 3)\***

# ISONICS CORPORATION

(Name of Issuer)

**COMMON STOCK, NO PAR VALUE**

(Title of Class of Securities)

**464895101**

(CUSIP Number)

**Richard Grossman**
**259 Oakford Street**
**West Hempstead, New York 11552**
**(516) 539-1993**

(Name, Address and Telephone Number of Person
Authorized to Receive Notices and Communications)

**November 14, 2003**

(Date of Event which Requires Filing of this Statement)

Check the following box if a fee is being paid with this statement [  ].  (A fee is not required only if the filing person:  (1) has a previous statement on file reporting beneficial ownership of more than five percent of the class of securities described in Item 1; and (2) has filed no amendment subsequent thereto reporting beneficial ownership of five percent or less of such class.) (See Rule 13d-7).

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box.  ☐

> **Note**: Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See §240.13d-7 for other parties to whom copies are to be sent.

> \* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

Source: ISONICS CORP, SC 13D/A, February 17, 2004

**Item 1.    Security and Issuer**

This Statement on Schedule 13D relates to the shares of Common Stock, no par value per share (the "Shares"), of Isonics Corporation, a California corporation (the "Company"), into which shares of Series A Convertible Preferred Stock are convertible. The principal executive offices of the Company are located at 5906 McIntyre Street, Golden, Colorado 80403.

**Item 2.    Identity and Background**

(a) This Statement is filed by Richard Grossman and Orin Hirschman by virtue of their direct beneficial ownership of shares and as the owner of each of Adam Smith Capital Management LLC ("ASCM") and Diamond Capital Management Inc. ("DCM"); by DCM by virtue of being the Investment Manager of Adam Smith Investments, Ltd., a British Virgin Islands corporation ("ASI"); by ASCM, by virtue of being the sole general partner of Adam Smith Investment Partners, L.P. ("ASIP"); by ASIP by virtue of its direct beneficial ownership of Shares, and by Richard and Ana Grossman JTWROS by virtue of their direct beneficial ownership of Shares. By virtue of the relationships described above, each of Richard Grossman and Orin Hirschman may be deemed to possess indirect beneficial ownership of the Shares held by each entity.

(b) The principal executive offices of ASCM, ASIP, DCM are c/o Richard Grossman, 259 Oakford Street, West Hempstead, NY 11552 and c/o Orin Hirschman, 6006 Berkeley Ave., Baltimore, MD 21209. The business address of Richard Grossman and Ana Grossman JTWROS is 259 Oakford Street, West Hempstead, NY 11552. The business address of Orin Hirschman is 6006 Berkeley Ave., Baltimore, MD 21209. The address of the principal executive offices of ASI is c/o Insinger Fund Administration (BVI) Limited, Tropic Isle Building, P.O. Box 438, Road Town, Tortola, British Virgin Islands.

(c) ASCM and DCM provide investment advisory services. ASI and ASIP are investment vehicles. Each of Richard Grossman and Orin Hirschman's principal business is acting as an officer and/or director of ASCM and DCM.

(d) None of the Reporting Persons has been convicted in a criminal proceeding in the past five years (excluding traffic violations or similar misdemeanors).

(e) During the past five years, none of the Reporting Persons was a party to a civil proceeding of a judicial or administrative body of competent jurisdiction as a result of which such person was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws.

(f) ASCM is a New York limited liability company. DCM is a New York corporation. ASI is a British Virgin Islands corporation. ASIP is a New York limited partnership. Richard Grossman, Ana Grossman, and Orin Hirschman are citizens of the United States.

9

Source: ISONICS CORP, SC 13D/A, February 17, 2004



**EDGAR** Online

| Regulation AB | File Envelopes & Jackets | SR22 Insurance Quotes | NAIC Reporting Software |
| --- | --- | --- | --- |
| CPA Firm Provides Guidance, Clarity and Reporting for ABS Organizations | Filing envelopes & project folders. Free next-day delivery over $49! | Compare Quotes From Top Companies on SR22 Insurance - Save 75%. | WINGS integrates annual statement & state filing forms preparation |
| www.TidwellDeWitt.com | OfficeWorld.com | www.sr22insurancequotes.com | www.eagletm.com |

Ads by Google

**Free White Papers on SEC Filings and XBRL**
**Download at EDGAR Online.**

Home | Filings | Profile | Financials | Ownership | Global | IPO's | Transcripts

People Search | My Searches and Alerts | My Folders

SEARCH   Filings   Go   [ Expanded Search ]

| CA Refinance Loans | Tons Of Prizes Right Now | Dba Filing | SEC Guidelines |
| --- | --- | --- | --- |
| Get Approved Fast Regardless of Your Credit - Free Incentives! | Take Our Short Survey And See What You've Won! Takes Only 30 Sec. | Dba Filing deals Find Dba Filing | Act now on expanded disclosure; get free guide to critical action steps |
| www.Hassle-FreeRefinance.com | www.popularq.net/WinStuff | DealCaptain.com | www.pearlmeyer.com/SEC |

Ads by Google

**WI FI TV INC**
Form:10KSB  Filing Date:1/15/2002  Jump to :  -- Use Sections To Navigate Through The Document --

Format : PDF    File  Back

```
SIGNATURES


In accordance with Section 13 or 15(d) of the Exchange Act, the
Registrant caused this report to be signed on its behalf by the undersigned,
thereunto duly authorized.


Dated: January 14, 2002          KANAKARIS WIRELESS



By: /S/ ALEX F. KANAKARIS


Alex F. Kanakaris, Chairman of the
Board, President and Chief Executive
Officer


In accordance with the Exchange Act, this report has been signed by the
following persons on behalf of the Registrant and in the capacities and on the
dates indicated.



SIGNATURE                     TITLE                       DATE
---------                     -----                       ----
/S/ ALEX F. KANAKARIS         Chairman of the Board,      January 14, 2002
-----------------------       President, Chief Executive
Alex F. Kanakaris             Officer, and Director
(Principal Executive
Officer)


/S/ BRANCH LOTSPEICH          Vice Chairman of the Board, January 14, 2002
-----------------------       Vice President, Secretary
Branch Lotspeich              and Director


/S/ DAVID THOMAS SHOMAKER      Acting Chief Financial     January 14, 2002
-----------------------       Officer (Principal Financial
David Thomas Shomaker          Officer)


/S/ JOHN ROBERT MCKAY          Webmaster and Director     January 14, 2002
-----------------------
John Robert McKay


Director                      January 14, 2002
-----------------------
Patrick McKenna


/S/ VAN HOLSTER                  Director                 January 14, 2002
-----------------------
Van Holster


Director                      January 14, 2002
-----------------------
Jeff Hall


/S/ ROSE FORBES                  Director                 January 14, 2002
-----------------------
Rose Forbes


/S/ CAROLINE MICHAELS            Director                 January 14, 2002
```



```
    ------------------------------
    Caroline Michaels


    /S/ CHARLES MOORE            Director                January 14, 2002
    ------------------------------
    Charles Moore


    EXHIBITS
    EXHIBIT NO.                          DESCRIPTION
    -----------                          -----------


    10.76.........................Letter dated December 13, 2001 from Alliance Equities, Inc.
    to the Registrant regarding Extension of Line of Credit


    10.77.........................Securities Purchase Agreement dated as of January 9, 2002 by
    and between Bank Insinger de Beaufort Safe Custody NV and
    the Registrant


    10.78.........................Convertible Debenture due January 9, 2003 made by the
    Registrant in favor of Bank Insinger de Beaufort Safe Custody NV


    10.79.........................Registration Rights Agreement dated as of January 9, 2002
    by and between the Registrant and Bank Insinger de Beaufort
    Safe Custody NV


    10.80.........................Stock Purchase Warrant dated as of January 9, 2002 issued by
    the Registrant to Bank Insinger de Beaufort Safe Custody NV


    10.81.........................Security Agreement dated as of January 9, 2002 by and between
    the Registrant and Bank Insinger de Beaufort Safe Custody NV


    10.82.........................Letter Agreement dated January 9, 2002 by and between the
    Registrant and Bank Insinger de Beaufort Safe Custody NV,
    Bristol Investment Fund, Ltd., Bristol Capital, LLC and
    Paul Kessler


    23.1..........................Consent of Weinberg & Company, P.A., independent
    certified public accountants
```

Ads by Google

## Financial Compliance

Solutions for Basel II, Patriot Act Anti
Money Laundering Compliance

www.metricstream.com

Advertise on this site

© 1995-2006 EDGAR Online, Inc. All rights reserved.
Terms of Use | Privacy Statement

**EXHIBIT 51.**

**Insinger Form SEC 144**

**Bank Insinger De Beaufort**

# Bank Insinger De Beaufort · 144 · Wescorp Energy Inc · On 1/28/04

**Filed On 1/28/04 3:57pm ET · SEC File 0-30095 ·
Accession Number 1019687-4-162**

| As Of Docs:Pgs | Filer Issuer | Filing Agent | As/For/On |
|---|---|---|---|
| 1/28/04 1:4 | Bank Insinger De Beaufort Wescorp Energy Inc | **144** Publicease Inc/FA | Other |

### Notice of Proposed Sale of Securities · Form 144
### Filing Table of Contents

| Document/Exhibit | Pages | Size | Description |
|---|---|---|---|
| 1: 144 | 4± | 23K | Notice of Proposed Sale of Securities |

```
                  UNITED STATES
         SECURITIES AND EXCHANGE COMMISSION
               WASHINGTON, DC 20549

                    FORM 144

       NOTICE OF PROPOSED SALE OF SECURITIES
PURSUANT TO RULE 144 UNDER THE SECURITIES ACT OF 1933

ATTENTION: TRANSMIT FOR FILING 3 COPIES OF THIS FORM CONCURRENTLY
                   WITH EITHER
      PLACING AN ORDER WITH A BROKER TO EXECUTE A SALE OR
                  EXECUTING A SALE
          DIRECTLY WITH A MARKET MAKER.
```

[Enlarge/Download Table]

```
--------------------------------------------------------------------------------
              --------------------------------------------
1(a) NAME OF ISSUER (Please type or print)        (b) IRS IDENT. NO.    (c)
                            S.E.C. FILE NO.
     CTI Diversified Holdings, Inc.                    33-0921967
                            000-30095
--------------------------------------------------------------------------------
              --------------------------------------------
(d) ADDRESS OF ISSUER         STREET     CITY         STATE        ZIP
                  CODE          (e) TELEPHONE NO.
                    ------------------------
     8709-50 Street                        Edmonton   Alberta      CANADA
                  T6E 5H4      Area Code    Number
                            604     218-7400
```

```
---------------------------------------------------------------------------
             --------------------------------------------------
 2(a)  NAME OF PERSON FOR WHOSE ACCOUNT THE    (b)  I.R.S. NO.    (c)  RELATIONSHIP    (d)
                   ADDRESS   STREET   CITY   STATE   ZIP CODE
       SECURITIES ARE TO BE SOLD                                        TO ISSUER
          Bank Insinger de Beaufort              n/a                  Shareholder
                Herengracht 537, 1017 BV Amsterdam,

                       The Netherlands
---------------------------------------------------------------------------
             --------------------------------------------------
  INSTRUCTION: The person filing this notice should contact the issuer to obtain the I.R.S.
                       Identification Number
                     and the SEC File Number
---------------------------------------------------------------------------
             --------------------------------------------------
                      Name and Address of        SEC USE
      Title of the Class    Each Broker Through      ONLY
  of Securities To   whom the Securities Are   ---------  Number of Shares or
                               Aggregate Market
  Be Sold (See instr.   To Be Offered or Each     Broker-    Other Units To Be
                               Value
     3(a)           Market Maker who is    Dealer       Sold        (See
                       instr. 3(d))
                   Acquiring the Securities    File    (See instr. 3(c))
                       (See instr. 3(b))     Number
---------------------------------------------------------------------------
             --------------------------------------------------
     Common Stock       HMS Securities, Inc.
                        160 Summit Ave.
       Montvale, NJ 07645                          12,091
                        $11,607.36
---------------------------------------------------------------------------
             --------------------------------------------------


---------------------------------------------------------------------------
             --------------------------------------------------


---------------------------------------------------------------------------
             --------------------------------------------------
                       Number of
                   Approximate Date of     Name of Each Securities
     Shares or          Sale                     Exchange
     Other Units   (See instr. 3(f))        (See instr. 3(g))
     Outstanding   (See instr.      (MO. DAY  YR.)
                       3(e))
---------------------------------------------------------------------------
                         ---
      22,817,121        01/29/04              OTC-BB
---------------------------------------------------------------------------
                         ---

---------------------------------------------------------------------------
                         ---

---------------------------------------------------------------------------
                         ---
```

**INSTRUCTIONS:**

1.  (a) Name of issuer.
    (b) Issuer's IRS Identification Number.
    (c) Issuer's SEC file number, if any.
    (d) Issuer's address, including zip code.
    (e) Issuer's telephone number, including area code.

2.  (a) Name of person for whose account the securities are to be sold.
    (b) Such person's or I.R.S. Identification number, if such a person is an entity.
    (c) Such person's relationship to the issuer (e.g., officer, director, 10 percent stockholder,
    or member of immediate family of any of the foregoing).
    (d) Such person's address, including zip code.

3.  (a) Title of the class of securities to be sold.
    (b) Name and address of each broker through whom the securities are intended to be sold.

    (c) Number of shares or other units to be sold (if debt securities, give the aggregate face amount).
    (d) Aggregate market value of the securities to be sold as of a specified date within 10 days prior to the filing of this notice.
    (e) Number of shares or other units of the class outstanding, or if debt securities the face amount thereof outstanding, as shown by the most recent report or statement published by the issuer.
    (f) Approximate date on which the securities are to be sold.
    (g) Name of each securities exchange, if any, on which the securities are intended to be sold.

2

## TABLE I--SECURITIES TO BE SOLD

Furnish the following information with respect to the acquisition of the
securities to be sold and with respect to the payment of all or any part of the
purchase price or other consideration therefor:

[Enlarge/Download Table]

| Title of the Class | Date You Acquired | Nature of Acquisition Date of Transaction | Nature of Payment | Name of Person From Whom Acquired (If Gift, Also Give Date Donor Acquired) | Amount of Securities Acquired |
|---|---|---|---|---|---|
| Common Stock | 4/16/02 | Purchase 4/16/02 | Cash | Issuer | 12,091 |

INSTRUCTIONS:
1. If the securities were purchased and full payment therefore was not made in cash at the time of purchase, explain in the table or in a note thereto the nature of the consideration given. If the consideration consisted of any note or other obligation, or if payment was made in installments describe the arrangement and state when the note or other obligation was discharged in full or the last installment paid.
2. If within two years after the acquisition of the securities the person for whose account they are to be sold had any short positions, put or other option to dispose of securities referred to in paragraph (d)(3) of Rule 144, furnish full information with respect thereto.

## TABLE II--SECURITIES SOLD DURING THE PAST THREE MONTHS

Furnish The Following Information as to All Securities of The Issuer Sold During
The Past Three Months By The Person For Whose Account The Securities Are To Be
Sold.

| Name and Address of Seller | Amount of Securities Sold | Title of Securities Sold Gross Proceeds | Date of Sale |
|---|---|---|---|

```
--------------------------------------------------------------------------------
                    ---------------------------------------
                              REMARKS:

                            INSTRUCTIONS:
        See the definition of "person" in paragraph (a) of Rule 144. Information is to
        be given not only as to the person for whose account the securities are to be
        sold but also as to all other persons included in that definition. In addition,
        information shall be given as to sales by all persons whose sales are required
        by paragraph (e) of Rule 144 to be aggregated with sales for the account of the
                           person filing this notice.

                             January 28, 2004
                    ---------------------------------------
                            (DATE OF NOTICE)
                              ATTENTION:
        The person for whose account the securities to which this notice relates are to
        be sold hereby represents by signing this notice that he does not know any
           material adverse information in regard to the current and prospective
        operations of the issuer of the securities to be sold which has not been
                            publicly disclosed.
                                        /s/ C.C. Broers Verduyn
                    ---------------------------------------
                             (SIGNATURE)

        The notice shall be signed by the persons for whose account the securities are
                      to be sold. At least one copy
         of the notice shall be manually signed. Any copies not manually signed shall
                      bear typed or printed signatures.

        ATTENTION: INTERNATIONAL MISSTATEMENTS OR OMISSION OF FACTS CONSTITUTE FEDERAL
                      CRIMINAL VIOLATIONS (SEE 18 U.S.C. 1001).
```

**Dates Referenced Herein  *and*  Documents Incorporated By Reference**

|  | | ***Referenced-On Page*** | | |
|---|---|---|---|---|
| ***This 144 Filing*** | ***Date*** | ***First*** | ***Last*** | ***Other Filings*** |
| Filed On / Filed As Of | ▼ 1/28/04 | 2 | | |

Top                                                         List All Filings

*Alternative Formats:*   Rich Text / Word (.rtf),  Text (.txt),  EDGAR (.sgml),
XML (.xml), et al.

*Copyright © 2007 **Fran Finnegan & Company**  All Rights Reserved.*
*www.secinfo*

**EXHIBIT 52.**

**Insinger US Patriot Act 51006**

## APPENDIX A TO SUBPART 1 OF PART 103 –
## CERTIFICATION REGARDING CORRESPONDENT ACCOUNTS
## FOR FOREIGN BANKS

(OMB Control Number1505-0184)

*The information contained in this Certification is sought pursuant to Sections 5318(j) and 5318(k) of Title 31 of the United States Code, as added by sections 313 and 319 (b) of the USA PATRIOT Act of 2001 (Public law 107-56).*

This Certification should be completed by any **foreign bank** that maintains a **correspondent account** with any U.S. bank or U.S. broker-dealer in securities (a **covered financial institution** as defined in 31 C.F.R.103.1755 (f). An entity that is not a foreign bank is not required to complete this Certification.

A **foreign bank** is a bank organized under foreign law and located outside of the United States (see definition at 31 C.F.R. 103.11(o)). A **bank** includes offices, branches, and agencies of commercial banks or trust companies, private banks, national banks, thrift institutions, credit unions, and other organizations chartered under banking laws and supervised by banking supervisors of any state (see definition at 31 C.F.R.103.11(c)) [1]

A **Correspondent Account** for a foreign bank is any account to receive deposits from, make payments or other disbursements on behalf of a foreign bank, or handle other financial transactions related to the foreign bank.

*Special instruction for foreign branches of U.S. banks*: A branch or office of a U.S. bank outside the United States is a foreign bank. Such a branch or office is not required to complete this certification with respect to Correspondent Accounts with U.S. branches and offices of the same U.S. bank.

*Special instruction for covering multiple branches on a single Certification* : A foreign bank may complete one Certification for its branches and offices outside the United States. The certification must list all of the branches and offices that are covered and must include the information required in Part C for **each** branch or office that maintains a Correspondent Account with a Covered Financial Institution. Use attachment sheets as necessary.

The undersigned financial institution, ***Bank Insinger de Beaufort N.V.*** hereby certifies as follows:

**B.** **Correspondent Accounts Covered by this Certification** : Check **one** box.

&#9746; This Certification applies to **all** accounts established for Foreign Bank by Covered Financial Institutions.

&#9744; This Certification applies to Correspondent Accounts established by _____ name of Covered Financial Institutions(s)) for Foreign bank.

---

[1] A « foreign bank » does not include any foreign central bank or monetary authority that functions as a central bank, or any international financial institution, or regional development bank formed by treaty or international agreement.

2

**C.    Physical Presence/Regulated Affiliate Status**: Check **one** box and complete the blanks.

☒    Foreign Bank maintains a **physical presence** in any country. That means:
- Foreign Bank has a place of business at the following street address: **Herengracht 537, 1017 BV Amsterdam,** where Foreign Bank employs one or more individuals on a full-time basis and maintains operating records related to its banking activities. Foreign Bank has also a place of business at the following street address : **Parklaan 60, 5613 BH Eindhoven and Toernooiveld 3, 2511 CX Den Haag,** where Foreign Bank employs one or more individuals on a full-time basis and maintains operating records related to its banking activities.
- The above addresses are in **The Netherlands** (insert country), where Foreign Bank is authorized to conduct banking activities.
- Foreign Bank is subject to inspection by **De Nederlandsche Bank N.V.**, (insert Banking Authority), the banking authority that licensed Foreign Bank to conduct banking activities.

☐    Foreign Bank does not have a physical presence in any country, but Foreign Bank is a **regulated affiliate**. That means:
- Foreign Bank is an affiliate of a depository institution, credit union, or a foreign bank that maintains a physical presence at the following street address : _____, where it employs one or more persons on a full-time basis and maintains operating records related to its banking activities.
- The above address is in _____ (insert country), where the depository institution, credit union, or a foreign bank is authorized to conduct banking activities.
- Foreign Bank is subject to supervision by _____, (insert Banking Authority), the same banking authority that regulates the depository institution, credit union, or foreign bank.

☐    Foreign Bank does **not** have a physical presence in a country and is **not** a regulated affiliate.

**D. Indirect Use of Correspondent Accounts** : Check box to certify.

☒    No Correspondent Account maintained by a Covered Financial Institution may be used to indirectly provide banking services to certain foreign banks. Foreign Bank hereby certifies that it does **not** use any Correspondent Account with a Covered Financial Institution to indirectly provide banking services to any foreign bank that does not maintain a physical presence in any country and that is not a regulated affiliate.

**E. Ownership Information** : Check box 1 or 2 below, **if applicable**.

☐    1. **Form FR Y-7 is on file**. Foreign bank has filed with the Federal Reserve Board  a current Form FR Y-7 and has disclosed its ownership information on Item 4 of Form FR Y-7.

3

☐    2. **Foreign Bank's shares are publicly traded**. Publicly traded means that the shares are traded on an exchange or an organized over-the-counter market that is regulated by a foreign securities authority as defined in section 3(a)(50) of the Securities Exchange Act or 1934 (15 U.S.C.78c(a)(50)).

If **neither** box 1 or 2 of Part E is checked, complete item 3 below, **if applicable**.

☒    3. Foreign Bank has no **owner(s)** except as set forth below. For purposes of this Certification, **owner** means any person who, directly or indirectly, (a) owns, controls, or has power to vote 25 percent or more of any class of voting securities or other voting interests of Foreign Bank ; or (b) controls in any manner the election of a majority of the directors (or individuals exercising similar functions) of Foreign Banks. For purposes of this Certification, (i) **person** means any individual, bank, corporation, partnership, limited liability company or any other legal entity; (ii) **voting securities or other voting interests** means securities or other interests that entitle the holder to vote for or select directors (or indiduals exercising similar functions) ; and (iii) members of the same family [2] shall be considered one **person**.

| Name | Address |
|------|---------|
| **Insinger de Beaufort Holdings S.A.** | **64-66 Avenue Victor Hugo 3rd floor L-1570 Luxembourg Luxembourg** |

F.    **Process Agent** : complete the following.:

The following individual or entity : **CT Corporation System** is a resident of the United States at the following street address: **111 Eight Avenue New York  NY 10011, and** is authorized to accept service of legal process on behalf of Foreign Bank from the Secretary of the Treasury of the Attorney General of the United States pursuant to Section 5318 (k) if title 31, United States Code.

G.    **General**

Foreign Bank hereby agrees to notify in writing each Covered Financial Institution at which it maintains any Correspondent Account of any change in facts or circumstances reported in the Certification. Notification shall be given within 30 calendar days of such change.

---

[2]    The same family means parents, spouses, children, siblings, uncles, aunts, grandparents, grandchildren, first cousins, stepchidren, stepsiblings, parents in-in-law ans spouses of any of the foregoing. In determining the owernship interests of the same family, any voting interest of any family member shall be taken into account.

4

Foreign Bank understands that each Covered Financial Institution at which it maintains a Correspondent Account may provide a copy of the Certification to the Secretary of the Treasury and the Attorney General of the United States. Foreign Bank further understands that the statements contained in this Certification may be transmitted to one or more departments or agencies of the United States of America for the purpose of fulfilling such departments' and agencies' governmental functions.

We, **R. Mooij and P.G. Sieradzki**, certify that we have read and understand this Certification, that the statements made in this Certification are complete and correct, and that we are authorized to execute this Certification on behalf of Foreign bank.

**Bank Insinger de Beaufort N.V.**

R. Mooij
Director

P.G. Sieradzki
Director

Executed on this October 4, 2006

**Received and reviewed by :**
Name : _____
Title : _____
For : _____
[Name of Covered Financial Institution]
Date : _____

5

## Attachment to USA Patriot Act certifications
## Global listing of all related affiliates, subsidiairies and branches

| Entity Name and Relationship to Entity Indicated in Section A (i.e. affiliate, subsidiairy or branch) | Street Address | | | | Banking Authority |
| --- | --- | --- | --- | --- | --- |
| | Street | City | Postal Code | Country | |
| Bank Insinger de Beaufort N.V. (Italia) | Via dei Due Macelli, 48 | Rome | 00187 | Italy | De Nederlandsche Bank, Banca d'Italia and CONSOB |
| Bank Insinger de Beaufort N.V. (UK) | 131 Finsbury Pavement | London | EC2A 1NT | United Kingdom | De Nederlandsche Bank and Financial Services Authority |

**EXHIBITS MACKEY AND CNR**

**EXHIBIT 53.**

**Mackey Case**

130V9F

**Time of Request:** Wednesday, August 01, 2007  21:54:08 EST
**Client ID/Project Name:**
**Number of Lines:** 750
**Job Number:**    1823:40591327

Research Information

**Service:**    LEXSEE(R) Feature
**Print Request:** Current Document: 1
**Source:** Get by LEXSEE(R)
**Search Terms:** 391 Md. 117

**Send to:**  NN/L, 130V9F
         OLIVER HILSENRATH
         822 EASTBROOK CT
         DANVILLE, CA 94506-1206

LEXSEE 391 MD. 117

**JAMES J. MACKEY, et al. v. COMPASS MARKETING, INC.**

**Misc No. 4, September Term, 2005**

**COURT OF APPEALS OF MARYLAND**

***391 Md. 117; 892 A.2d 479; 2006 Md. LEXIS 67***

**February 9, 2006, Filed**

**SUBSEQUENT HISTORY:** US Supreme Court certiorari dismissed by Mackey v. Compass Mktg., 2006 U.S. LEXIS 5413 (U.S., Sept. 22, 2006)

**PRIOR HISTORY:**    [***1] Case No. 04cv1663-AMD. Certified Question from U.S. District Court for the District of Maryland. Andre M. Davis, JUDGE.

**DISPOSITION:**    CERTIFIED QUESTIONS OF LAW ANSWERED AS SET FORTH ABOVE. COSTS TO BE EQUALLY DIVIDED BY THE PARTIES.

**HEADNOTES**

   COURTS - PERSONAL JURISDICTION - LONG-ARM JURISDICTION - DUE PROCESS: Conspiracy theory of personal jurisdiction is consistent with the *Due Process Clause of the Fourteenth Amendment of the United States Constitution*.

   COURTS - PERSONAL JURISDICTION - LONG-ARM JURISDICTION - MARYLAND LONG-ARM STATUTE: Maryland law recognizes the conspiracy theory of personal jurisdiction as a basis for obtaining personal jurisdiction in Maryland over a co-conspirator, as one co-conspirator acts as the "agent" of another co-conspirator within the meaning of the Maryland long-arm statute when the requirements of the conspiracy theory of personal jurisdiction are met.

**COUNSEL:** ARGUED BY: Anthony Herman (Robert J. Lundman of Covington & Burling of Washington, D.C.).

ARGUED BY: Lawrence S. Robbins (Alison C. Barnes and Max Huffman of Robbins, Russell, Englert, Orseck

& Untereiner LLP of Washington, D.C.; Herbert Better and Sean Vitrano of Zuckerman Spaeder LLP of Baltimore, MD) all on brief. FOR APPELLANTS.

ARGUED BY: Jeffrey Jacobovitz (Schiff Hardin of Washington, D.C.; William M. Hannay and Michael J. Boffa of Schiff Hardin LLP of Chicago, Illinois).

ARGUED BY: Ellen S. Cooper, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, of Baltimore, MD) all on brief as amicus. FOR APPELLEE.

**JUDGES:** ARGUED BEFORE: Bell, C.J.; Raker, Wilner, Cathell, Harrell, Battaglia, and Greene, JJ. Opinion by Raker, J.

**OPINION BY:** Raker

**OPINION**

   [*121]  [**481]  Opinion by Raker, J.

   In this Certified Question case, pursuant to the Maryland Uniform Certification of Questions of Law Act, Maryland Code (1974, 2002 Repl. Vol., 2004 Cum. Supp.), *§§ 12-601 through 12-613 of the Courts and Judicial Proceedings Article*, and Maryland Rule 8-305, the United States District Court for the District of Maryland has certified the following questions of Maryland law:

   "(1) Whether Maryland recognizes the conspiracy theory of jurisdiction as a matter of state law?"

   "(2) If Maryland recognizes the conspiracy

391 Md. 117, *121; 892 A.2d 479, **481;
2006 Md. LEXIS 67, ***1

theory of jurisdiction, what elements must a plaintiff allege for a court to have jurisdiction over the out-of-state defendant under that theory?"

Our answer to the first question shall be YES, and we shall answer the second question by adopting the standard articulated in *Cawley v. Bloch, 544 F. Supp. 133 (D. Md. 1982).*

I.

We recite the facts as [***2] set out in the certification order.

[*122] "This action arises from an alleged conspiracy between Defendants to cut Plaintiff Compass Marketing Inc.'s brokerage commissions and otherwise interfere with Compass' business. Compass filed a complaint against defendants Schering-Plough Corp., Schering-Plough Health Care Products, Inc., Schering-Plough Health Care Products Sales Corp. (sometimes referred collectively as Schering-Plough), Wyeth (Wyeth was previously known [as] the Whitehall-Robins Healthcare Division of American Home Products Corporation, but is referred to herein as Wyeth), James J. Mackey, and Samuel Severino.

"Plaintiff's complaint was filed in May 2004 in the U.S. District Court for the District of Maryland. Schering-Plough and Wyeth answered denying liability. [**482] Defendants Severino and Mackey each moved to dismiss the Complaint against them claiming, among other grounds, lack of jurisdiction over them personally under the Maryland long arm statute. On March 25, 2005, this Court granted the motion in part, with leave for Plaintiff to file an amended complaint, but denied the motion without prejudice on the issue of personal jurisdiction, deciding to certify the issue of [***3] whether Maryland recognizes the conspiracy theory of jurisdiction as a matter of state law to the Maryland Court of Appeals.

"The allegations stated below are taken from plaintiff's First Amended Complaint. At this preliminary stage, this Court has not made any findings of fact regarding the alleged conspiracy or any other facts set forth in the First Amended Complaint. Defendants Schering-Plough and Wyeth deny the existence of any conspiracy or liability and deny many of the specific allegations set forth below, and defendants Mackey and Severino have not answered the complaint because they contest this Court's jurisdiction over them.

"Schering-Plough and Wyeth are in the business of manufacturing and distributing pharmaceutical and other consumer health care products in the United States and throughout the world. Schering-Plough and Wyeth do not dispute that they are each subject to jurisdiction in Maryland. [*123] Compass is a Maryland based broker in the business of marketing and brokering consumer health care products and other products. Some but not all of Schering-Plough and Wyeth goods brokered by Compass are delivered by those companies to customers in Maryland. Sam Severino was, [***4] at the time, Director, Special Markets, of what is now Wyeth; James Mackey was and is Senior Vice President of Sales of Schering-Plough. At the time of relevant events, and for several years previously, Compass brokered consumer health care products for both Schering-Plough and Wyeth pursuant to separate agreements.

"In January 2001, Severino met with Compass in Maryland to negotiate a cut in the brokerage commission paid by Wyeth to Compass, but upon learning that Schering-Plough was paying Compass an even higher brokerage fee, Severino decided not to cut Compass' brokerage fee at that time. Shortly thereafter, Severino and Mackey communicated concerning cutting Compass' brokerage commissions. Mackey and Severino were long-time

friends and/or business colleagues, and just prior to his employment at Schering-Plough, Mackey worked at Wyeth and was Severino's superior. Mackey told Severino to meet with Thomas Moeller, Vice President of Sales at Schering-Plough responsible for the division which included Compass, to discuss jointly cutting the brokerage fees that Wyeth and Schering-Plough were paying to Compass; and that Mackey told Moeller to meet with Severino, to discuss jointly cutting [***5] the brokerage fees that Wyeth and Schering-Plough were paying to Compass. Sometime prior to March 30, 2001, Severino and Moeller met at a trade show, held at a location other than in Maryland, and reached an agreement for Wyeth and Schering-Plough to jointly cut the brokerage fees that Wyeth and Schering-Plough were paying to Compass.

"On March 30, 2001, Compass received a telephone call from Peggy Smith of Schering-Plough, informing Compass that its commissions from Schering-Plough were being cut to four percent for Compass' largest account only. Thereafter, Compass received a [**483] letter from Schering-Plough, dated [*124] April 5, 2001, confirming that Compass' commissions from Schering-Plough were cut to four percent, effective April 2, 2001, not only for Compass' largest account, but for all of Compass' business (excluding new customers for the first 6 months). On or about April 2, 2001, Compass received a letter from Wyeth, signed by Severino and dated March 30, 2001, informing Compass that its commissions from Wyeth were being cut to three percent for its largest account, effective May 1, 2001 (Compass' commissions on other existing Wyeth's [sic] accounts would be five percent).

"Compass [***6] sought to have Schering-Plough not put the commission cuts into effect, but was unsuccessful. The cuts went into effect in June and July 2001, when Compass received in Maryland the first reduced commission payments from Wyeth and Schering-Plough respectively."

II.

Appellants Mackey and Severino argue before this Court that Maryland law does not recognize the conspiracy theory of jurisdiction because it is inconsistent with the plain language of the Maryland "long-arm" statute, Md. Code (1974, 2002 Repl. Vol., 2005 Cum. Supp.), *§ 6-103(b) of the Courts and Judicial Proceedings Article.* [1] They argue further that the conspiracy theory violates the *Due Process Clause of the Fourteenth Amendment to the United States Constitution* by not satisfying the minimum contacts test required by *Int'l Shoe Co. v. Washington, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945),* and its progeny because it permits the contacts of one person with the forum state to serve as the contacts of another person for purposes of the minimum contacts test.

> 1    Unless indicated otherwise, all subsequent statutory references herein shall be to Md. Code (1973, 2002 Repl. Vol., 2005 Cum. Supp.), Courts and Judicial Proceedings Article.

[***7] Appellee Compass Marketing urges this Court to recognize the conspiracy theory. In response to appellants' arguments, appellee notes that the majority of jurisdictions that have considered this issue have recognized the conspiracy theory of [*125] jurisdiction. Appellee recommends that we adopt the standard set out in *Cawley v. Bloch, 544 F. Supp. 133 (D. Md. 1982).* Appellee contends that *Cawley's* requirement that it be reasonable for the co-conspirators to expect that their contemplated conspiracy will lead to consequences in a particular forum gives the co-conspirators fair warning sufficient to satisfy due process concerns that they could be subject to the forum's jurisdiction because of acts done in furtherance of the conspiracy.

III.

The question of whether Maryland recognizes the conspiracy theory of jurisdiction as a matter of state law presents an issue of first impression for this Court. It is

clear today that physical presence within a state is not a necessary prerequisite to the proper assertion of personal jurisdiction and that under most states' long-arm statutes, certain acts and effects of those acts may be the basis for a court to exercise jurisdiction [***8] of a nonresident as well as a person who has not physically entered within the territorial borders of the state.

Courts have drawn routinely from the substantive law of agency to justify the exercise of personal jurisdiction over nonresident defendants. Imputation, or attribution, of jurisdictional contacts is not a new notion. It is long-established that personal jurisdiction may be exercised [**484] over a nonresident defendant on the basis of the actions of the nonresident defendant's agent. Maryland's long-arm statute explicitly grants jurisdiction over a principal based on acts performed through an agent. See *§ 6-103(b)* (providing for exercise of personal jurisdiction over someone who performs acts enumerated in statute personally or "by an agent"). [2] Since the [*126] inception of the *International Shoe* line of jurisprudence, the Supreme Court has not expressed any doubt that the acts of corporate agents may be attributed to a corporation for purposes of determining whether personal jurisdiction is proper over the principal. *See Int'l Shoe, 326 U.S. at 316-19, 66 S. Ct. at 158-60* (holding that, because "the corporate personality is a fiction," whether a corporation's [***9] contacts with a forum are sufficient to subject it to suit in that forum is determined by reference to the "activities carried on its behalf by those who are authorized to act for it").

   2   The Maryland Long-Arm Statute, Md. Code (1974, 2002 Repl. Vol., 2005 Cum. Supp.), *§ 6-103 of the Courts and Judicial Proceedings Article*, provides as follows:

    "(a) If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.

    (b) A court may exercise personal jurisdiction over a person, who directly or by an agent:

    (1) Transacts any business or performs any character of work or service in the State;

    (2) Contracts to supply goods, food, services, or manufactured products in the State;

    (3) Causes tortious injury in the State by an act or omission in the State;

    (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

    (5) Has an interest in, uses, or possesses real property in the State; or

    (6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

    (c)(1)(i) In this subsection the following terms have the meanings indicated.

    (ii) 'Computer information' has the meaning stated in *§ 22-102 of the Commercial Law Article.*(iii) 'Computer program' has the meaning stated in *§ 22-102 of the Commercial Law Article.*(2) The provisions of this section apply to computer information and computer programs in the same manner as they apply to goods and services."

Subsequent references to "the long-arm statute" shall refer to this section.

391 Md. 117, *126; 892 A.2d 479, **484;
2006 Md. LEXIS 67, ***9

[***10] Analogous to the agency concept of jurisdiction is the conspiracy theory of jurisdiction. Under this theory, an out-of-state party involved in a conspiracy who would lack sufficient, personal, "minimum contacts" with the forum state if [*127] only the party's individual conduct were considered nevertheless may be subject to suit in the forum jurisdiction based upon a co-conspirator's contacts with the forum state. The basic premise of the conspiracy theory of personal jurisdiction is that certain acts of one co-conspirator that are done in furtherance of a conspiracy may be considered to be the acts of another co-conspirator for purposes of determining whether a forum state may exercise personal jurisdiction over the other co-conspirator. Put differently, the conspiracy theory permits certain actions done in furtherance of a conspiracy by one co-conspirator to be attributed to other co-conspirators for jurisdictional purposes.

Courts around the country have utilized conspiracy concepts to establish personal jurisdiction. *See, e.g., Leasco Processing Equip. Corp. v. Maxwell, 468 F.2d 1326* [**485] *(2d Cir. 1972).* [3] [*128] Courts adopting the conspiracy theory of personal jurisdiction have [***11] recognized that this use of the fact of a conspiracy to attribute the contacts of one co-conspirator to another co-conspirator for jurisdictional purposes is an extension of the principle that the acts of one civil co-conspirator are attributed to other co-conspirators for purposes of determining the civil liability of the participants in the conspiracy. *See, e.g., Textor v. Board of Regents, 711 F.2d 1387 at 1392* (noting that "the 'conspiracy theory' of personal jurisdiction is based on the 'time honored notion that the acts of [a] conspirator in furtherance of the conspiracy may be attributed to the other members of the conspiracy.'" (quoting *Gemini Enterprises, Inc. v. WFMY Television Corp., 470 F. Supp. 559 at 564*) (alterations in original)).

3    The highest courts of the states of Delaware, Florida, Minnesota, Tennessee, and South Carolina have recognized the conspiracy theory of jurisdiction. *See Chenault v. Walker, 36 S.W.3d 45 (Tenn. 2001); Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd., 752 So. 2d 582 (Fla. 2000); Hammond v. Butler, Means, Evins & Brown, 300 S.C. 458, 388 S.E.2d 796 (S.C. 1990); Istituto Bancario Italiano SpA v. Hunter Eng'g Co., 449 A.2d 210 (Del. 1982); Hunt v. Nevada State Bank, 285 Minn. 77, 172 N.W.2d 292 (Minn.*

*1969).* The Texas Supreme Court has rejected the conspiracy theory. *See Nat'l Indus. Sand Ass'n v. Gibson, 897 S.W.2d 769, 38 Tex. Sup. Ct. J. 541 (Tex. 1995).*

Intermediate state appellate courts in Illinois, New Mexico, Georgia, and New York have recognized the conspiracy theory. *See Santa Fe Technologies, Inc. v. Argus Networks, Inc., 2002 NMCA 30, 131 N.M. 772, 42 P.3d 1221 (N.M. Ct. App. 2002); Cameron v. Owens-Corning Fiberglas Corp., 296 Ill. App. 3d 978, 695 N.E.2d 572, 231 Ill. Dec. 55 (Ill. App. Ct. 1998); Rudo v. Stubbs, 221 Ga. App. 702, 472 S.E.2d 515 (Ga. Ct. App. 1996); Reeves v. Phillips, 54 A.D.2d 854, 388 N.Y.S.2d 294 (1976).* Intermediate state appellate courts in California and Washington have rejected the conspiracy theory. *See Hewitt v. Hewitt, 78 Wn. App. 447, 896 P.2d 1312 (Wash. Ct. App. 1995); Mansour v. Super. Ct. of Orange County, 38 Cal. App. 4th 1750, 46 Cal.Rptr.2d 191 (Cal. Ct. App. 1995).*

Many federal courts have recognized the conspiracy theory in various forms. *See, e.g., Textor v. Bd. of Regents, 711 F.2d 1387 (7th Cir. 1983); Remmes v. Int'l Flavors & Fragrances, Inc., 389 F. Supp. 2d 1080 (N.D. Iowa 2005); In re Vitamins Antitrust Litig., 270 F. Supp. 2d 15 (D.D.C. 2003); Gen. Motors Corp. v. Ignacio Lopez de Arriortua, 948 F. Supp. 656 (E.D. Mich. 1996); Cawley, 544 F. Supp. at 135; Vermont Castings, Inc. v. Evans Products Co., 510 F. Supp. 940 (D. Vt. 1981); Gemini Enterprises, Inc. v. WFMY Television Corp., 470 F. Supp. 559 (M.D.N.C 1979); McLaughlin v. Copeland, 435 F. Supp. 513 (D. Md. 1977).* Others have declined to adopt it, holding that it is inconsistent with due process. *See In re New Motor Vehicles Canadian Exp. Antitrust Litig., 307 F. Supp. 2d 145 (D. Me. 2004); Steinke v. Safeco Ins. Co. of Am., 270 F. Supp. 2d 1196 (D. Mont. 2003); Insolia v. Philip Morris, Inc., 31 F. Supp. 2d 660 (W.D. Wis. 1998); Karsten Mfg. Corp. v. U.S. Golf Ass'n, 728 F. Supp. 1429 (D. Ariz. 1990); Kipperman v. McCone, 422 F. Supp. 860 (N.D. Cal. 1976).*

[***12]    It is well established in Maryland law that a conspirator can be liable for the conduct of a co-conspirator. A civil conspiracy has been defined in

Maryland as "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Hoffman v. Stamper, 385 Md. 1, 24, 867 A.2d 276, 290 (2005)* (quoting *Green v. Wash. Sub. San. Comm'n, 259 Md. 206, 221, 269 A.2d 815, 824 (1970)).* The plaintiff must prove an unlawful agreement, the commission of an overt act in furtherance of the agreement, and that as a result, the plaintiff suffered actual injury. *Id. at 25, 867 A.2d at 290.* The unlawful agreement is not actionable by itself; rather, the "tort actually lies in the act causing the harm" to the plaintiff. *Id.* Thus, civil conspiracy is not "capable of independently sustaining an award of damages in the absence [*129] of other tortious injury to the plaintiff." *Id.* (internal citations and quotations omitted).

[**486] In the often cited case of *Cawley v. Bloch, 544 F. Supp. 133, 135,* [***13] *(D. Md. 1982),* the United States District Court for the District of Maryland discussed the conspiracy theory of jurisdiction. Judge Joseph H. Young explained that the conspiracy theory of jurisdiction is based on two principles: (1) that the acts of one co-conspirator are attributable to all co-conspirators, and (2) that the constitutional requirement of minimum contacts between non-resident defendants and the forum can be met if there is a substantial connection between the forum and a conspiracy entered into by such defendants. The court articulated the theory as follows:

"Under that doctrine, when

(1) two or more individuals conspire to do something

(2) that they could reasonably expect to lead to consequences in a particular forum, if

(3) one co-conspirator commits overt acts in furtherance of the conspiracy, and

(4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state, then those overt acts are attributable to the other co-conspirators,

who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum."

[***14] *Id. at 135.*

We shall recognize this version of the theory, based on the premise that one co-conspirator is acting as the agent of the others, and that those acts are acts of the other co-conspirator done 'by an agent' within the meaning of *§ 6-103(b)* of the Maryland long-arm statute.

We now turn to the issue posed by the first certified question: whether Maryland recognizes the conspiracy theory of jurisdiction. Determination of personal jurisdiction is a two-step process. First, the requirements under the long-arm statute must be satisfied, and second, the exercise of [*130] jurisdiction must comport with due process. Maryland has construed our long-arm statute to authorize the exercise of personal jurisdiction to the full extent allowable under the *Due Process Clause. See, e.g., Beyond v. Realtime, 388 Md. 1, 15, 878 A.2d 567, 576 (2005); Geelhoed v. Jensen, 277 Md. 220, 224, 352 A.2d 818, 821 (1976).* Thus, the evaluation becomes one of determining whether the defendant's actions satisfy the minimum contacts required by due process so that "maintenance of the suit does not offend traditional notions of fair play and substantial [***15] justice." *Int'l Shoe, 326 U.S. at 316, 66 S. Ct. at 154.* The Court must be assured that defendant's contacts with Maryland "are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490 (1980).*

Although this question is ultimately one of Maryland statutory law, its resolution requires us to first consider whether the conspiracy theory of personal jurisdiction is consistent with the *Due Process Clause.* This is so for two reasons. First, if the conspiracy theory were inconsistent with due process, that inconsistency would require us to reject the conspiracy theory as an interpretation of the long-arm statute. *See Nationsbank v. Stine, 379 Md. 76, 86, 839 A.2d 727, 733 (2003)* (in deciding between competing constructions of a statute, we prefer the construction that avoids raising a constitutional issue). Maryland courts, of course, would not exercise jurisdiction over a non-resident defendant if it were inconsistent with due process. Second, as noted

above, we interpret the long-arm statute in light of the intent of the [**487] General [***16] Assembly to extend personal jurisdiction to the limits permitted by the *Due Process Clause*.

A. Due Process and the Conspiracy Theory of Personal Jurisdiction

We conclude that the conspiracy theory of personal jurisdiction is consistent with the *Due Process Clause of the Fourteenth Amendment*. The central due process issue raised by the conspiracy theory is whether the relationship between [*131] co-conspirators specified by the conspiracy theory is sufficient to justify the attribution contemplated by the theory. The legal relationship of one party to another may affect the jurisdictional balance; under the attribution method, the legal relationship between two or more persons may be such that it is reasonable to *attribute* the jurisdictional contacts of one party to the other. The effect of attribution is that the contacts that permit jurisdiction over the first party may be used against the second, thereby establishing jurisdiction over that party also. Applied to the conspiracy theory of jurisdiction, the acts of a co-conspirator in furtherance of the conspiracy may be attributed to other co-conspirators if the requirements of the conspiracy theory are met. The attribution principle [***17] enables a court to exercise jurisdiction over nonresidents involved in a conspiracy when a co-conspirator performs jurisdictionally sufficient acts in furtherance of the conspiracy.

The use of contact attribution for purposes of establishing personal jurisdiction over nonresident defendants is well-established in the Supreme Court's minimum contacts due process jurisprudence. As discussed, supra, *International Shoe* itself established that attribution of the acts of an agent for personal jurisdiction purposes is consistent with due process. Likewise, courts applying the *International Shoe* standard have held that actions of a partner in the scope of the partnership's business may be attributed to a partnership. *See, e.g., Sher v. Johnson, 911 F.2d 1357, 1362 (9th Cir. 1990)* (holding that, because "for purposes of personal jurisdiction, the actions of an agent are attributable to the principal," the acts of a partner are treated as acts of the partnership for purposes of determining whether personal jurisdiction is proper over the partnership if the acts are treated as acts of the partnership under applicable state partnership law). Courts applying *International* [***18]

*Shoe* and its progeny have held also that the actions of a subsidiary corporation may be attributed to a parent corporation under some circumstances, even if it would not necessarily be appropriate to pierce the corporate veil between the parent and the subsidiary. *See, e.g., Gallagher v. Mazda Motor of Am., Inc., 781 F. Supp. 1079, 1085 [*132] (E.D. Pa. 1992)* (holding that the acts of a subsidiary may be attributed to a parent for jurisdictional purposes if the parent would have done these acts itself if the subsidiary did not exist); *Bulova Watch Co., Inc., v. K. Hattori & Co., Ltd., 508 F. Supp. 1322, 1342 (E.D.N.Y 1981)* (same).

Finally, in *World-Wide Volkswagen,* the Supreme Court addressed the issue of when the actions of distributors of a manufacturer's goods may be attributed to a manufacturer for jurisdictional purposes. In *World-Wide Volkswagen*, the defendant, World-Wide, was a regional distributor of Volkswagen automobiles, selling to dealerships in New York, New Jersey, and Connecticut that then sold the cars to residents of those states. *World-Wide Volkswagen, 444 U.S. at 298, 100 S. Ct. at 567*. Given that its products [***19] were not distributed to retailers who sold into Oklahoma, the forum at issue, World-Wide did not place its cars into the stream of commerce with the expectation that they would be purchased by Oklahoma consumers. *Id. at [**488] 297-98, 100 S. Ct. at 567*. Consequently, the Court concluded that World-Wide could not have reasonably anticipated facing a suit in Oklahoma based upon allegations that these automobiles were defective. *Id. at 296-97, 100 S. Ct. at 566-67* (rejecting this view because under it "every seller of chattels would in effect appoint the chattel his agent for service of process"). The *World-Wide Volkswagen* Court, however, held that a manufacturer could be subject to jurisdiction in a forum state if it "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id. at 298, 100 S. Ct. at 567*. Thus, the Court effectively held that the acts distributors take in distributing a manufacturer's products into a particular forum state may be attributed to the manufacturer for purposes of obtaining personal jurisdiction over the manufacturer in the state if the [***20] manufacturer placed its products into the stream of commerce with the expectation that they would eventually be purchased in the state.

We conclude that the conspiracy theory of jurisdiction does not violate due process. We find that the

relationship between co-conspirators contemplated by the conspiracy theory [*133] is similar to the relationship that the Supreme Court deemed sufficient in *World-Wide Volkswagen* to warrant attribution of the acts of a distributor of goods to the manufacturer of the goods. We further conclude that the relationship between co-conspirators contemplated by the conspiracy theory is different than the relationships that the Supreme Court has found insufficient for attribution.

In *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)*, Justice Brennan provided a helpful synthesis of the Supreme Court's due process personal jurisdiction jurisprudence. Justice Brennan explained that a central purpose behind the due process minimum contacts requirement of *International Shoe* is to ensure that "individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign. [***21] '" *Id. at 471-72, 105 S. Ct. at 2181-82* (quoting *Shaffer v. Heitner, 433 U.S. 186, 218, 97 S. Ct. 2569, 2587, 53 L. Ed. 2d 683 (1977)* (Stevens, J., concurring)). This "fair warning" requirement serves the further purpose of ensuring that potential defendants can with reasonable certainty predict the fora in which they may be forced to defend suits if they engage in certain types of conduct. *See id. at 472, 105 S. Ct. at 2182*. This in turn permits "'potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *Id.* (quoting *World-Wide Volkswagen, 444 U.S. at 297, 100 S. Ct. at 567*).

It was this due process concern that, without fair warning that a potential defendant may be subject to suit in a particular forum, the potential defendant would be unable to plan its activities so as to take into account the possibility of defending a suit in that forum that led the *World-Wide Volkswagen* Court to delineate the scope of the stream of commerce theory as it did. In *Burger King*, Justice Brennan explained that the fair warning requirement [***22] is satisfied if a defendant purposefully directs activities at the forum state and litigation arises out of those activities. *See id. at 472-73, 105 S. Ct. at 2182*. He then applied that principle to the Court's holding in [*134] *World-Wide Volkswagen*, noting that the fair warning requirement explains the Court's conclusion in *World-Wide Volkswagen* that a manufacturer must expect that its products will be distributed in a particular forum when it places them in

the stream of commerce in order to be subject to suits related to those products in that forum. *See id.* As the *World-Wide* [**489] *Volkswagen* Court noted, World-Wide's lack of fair warning that it may face suit in Oklahoma by selling cars to dealerships in the Northeast left it unable to "act to alleviate the risk of . . . litigation by procuring insurance, passing the expected costs on to customers, or . . . severing its connection with the State." *World-Wide Volkswagen, 444 U.S. at 297, 100 S. Ct. at 567*.

The relationship between co-conspirators required by the conspiracy theory ensures that a co-conspirator subjected to the personal jurisdiction of a forum state under the theory has fair warning that [***23] he or she could be subjected to suit in the forum state sufficient to satisfy the due process concerns about fair warning of the possibility of suit that motivated the *World-Wide Volkswagen* Court. According to the conspiracy theory, a co-conspirator can be subjected to the personal jurisdiction of a particular forum only if the co-conspirator had a reasonable expectation, at the time the co-conspirator agreed to participate in the conspiracy, that acts to be done in furtherance of the conspiracy by another co-conspirator would be sufficient to subject that other co-conspirator to personal jurisdiction in the forum. Civil co-conspirators can be held liable for the acts of other co-conspirators done in furtherance of their conspiracy. *See Hoffman v. Stamper, 385 Md. 1, 24-25, 867 A.2d 276, 290 (2005)*. Thus, a co-conspirator who agrees to participate in a conspiracy that the co-conspirator reasonably anticipated or could be said to have reasonably anticipated at the time of agreeing to enter it will result in acts done in furtherance of the conspiracy sufficient to subject another co-conspirator to the personal jurisdiction of a particular forum can also reasonably [***24] anticipate being subject to suit in that forum by entering into the conspiracy.

[*135] It is important to note that under the conspiracy theory, acts of one co-conspirator done in the course of the conspiracy that subject that co-conspirator to personal jurisdiction in a particular forum are attributed to another co-conspirator only if the other co-conspirator reasonably expects *at the time the other conspirator agreed to participate in the conspiracy* that such acts will be done and that such acts will subject the co-conspirator who performs them to the personal jurisdiction of the forum state. This requirement, that the reasonable expectation be present at the time the

co-conspirator agrees to the conspiracy, satisfies the *World-Wide Volkswagen* requirement that personal jurisdiction is proper over a person in a particular forum. If a person contemplating entering into a conspiracy wishes to avoid being subject to the personal jurisdiction of a particular forum based on the forum-related actions of another co-conspirator, that person can simply refrain from entering into the conspiracy, or can agree to enter into the conspiracy only if it is modified so that it does not contemplate [***25] actions directed at the forum the person wishes to avoid.

Because the conspiracy theory gives one subject to personal jurisdiction in a forum the ability to avoid in advance being subject to suit in the forum, it satisfies the fundamental due process requirement that a defendant can be involuntarily subjected to the personal jurisdiction of a forum only if the defendant "purposefully avails itself of the privilege of conducting activities in the forum state." *Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 1239-40, 2 L. Ed. 2d 1283 (1958)*; *see Burger King, 471 U.S. at 474, 105 S. Ct. at 2183* ("the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' with the forum state"). *World-Wide Volkswagen* recognized that if a defendant's activities are such that the [**490] defendant can reasonably anticipate being subject to suit in a forum by virtue of his or her intentional acts, the defendant has purposefully availed itself of privilege of conducting activities within the forum:

"When a corporation 'purposefully avails itself of the privilege of conducting activities within the forum State,' it has [***26] clear notice that it is subject to suit there, and can act to [*136] alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. Hence if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of

injury to its owner or to others."

*World-Wide Volkswagen, 444 U.S. at 297, 100 S. Ct. at 567* (citations omitted). The conspiracy theory satisfies the *World-Wide Volkswagen* fair warning requirement, and therefore, it also satisfies the purposeful availment requirement as well.

Our conclusion that the conspiracy theory is consistent with due process is reinforced by comparison of the relation between co-conspirators required under the theory with the situations in which the Court has held that a relation between two [***27] parties is insufficient to warrant attribution of the acts of one party to the other for purposes of obtaining personal jurisdiction over the other party. The Supreme Court has held consistently that a person cannot be subject to personal jurisdiction in a particular forum based on the unilateral forum-related activities of a third party. *See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416-17, 104 S. Ct. 1868, 1873, 80 L. Ed. 2d 404 (1984)* (holding that acceptance of a check from a third party drawn on a bank located in the forum state cannot be considered in determining whether the acceptor of the check can be subjected to the personal jurisdiction of the forum state because it is the "unilateral activity of a . . . third person"); *Kulko v. Super. Ct., 436 U.S. 84, 93-94, 98 S. Ct. 1690, 1697-98, 56 L. Ed. 2d. 132 (1978)* (holding that a forum state could not obtain personal jurisdiction over a parent in a custody action simply because the parent agreed to a visitation arrangement with the other parent and the other parent took the child to the forum state [*137] and initiated suit, as this would "arbitrarily subject one parent to suit [***28] in any State of the Union where the other parent chose to spend time while having custody of their offspring pursuant to a separation agreement"); *Hanson v. Denckla, 357 U.S. at 253, 78 S. Ct. at 1239-40* (holding that Florida courts could not obtain personal jurisdiction over Delaware trust simply because powers of appointment under trust were executed in Florida because "the unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State").

Unlike the situations in *Helicopteros, Kulko,* and *Hanson,* basing personal jurisdiction on the actions of a co-conspirator according to the requirements of the conspiracy theory does not result in personal jurisdiction based on the unilateral forum-related actions of a third

391 Md. 117, *137; 892 A.2d 479, **490;
2006 Md. LEXIS 67, ***28

party. By the terms of the conspiracy theory, a co-conspirator to whom the acts of another co-conspirator are attributed must have agreed to participate in a conspiracy that he or she could reasonably have expected at the time of agreement to involve the forum-related actions attributed to him or [**491] her. The acts attributed are not simply unilateral acts of the co-conspirator [***29] who literally performed them, but are also the acts of the other co-conspirator.

The Supreme Court has stated also that an exercise of personal jurisdiction is inconsistent with due process if a defendant is "haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *See Burger King, 471 U.S. at 475, 105 S. Ct. at 2183* (quoting *Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774, 104 S. Ct. 1473, 1478, 79 L. Ed. 2d 790 (1984)* ("random" and "fortuitous"), and *World-Wide Volkswagen, 444 U.S. at 299, 100 S. Ct. at 568* ("attenuated")). An exercise of personal jurisdiction over a co-conspirator based on the relationship between co-conspirators required under the conspiracy theory is not random, fortuitous, or attenuated. It is neither random nor fortuitous because it is based on the co-conspirator's deliberate choice to enter into the conspiracy. Nor is it too "attenuated," as the co-conspirator must reasonably expect at the time of entering into the conspiracy that acts in furtherance of the conspiracy [*138] upon which jurisdiction is based will be directed against the forum state. *Compare World-Wide Volkswagen, 444 U.S. at 299, 100 S. Ct. at 568* [***30] (holding that revenues World-Wide may have derived from the fact that automobiles they sold to dealers who then sold to customers in New York, New Jersey, and Connecticut were able to be used in Oklahoma was "far too attenuated a contact to justify [Oklahoma's] exercise of *in personam* jurisdiction").

Our conclusion that the conspiracy theory is consistent with due process is also reinforced by the fact that many courts that have considered the issue have reached the same conclusion as we do today. [4] Five state supreme courts, four state [*139] [**492] intermediate appellate courts, and numerous federal courts have recognized the conspiracy theory. The Minnesota Supreme Court, in *Hunt v. Nevada State Bank, 285 Minn. 77, 172 N.W.2d 292 (Minn. 1969)*, held that the conspiracy theory was permitted both under Minnesota's long-arm statute and consistent with due process. Considering the due process issue, the court concluded that assertion of personal jurisdiction over out-of-state

co-conspirators under the conspiracy theory "does not offend our notions of fundamental fairness." *Hunt, 172 N.W.2d at 312*. The court's holding was based in part on the asymmetry that [***31] would result if co-conspirators are permitted to enjoy the benefits and protections of the law of a forum, but are not subject to the personal jurisdiction of that forum:

> "With respect to any of the [co-conspirator] defendants, to suggest that it is unfair to require them to respond to an action in this jurisdiction would seem to say that they may rely on our contract law to uphold the terms of lawful agreements but that they may not be required to defend an action based on injury to our citizens as a result of an unlawful agreement."

*Id.*

4   Despite this wide agreement among courts that the conspiracy theory of personal jurisdiction is consistent with due process, a minority of courts have taken a contrary view. One such argument is based on *Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 74 S. Ct. 145, 98 L. Ed. 106 (1953)*. *See, e.g., In re New Motor Vehicles Canadian Exp., 307 F. Supp. 2d 145, 158 (D. Me. 2004)* (rejecting conspiracy theory on basis of *Bankers Life*). In *Bankers Life*, the Court noted in dicta that the petitioner's conspiracy theory of venue under *15 U.S.C. § 15*, a federal antitrust venue statute, "has all the earmarks of a frivolous albeit ingenious attempt to expand the statute." *Id. at 384, 74 S. Ct. at 149*. Some courts and commentators have seized upon these dicta in *Bankers Life* to conclude that the conspiracy theory is inconsistent with due process. This reliance, however, is misplaced, as the Court's dicta were not premised on the *Due Process Clause*, but rather on its view that Congress would have been more explicit in the text of *15 U.S.C. § 15* if it intended to permit conspiracy as a basis for venue in private civil antitrust actions. *Bankers Life, 346 U.S. at 384, 74 S. Ct. at 148-49*.

One other argument against the conspiracy theory that has appealed to some courts is the argument that the conspiracy theory is

391 Md. 117, *139; 892 A.2d 479, **492;
2006 Md. LEXIS 67, ***31

inconsistent with the Supreme Court's admonition in *Rush v. Savchuk, 444 U.S. 320, 332, 100 S. Ct. 571, 579, 62 L. Ed. 2d 516 (1980)*, that "the requirements of *International Shoe* . . . must be met as to each defendant over whom a state court exercises jurisdiction." *See, e.g., Gibson, 897 S.W.2d at 773* (rejecting conspiracy theory because *Rush* "makes clear . . . [that] it is the contacts of the defendant himself that are determinative" (quoting *Siskind v. Villa Found. for Educ., Inc., 642 S.W.2d 434, 437-38, 26 Tex. Sup. Ct. J. 78 (Tex. 1982))*. This argument rests on a misreading of *Rush*. The statement quoted from *Rush* does not stand for the proposition that all attribution for purposes of obtaining personal jurisdiction is inconsistent with due process, as the Court made perfectly clear by stating in the sentence preceding it that "naturally, the parties' relationships with each other may be significant in evaluating their ties to the forum." *Rush, 444 U.S. at 332, 100 S. Ct. at 579*. Consistent with this statement, the *Rush* court did not reject contact attribution per se, but simply rejected the holding of the lower court that the contacts of one defendant could be attributed to another defendant simply by virtue of the fact that they were defending parties in the same action. *Id. at 331-32, 100 S. Ct. at 579*.

[***32] Judge Posner, in *Stauffacher v. Bennett, 969 F.2d 455 (7th Cir. 1992)*, echoed this rationale. Finding it difficult to understand why personal jurisdiction should be exempted from the general rule that the acts of co-conspirators are attributed to one another, he concluded that "if through one of its members a conspiracy inflicts an actionable wrong in one jurisdiction, the other members should not be allowed to escape being sued there by hiding in another jurisdiction." *Id. at 459*. Because the plaintiffs in *Stauffacher* failed to allege that the defendant at issue was a member of the conspiracy, the court [*140] did not need to decide whether the conspiracy theory was consistent with due process. *Id. at 460*.

The Delaware Supreme Court, in holding that the conspiracy theory is consistent with due process, emphasized that the awareness of actions in furtherance of the conspiracy directed at the forum state that a co-conspirator must have when that person agrees to participate in the conspiracy permits the conclusion that

the act of agreeing to the conspiracy is an act of purposeful availment:

"[A] defendant who has so voluntarily [***33] participated in a conspiracy with knowledge of its acts or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws."

*Istituto Bancario, 449 A.2d at 225* (citations omitted); *see also Santa Fe Technologies, 42 P.3d at 1234* (following *Istituto Bancario*).

**B. The Maryland Long-Arm Statute and the Conspiracy Theory**

We have long recognized that the General Assembly, in enacting the long-arm statute, intended "to expand the boundaries of permissible in personam jurisdiction to the limits permitted by the Federal Constitution." *Geelhoed, 277 Md. at 224, 352 A.2d at 821*; *see § 6-101(b)* ("It is the intention of the General Assembly to extend the personal jurisdiction . . . of the courts of the state . . . to the fullest extent permitted by the Constitution and laws of the United States."). [5] Consequently, [*141] we [**493] interpret the long-arm statute in light of this intention, "rendering where possible an interpretation consistent with" the requirements imposed by the *Due Process Clause. See*, [***34] *e.g., Geelhoed, 277 Md. at 224, 352 A.2d at 821*. [6] Applying this principle of statutory construction, we hold that a co-conspirator is an "agent" within the meaning of *§ 6-103(b)* when the requirements of the conspiracy theory are met.

5    Our long-standing approach to the interpretation of the Maryland long-arm statute that the reach of the statute is as far as due process permits is consistent with the approach taken by most jurisdictions. Some jurisdictions have legislatively adopted expansive approaches to their long-arm statutes. *See, e.g., Tenn. Code Ann. § 20-2-214(a)(6) (1994)* (permitting exercise of personal jurisdiction over nonresident defendant on "any basis not inconsistent with" the state or federal Constitution). Other jurisdictions have adopted expansive interpretations of their long-arm statutes by judicial decision. *See, e.g.,*

391 Md. 117, *141; 892 A.2d 479, **493;
2006 Md. LEXIS 67, ***34

*Automatic Sprinkler Corp. of Am. v. Seneca Foods Corp., 361 Mass. 441, 280 N.E.2d 423, 424 (Mass. 1972)* (holding that the Massachusetts long arm statute permits "an assertion of jurisdiction over [a nonresident defendant] to the limits allowed by the Constitution of the United States.").

[***35]

6   We stated recently in *Beyond v. Realtime, 388 Md. 1, 15, 878 A.2d 567, 576 (2005)* that "we have consistently held that the purview of the long arm statute is coextensive with the limits of personal jurisdiction set by the *due process clause of the Federal Constitution.*" We did not, of course, mean by this that it is now permissible to simply dispense with analysis under the long-arm statute. *See id. at 14, 878 A.2d at 575* (noting that personal jurisdiction analysis entails "dual considerations," the first of which is analysis under the long-arm statute). Rather, we meant no more than what we said in *Geelhoed, viz.,* that we interpret the long-arm statute to the limits permitted by the *Due Process Clause* when we can do so consistently with the canons of statutory construction. *See id. at 15, 878 A.2d at 577* (citing *Geelhoed* in support of above-quoted language).

The issue before us is one of statutory interpretation, and we therefore apply well-settled principles of statutory construction. The cardinal rule of statutory interpretation [***36] is to ascertain and effectuate the intent of the Legislature. *Kushell v. DNR, 385 Md. 563, 576, 870 A.2d 186, 193 (2005).* If the statutory language is unambiguous when construed according to its ordinary and everyday meaning, then we give effect to the statute as it is written. *Collins v. State, 383 Md. 684, 689, 861 A.2d 727, 730 (2004).* If, however, the statutory text reveals ambiguity, "then the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal." *Price v. State, 378 Md. 378, 387, 835 A.2d 1221, 1226 (2003).* When we do find such an ambiguity, we look at the meaning of the statutory language at issue "in light of the objectives and purposes of the [legislative] enactment." *Id. at 388, 835 A.2d at 1226.*

[*142]   As a matter of substantive law, a conspirator who performs an act in furtherance of the conspiracy does so as an agent for his co-conspirators. With respect to criminal conspiracies, Maryland has long recognized

the common-law rule that the existence of a conspiracy creates an agency relationship between the [***37] co-conspirators, and that this relationship serves as the basis for holding one co-conspirator liable for some criminal acts of other co-conspirators.

In *Campbell v. State, 293 Md. 438, 443, 444 A.2d 1034, 1037 (1982),* we examined criminal co-conspirator liability in the context of reaffirming the common law "agency" theory of felony murder. We reaffirmed the common-law approach to determining the scope of the felony-murder rule, and rejected a broad application of the proximate cause theory of felony-murder taken by some jurisdictions. *See* [**494] *id. at 450-52, 444 A.2d at 1041-42.*  7   In the course of explaining our common-law "agency" approach to felony-murder, we relied on the "classic statement of the agency theory" given by the court in *Commonwealth v. Campbell, 89 Mass. 541, 7 Allen 541 (1863),* quoting from the court's opinion as follows:

"'There can be no doubt of the general rule of law, that a person engaged in the commission of an unlawful act is legally responsible for all the consequences which may naturally or necessarily flow from it, and that, if he combines and confederates with others to accomplish an illegal purpose, he is liable [***38] *criminaliter* for the acts of each and all who participate with him in the execution of the unlawful design. *As they all act in concert for a common object, each is the agent of all the others, and the acts done are therefore the acts of each and all.*

* * * * * *

*No person can be held guilty of homicide unless the act is either actually or constructively his, and it cannot be his* [*143] *act in either sense unless committed by his own hand or by some one acting in concert with him or in furtherance of a common object or purpose.*'"

*Campbell, 293 Md. at 443-44, 444 A.2d at 1038* (quoting *Campbell, 89 Mass. at 543-44* (emphasis added)). In *Campbell,* we recognized that the existence of a criminal

391 Md. 117, *143; 892 A.2d 479, **494;
2006 Md. LEXIS 67, ***38

conspiracy creates an agency relationship between the participants in the conspiracy, and we further recognized that this agency relationship establishes the scope of the extent to which the actions of one co-conspirator can be attributed to another for purposes of the felony-murder rule. *See also Watkins v. State, 357 Md. 258, 269-73, 744 A.2d 1, 6-9 (2000)* (discussing agency theory); *State v. Stouffer, 352 Md. 97, 116, 721 A.2d 207, 216 (1998)* [***39] (same).

> 7    In *Campbell*, we stated that "the proximate cause theory ordinarily should not be employed to extend the applicability of the felony murder doctrine." *Id. at 451, 444 A.2d at 1041.* We did, however, endorse its application in "shield" cases. *See id. at 451 n.3, 444 A.2d at 1041 n.3.*

Maryland law has also long recognized civil conspiracy as a basis for tort liability. As far back as *Kimball v. Harman, 34 Md. 407 (1871)*, it was well-established that co-conspirators could be subjected to civil tort liability based on acts taken in furtherance of the conspiracy by members of the conspiracy. In *Harman*, we stated as follows:

> "There is no doubt of the right of a plaintiff to maintain an action on the case against several, for conspiring to do, and actually doing, some unlawful act to his damage. But it is equally well-established, that no such action can be maintained unless the plaintiff can show that he has in fact been aggrieved, or has sustained actual legal damage [***40] by some overt act, done in pursuance and execution of the conspiracy."

*Harman, 34 Md. at 409.* We have held consistently that civil conspiracy "is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Hoffman, 385 Md. at 25, 867 A.2d at 290* (internal citations and quotations omitted). Thus, "'no action in tort lies for conspiracy to do something unless the acts actually done, if done by one person, would constitute a tort.'" *Alleco v. Weinberg Foundation, 340 Md. 176, 190, 665 A.2d 1038, 1045 (1995)* (quoting *Domchick* [*144] *v. Greenbelt Services, 200 Md. 36, 42, 87 A.2d 831, 834 (1952))*. Nonetheless, where the acts done in furtherance of the conspiracy by the [**495] members of the conspiracy

constitute a separate tort, these acts are attributed to other members of the conspiracy for purposes of establishing civil tort liability over them. In this respect, civil conspiracy is similar to criminal conspiracy: both with civil conspiracy and with criminal conspiracy, the acts of one co-conspirator in furtherance of the conspiracy are regarded as acts [***41] of other co-conspirators for purposes of establishing liability (civil or criminal, as the case may be) over the other co-conspirator. Thus, we have recognized that civil co-conspirators, like criminal co-conspirators, act as agents of one other when engaging in acts in furtherance of their conspiracy. In *Western Maryland Dairy v. Chenowith, 180 Md. 236, 23 A.2d 660 (1942)*, we stated as follows:

> "A fraudulent conspiracy, sufficient to serve as the basis for an action in a civil case, is the confederation of two or more persons to cheat and defraud, when the design has actually been executed by the confederates with resulting damage to their victim. *Rent-A-Car Co. v. Globe & Rutgers Fire Insurance Co., 161 Md. 249, 260, 156 A. 847.* When individuals associate themselves together in an unlawful enterprise, any act done by one of the conspirators is in legal contemplation the act of all. *The mind of each being intent upon a common object, and the energy of each being enlisted in a common purpose, each is the agent of all the others, and the acts done and words spoken during the existence of the enterprise are consequently the acts and words of* [***42] *all."*

*Id. at 243, 23 A.2d at 664* (emphasis added).

Despite the long-standing characterization of co-conspirators as "agents" of one another under Maryland law, appellants argue that the conspiracy theory of personal jurisdiction is inconsistent with the text of the long-arm statute because the substantive law of agency requires for the creation of an agency relationship that the principal has the right to control the agent. *See, e.g., Beyond, 388 Md. at 27, 878* [*145] *A.2d at 583.* We are not persuaded. As noted above, we have long recognized that the intent of the General Assembly in enacting *§ 6-103(b)* was to permit all exercises of personal jurisdiction that are consistent with due process. Therefore, given our conclusion above that the

conspiracy theory of jurisdiction is consistent with due process, and the support in Maryland law for the proposition that co-conspirators act as agents of one another when they act in furtherance of a conspiracy, we conclude that the General Assembly intended a broad construction of the term "agent" and did not intend to require a showing that one exercises control over the other. We hold that when the requirements of the [***43] conspiracy theory are met, one co-conspirator may be the "agent" of another co-conspirator within the meaning of § 6-103(b).

IV.

We now turn to the second question certified to this Court--the requisite elements a plaintiff must allege for a court to have jurisdiction over the out-of-state defendant under that theory. Appellants urge us to adopt the following additional elements: (1) one co-conspirator committed an act in Maryland that had an effect on the plaintiff in Maryland, and the defendant co-conspirator had actual prior knowledge that the co-conspirator would commit this act in Maryland; (2) the co-conspirator who committed this act was acting at the direction of the defendant co-conspirator in the context of a relationship "tantamount to actual agency;" and (3) the conspiracy was intended at least in part to benefit the defendant co-conspirator individually. [**496] We consider and reject each of these in turn.

As for the first proposed element, the Supreme Court's opinion in *Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)*, makes clear that it is not always necessary for a defendant to commit an act in a forum state in order for that state [***44] to exercise personal jurisdiction over the defendant consistently with due process. In *Calder*, the plaintiff below, Jones, a California resident, alleged that the defendants libeled her by writing, editing, and publishing in Florida an [*146] article about her. *Id. at 784, 104 S. Ct. at 1484*. Although the defendants never personally performed any actions in California in connection with the article about Jones, [8] the Court nonetheless held that personal jurisdiction over the defendants in California was consistent with due process. *Id. at 785-89, 104 S. Ct. at 1485-87*. The Court concluded that personal jurisdiction in California was proper because the defendants created and distributed an article that they knew would be widely circulated in California and would cause injury to a California resident, and therefore could "'reasonably anticipate

being haled into court there' to answer for the truth of the statements made in their article." *Id. at 789-90, 104 S. Ct. at 1487* (quoting *World-Wide Volkswagen, 444 U.S. at 297, 100 S. Ct. at 567*).

> 8    The trial court did find that one of the defendants took a trip to California in connection with the article, but the *Calder* Court made clear that it did not base its holding on this finding. *See id. at 785 n.4, 104 S. Ct. at 1485 n.4.*

[***45] We do not adopt the second proposed element because adopting it would itself be "tantamount" to a rejection of the conspiracy theory of personal jurisdiction. As explained above in our discussion of the conspiracy theory and due process, the requirement of single or multi-directional control is not necessary for contact attribution to be consistent with due process.

Finally, we see no reason to require that the conspiracy be intended to individually benefit a defendant co-conspirator. Appellants argue that this requirement is necessary to ensure that the out-of-state co-conspirator is purposefully directing activities at Maryland. In support of this position, appellants cite two Second Circuit cases, *Green v. McCall, 710 F.2d 29 (2d Cir. 1983)*, and *Grove Press, Inc. v. Angleton, 649 F.2d 121 (2d Cir. 1981)*. Neither of these cases, however, supports appellants' position.

In *Grove Press*, the plaintiffs, Grove Press and two of its officers, filed suit against several CIA employees in the Southern District of New York. *Id. at 122*. Although the CIA [*147] employee defendants "had not personally committed any tortious acts in New York," [***46] the District Court held that personal jurisdiction over them was proper in New York because they had done so through New York-based CIA officials acting in New York, whom the District Court found were co-conspirators of the defendants. *Id. at 122-23*. The *Grove Press* court reversed, holding that there was an insufficient factual basis in the record to support the District Court's finding of a conspiracy:

> "Plaintiffs have made no showing whatever that any of the unnamed CIA employees who allegedly performed the in-State tortious acts necessary for jurisdiction under [the New York long-arm statute] were parties to the 'common agreement.' So far as the record

391 Md. 117, *147; 892 A.2d 479, **496;
2006 Md. LEXIS 67, ***46

discloses, these individuals, whoever they were, were simply United States employees acting as agents for the United States government."

*Id. at 123*. Similarly, the *Green* court held that an assertion of personal jurisdiction [**497] over government officers in their individual capacities was not permitted under a similar provision of the Connecticut long-arm statute because the in-State government actors were simply acting in their official capacities, and not as the agents of the [***47] defendant government officers in their individual capacities. *See Green, 710 F.2d at 33-34*.

Neither *Grove Press* nor *Green* held that due process invariably requires a showing of intended "individual benefit" on the part of a co-conspirator in order to exercise personal jurisdiction over that co-conspirator under the conspiracy theory. Rather, they held, unremarkably, that there must be a conspiracy, and that the persons who undertook the forum-directed activities that are to serve as the basis for exercising personal jurisdiction over the other co-conspirators must have been part of the conspiracy. [9] These requirements are

incorporated [*148] in the *Cawley* elements. *See Cawley, 544 F. Supp. at 135*. Consequently, we find no support for appellants' third proposed element in *Grove Press* or *Green*, and hence are unpersuaded by appellants' argument that we should adopt this element.

9   At best, *Grove Press* supports the position that evidence that a putative co-conspirator stands to benefit individually from a proposed common course of action is relevant to the issue of whether that putative co-conspirator is actually part of the conspiracy in question. *See Grove Press, 649 F.2d at 122-23* (noting in support of its holding that the District Court "found nothing to suggest that [the defendants] expected to benefit as individuals from the wrongdoing alleged in the complaint").

[***48]

**CERTIFIED QUESTIONS OF LAW ANSWERED AS SET FORTH ABOVE. COSTS TO BE EQUALLY DIVIDED BY THE PARTIES.**

130V9F

********** Print Completed **********

Time of Request: Wednesday, August 01, 2007  21:54:08 EST

Print Number:    1823:40591327
Number of Lines: 750
Number of Pages: 15

Send To:  NN/L, 130V9F
          OLIVER HILSENRATH
          822 EASTBROOK CT
          DANVILLE, CA 94506-1206

**EXHIBIT 54.**


**Canadian National Railway Case 2007**

130V9F

**Time of Request:** Sunday, August 12, 2007   03:52:15 EST
**Client ID/Project Name:**
**Number of Lines:** 305
**Job Number:**      1862:42089310

Research Information

**Service:**    LEXSEE(R) Feature
**Print Request:** Current Document: 1
**Source:** Get by LEXSEE(R)
**Search Terms:** 2007 U.S. Dist. LEXIS 4890

**Send to:** NN/L, 130V9F
          OLIVER HILSENRATH
          822 EASTBROOK CT
          DANVILLE, CA 94506-1206

LEXSEE 2007 U.S. DIST. LEXIS 4890

**The Estate of Arthur R. Sumrall, by and through Carolyn A. Sumrall, Individually and as Personal Representative on Behalf of the Estate of Arthur R. Sumrall, PLAINTIFF vs. Illinois Central Railroad Company, Canadian National Railway Company, Sylvester Brown, Unidentified Entities 1 through 10, John Does 1 through 10, DEFENDANTS**

**CIVIL ACTION NO. 2:06CV166KS-MTP**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF MISSISSIPPI, HATTIESBURG DIVISION**

*2007 U.S. Dist. LEXIS 4890*

**January 23, 2007, Decided
January 23, 2007, Filed**

**COUNSEL:** [*1] For The Estate of Arthur R. Sumrall, by and through Carolyn A. Sumrall individually and as personal representative on behalf of the Estate of, Plaintiff: James B. McHugh, LEAD ATTORNEY, McHugh Fuller Law Group, PLLC, Hattiesburg, MS; Michael Jay Fuller, Jr., LEAD ATTORNEY, McHugh Fuller Law Group, Hattiesburg, MS.

For Illinois Central Railroad Company, Canadian National Railway Company, Defendant: Vicki R. Leggett, LEAD ATTORNEY, ZACHARY & LEGGETT, Hattiesburg, MS; Patrick H. Zachary, ZACHARY & LEGGETT, Hattiesburg, MS.

**JUDGES:** Keith Starrett, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Keith Starrett

**OPINION**

**MEMORANDUM OPINION AND ORDER**

This cause is before the court on a motion to dismiss filed by defendant Canadian National Railway Company. From its review of all matters made a part of the record of this case as well as applicable law, and being thus fully advised in the premises, the court FINDS that the motion is not well taken and should be DENIED. The court specifically finds as follows:

FACTUAL BACKGROUND

This lawsuit arises out of a motor vehicle-train collision that occurred on April 25, 2004 at a highway gradecrossing in Beaumont, Perry County, Mississippi, resulting [*2] in the death of Arthur R. Sumrall, the driver of the vehicle. The widow and personal representative of the Estate of Arthur R. Sumrall, Carolyn A. Sumrall, filed this suit on April 5, 2006 in the Circuit Court of Perry County, Mississippi. The suit was removed to federal court on June 23, 2006 on the basis of diversity jurisdiction. In the complaint, plaintiff alleges that defendant Canadian National Railway Company ("CNR") failed to properly inspect and maintain its railways and railway crossings -- specifically, that it failed to give reasonable and timely audible or visible warnings of the approach of the train prior to the collision, that it failed to exercise reasonable care in operating the train prior to the collision, and that it failed to maintain a reasonably safe crossing -- all of which contributed Arthur R. Sumrall's death. Plaintiff asserts causes of action against CNR (and against the other defendants) for negligence, malice and/or gross negligence, statutory survival, and statutory wrongful death.

CNR is a Canadian corporation with its principal place of business in Montreal, Quebec, Canada. CNR is not registered or licensed to do business in the State of Mississippi, [*3] has no agent for service of process in Mississippi and files no tax returns in the State of

Mississippi. According to CNR, it has no employees residing in the State of Mississippi, does not operate as a railroad in the State of Mississippi, and owns no land or track in the State of Mississippi. [1]

> 1    Plaintiff disputes this contention and has offered several documents in support of its position that, in fact, CNR does business in Mississippi. These will be discussed below in the court's analysis of personal jurisdiction.

CNR owns all the stock of Grand Trunk Corporation ("GTC"), a Delaware corporation. GTC is a holding company that does not operate as a railroad in any state and has no employees. GTC, in turn, owns all the stock of Illinois Central Corporation ("ICC"), a Delaware corporation. ICC also does not operate as a railroad in any state, nor does it have any employees. ICC is the sole shareholder of defendant Illinois Central Railroad Company ("ICRR"), the entity that, according to CNR, owns the locomotives [*4] involved in the accident at issue in this case and owns and maintains the track and right-of-way where the accident occurred. ICRR is incorporated in the State of Illinois, with its principal place of business in Illinois. According to CNR, ICRR owns land, track and other facilities in the State of Mississippi, has employees in the State of Mississippi and files tax returns in Mississippi.

Plaintiff attempted to serve process upon CNR by serving its agent for process in the State of New York. On July 5, 2006, CNR moved to dismiss on the grounds that it was not properly served with process, and that this court lacks personal jurisdiction under the Mississippi long-arm statute and the *due process clause of the United States Constitution*.

ANALYSIS

Service of Process

*Rule 4(h) of the Federal Rules of Civil Procedure*, which governs service upon both domestic and foreign corporations, [2] provides: "Unless otherwise provided by federal law, service upon a domestic or foreign corporation . . . shall be effected: (1) in a judicial district of the United States in the manner prescribed for individuals by subdivision (e)(1), [3] *or by* [*5] delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of

process . . ." (emphasis added).

> 2    Curiously, in its brief CNR cites *Rule 4(f)*, which governs service upon individuals in foreign countries. This provision is inapplicable to the instant case.
> 3    *Rule 4(e)(1)* provides that service shall be effected pursuant to the law of the state in which the district court is located, or in which service is effected. Rule 4(d)(4) of the Mississippi Rules of Civil Procedure provides that foreign corporations may be served by delivering a copy of the summons and complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process. Rule 311 of the New York Civil Practice Law and Rules provides that service may be made upon a foreign corporation by serving its officer, director, managing or general agent, or cashier or assistant cashier or any other agent authorized by appointment or by law to receive service. Thus, under either of these rules, service upon CNR was proper.

[*6]  As CNR's registered agent for service of process in New York was served with the summons and complaint, this satisfies *Rule 4(h)(1)* and therefore service of process was properly effected. Having determined this threshold issue, the court now turns to the question of whether it can exercise personal jurisdiction over CNR.

Personal Jurisdiction

When a nonresident defendant moves to dismiss for lack of personal jurisdiction, plaintiff has the burden of establishing that the court has jurisdiction over the defendant. *Lofton v. Turbine Design, Inc., 100 F.Supp. 2d 404, 407 (N.D. Miss. 2000)*(citation omitted). However, plaintiff need not make a full showing on the merits; plaintiff must merely make a *prima facie* showing of the facts upon which *in personam* jurisdiction is predicated to avoid dismissal for lack of jurisdiction. *Id. at 408*; *see also Thompson v. Chrysler Motors Corp., 755 F.2d 1162, 1165 (5th Cir. 1985)*. In making this showing, the allegations of the complaint, except as controverted by defendant's affidavits, must be accepted as true, and all relevant factual disputes are resolved in favor of the plaintiff. [*7]  *Lofton, 100 F.Supp. 2d at 407* (citation omitted); *Thompson, 755 F.2d at 1165*; *Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 2006 U.S. App. LEXIS 30391, 2006 WL 3564657, at * 1 (5th Cir.*

2006)(citation omitted).

A federal court sitting in diversity may exercise *in personam* jurisdiction Over a nonresident corporate defendant if: 1) the forum state's long-arm statute confers personal jurisdiction; and 2) exercise of personal jurisdiction comports with the *Due Process Clause of the Constitution. Latshaw v. Johnston, 167 F.3d 208, 211 (5th Cir. 1999)*. Mississippi's long-arm statute, *section 13-3-57 of the Mississippi Code Annotated*, provides:

> Any . . . foreign or other corporation not qualified under the Constitution and laws of this state as to doing business herein, who shall make a contract with a resident of this state to be performed in whole or in part by any party in this state, or who shall commit a tort in whole or in part in this state against a resident or nonresident of this state, or who shall do any business or perform any character of work or service in this state, shall by such act or acts [*8] be deemed to be doing business in Mississippi and shall thereby be subjected to the jurisdiction of the courts of this state.

As CNR admits, plaintiff's allegations sound in tort. Therefore, the court will analyze the tort prong of the long-arm statute. The Mississippi Supreme Court has held that personal jurisdiction over a defendant who allegedly committed a tort is proper if any of the elements of the tort -- or any part of an element -- takes place in Mississippi. *Jobe v. ATR Mktg., 87 F.3d 751, 753 (5th Cir. 1996)(citing Smith v. Temco, Inc., 252 So. 2d 212, 216 (Miss. 1971))*. And the Mississippi Supreme Court has also stated that "[t]he tort is not complete until injury occurs, and if the injury occurs in this State, then, . . . the tort is committed, at least in part, in this State, and [in] personam jurisdiction of the nonresident tort feasor is conferred upon the Mississippi court." *Smith, 252 So. 2d at 216 (quoted in Thompson, 755 F.2d at 1168); see also Lofton, 100 F.Supp. 2d at 409* (citations omitted)("a tort is considered to have been committed in part in Mississippi [*9] where the injury results in the state).

Plaintiff alleges that CNR's failure to properly inspect and maintain its railways and railway crossings caused or contributed to Arthur R. Sumrall's death.

Plaintiff asserts causes of action against CNR (and against the other defendants) for negligence, malice and/or gross negligence, statutory survival, and statutory wrongful death. The accident at issue in this case occurred in Mississippi, and Arthur R. Sumrall's death occurred in Mississippi. The court finds this is sufficient to make *a prima facie* showing of personal jurisdiction under the tort prong of Mississippi's long-arm statute. [4] *See, e.g., Seiferth, 2006 U.S. App. LEXIS 30391, 2006 WL 3564657, at * 3* (holding that tort prong of Mississippi's long-arm statute permitted exercise of personal jurisdiction over nonresident defendant where injury (death) resulting from defendant's alleged negligence occurred in Mississippi); *Thompson, 755 F.2d at 1168* (holding that court could exercise personal jurisdiction over nonresident manufacturer of automobile, pursuant to tort prong of Mississippi's long-arm statute, where accident at issue in negligence action occurred in Mississippi). [*10]

> [4] Accordingly, the court need not -- and thereby declines -- to reach plaintiff's argument that this court has *in personam* jurisdiction over CNR pursuant to the "doing business" prong of the long-arm statute. (Nor will the court address the contract prong of the long-arm statute, as neither party alleges that it is implicated and none of plaintiff's allegations against CNR sound in contract.)

However, this does not resolve the issue. The court must now determine whether subjecting CNR to *in personam* jurisdiction in Mississippi would comport with the *Due Process Clause of the Fourteenth Amendment to the Constitution. Lofton, 100 F.Supp. 2d at 409*. In order to so determine, the court must find:) that CNR has purposefully established "minimum contacts" with Mississippi; and 2) that exercising personal jurisdiction over CNR would not offend "traditional notions of fair play and substantial justice." *Bullion v. Gillespie, 895 F.2d 213, 216 (5th Cir. 1990)*(citations omitted).

[*11] The court will first address the minimum contacts requirement. A defendant has the requisite minimum contacts with a state when "it purposely avails itself to the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958)*. The minimum contacts "must come about by an action of the defendant

purposefully directed toward" the forum state. *Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 112, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)*(citations omitted). In order for this court to have personal jurisdiction over CNR, CNR's contacts with Mississippi must be such that it would "reasonably anticipate being haled into court" here. *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)*.

Under the minimum contacts analysis, personal jurisdiction can be either specific or general. *Bryant v. Salvi, 141 Fed. Appx. 279, 282 (5th Cir. July 12, 2005)*. The focus here is on the nature of the underlying litigation. *Lofton, 100 F.Supp. 2d at 409*. The court may exercise specific jurisdiction over a nonresident defendant when the suit "arises [*12] out of or is related to" the defendant's contacts with the forum." *Id.* (*citing Petroleum Helicopters, Inc. v. Avco Corp., 804 F.2d 1367, 1370 (5th Cir. 1986)*). On the other hand, general jurisdiction involves a suit which does not arise from the nonresident defendant's contacts with the forum state and can be asserted only where the defendant has had "continuous and systematic contacts" with the forum state. *Id.* (*citing Interfirst Bank Clifton v. Fernandez, 844 F.2d 279, 283 (5th Cir. 1988)*).

Plaintiff has offered a number of documents in support of its contention that CNR does business in Mississippi within the meaning of the "doing business" prong of the long-arm statute. Although the court has declined to address that particular issue in light of its conclusion that the tort prong of the long-arm statute was satisfied, those documents will be used to analyze CNR's contacts with Mississippi for the purposes of the minimum contacts analysis.

First, plaintiff offers a Form 40-F, filed by CNR with the United States Securities and Exchange Commission ("SEC") for the fiscal year 2005. In that document, it is stated that "[a]s of December 31, 2005, [CNR] [*13] operated approximately . . . 6, 300 route miles in sixteen U.S. states . . . with principal routes . . . to the major U.S. rail hubs of Buffalo, Detroit, Duluth/Superior, Minneapolis/St. Paul, Chicago, St. Louis, *Jackson,* Memphis, New Orleans, Baton Rouge, and Mobile" (emphasis added). The document also states: "[CNR] spans Canada and mid-America, serving all five major Canadian ports on the Atlantic and Pacific oceans and the Great lakes as well as New Orleans on the Gulf of Mexico" and that CNR "originated approximately 87% of traffic moving along its network in 2005." The document further states that CNR has approximately 6, 561 employees in the United States. That document includes statements that CNR: "interchanges traffic with Kansas City Southern Railroad at Jackson, Mississippi"; serves "large grain processors in . . . Mississippi"; is a "leading carrier of automotive products originating in . . . Mississippi"; and can access traffic from an automobile assembly plant in Mississippi." Finally, in describing CNR's corporate organization, it is stated: "The Company's strategic initiatives, which drive its operational direction, are developed and managed centrally by corporate [*14] management and are communicated to its regional activity centers."

Plaintiff also offers CNR's Form 6-K, filed with the SEC in March 2006. This document states: "The Company manages its rail operations as one business segment over a single network that spans vast geographic distances and territories, with operations in Canada and the United States. . . The Company's strategic initiatives, which drive its operational direction, are developed and managed centrally by corporate management and are communicated to its regional activity centers. . ." In the Notes to Consolidated Financial Statements, it is stated: "[CNR], directly and through its subsidiaries, is engaged in the rail and related transportation business. [CNR] spans Canada and mid-America, from the Atlantic and Pacific oceans to the Gulf of Mexico, serving the . . . key cities of . . . Jackson, Mississippi, with connection to all points in North America." In President and CEO E. Hunter Harrison's message to CNR's shareholders, as set forth in the Form 6-K, Mr. Harrison discusses accidents in Flora, Mississippi and Alberta, Canada, that cost five CNR employees their lives (four died in Mississippi and one died in Alberta). [*15] Mr. Harrison concluded his remarks by stating: "The loss of life we sustained in 2005 will remain with me for a long, long time."

In addition to the documents filed with the SEC, plaintiff has also offered various other documents created by CNR. In CNR's Investor Fact Book for 2005, it is stated that CNR is the "only rail network on the North American continent to connect three coasts -- the Pacific, the Atlantic, and the Gulf of Mexico." A map of CNR's rail systems in the Fact Book then shows CNR rail lines running through Mississippi from Memphis to New Orleans and from Jackson, Mississippi to Mobile, Alabama. A "CN Average Traffic Density Map" is also

found in the Fact Book, demonstrating the level of traffic on CNR's rail lines, including those running through Mississippi. CNR's railroads in Mississippi are also pictured on additional maps throughout the Fact Book. Other references are made throughout the Fact Book to CNR's activity in Mississippi: CNR's "tricoastal network" is described, which includes ports on the Gulf of Mexico such as Gulfport, Mississippi; Jackson, Mississippi is listed as one of CNR's "intermodal terminals" which allows CNR to deliver customers' shipments [*16] to destinations across North America; the document states that "[CNR's] domestic grain movements include corn and soybeans from [Illinois, Iowa, Michigan and Wisconsin] to large grain processors in . . . Mississippi"; several Mississippi customer locations are displayed for forest products along CNR's railroads; CNR is described as a "leading carrier of automotive products originating in. . . Mississippi" and the Nissan plant in Canton, Mississippi is mentioned in particular, along with a map showing Canton's location along with other assembly and parts plants on CNR's rail lines; and several principal plant facilities for metals and minerals in Mississippi are displayed.

In addition, a news release dated July 19, 2006 states that CNR serves the "key city of Jackson, Mississippi, among others, with connections to all points in North America. Identical language is used on numerous other news releases published during the last few years. In a public stock information report for CNR dated August 14, 2006, it is stated in the summary: "[CNR], directly and through its subsidiaries, is engaged in the rail and related transportation business . . . [CNR] spans Canada and mid-America, [*17] from the Atlantic and Pacific oceans to the Gulf of Mexico, serving . . . the cit[y] of . . . Jackson, Mississippi, with connections to all points in North America."

Finally, plaintiff has offered a report published by the National Transportation Safety Board ("NTSB") dated following an investigation into the accident at Flora, Mississippi discussed above by Mr. Harrison. The NTSB began its report by noting that CNR was an involved party and that the investigation into the accident focused on CNR's track maintenance. The safety issue examined by the NTSB was "[CNR's] continuous welded rail maintenance and inspection procedures and standards." The report notes that several CNR employees participated in the 2004 maintenance history for the track at issue, including a CNR welder, a CNR track inspector,

a CNR track foreman and a CNR track supervisor. The NTSB's conclusion included findings that "[a]lthough [CNR] had written instructions for maintaining continuous welded rail and preventing track buckling, track employees at multiple levels did not follow or ensure adherence to these instructions." CNR was therefore cited by the NTSB for its failure to comply with procedure and [*18] lack of rail anchors.

Based on the foregoing evidence, the court concludes that plaintiff has sufficiently demonstrated that CNR has "purposely avail[ed] itself to the privilege of conducting activities within" Mississippi. *Hanson, 357 U.S. at 253*. CNR's own documents establish that it owns and operates (both directly and through subsidiaries) rail lines throughout the United States, including in Mississippi. [5] This fact was repeatedly touted by CNR throughout the documents. CNR was also cited by the NTSB for an accident occurring in Mississippi resulting from its failure to maintain its tracks properly. CNR could hardly argue that it could not "reasonably anticipate being haled into court" in Mississippi. *World-Wide Volkswagen Corp., 444 U.S. at 297*.

[5]    CNR disputes that it owns, operates or maintains the rail lines at issue in this lawsuit. In the affidavit of Cynthia A. Bergmann, Corporate Counsel -- U.S. for CNR and its U.S. subsidiaries, submitted in support of CNR's motion to dismiss, it is averred that "CNR does not operate as a railroad in the State of Mississippi, owns no land or track in the State of Mississippi, and has no employees in the State of Mississippi." Ms. Bergmann also avers that CNR's subsidiary and co-defendant ICRR, on the other hand, does. However, as discussed earlier, plaintiff need only make a *prima facie* case of personal jurisdiction, and all relevant factual conflicts are resolved in plaintiff's favor. *Lofton, 100 F.Supp. 2d at 407* (citation omitted); *Thompson, 755 F.2d at 1165*; *Seiferth, 2006 U.S. App. LEXIS 30391, 2006 WL 3564657, at * 1* (citation omitted). The court also notes that CNR did not reply to plaintiff's opposition to its motion to dismiss and therefore did not attempt to explain or refute any of the evidence discussed above. Accordingly, viewing the facts discussed above in plaintiff's favor, the court finds that plaintiff has sufficiently established that CNR has the requisite minimum contacts with Mississippi for this court to exercise

*in personam* jurisdiction. Moreover, the court notes that the fact that another party -- namely, ICRR -- might ultimately be responsible for the alleged negligence bears on the merits of the case and does not affect the jurisdictional analysis. *See, e.g., Seiferth, 2006 U.S. App. LEXIS 30391, 2006 WL 3564657, at * 7* ("A defendant with the required minimum contacts 'cannot avoid personal jurisdiction by speculating as to whether another party was actually responsible for the accident.'")(*citing Nuovo Pignone, 310 F.3d at 380*).

[*19] The court further finds that plaintiff's claims arise out of or result from CNR's contacts with Mississippi. The relevant contacts, as demonstrated by the documentary evidence discussed above, are CNR's ownership, operation and maintenance of rail lines in Mississippi. Plaintiff's allegations against CNR -- that it was negligent in its maintenance of its rail lines, thereby contributing to Arthur R. Sumrall's death -- arise out of or result from these contacts. Accordingly, the court can exercise specific personal jurisdiction over CNR. The court further finds that it also has general jurisdiction over CNR because, based on the foregoing evidence, CNR has had "continuous and systematic contacts" with Mississippi. *Interfirst Bank Clifton v. Fernandez, 844 F.2d 279, 283 (5th Cir. 1988)*(*citing Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*).

Having found that the first prong of the jurisdictional test is met, the court will now proceed to the second prong -- whether exercising personal jurisdiction over CNR would offend "traditional notions of fair play and substantial justice." *Bullion 895 F.2d at 216* (citations [*20] omitted). In this analysis, the burden of proof is on CNR to show that the exercise of personal jurisdiction is "unfair or unreasonable" based on the following five factors: 1) the burden on CNR; 2) the interests of Mississippi; 3) plaintiff's interest in obtaining relief; 4) the "interstate judicial system's interest in the most efficient resolution of controversies"; and 5) "the shared interests of the several states in furthering fundamental social policies." *Seiferth, 2006 U.S. App. LEXIS 30391, 2006 WL 3564657, at * 7* (*citing Nuovo Pignone, SpA v.*

*Storman Asia M/V, 310 F.3d 374, 382 (5th Cir. 2002)*). The defendant must make a "compelling case" that the exercise of jurisdiction would be unfair or unreasonable. *Nuovo Pignone, 310 F.3d at 382* (*citing Burger King, 471 U.S. at 477*).

As for the first factor, CNR has not provided the court with any reason why defending this lawsuit in Mississippi would be burdensome. Additionally, the court notes that as set forth in the documents provided by plaintiff discussed above, CNR engages in substantial business in the United States and several thousand employees in the United States. *See, e.g., Nuovo Pignone, 310 F.3d at 382* [*21] (rejecting foreign defendant's burden argument where it presented itself as a specialist in "worldwide transport and logistics" that maintained offices in the United States); *Access Telecom, Inc. v. MCI Telecomm., Corp., 197 F.3d 694, 716 (5th Cir. 1999), reh'g en banc denied, 210 F.3d 365 (5th Cir. 2000)*(rejecting foreign company's claim that subjecting it to suit in the United States would be burdensome where the company had engaged in "numerous business dealings in the United States"). Moreover, the second, third and fourth factors also militate in favor of this court exercising jurisdiction over CNR. Mississippi certainly as a substantial interest in this case, as decedent Arthur R. Sumrall was a resident of this state and the accident occurred in this state, plaintiff certainly has an interest in obtaining relief from CNR, and the most efficient resolution of this controversy would be to litigate plaintiff's claims in one forum and in one proceeding, rather than piecemeal. With respect to the final factor, the court can find no reason (nor has CNR provided one) why this factor would apply in this case.

IT IS, THEREFORE, ORDERED AND ADJUDGED that [*22] CNR's motion to dismiss [# 4] is DENIED.

SO ORDERED and ADJUDGED on this, the 23rd day of January, 2007.

s/ Keith Starrett

UNITED STATES DISTRICT JUDGE

130V9F

********** Print Completed **********

Time of Request: Sunday, August 12, 2007  03:52:15 EST

Print Number:   1862:42089310
Number of Lines: 305
Number of Pages: 6

Send To:  NN/L, 130V9F
          OLIVER HILSENRATH
          822 EASTBROOK CT
          DANVILLE, CA 94506-1206