1
2
3
4

HANA HILSENRATH
OLIVER HILSENRATH
822 Eastbrook Court
Danville, CA 94506
Telephone: 925 212 6299
Facsimile: 925 736 7571
ohlx@sbcglobal.net

5

PLAINTIFFS *IN PRO PER*

6
7
8

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

9
10
11
12
13
14
15
16
17

HANA HILSENRATH AND OLIVER
HILSENRATH,

Plaintiffs,

v.

EQUITY TRUST (JERSEY) LIMITED,
CANDOVER INVESTMENTS PLC,
INSINGER DE BEAUFORT SA, JARDINE
MATHESON HOLDINGS LIMITED, PHILIP
JOSEPH AUSTIN, GRANT BROWN,
MELVYN KALMAN, JOHN PERKINS,
CAROLINE BOUGEARD, AND DOES 1-9,

Defendants.

**Case 4:07-cv-03312-CW**

FIRST AMENDED COMPLAINT FOR THE
VIOLATION OF THE RACKETEER
INFLUENCED AND CORRUPT
ORGANIZATIONS (RICO) ACT 18 U.S.C.S.
§ 1961 ET SEQ., HARBORING A CIVIL
CONSPIRACY OF EXTORTION, INVASION
OF PRIVACY, AIDING AND ABETTING A
MALICIOUS PROSECUTION

**Judge: Hon. Claudia Wilken**

[Jury Trial Demand]

18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

1.    In May 2007, in *Case No: 4:02-cv-1068 Janvrin Holdings Limited et al v. Hilsenrath et al.*
the Federal Court determined that Janvrin at al. invaded the Hilsenraths' privacy and
proceeded to blackmail Hilsenrath and his company, while causing significant damage,
financial and personal. The federal Court concluded that Janvrin et al are to financially
compensate the Hilsenraths in damages and pretrial assessment on account of their actions.

2.    Janvrin et al effected their scheme with no employees, management or facilities of their own.
Janvrin et al effected their scheme by means of its harboring corporate parent over more than
a decade, from 1996 to 2007.

3.    Janvrin et al's harboring corporate parent provided the strategy and the means to plan and
execute the conspiracy: the legal counsel the financing, the management and the employees.

4.    Janvrin et al's harboring corporate parent did not change in substance over the relevant decade, although it changed names and control several times.

5.    Nevertheless, with each change of name or control, Janvrin et al's parent remained fully committed to the conspiracy in subject.

6.    At the very beginning of the conspiracy in 1996, Janvrin's harboring parent was known as (1) Matheson Trust (Jersey) and was controlled by Jardine Matheson Holdings Limited; (2) in 2000 it changed its name to Insinger de Beaufort Trust (Jersey) Limited and was controlled by Insinger de Beaufort SA and (3) in 2003 it changed its name again to Equity Trust (Jersey) Limited and turned over control to Candover Investments PLC.

7.    The persons involved stayed the same over most of that decade.

8.    By this present complaint, plaintiffs Hana and Oliver Hilsenrath are now seeking a judgment against the individual harboring parents of Janvrin et al. and their executives

### THE PARTIES

Plaintiffs

9.    Plaintiffs Hana and Oliver Hilsenrath (referenced collectively as THE HILSENRATHS) are private individuals and professionals. The Hilsenrath family were the largest shareholders of US Wireless Corporation (USWC), a former publicly traded California based company. Oliver HILSENRATH was the founder, Chairman and CEO of US Wireless Corporation.

Defendants

10.   Equity Trust (Jersey) Limited (EQUITY) is a Jersey/UK based trust company and it is the owner and operator of Janvrin Holdings Limited, Crossgar Limited and Ryburn Limited (Janvrin at al).

11.   Janvrin et al are three shell corporations set up, owned, financed, and operated by Equity.

12.   At all relevant time to this complaint Equity Trust, under its various names, provided Janvrin et al with all personnel, directors, secretaries, nominee shareholders, legal advisers, banking facilities, funding, communication facilities and office facilities.

13.   Janvrin et al never had management, interests, officers, funds or facilities other than those of-and-by Equity Trust.

14.   Candover Investment PLC (CANDOVER) is an investment trust listed on the London Stock Exchange.

15.    CANDOVER acquired the majority control over Insinger de Beaufort Trust (Jersey) Limited (INSINGER TRUST) through a management buyout and gave it its abovementioned new name Equity Trust (EQUITY). Candover have full and competent control over Equity since 2003.

16.    Insinger de Beaufort Holdings SA (INSINGER) is an Anglo-Dutch banking group and owner of the Bank Insinger de Beaufort NV, a signatory on the US patriot Act for financial transparency.

17.    INSINGER were the controlling owner of INSINGER TRUST between 2000 and 2003, when they sold INSINGER TRUST to CANDOVER.

18.    INSINGER acquired Matheson Trust (Jersey) Limited in June 2000 from Jardine Matheson Holdings Limited and changed its name to INSINGER TRUST.

19.    Jardine Matheson Holdings Limited (JARDINE) is a Hong-Kong Based conglomerate and the original controlling owner of Matheson Trust (Jersey) Limited sold to INSINGER in June 2000 as abovementioned.

20.    Throughout the relevant decade 1996-2007 Matheson Trust, Insinger Trust and Equity Trust operated in the same facility with the same employee base in Jersey/UK and will be referenced in this complaint with its present name Equity Trust (Jersey) Limited (EQUITY TRUST).

21.    At all relevant time to this complaint Pilip Joseph Austin (AUSTIN), Melvyn Kalman (KALMAN), John Perkins (PERKINS), Grant Brown (BROWN) and Caroline Bougeard (BOUGEARD) were executives of both Equity Trust and Janvrin et al.

22.    Austin is managing director of Equity trust since may 2006.

23.    Kalman left Equity Trust in 2003. Perkins left Equity Trust in 2005. Brown left Equity trust in May 2007 and Bougeard is still in her positions till the present day.

24.    The California lawfirm Nixon Peabody LLP (NIXON) was hired as a legal utensil to implement Equity's extortion plan in the US.

**JURISDICTION AND VENUE**

25.    The Federal Court has jurisdiction over this case and the venue in the Northern District of California is adequate pursuant to *28 U.S.C. §1330, §1331, §1332.*

26.    Plaintiffs are US citizens and residents of the northern district of California.

27. Defendants are foreign (non-US) corporations and foreign citizens. The complaint refers to the solicitation of services by Equity Trust of the plaintiffs and their company in the United States. The subject of the complaint refers to securities and corporate mater of US Wireless Corporation, a publicly trades company operating out of San Ramon California.

28. This case is related to two other federal cases: *4:02-cv-01068-CW-BZ and 3:03-cr-00213-WHA*

## LIMITATIONS OF STATUTE

29. This present complaint regarding harboring of a criminal organization and of criminal acts culminated recently in defendants' malicious prosecution in the case Janvrin et al v. Hilsenrath et. al. (4:02-cv-1068 CW,BZ). Defendants' own case was dismissed by the Federal Court in Oakland, California on March 12, 2007 – three months ago. No limitations of statute are therefore applicable to this complaint.

## GENERAL ALLEGATIONS:
## ARCHITECTURE OF A CRIMINAL ORGANIZATION

30. Equity trust under its three relevant names (Matheson, Insinger and Equity) and under its three relevant controlling owners (Jardine Matheson, Insinger de Beaufort and Candover) have build and maintained a professional platform for hosting criminal activity and racketeering.

31. Equity Trust have refined and perfected a corporate architecture that allows performing criminal acts without the possibility of identifying the criminal behind the act. Plaintiffs have obtained ample documentation and ample forensic analysis to establish the inner works of the Equity trust's "protected hit and run" strategy. [Exhibit A]

32. This strategy is complex, and required planning and legal expertise over a decade, therefore it is unlikely to have unfolded without the supervision, awareness and hands-on participation of Equity Trust's controlling shareholders Jardine, Insinger and Candover, who also benefited from the fruits of this activity.

33. It is very likely that this "protected hit and run" strategy and corporate architecture can and is used to promote unlawful, criminal and even highly dangerous schemes all over the world, given the broad reach of Equity Trust and its variety of controlling owners.

34.   <u>STEP 1</u> in Equity's strategy is the set up of a Trust in Jersey. The trust owns the activity to be performed. It is unlisted and confidential.

35.   In this current case a trust by the name of THE REVENGE TRUST was set up to extort the Hilsenraths and their company US Wireless.

36.   <u>STEP 2</u> The Trust is run by a trustee who himself is another company formed by Equity: in our case DERARD LIMITED formed in another jurisdiction such that the same laws or courts would not be able to deal with actions of REVENGE and DERARD.

37.   <u>STEP 3</u> The actual criminal activity will not be done by REVENGE or DERARD, but by a lower level SHELL CORPORATION that will be wholly owned by the Trust (in our Case REVENGE trust). Those shell corporation were too incorporated in a separate jurisdiction than Jersey/UK such as to confuse the legal jurisdictions and provide for lack of ability to sue or investigate all three in one place: such came to life Janvrin, Rayburn and Crossgar (case: *4:02-cv-1068 Janvrin Holdings Limited et al v. Hilsenrath et al.)* all incorporated in the British Virgin Islands (BVI).

38.   <u>STEP 4</u> To further protect the employees of Equity tasked with operating the criminal network, the Directors and Secretaries of the operating arm, in our case Janvrin et al, are also not personally exposed in the affairs of the shells. The actual directors and secretaries are another set of corporation, in our case Wesley Secretaries and CH Limited. These corporations too are carefully formed in a different jurisdiction than Revenge and Equity themselves.

39.   <u>Step 5</u> The last protective layer of the criminal corporate architecture are the shareholders: a person who might be or might act as a shareholder at the very remote end of the structure (of say - Janvrin et al) could be found liable of culpable for the criminal acts intended. Therefore an additional protective layer is build in the form of a shareholder nominee – another company, CN Limited in our case:  the virtual shareholder.

## MODUS OPERANDI OF THE CRIMINAL ORGANIZATION

40.   The criminal organization when ready for business is performing its various acts in far foreign countries, from Jersey/UK, like California and the USA.

41.   Janvrin is next tasked to stealing documents, extorting, initiating multi million dollars malicious litigations etc.

42. In the process it hires million Dollar American law firms and advisors to implement the plan. Janvrin et al and other shell corporations pay the attorneys. They are thus far removed from Equity, Candover, Revenge and others who are to enjoy the fruits of the actions taken.

43. Revenues from the crime are being transferred to overseas banks (Matheson bank, Royal Bank of Scotland, etc. in our case) and then dissipate to other obscure corporations and unknown persons.

44. When however their scheme is uncovered, the damage identified and the courts get involved, in our case the federal courts in San Francisco and Oakland, the criminal organization is melting away with no traces left and no one liable.

45. Such when the Hilsenraths in case: *4:02-cv-1068 Janvrin Holdings Limited et al v. Hilsenrath et al* brought a counterclaim against Janvrin - Equity Trust closed Janvrin et al.

46. The directors, the shareholder nominees and the structure vanished: no corporations, no people, and no assets.

47. When the Court in Oakland summoned the Janvrin litigants to appear in court after 7 years of frivolous litigation: no one showed up – there was nobody accountable - just a set of insignificant corporations in half dozen foreign jurisdictions.

48. In a summary report of the forensic expert who has investigated this case, he summarizes the inner works of the Equity Trust criminal structure: "REVENGE trust sent a threatening letter to Derard Limited about the court order to appear in the Oakland federal court, Derard Limited then sent another urgent and threatening letter to the shareholder nominee CH Limited, who threatens in no ambiguous words the director nominee of Janvrin, Ryburn and Crossgar who is CN Limited. This latter sends a threatening answer back to Revenge Trust".

49. However all of the above urgent correspondence is being written up <u>by</u> the one and very same person at Equity Trust, in that very same day, <u>to</u> that very same person, bears the same unidentified signature of that person that signs without identity for all the above: Revenge trust, Equity trust, Janvrin, Rayburn, Crossgar, Derard Limited and CH Limited and CN Limited.[Exhibit B]

50. The address of all companies and entities bearing the same signature of the nameless signatory are one and the same: that of Equity Trust (Jersey) Limited – 28-30 The Parade St. Helier, Jersey/United Kingdom – the harboring host of the scheme.

51.    The "system" has accomplished its purpose: there is no tangible person or entity accountable for evading the Federal order to show up in US court on this tortuous and malicious 7 years litigation.

52.    Nonetheless, Kalman, Perkins, Brown, Bougeard and others were identified as acting behind the above criminal structure.

53.    An inspection of the Equity Trust public information substantiates the concealment of Equity's top management (in its various incarnations).

54.    Equity Trust[1], one of the largest financial trust companies has offices around the world (including in the United States), sales reps around the world, but no trace of top management: No Chairman, No CEO, No General Manager, No CFO, No General Counsel etc.

55.    Plaintiffs allege that the *de facto* control of Equity trust, (formerly Insinger trust, formerly Matheson trust) and its modus operandi relies and stems from their controlling owners throughout the entire period of the alleged conspiracy (2000-2007).

56.    Such, Candover facilitated a Management Buyout[2] when taking control of Insinger Trust in 2003; therefore their alliance with the so-called Insinger/Equity Management is self-understood.

57.    Above and beyond, Insinger de Beaufort is a signatory to the US patriot act and therefore has and had a commitment to transparency in its main and subsidiary operations.

### THE FACTS

58.    In March 2000, three Equity trust (then Matheson trust) corporations: Janvrin, Rayburn and Crossgar hired the US lawfirm of NIXON et al. to implement a scheme to improperly sell expired securities of US Wireless Corporation in the open market.

59.    The Equity shells Janvrin et al proceeded with Nixon's assistance to file litigation in federal court to provide the vehicle to coerce US Wireless and its management to give in to their pressure to trade the securities.

60.    In order to further their scheme, in and about November 2000, Janvrin et al. conspired[3] with NIXON at al and others to:

---

[1] http://www.equitytrust.com/content/index.htm

[2] http://www.internationallawoffice.com/Deals/Detail.aspx?r=2238

[3] **Unruh v. Truck Ins. Exch., 7 Cal. 3d 616, \***

a. unlawfully obtain, use and trade private financial records of the HILSENRATHS,

b. blackmail the HILSENRATHS and others in his company with making those records public,

c. impeach the company and hurt its publicly traded stock

unless a favorable arrangement was made on behalf of Janvrin et al. and NIXON.

61. Janvrin et al and Nixon personally and knowingly accessed confidential financial records of the HILSENRATHS held at Equity Trust. The retrieval of records occurred, but was not limited, to a week long effort in London, in which Equity executives Kalman and Perkins, Nixon personnel and Janvrin selected, retrieved and photocopied HILSENRATH family records and brought them back to California to put them to use as decided between them.

62. One of the 9 participants at the broadly attended London documents-harvesting meeting describes the events in a sworn affidavit:

> **"The abovementioned confidential Hilsenrath records were handed to the Nixon Peabody attorneys with the objective to impeach Hilsenrath with his holdings in offshore trusts and get the CEO Hilsenrath fired. Hilsenrath was identified as the primary hurdle in the Janvrin litigation."[4]**

63. On several documented occasions between December 2000 and April 2001, defendants through their attorneys made specific threats to employees and advisors of US Wireless

---

To state a cause of action for conspiracy the complaint must allege: (1) the formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting. (*Mox Incorporated* v. *Woods, supra*; *Orloff* v. *Metropolitan Trust Co.* (1941) 17 Cal. 2d 484, 488 [110 P.2d 396]; see *Wise* v. *Southern Pacific Co.* (1963) 223 Cal. App. 2d 50, 64-65 [35 Cal. Rptr. 652]; Witkin, *op. cit. supra*, Pleading, § 774, p. 2390.)

"Malice is properly pleaded by alleging the wrongful motive, intent or purpose." (3 Witkin, *op. cit. supra*, Pleading, § 766, at p. 2383.) A general allegation of such intent is sufficient to support a claim for exemplary damages. (*3 Witkin, op. cit. supra, Pleading, § 769, p. 2385*.)

[4] **Wynn v. NBC, 234 F. Supp. 2d 1067.** The elements for a claim of tortious interference with contractual relations are: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.
As an element of a tortious interference with contractual relations claim, plaintiffs must plead facts sufficient to support an inference that defendants intended to cause the alleged breach

---

1    stating that they will disturb the company by use of the stolen records if their demands were

2    not met.

3    64.    Under the pressure of the above threats, the Board of Directors of USWC (1) settled the

4    dispute with Janvrin et al on the basis of $4.5 million in cash, 2.5 million shares of stock of

5    USWC and 750,000 options of Mr. HILSENRATH's holdings; and (2) launched a secret

6    investigation of the above allegations of impropriety against USWC's CEO Oliver

     HILSENRATH as alleged by the Nixon et al.

7    65.    Money and stock were transferred to 5 different shell corporations of Equity trust (then

8    Insinger de Beaufort)

9    66.    In May 2001 the USWC Board of Directors fired founder and CEO Oliver HILSENRATH as

10   the result of that investigation.

11   67.    USWC did not survive the dismissal of its CEO, and went bankrupt 6 weeks later, rendering

     useless the 2.5 million shares in the hands of Janvrin et al.

12   68.    In March 2002, defendants Equity Trust, by means of Janvrin et al and their attorneys NIXON

13   initiated a new, bogus, litigation against HILSENRATH.

14   69.    This time defendants claimed that they were surprised and financially hurt by the

15   investigation against HILSENRATH and the subsequent collapse of US Wireless.

16   70.    This was a second, new phase of the extortion and ongoing malicious prosecution given that it

17   was Equity and NIXON themselves that instigated the internal investigation in order to

     exercise pressure on HILSENRATH.

18   71.    In 2005, upon the discovery of tangible evidence of the invasion of privacy, of the organized

19   trade and use of HILSENRATH family financial documents, Hana and Oliver HILSENRATH

20   filed a counterclaim against Janvrin et al in case No. *4:02-cv-1068 Janvrin Holdings Limited*

21   *et al v. Hilsenrath.*

22   72.    In 2007, the Court ordered representatives or trustees of Janvrin et al, Nixon Peabody's

23   clients, to show up in Court, in person, if they wish to continue to prosecute their seven-year-

     old case.

24   73.    The "case" was but a sophisticated cover-up scheme planned and executed by Equity, Janvrin

25   and NIXON. Once the cover was of no use and possibly even a risk, no one from the British

26   trust, NIXON's clients, would bother risk a trip to the United States.

27   74.    Therefore the plaintiffs in that litigation [4:02-cv-1068] simply stood the Court up -- NO

28   representative or trustee of Janvrin showed up.

75. The Court proceeded to dismiss Janvrin's complaint, and ordering Janvrin's default with respect to the HILSENRATH counterclaim.

76. Two weeks later in March 2007, Janvrin's attorneys from Nixon briefed the Court that Janvrin, Rayburn & Crossgar do not exist anymore for an unknown period of time.

77. Between 2005 and 2006, in a broad US government investigation it was determined that the documents used by NIXON at al and Janvrin, Rayburn and Crossgar to impeach Mr. HILSENRATH, were not related to improper financial transactions and, in fact, the USWC CEO did not engage in defrauding USWC or its shareholders.

78. The HILSENRATHS, who had the vast majority of their assets invested in USWC stock, lost the value of 6.5 million shares of USWC worth over $26 million at the company's last day of trade ever: May 29, 2001; Thus rendering the damage irreparable.

79. As further result of defendants' malicious prosecution, the HILSENRATHS lost a severance package, lost several years of wages and income and experienced severe adversity resulting form defendants' defamation.

80. Starting 2001, Equity personnel embarked in a process of destroying the documentation and correspondence between themselves and their attorneys Nixon Peabody on the abovementioned extortion plan and of the extortion documents made available to Nixon to use against US Wireless.

81. In June 2005, as part of a US government investigation prompted by the dismissal of Oliver Hilsenrath, CEO of US Wireless, the extortion documents resurfaced through a third party.

82. The objective of the document destruction by Equity was two fold: (1) to eliminate the evidence of their organized crime and (2) to impeach Hilsenrath with his own stock transactions and bury the Hilsenraths in a US government investigation.

83. In 2006, the US government and the Jersey government initiated their own investigation into the destroyed Equity Trust records.

84. In early 2007, Equity Trust admitted in writing that the Equity Trust records now available in the hands of the Hilsenraths and the US government could not be located anymore at Equity Trust.

85.     Perkins, director of Equity Trust, was interviewed about the aforementioned London meeting and the above described conspiracy during a joint mission to Jersey/UK by the US Attorney[5] in San Francisco and the Plaintiff in this complaint, Oliver Hilsenrath.

86.     After denying his involvement, Perkins was confronted with a copy of one of the extortion packages. At that point the presiding Jersey judicial officer stopped the interview to prevent Perkins from self-incrimination and incrimination of his employer (Equity Trust formerly Insinger Trust formerly Matheson Trust) [see Exhibit C].

## LEGAL ALLEGATION OF HARBORING

87.     In *Greenbaum v. Islamic Republic of Iran, 451 F. Supp. 2d 90, 2006 U.S. Dist. LEXIS 57432 (D.D.C., August 10, 2006, Decided)*:

> **"Civil conspiracy under California law consists of formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design. It is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration actionable *Greenbaum v. Islamic Republic of Iran, 451 F. Supp. 2d 90, 2006 U.S. Dist. LEXIS 57432 (D.D.C., August 10, 2006, Decided)*"**

88.     In *Greenbaum v. Islamic Republic of Iran* -- Plaintiff was fatally hurt by terrorists that have used Iran as training grounds and while Iran also hosted and supported the honing of their skills without necessarily taking direct part in the terrorist act that brought to plaintiffs demise.

89.     While in the present complaint plaintiffs allege full-fledged involvement of Equity Trust (Jersey) Limited in Janvrin and Nixon's acts against them, in *Greenbaum v. Islamic Republic of Iran* the California Court suggests that full participation is not necessary to prove that Equity Trust (Jersey) Limited and the other defendants took part in the alleged conspiracy in order to be liable.

---

[5] Case 3:03-cr-00213-WHA USA v. Hilsenrath

90.     The California Court states that it is sufficient to show that Equity Trust (Jersey) Limited et al hosted Janvrin, Ryburn Crossgar and Nixon and were aware of their actions in order to determine that by harboring they became co-conspirators.

91.     This is more so the case as here Equity Trust (Jersey) Limited et al provided the actual personnel, legal counsel, offices and payroll for the persons acting against plaintiffs.

## LEGAL ALLEGATION OF VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)[6] ACT

*92.*     In *Flores v. Emerich & Fike, 416 F. Supp. 2d 885* the Court clearly identified the element of a RICO allegation. The conduct of Equity Trust et al substantially meets the legal criteria for RICO in *Flores*.

*93.*     A violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C.S. § 1961 et seq., consists of the following elements:

   a.    CONDUCT/PATTERN OF RACKETEERING ACTIVITY – Equity et al PREDICATE ACTS:

         i.   **robbery of documents and records** through invasion of privacy,

---

[6]**18 USCS § 1961**

   (1)  (1)  "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act [21 USCS § 802]), which is chargeable under State law and punishable by imprisonment for more than one year

   (2)  "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

A civil complaint under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.S. §§ 1961-1968, must at least allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as predicate acts) (5) causing injury to plaintiff's business or property. Where a plaintiff alleges that a defendant has violated 18 U.S.C.S. § 1962(c) (conducting the affairs of a racketeering enterprise) and (d) (conspiring to commit racketeering), the plaintiff must show that the racketeering enterprise exists independently from the acts of racketeering.  **Flores v. Emerich & Fike, 416 F. Supp. 2d 885**

      ii.  **unlawful transmission of information** by means of wire and mail,

     iii.  **extortion**,

     iv.  **unlawfully obtaining assets**,

      v.  **unlawfully distributing assets** by means of mail and wire,

     vi.  **recurring extortion** for the second time in the form of a bogus, malicious legal action,

    vii.  implementation of a **cover-up scheme,**

   viii.  **destruction of records,**

     ix.  with objective of **obstruction of justice,**

      x.  **entrapment**,

     xi.  **tempering with a criminal investigation** and

    xii.  **evading prosecution**.

b.  ENTERPRISE – Equity et al have put in motion an elaborate and well-designed corporate system with multiple entities in multiple jurisdictions. All coordinated to harbor the executors of the scheme.

c.  RELATEDNESS (*criminal acts that share similar purposes, results, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics*). – The decade long conspiracy was targeted and partly successful in obtaining unlawful assets and benefits from a US public company, its executives and their families by means of extortion and entrapment, obstruction of justice and malicious prosecution.

d.  CONTINUITY (*closed period of repeated conduct or a threat of future criminal activity*). –

      i.  Equity at al acted in closely timed multiple steps to execute its conspiracy

      ii.  As to the threat of future criminal activity, there can be no doubt that Equity et al are operating an efficient and lively criminal enterprise, to this very day, committed to its very structure and purpose.

iii.  The very evidence of the above statement is well displayed in Equity's evasion from prosecution as exemplified in Exhibit A.

## AUSTIN'S PERJURY IN FEDERAL COURT

94.  After the filing of the original complaint in this current case, Equity trust's managing partner took the conspiracy to a new level through perjury in federal Court.

95.  Such in order to cover up the acts of his organization as described above, Austin is making the following false assertions under penalty of perjury (Supplemental Exhibit A):

   a.  Equity trust never owned Janvrin et al

   b.  Equity trust never financed Janvrin et al

   c.  Equity trust has its entire operations in Jersey/UK

   d.  Equity trust is doing no business in the United States and not subject to federal jurisdiction[7].

96.  The objective is to distance his organization through perjury from responsibility to the conspiracy and to the hosting of the acts while evading US federal jurisdiction, when in fact:

   a.  Supplemental Exhibit B presents two Deeds of Trust stating clearly that Equity trust are the owners of Crossgar and Ryburn.

   b.  Supplemental Exhibit B also shows that Equity trust has an operation under the same name in BVI and is the registered agent for Janvrin et al.

   c.  Supplemental Exhibit C presents Equity trust internal correspondence attesting to both the decision to finance Janvrin et al. as well as attests to the purpose of the financing which was to "not affect OUR (Equity trust's) pursuit of the existing claims of Janvrin, Ryburn and Crossgar against US Wireless/Oliver Hilsenrath."

   d.  The Equity trust Website states that Equity trust operates an active division in New Your City devoted solely to "assists US clients with the establishment of international structures and provides for related corporate trust and management services" - [Hilsenrath Declaration – Exhibit E: Equity Trust web site].

---

[7] Austin states that Equity has no offices in California but omits to say that Equity has an office in New Your City with the stated objective of soliciting clients in all North America including California.

1   To leave no doubt as to Equity trust's deep roots in the USA, Equity trust states in the same

2   exhibit:

3

4       "Equity Trust is the preferred service provider for North American
        multinationals and medium-sized companies. We offer a one-stop
        sales office located in New York.

5

6       We establish vehicles for North American corporate clients in
        many Equity Trust jurisdictions including Luxembourg, the

7       Netherlands, the Netherlands Antilles and the Cayman Islands.
        Additionally we can offer services in Aruba, British Virgin Islands,

8       Hong Kong, Jersey, Argentina, and Switzerland."

9   97.   Austin's recent perjury in Federal court stresses the relentlessness of this organization in

10        pursuit of its fraudulent agenda.

11

12                          **FIRST CAUSE OF ACTION**

13                 **(Harboring a conspiracy in a scheme to blackmail)**

14  Plaintiffs Hana and Oliver HILSENRATH reallege and incorporate into this cause of action each and
    every paragraph in this complaint.

15  98.   Defendants harbored and were full partners at the joint scheme with Janvrin.

16  99.   Janvrin et al relied on Equity Trust's facilities, funds and personnel to actually work the

17        conspiracy.

18  100.  Janvrin et al were also long dead and closed while the bogus conspiracy was continuing to

19        seek to squeeze money from the HILSENRATHS – all fueled and driven by Equity Trust to

20        meet their goals.

21  101.  In a May 16 recommendation for judgment, the Federal court recommended to award the

22        Hilsenraths $15 million in damages and prejudgment interest.

23  102.  Equity et al have equal and separate responsibility towards their victims; the Hilsenraths are

24        therefore entitled to $15 million from defendants in damages and prejudgment interest.

    WHEREFORE, defendant Oliver HILSENRATH prays relief as set forth below.

25

26

27

28

**SECOND CAUSE OF ACTION**

**(Aiding and abetting[8] in a blackmail scheme as part of the prosecution of Janvrin v. Hilsenrath)**

Plaintiffs Hana and Oliver HILSENRATH reallege and incorporate into this cause of action each and every paragraph in this complaint.

103.    Defendants aided and abetted a blackmail scheme that resulted in the abovementioned settlement agreement with US Wireless.

104.    Mr. HILSENRATH is entitled to this Court's declaration that defendant should compensate Mr. HILSENRATH in an amount equal to the extorted settlement, an amount of $7.5 million.

WHEREFORE, defendant Oliver HILSENRATH prays relief as set forth below.

**THIRD CAUSE OF ACTION**

**(Constructive trust – re Second Cause of Actions)**

---

[8] **United States v. Barnett, 667 F.2d 835**  An aider and abettor is liable for any criminal act which in the ordinary course of things was the natural or probable consequence of the crime that he advised or commanded, although such consequence may not have been intended by him.

 It is not essential that the accessory know the modus operandi of the principal. It is also not necessary that the person accused of aiding and abetting know all the details of the crime or all the persons who were perpetrating the crime

------------------

**Chance World Trading E.C. v. Heritage Bank of Comm..., 2004 U.S. Dist**.   To properly state a claim for aiding and abetting the tortious breach of a duty, a plaintiff must plead that a defendant: (1) had knowledge that another's conduct constitutes a breach of a duty; and (2) substantially assisted or encouraged that breach

Liability under a civil conspiracy requires a co-conspirator have an independent duty to a plaintiff. Tort recovery for civil conspiracy is only allowed against a party who already owes the duty, under substantive tort law, that was violated.

Under California law, there are two major distinctions between aiding and abetting and civil conspiracy which explain why an independent duty requirement is not an element of aiding and abetting. First, conspirators are held jointly liable for the tort committed, whereas aiders and abettors are not held liable as joint tortfeasors for the underlying tort. In a civil conspiracy, because liability is premised on the commission of a single tort, it is logical that all conspirators must be legally capable of committing the wrong. Second, in aiding and abetting, the defendant's conduct must be a substantial factor in causing the harm, while conspiracy requires no proof that the conspirator did anything that actually caused the harm. Consequently, a claim for aiding and abetting does not require that the defendant owe an independent duty to the plaintiff.

Under California law, the second element of civil aiding and abetting of a tort, substantial assistance, requires the plaintiff to allege that the actions of the aider/abettor proximately cause the harm on which the primary liability is predicated. In other words, the assistance must have been a substantial factor in causing the harm suffered

To properly state a claim for aiding and abetting the tortious breach of a duty, a plaintiff must plead that a defendant: (1) had knowledge that another's conduct constitutes a breach of a duty; and (2) substantially assisted or encouraged that breach.

Plaintiff Oliver HILSENRATH realleges and incorporates into this cause of action each and every paragraph in this complaint.

105.   Mr. HILSENRATH is entitled to this Court's order imposing a constructive trust on all funds and consideration due to him from defendants in connection with the abovementioned 2001 Settlement Agreement.

WHEREFORE, plaintiff Oliver HILSENRATH prays relief as set forth below.

## FOURTH CAUSE OF ACTION

### (Invasion of privacy as part of the prosecution of
### Janvrin v. Hilsenrath)

Plaintiff Oliver HILSENRATH realleges and incorporates into this cause of action each and every paragraph in this complaint.

106.   Defendants conspired and invaded Mr. and Mrs. HILSENRATH's privacy[9], reviewed and copied their personal information, and put it to their personal use. The invasion of privacy should be classified as "intrusion of seclusion"[10].

107.   The theft of the private documents[11], their distortion and use to *slander per se*[12] and ultimate unlawful dissemination of the documents caused: (1) Mr. HILSENRATH's termination as CEO[13] – loss of severance of $3.18 million, (2) indefinite stop of trade of US Wireless stock –

---

[9]   <u>Intrusion into the seclusion</u> of another: **Fisher v. Quality Hyundai, Inc., 2002 U.S. Dist.**

[10]   That a plaintiff has received damages for his claim of unreasonable public disclosure of private facts does not preclude an award of damages for his claim of intrusion upon seclusion: **Doe v. High-Tech Inst., Inc., 972 P.2d 1060**

[11]   The tort is completed with the obtaining of the information by improperly intrusive means: **Pearson v. Dodd, 133 U.S. App. D.C. 279**

[12]   "Slander per se" categories include charges that the plaintiff has committed a serious crime … the statement "you stole the money" has been held to be slander per se. **Hruby v. Kalina, 424 N.W.2d 130 (Neb. 1988) - Gilbert Law Summaries/Torts: Slander per se-special damages not required IS12431**

[13]   **Applied Equip. Corp. v. Litton Saudi Arabia, 7 Cal. 4th 503,** To recover in tort for intentional interference with the performance of a contract, a plaintiff must prove: (1) a valid contract between plaintiff and another party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.

------------------------------------

**Wynn v. NBC, 234 F. Supp. 2d 1067**  The elements for a claim of tortious interference with contractual relations are: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. As an

the HILSENRATHS' loss of value of 5.3 million shares of stock at $2.94/share at the last day of trade[14] - value of $15.58 million, (3) US freeze action of $7.3 million assumed embezzled per defendant's fake allegations, (4) legal fees to attorneys of total $1.6 million and (5) Personal time invested and self representation at $275,000/annum[15] and a loadstar doubling the value of time invested[16] and amounting to personal time, with loadstar of $3.2 million for the time-frame 2001 to 2007.

108.    Plaintiffs seek DAMAGES (before exemplary damages) of $30.76 million.

WHEREFORE, defendant Oliver and Hana HILSENRATH pray relief as set forth below.

## FIFTH CAUSE OF ACTION

### (Intrusion of seclusion as part of prosecution of Janvrin v. HILSENRATH – Exemplary Damages)

Plaintiff Oliver HILSENRATH realleges and incorporates into this cause of action each and every paragraph in this complaint.

109.    Defendant further conspired to invade plaintiffs' privacy and use distorted financial records to unfairly remove Mr. HILSENRATH from his post as CEO.

110.    Defendants' actions resulted in plaintiffs' loss of good name and good reputation[17].

111.    Plaintiffs seek relief including general, special and exemplary damages/punitive damages from *Intrusion of Seclusion* pursuant to *Civil Code Sect. 1708.8 (d)* and *Civil Code Section 48 a. 2.*[18] -- resulting in triple damages of $92.28 million.

WHEREFORE, defendant Oliver HILSENRATH prays relief as set forth below.

## SIXTH CAUSE OF ACTION

### (Hana HILSENRATH damages - invasion of privacy as part of prosecution of Janvrin v. Hilsenrath)

---

element of a tortious interference with contractual relations claim, plaintiffs must plead facts sufficient to support an inference that defendants intended to cause the alleged breach

[14]  May 29, 2001 – first business day after CEO fired – last day of trade ever in the stock of the company

[15]  Last salary earned before termination from US Wireless

[16]  Pursuant to **Guam Soc'y of Obstetricians & Gynecologists v. Ada, 100 F.3d 691**

[17]  The key to proving a defamation action is showing injury to reputation: *Smith v. Mission Assocs., 225 F. Supp. 2d 1293*

[18]  These type of damages do not preclude pursuit of multiple theories: *Hubbard Business Plaza v. Lincoln Liberty Life Ins. Co., 596 F. Supp. 344*

Plaintiff Hana HILSENRATH realleges and incorporates into this cause of action each and every paragraph in this complaint.

112.   Hana HILSENRATH is a mother of six children, 4 of whom are minors, and does not work outside the home.

113.   As a legal result of the invasion of privacy by defendants Mrs. HILSENRATH has suffered fear, anguish, and illness; has been exposed to personal threats by shareholders of U.S. Wireless; and has suffered constant fear of retaliation and revenge to herself and/or her children.

114.   Mrs. HILSENRATH has also seen the structure and security of her family threatened by the disclosure of her family's private information, and has lost the vast majority of her personal wealth.

115.   As the result of defendants' actions, Mrs. HILSENRATH suffered loss of tangible assets in value of $7.3 million, which she requires to recover from defendants.

WHEREFORE, defendant Hana HILSENRATH prays relief as set forth below.


### SEVENTH CAUSE OF ACTION

### (Hana HILSENRATH exemplary damages - invasion of privacy as part of the prosecution of Janvrin v. Hilsenrath)

Plaintiff Hana HILSENRATH realleges and incorporates into this cause of action each and every paragraph in this complaint.

116.   Hana HILSENRATH has suffered damages as the result of "intrusion of seclusion"[19].

117.   The TOTAL RELIEF sought under this cause of action include general, special and exemplary damages/punitive damages resulting from *Intrusion of Seclusion* pursuant to *Civil Code Sect. 1708.8 (d)* and *Civil Code Section 48 a. 2.*[20] -- resulting in triple damages of $21.9 million.

WHEREFORE, defendant Hana HILSENRATH prays relief as set forth below.

---

[19] That a plaintiff has received damages for his claim of unreasonable public disclosure of private facts does not preclude an award of damages for his claim of intrusion upon seclusion: **Doe v. High-Tech Inst., Inc., 972 P.2d 1060**

[20] These type of damages do not preclude pursuit of multiple theories, **Hubbard Business Plaza v. Lincoln Liberty Life Ins. Co., 596 F. Supp. 344**

**EIGHTH CAUSE OF ACTION**

**(Malicious prosecution of second case Janvrin v. Hilsenrath)**

Plaintiffs Hana and Oliver HILSENRATH reallege and incorporate into this cause of action each and every paragraph in this complaint.

118.   In 2002, Janvrin at al, hosted by Equity trust, then Insinger Trust, filed a new lawsuit against the HILSENRATHS on the knowingly false pretense that they did not know before the 2001 settlement that USWC initiated an investigation into Mr. HILSENRATH's financials.

119.   It was however Equity themselves through their co-conspirators Janvrin and Nixon Peabody that instigated the investigation as also determined by the federal Court in [4:02-cv-1068].

120.   This act of malicious prosecution lasted 5 years and ended only in March 2007.

121.   In the course of this malicious and knowingly frivolous lawsuit, Equity through Janvrin were seeking over $7 million specifically from the HILSENRATHS.

122.   Equity through Janvrin were actively banking on the perceived weakness of the HILSENRATH's after the USWC scandal instigated by Janvrin and Nixon themselves.

> **"In the case of the tort of malicious prosecution, the fundamental interest protected is that of every person to be free from unjustifiable and unreasonable litigation initiated without probable cause, and the corresponding duty is to refrain from initiating such unjustified litigation".[21]**

123.   In 2005, defendants by means of false declarations from Nixon sought to obtain a $7 million judgment against HILSENRATH from the Federal Court in California.

124.   The HILSENRATHS lived for years with fear of a possible judgment of that size as the result of this bogus and malicious litigation.

125.   Plaintiffs seek declaratory and exemplary damages from defendants in an amount in excess of triple that amount - $21 million.

WHEREFORE, defendants Hana and Oliver HILSENRATH pray relief as set forth below.

---

[21] **Sheldon Appel Co. v. Albert & Oliker (1989) 47 Cal.3d 863, 881-882, 254 Cal. Rptr. 336, 765 P.2d 498.**

## NINTH CAUSE OF ACTION[22]

### (Destruction of documents with criminal intent)

Plaintiffs Hana and Oliver HILSENRATH reallege and incorporate into this cause of action each and every paragraph in this complaint.

126.    Defendants destroyed the records of the blackmail conspiracy.

127.    Defendants destroyed records attesting to the Hilsenraths' assets in order to induce the US government to commence and sustain an investigation against Oliver Hilsenrath that proved to be baseless.

128.    By the destruction of the documents, defendants hindered the legal process of the Hilsenraths to recover damages from the malicious prosecution against them by Janvrin and Equity.

129.    By the destruction of the documents, defendants caused a wasteful and painful US government investigation into the Hilsenrath assets that destroyed most of the Hilsenrath's remaining assets.

130.    Plaintiffs request the Court to order defendants to compensate them at least in the amount of $10.9 million including $7.3 million of cash losses and $3.6 million in legal expenses.

131.    Plaintiffs request the court to order defendants to pay exemplary damages for the destruction of records in an amount according to proof.

WHEREFORE, defendants Hana and Oliver HILSENRATH pray relief as set forth below.

---

[22] **Leon v. IDX Sys. Corp., 464 F.3d 951** A party's destruction of evidence qualifies as willful spoliation if the party has some notice that the documents were potentially relevant to the litigation before they were destroyed. Moreover, because the relevance of destroyed documents cannot be clearly ascertained because the documents no longer exist, a party can hardly assert any presumption of irrelevance as to the destroyed documents
The prejudice inquiry looks to whether the spoiling party's actions impaired the non-spoiling party's ability to go to trial or threatened to interfere with the rightful decision of the case. Prejudice can be found when a party's refusal to provide certain documents forces the other party to rely on incomplete and spotty evidence at trial.

-------------

**In re Holocaust Victim Assets Litig., 302 F. Supp. 2d 59** It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction. An adverse inference should serve the function, insofar as possible, of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

1

## TENTH CAUSE OF ACTION

2

### (Court order to prevent defendants to do business and solicit clients in the United States of

3

### America)

4

Plaintiffs Hana and Oliver HILSENRATH reallege and incorporate into this cause of action each and

every paragraph in this complaint.

5

132.    Defendants collectively violated all standards of fair financial and banking business towards

6

their clients.

7

133.    No person should be solicited or exposed to the abuse and criminal behavior of these

8

collective defendants.

9

134.    The very actions and means of operations of these financial institutions constitute an ongoing

10

criminal threat in today's was against dangerous abuse of covert financing.

11

135.    Defendants' actions brought them to a point of no return.

12

136.    Plaintiffs request the Court's Order to bar all defendants from doing business in or with the

United States and its citizens.

13

14

## ELEVENTH CAUSE OF ACTION: RICO ALLEGATION

15

Defendants collectively act and acted as an organized crime cartel in violation of the RICO act.

16

137.    Defendants acted in conspiracy with each other and other parties for more than a decade.

17

138.    Defendants acted in a chain of countless steps over a decade to extort, entrap, obtain financial

benefits and then cover up a wide scale criminal conspiracy.

18

139.    Plaintiffs were the primary victims of defendants' conduct.

19

140.    Plaintiffs lost the majority of their assets and lived in torturous conditions for over seven years

20

as the result of defendants' conduct.

21

141.    Plaintiffs are entitled to[23] threefold the damages they sustained in their business or property

22

by reason of a violation of section 1962 and the cost of suit, including a reasonable attorney's

fee amounting to $278.58 million.

23

24

[23] **Rosenberg v. JCA Assocs., 2007 U.S. Dist. LEXIS 23570**

25

**19** 18 U.S.C. § 1964(c) provides:

26

Any person injured in his business or property by reason of a violation of section 1962

of this chapter may sue therefore in any appropriate United States district court and

27

shall recover threefold the damages he sustains and the cost of suit, including a

reasonable attorney's fee, . . .

28

**TWELFTH CAUSE OF ACTION**

**(Austin's perjury in Federal Court to defeat execution of District Court Order)**

Plaintiffs Hana and Oliver HILSENRATH reallege and incorporate into this cause of action each and every paragraph in this complaint.

142.   Defendant Austin committed perjury in a declaration to the federal Court in which he falsely asserts that Equity trust are not owner nor did they ever finance Janvrin, Ryburn and Crossgar.

143.   The objective and the timing of the above false statement is targeted to evade an $8 million[24] judgment against Janvrin at al by the District Court.

144.   Plaintiffs are entitled to be compensated with at least $8 million for Austin's attempt to conspire and deprive them of the Court's judgment.

**PRAYER**

145.   By way of this complaint, Mr. and Mrs. HILSENRATH pray relief as follows:

a.   That this Court order defendants to pay plaintiffs Hana and Oliver HILSENRATH, for co-conspiring against them with Janvrin et al, an amount equal to $15 million in damages and prejudgment interest. This amount shall be equal to the federal Court recommended damages to be paid by Janvrin to the Hilsenraths for Janvrin's participation in the same blackmail conspiracy.

b.   That this Court order defendants to pay to plaintiff Mr. HILSENRATH for aiding and abetting the extortion scheme that lead to the 2001 settlement with their clients, an amount equal to his share of that settlement -- $7 million.

c.   That this Court impose a constructive trust on any amounts reimbursed to plaintiffs in connection to the 2001 improper settlement.

d.   That Mr. HILSENRATH recover damages for invasion of privacy and breach of governing statutes at least in the amount of $30.76 million.

e.   That Mr. HILSENRATH recover exemplary damages resulting from intrusion to seclusion in an amount not less than $92.28 million.

f.   That Mrs. HILSENRATH recover damages for defendants scheme to extort, defame and invade her privacy, at least in the amount of $7.3 million.

---

24 The award of the court is a minimum of $8 million and a maximum of $15 million with the exact amount being still *sub judice*.

g.   That Mrs. HILSENRATH recover exemplary damages resulting from defendants' intrusion to seclusion in an amount no less than $21.9 million.

h.   That Mr. and Mrs. HILSENRATH recover damages and exemplary damages resulting from defendants' malicious prosecution in an amount no less than $21 million.

i.   That Mr. and Mrs. HILSENRATH recover damages and exemplary damages resulting from defendants' malicious destruction of documents and records in an amount no less than $10.9 million and exemplary damages according to proof.

j.   That plaintiffs recover prejudgment interest on sums with which they parted, and on all damages they recover.

k.   That the Court Orders to bar defendants from doing business in the United States.

l.   That the Court compensate Mr. and Mrs. Hilsenrath for being the victims of a racketeering organization and for damages incurred therefore in an amount of $278.58 million.

m.   That the Court compensate Mr. and Mrs. Hilsenrath for being deprived through Austin's perjury of the reward according to the District's Court's order in the amount of at least $8 million.

n.   That this Court award such other and further relief as it deems proper.


Dated: September 17, 2007


Respectfully submitted,


_____/s_____          _____/s_____

HANA HILSENRATH          OLIVER HILSENRATH