HANA HILSENRATH
OLIVER HILSENRATH
822 Eastbrook Court
Danville, CA 94506
Telephone: 925 212 6299
Facsimile: 925 736 7571
ohlx@sbcglobal.net

<u>PLAINTIFFS *IN PRO PER*</u>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HANA HILSENRATH AND OLIVER HILSENRATH,<br><br>                    Plaintiffs,<br>                    v.<br><br>EQUITY TRUST (JERSEY) LIMITED, CANDOVER INVESTMENTS PLC, INSINGER DE BEAUFORT SA, JARDINE MATHESON HOLDINGS LIMITED, PHILIP AUSTIN, GRANT BROWN, MELVYN KALMAN, JOHN PERKINS, CAROLINE BOUGEARD, AND DOES 1-9,<br>                    Defendants. | **Case 4:07-cv-03312-CW**<br><br>OPPOSITION TO KALMAN, PERKINS MOTIONS TO DISMISS AND/OR STRIKE<br><br>**Judge: Hon. Claudia Wilken**<br>**Date: Nov 1, 2007**<br>**Time: 14:00**<br>**Place: Courtroom 2, 4th Floor** |

## **IMPROPER FILING**

Knapp filed with this court on behalf of PERKINS and KALMAN a motion to dismiss on grounds of lack of jurisdiction and to strike on the merits.

Liberally construed Knapp's motion is based on a wealth of exhibits that are not supported by a sworn declaration pursuant to Local Rule 7-5 for the Court to even consider this motion.

A motion to strike, for all practical purposes a motion for summary judgment, should be filed appropriately. Knapp cannot expect special *pro per* treatment, therefore the court is respectfully requested to dismiss Knapp's motions for not being properly submitted.

1

## ORGANIZATION OF THIS DOCUMENT

Plaintiffs include by reference to this opposition all arguments relevant to KALMAN and PERKINS regarding special and general jurisdiction that were presented to this court in Doc 50 and exhibits: "Opposition to all defendant's motions to dismiss".

## INTRODUCTION

The Hilsenraths were introduced to PERKINS and KALMAN, then of Jardine Matheson Trust, in a two fold capacity: Jardine Matheson were to be the largest investors in US Wireless, the Hilsenraths' startup in California, and also as world-class personal trust managers.

The initial solicitation of the Hilsenraths as private clients was at PERKINS' initiative, on behalf of Jardine Matheson Trust by means of his letter faxed to the Hilsenraths' home in Alamo California [Exhibit A – PERKINS Initial solicitation 1996].

When the Hilsenraths were required to submit to the trust a copy of their passports, they presented the only passports they had: Israeli passports. Only in 1999-2000 the Hilsenraths became US citizens.

PERKINS knew about the Hilsenraths' permanent residency in California when he and KALMAN coordinated a multi million Dollar private placement in the Hilsenraths' startup US Wireless in 1996, a startup largely based on Hilsenrath's skills in radio technology. PERKINS, KALMAN and their subsequent investors were counting on the Hilsenraths prolonged stay in the United States as a (written) commitment the Hilsenraths needed to make to assure the company's viability and the viability of Jardine Matheson's investment [Exhibit B – Jardine Matheson Trust letter to Lampert and Lampert].

Jardine Matheson Trust's solicitation of the Hilsenraths is and was along the line of Equity Trust's (the present incarnation of Jardine Matheson) strategy as articulated in their own website: "we cater to North American multinationals".

The relationship sought by the Hilsenraths, and seemingly offered by Jardine Matheson, was one of literal "trust" as articulated in Exhibit A – a relationship with a trustworthy, reliable and financially savvy institution that would not only remove the burden of managing the personal finances, but would also take care of the Hilsenrath family in case of death or tragedy.

While well educated, the Hilsenraths education is in areas of technology and project management not in finance, law or asset management. Prior to PERKINS' solicitation, the Hilsenraths never had more than a bank account in the nearby local shopping center, never had a

trust, had never incorporated a company, and had never dealt with tax other than through a paycheck.

It was the Hilsenraths' naiveté and lack of financial savvy that compelled the Hilsenraths to enter in a relationship without rigorous written agreements. Further, the Hilsenraths were driven by a mix of fundamental trust in a handshake, trust in good faith and the hope to have found a credible outfit to take care of the many children of the family, should tragedy strike.

It was this belief in good faith that determined the Hilsenraths to develop their assets in Aida without ever having a signed agreement [see declarations of Austin Exhibit C], in TA with an agreement signed in 1999, when the trust was formed and funded in 1997, OHFI in which an agreement was signed in 1999 when all the US Wireless stock was invested in 1998 and in the later Firefly Trust in June 2001 while all funding was already concluded in May.

All the agreements were boilerplate, un-negotiated forms[1]. See also **Brazil v. Dell Inc., 2007**

---

[1] A **standard form contract** (sometimes referred to as an **adhesion contract** or **boilerplate** contract) is a contract between two parties that does not allow for negotiation, i.e. *take it or leave it*. It is often a contract that is entered into between unequal bargaining partners, such as when an individual is given a contract by the salesperson of a multinational corporation. The consumer is in no position to negotiate the standard terms of such contracts and the company's representative often does not have the authority to do so.

There are a number of reasons why such terms might be excepted:

- **Standard form contracts are rarely read.** …Even if such information is discovered the consumer is in no position to bargain as the contract is presented on a "take it or leave it" basis. Coupled with the often large amount of time needed to read the terms, the expected payoff from reading the contract is low and few people would be expected to read it.

- **Access to the full terms may be difficult or impossible before acceptance**. Often the document being signed is not the full contract; the purchaser is told that the rest of the terms are in another location. This reduces the likelihood of the terms being read and in some situations, such as software end user license agreements, can only be read after they have been notionally accepted by purchasing the good.

- **Boilerplate terms are not salient**. The most important terms to purchasers of a good are generally the price and the quality, which are generally understood before the contract of adhesion is signed. Terms relating to events which have very small probabilities of occurring or which refer to particular statutes or legal rules do not seem important to the purchaser. This further lowers the chance of such terms being read and also means they are likely to be ignored even if they are read.

- **Access to the full terms may be difficult or impossible before acceptance**. Often the document being signed is not the full contract; the purchaser is told that the rest of the terms are in another location. This reduces the likelihood of the terms being read and in some situations, such as software end user license agreements, can only be read after they have been notionally accepted by purchasing the good.

**U.S. Dist. LEXIS 59095.**

And all the above while the Hilsenraths were clearly oblivious of the elaborate conspiracy of PERKINS, KALMAN and their corporation in abusing their trust.

How could anyone have anticipated that a decade later, in 2006, when tragedy did hit the Hilsenraths, Equity Trust, their trusted trustee, would send them a letter stating paraphrased: "<u>we</u> are the owners of your assets now; <u>we</u> will give you nothing; your problems are not <u>our</u> problems – you don't like it? Then sue us! [Exhibit D – Grant Brown's letters to the Hilsenraths' attorney Federal Public Defender Steve Kalar].

Clearly the "but if" principle of law governs the relationship of the Hilsenraths with PERKINS, KALMAN and Equity Trust, in its various incarnations and corporate masters: Undoubtedly, had the PERKINS solicitation in Exhibit A not occurred, the Hilsenraths would still run their finances at the Bank of America branch in the shopping center of Alamo California.

## VIOLATION OF THE RICO ACT

KALMAN and PERKINS assert that the RICO allegation is improperly alleged in the current complaint. KALMAN AND PERKINS assert that there are no multiple acts to provide an allegation of a patter. KALMAN AND PERKINS err.

Here is a complete unfolding of alleged violation to support the RICO allegation against KALMAN AND PERKINS:

1. In and about December 2000 -- Unlawful trade of Hilsenrath financial records to Nixon Peabody and others with the purpose to impeach and remove Hilsenrath from CEO position [Exhibit E]
2. April 2001 -- Extorting a settlement;
3. March - May 2001 -- Wire fraud to extract money from the Hilsenraths:
    i. Wire transfer Exhibit F,
    ii. Wire transfer Exhibit G,
    iii. Wire transfer Exhibit H,
    iv. Wire transfer Exhibit I,

---

In the case of contracts of adhesion the forum will scrutinize such contracts with care and will refuse to apply any choice-of-law provision they may contain if to do so would result in substantial injustice to the adherent **Omstead v. Dell, Inc., 473 F. Supp. 2d 1018**

v.  Summary of Wire transfers Exhibit J

A Total of -- 4 different acts of Wire Fraud.

4. June 2001 – Fraud in opening of a new Hilsenrath family trust (Firefly) while concealing that Insinger had traded financial records of the Hilsenraths in December 2000 - with the purpose of embezzling further Hilsenrath assets; It is clear from the Brown letter to Attorney Kalar [Exhibit D] that Equity's plan was to have a hold on Hilsenrath assets in view of collection of the tentative default entered by this court in 2004 in Janvrin v. Hilsenrath.

5. March 2002-2007 -- Malicious prosecution in further harassment of victims/witnesses to file Case 4:02-cv-01068-CW Janvrin Holdings Limited et al v. Hilsenrath et al under the pretext of not knowing of an investigation that they themselves instigated;

6. Between 2000 and 2006 – destruction of the extortion records [Exhibit K] to cover up the conspiracy; [See also Exhibit M – Perkins' interview with the US Attorney's mission in Jersey re the London 2000 package].

7. Between 2000 and 2006 – further destruction of the records to obstruct justice and obstruct a criminal investigation in Case 3:03-cr-00213-WHA USA v. Hilsenrath, et al.

As documents and correspondence abundantly shows, Kalman, Perkins were part of a team comprised of dozens of people that took to undertake, contract, threaten, trade, carry personal information through multiple jurisdictions, operating a dozen attorneys in multiple counties and ultimately conceal and make records disappear. They availed themselves to a court and equally easy disappeared. One generation of employees left but another, new one, carried on.

The existence of a pattern and an organization are without doubt.

## ANTI SLAPP FAILS

Knapp raises the Anti-SLAPP defense for KALMAN AND PERKINS, Insinger officials at the time, and their malicious disclosures of records of the Hilsenraths in and about a London Meeting with Janvrin attorneys in December 2000.

In other words Knapp admits that KALMAN AND PERKINS uncovered to Dahan, Nixon Peabody and others, present at that event, allegedly unlawful dealings of the Hilsenraths as a matter of "public service".

5

This assertion significantly fails and is disingenuous for the following reasons:

1. Invoking the Anti SLAPP defense essentially infers that KALMAN AND PERKINS and Insinger were aware of certain unlawful conduct of the Hilsenraths in relation to their holdings in Jersey between 1996 and 2000. If so what were those unlawful acts? If KALMAN AND PERKINS and Insinger were aware of unlawful use of their trusts why did they not attempt to stop it? They were after all the controlling trustees [see Brown letters to Kalar Exhibit D]?
2. Were KALMAN AND PERKINS and Insinger secretly "accumulating" evidence of unlawful acts of the Hilsenraths in order to blackmail them later? If so their conduct falls into the RICO category.
3. Since 1999 (KALMAN reporting in his testimony to the SEC) Insinger, Equity Trust had a new KYC (Know Your Client) policy in which they were obligated to investigate all sources of funds received. Why then didn't they stop the Hilsenraths investments if they thought something was improper?
4. Jersey Financial Services have a mandatory policy that requires local financial institutions to fill an STR (Suspicious Transaction Reports) every time they suspect a client or a transaction. Why then did KALMAN, PERKINS, Insinger of Equity not file any STR about the Hilsenraths conduct if they were suspicious?
5. Further, in March 2003, KALMAN was interviewed under oath by the SEC. KALMAN was asked insistently and repeatedly: was there anything out of order, improper or suspicious about the Hilsenrath holdings and transaction in the Jersey trust? Melvin consistently replied: No. There was noting suspicious or improper at the best of my knowledge [Exhibit L – Kalman interview with the SEC].
6. Then what public service were PERKINS and KALMAN doing by handing the Hilsenrath private and confidential records to Nixon Peabody, Dahan and others? Were Nixon Peabody and Dahan their understanding of public servants who need to be made aware of the Hilsenrath records?

    Why not an STR to the Jersey Police or a report to the SEC mission who he interviewed with?
7. KALMAN and PERKINS had nothing improper or suspicious to report. And if they had Nixon and Dahan were not the proper audience for the documents. KALMAN and

6

PERKINS were on a mission to extort. They unlawfully distorted and traded Hilsenrath financial records. In the confines of the London hotel away from the eyes of the authorities. Outside their own jurisdiction to be on the safe side. [Exhibit M – Perkins' interview with the US Attorney's mission in Jersey re the London 2000 package]

> **Schering Corp. v. First DataBank, Inc., 2007 U.S. Dist. LEXIS 50164** A court considering an anti-SLAPP motion must engage in a two-part inquiry. First, in order to prevail on a motion to strike, the moving party must make an initial prima facie showing that the claimant's suit arises from an act in furtherance of its rights of petition or free speech in connection with a public issue. "An act in furtherance" includes, but is not limited to, "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or any other conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public
> \* \* \*
> "In ruling on a motion to strike, the trial court does not weigh the evidence or determine questions of credibility; instead the court accepts as true all of the evidence favorable to the plaintiff." _Nagel v. Twin Labs., Inc._, 109 Cal. App. 4th 39, 134 Cal. Rptr. 2d 420, 424 (2003). Indeed, the California Supreme Court has recognized that the anti-SLAPP "statute poses no obstacle to suits that possess minimal merit." _Navellier v. Sletten,_ 29 Cal. 4th 82, 124 Cal. Rptr. 2d 530, 52 P.3d 703, 712 (Cal. 2002).

A secret lounge in an obscure hotel in London amongst private conspirators is no replacement for "a place open to the public or a public forum".

8. Upon the US Wireless fiasco, KALMAN, PERKINS, Insinger and Equity covered their unlawful traces by a methodical destruction of documents and correspondence.

Knapp's SLAPP theory grossly fails[2].

## **MALICIOUS PROSECUTION CONFIRMED**

Plaintiffs allege two prongs of malicious prosecution:

1. Filing in March 2002 a second Janvrin litigation by KALMAN and PERKINS alleging that Insinger did not know about the allegations against Hilsenrath, allegations that they themselves initiated.

---

[2] Equilon Enterprises v. Consumer Cause, Inc., 29 Cal. 4th 53, ∗

CRITERION 1 FOR MALICIOUS PROSECUTION - NO MERITS: Judge Zimmerman in his 2005 recommendation to set aside the default entered by this court, states that Hilsenrath under no circumstance had a personal liability for unpaid US Wireless debt thus offering a second aspect of the malicious initiation of this action against Hilsenrath [Exhibit N- Zimmerman R&R 2005].

2. Walking away from a litigation in which they, themselves, were the Plaintiffs. Here surprisingly, Knapp confuses the roles of Plaintiff and Defendant and is confused about who was what. To clarify, KALMAN and PERKINS, defendants in this present action were directors for the plaintiffs in Janvrin v. Hilsenrath. Knapp brings an excellent case that clearly concludes that walking away from a case by plaintiffs is considered malicious.[Exhibit O: Judge Wilken enters default upon Janvrin No-Show]

> **Minasian v. Sapse, 80 Cal. App. 3d 823**
> A dismissal for failure to prosecute under Cal. Civ. Proc. § 583(a) does reflect on the merits of the action, and that reflection is favorable to the defendant in the action. The reflection arises from the natural assumption that one does not simply abandon a meritorious action once instituted.
>
> Followed recently by **Ross v. Kish, 145 Cal. App. 4th 188.**

CRITERION 2 FOR MALICIOUS PROSECUTION CASE ENDED IN FAVOR OF VICTIMS: By abandoning the litigation, the case was concluded in a counterclaim in favor of the Hilsenraths, the victims of the malicious prosecution.

The judgment in favor of the Hilsenraths was the result of an evidentiary hearing <u>on the merits</u> of the case and was concluded in an 8 million Dollar reward to be paid to the Hilsenraths by Janvrin et al.

KALMAN and PERKINS are making an additional disingenuous attempt to temper with chronology and allege that they were involved in the alleged extortion but not in the subsequent malicious prosecution filed in March 2002.

In other words, Knapp wants this court to believe that KALMAN and PERKINS were both still at Equity Trust till 2004 and 2005 (see Brown declaration who replaced KALMAN in 2004 Doc 25) but handed over Janvrin et al to someone else at Equity Trust after the extortion was completed in 2001.

The motivation of KALMAN and PERKINS to hide their lead role as directors of Janvrin et al in the Janvrin litigation of 2002 is a disingenuous attempt to evade the limitation of statute of this malicious litigation that continued till the Janvrin abandonment of the case by a no show in March 2007[Exhibit O – no show].

**Minasian v. Sapse, 80 Cal. App. 3d 823**
**(1) Malicious Prosecution § 7--Essentials to Maintenance of Action-- Favorable Termination--Dismissal for Failure to Prosecute.** --A dismissal for failure to prosecute under Code Civ. Proc., § 583, subd. (a), reflects on the merits of the action in a manner favorable to the defendant in that action and is a favorable termination for purposes of a subsequent action for malicious prosecution. Thus, judgment for defendant on the pleadings in an action for malicious prosecution was improper where plaintiff alleged that defendant had maliciously and without probable cause cross-complained against him in a previous action, causing plaintiff emotional distress, and that the cross-complaint had been dismissed after two years for failure to prosecute.
**(2)** "Looking at the matter in the light of principle, it would seem that the failure of the plaintiff to prosecute his suit should be regarded as a concession of his inability to maintain it. The issues are not actually examined and passed upon, but by his failure to appear he virtually confesses that the result of the trial would be to find them against him."

## DEFAULT JUDGMENT IS A CONFIRMATION OF THE WELL-PLEADED ALLEGED FACTS

In a repetitive confusion between plaintiffs and defendants' and counterclaimants' roles in the present case and Janvrin v. Hilsenrath (in which KALMAN and PERKINS were directors for Plaintiffs and counterdefendants, Knapp misinterprets the law as to the significance of a default judgment.

To set the record straight: a default judgment is a confirmation on the merits of the well-pleaded allegations of counterclaimants the Hilsenraths. As the result, the allegations of extortion by Janvrin, Ryburn, Crossgar are confirmed and accepted as true by the court amid deliberate absence from the court of counterdefendants Janvrin et al, of which KALMAN and PERKINS were directors.

While indeed the lack of financial viability could have been a motivator for Janvrin to dismiss their case in 2004, 2005, 2006, there are proper way of doing this and disappearance from the court after 7 years and amid a pending counterclaim is not the method of choice for a respectable corporation.

## WHO IS COVERED BY THE LITIGATION PRIVILEGE
## OF CIV. CODE, § 47, SUBD. (b)

Knapp is raising the litigation privilege as a defense for KALMAN and PERKINS' dissemination of personal Hilsenrath records in London 2000.

If Knapp's theory is correct and KALMAN and PERKINS were covered by the litigation privilege then Knapp confirms that THEY are the actors behind Janvrin and the response to Hana Hilsenrath's statement in Court in the May 2, 2007 hearing on the Janvrin default judgment: "We were not extorted by a piece of paper, we were extorted by people…"

If Knapp is correct than KALMAN and PERKINS are the Janvrin et al. actors and tortfeasors then the matter of this court's jurisdiction over them cannot be disputed. Ironically, it was KALMAN AND PERKINS WHO CHOSE THE California jurisdiction in Janvrin v. US Wireless (2000) and later in Janvrin v. Hilsenrath (2002)

The substantive issue of their right to disseminate private records to Nixon, Dahan and others as part of Janvrin v. US Wireless (first litigation) should have been brought by KALMAN and PERKINS as a defense to the Counterclaim in Janvrin v. Hilsenrath (second litigation). At this point the inappropriate nature of those transfers of documents and the extortion are a firm, established conclusion of Janvrin v. Hilsenrath.

The litigation privilege can only establish this court's jurisdiction over KALMAN and PERKINS. It cannot change the already confirmed fact that the Janvrin extortion took place.

**Moser v. Triarc Co., Inc.** 2007 WL 1111245 S.D.Cal.,2007.

> All persons who are shown to have participated in an intentional tort are liable for the full amount of the damages suffered. This rule applies to intentional torts committed by shareholders and those acting in their official capacities as officers or directors of a corporation, even though the corporation is also liable.

There is a second option, that Knapp is wrong and the litigation privilege does not cover KALMAN and PERKINS. In that case their dissemination of stolen documents from the Hilsenrath trust was in furtherance of a conspiracy to extort the Hilsenraths and other US Wireless executives. KALMAN and PERKINS were simple seeking to extort California citizens, a US publicly traded corporation and therefore this court's jurisdiction over KALMAN and PERKINS is straightforward.

# SLAPP AND THE LITIGATION PRIVILEGE DON'T MIX

"A threat that constitutes criminal extortion is not cleansed of its illegality merely because it is laundered by transmission through the offices of an attorney -- Extortion is not a constitutionally protected form of speech."[3]

Knapp's mix of SLAPP and the litigation privilege in the KALMAN and PERKINS defense is a mix disfavored by law.

The same case referring to the litigation privilege Civ. Code, § 47:

> Where a defendant brings a motion to strike under Code Civ. Proc., § 425.16, based on a claim that the plaintiff's action arises from activity by the defendant in furtherance of the defendant's exercise of protected speech or petition rights, but either the defendant concedes, or the evidence conclusively establishes, that the assertedly protected speech or petition activity was illegal as a matter of law, the defendant is precluded from using the statute to strike the plaintiff's action

Knapp's motion to strike should therefore be denied on either the base of the privilege or on the base of SLAPP.

# THE LITIGATION PRIVILEGE DOES NOT COVER DESTRUCTION OF EVIDENCE

> **§ 47. Privileged publication or broadcast**
> **(2)** This subdivision does not make privileged any communication made in furtherance of an act of intentional destruction or alteration of physical evidence undertaken for the purpose of depriving a party to litigation of the use of that evidence, whether or not the content of the communication is the subject of a subsequent publication or broadcast which is privileged pursuant to this section. As used in this paragraph, "physical evidence" means evidence specified in Section 250 of the Evidence Code or evidence that is property of any type specified in Chapter 14 (commencing with Section 2031.010) of Title 4 of Part 4 of the Code of Civil Procedure.

---

[3] Flatley v. Mauro, 39 Cal. 4th 299

11

**FORUM AND CONTRACTS**

Knapp and other parties in this litigation are pulling this case to be litigated in Jersey, Channel Island.

On the face of it, the arguments are borderline incoherent. This litigation is about harboring a conspiracy with tortuous acts all directed to California. All about stock and cash from the Hilsenraths and their California Corporation US Wireless. The Hilsenraths are California citizen and were California citizens at all relevant instants to this case (even while still being only Israeli citizens): 1996 formation of US Wireless, 2000 the London meeting, 2001 the collapse of US Wireless and back in 2005 at the default hearing entered by this court against the Hilsenraths and in 2007 at the judgment against Janvrin. All litigations were always held in California and by the initiatives of KALMAN, PERKINS and what is called Equity Trust today.

In the past, KALMAN, PERKINS, Equity, Insinger et al did everything they could to avoid the Jersey courts. They never brought an action there even though US Wireless had its own Jersey based affiliate: US Wireless International.

Even when they planned to transmit extortion documents all conspirators decided to avoid the Jersey jurisdiction and decided to drag bags of Hilsenraths' files to London.

There is no doubt that the effort to drag this case to Jersey is a defense tactic in an effort to derail this case. While Equity et al can afford any attorneys everywhere, the Hilsenraths are litigants *in pro per* and could not afford a litigation in Jersey.

Not only is California the appropriate forum for this case, it is the only viable forum for the Hilsenraths. To deny this forum is to deny the right to litigate this case. There is not alternative forum.

Albeit disingenuous, the pretext to bring this case to Jersey is based on the Hilsenraths being clients of a trust there. This case is not about trust matters or handling of the trusts but about torts of Equity/Insinger Jardine Trust directed personally against the Hilsenraths as persons and executives without any connections to them being clients of the Jersey trusts.

Even if those contracts would have had relevance to this case they are all void.
1. The Aida contract – was never signed by any trust executive, therefore it is invalid (KALMAN testifies to the SEC that an agreement not signed by the trust is not valid see Exhibit L).
2. The Telecom Associates contract was signed in 1999 while the account was opened in 1997. Obviously none of the parties ever paid attention to the content of a contract

referring to a 2 year old account

3. Same in 1999, when apparently personnel at Insinger noticed there are no contracts in place, they also sent a form contract for OHFI that was formed in 1998 and included all US Wireless stock position of the Hilsenraths

4. All contracts were boilerplate non-negotiated forms regarded of little value and paid no attention to by both sides, and with a total good faith assumption of care by the Hilsenraths.

> **Brennan v. Bally Total Fitness, 198 F. Supp. 2d 377,** *
>
> An agreement is unenforceable when it is unconscionable. An unconscionable contract is one which is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms. In other words, a contract is unconscionable where there is an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.
>
> A contract is substantively unconscionable where its terms are unreasonably favorable to the party against whom unconscionability is claimed. While the procedural aspect of unconscionability is shown by reference to the contract formation process, substantive elements of unconscionability appear in the context of the contract per se.
>
> The test for procedural inadequacy in forming a contract is whether, in light of all the facts and circumstances, a party lacks a meaningful choice in deciding whether to sign the contract
>
> To determine whether a contract was validly formed, a court should focus on evidence of high pressure or deceptive tactics, the use of fine print in the contract, and any disparity in experience and education, bargaining power, between the parties.
>
> See also **Gillman v. Chase Manhattan Bank, N. A., 73 N.Y.2d 1,**
>
> An unconscionable contract has been defined as one which is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms. The doctrine, which is rooted in equitable principles, is a flexible one and the concept of unconscionability is intended to be sensitive to the realities and nuances of the bargaining process.

## TERMINATION OF ALL CONTRACTS BY EQUITY – JULY 2000

5. In July 2000, KALMAN, PERKINS and Insinger determined that they had a conflict of interest [Exhibit P, Exhibit L] and resigned from all the Hilsenrath accounts: Aida (renamed Borazon), Telecom Associates, OHFI et al.

6. In December 2000, when they transferred the extortion documents to Nixon and Dahan they did not have any single contract left with the Hilsenraths.

On what basis then do all defendants try to pull this case to Jersey? On the basis of contracts that they themselves VOIDED before engaging in extortion against California citizens – the Hilsenraths?

As Explained in Exhibit P and L, by KALMAN and PERKINS, they VOIDED the Hilsenrath management agreements exactly for the purpose of not having obligations under Jersey law.

The court should agree with that rationale – there are no ties to the Jersey jurisdiction by the very initiative and acts of KALMAN, PERKINS, and Insinger et al[4].

## **THE JANVRIN-US WIRELESS 2001 SETTLEMENT AGREEMENT**

The April 2001 settlement obtained by KALMAN and PERKINS was the product of their extortion of multiple persons at US Wireless. The releases sought by Janvrin et al in that settlement were the result of severe threats on US Wirelesses executives family members and without any knowledge that Insinger themselves were involved in extorting the settlement [Exhibits R –declaration Hana Hilsenrath, Exhibit S – Letter to Janvrin attorney].

Further in the court's conclusion in Janvrin v. Hilsenrath it was determined that the contract was the result of an unlawful act and Janvrin et al ordered to return all consideration

---

[4] As the result of this court aggregation of a number of related cases, it is brought to the attention of the court that an additional contract was signed by the Hilsenraths in June 2001 re the Firefly Trust. This contract has no bearing on this particular case but is relevant to the related Case 4:07-cv-04162-CW Hilsenrath v. Equity Trust (Jersey) Limited et al.

Insinger de Beaufort, Equity Trust of today, committed fraud by concealing the information of their bad acts. In 2001 the Hilsenraths engaged Equity Trust to manage the Firefly trust oblivious of KALMAN, PERKINS' and Insinger's participation at the London 2000 meeting and subsequent production and distortion of their financial records. Therefore Equity Trust was aware that upon discovery of the conspiracy they would be haled into the California court.

The Hilsenrath requested to close Firefly immediately upon discovery of the conspiracy upon Equity's opposition [Exhibit xx]. Finally the Firefly Trust was closed, with the intervention of the US government. The Hilsenraths were requested to indemnify Equity Trust with respect to the distributed assets, and specifically alerted Equity Trust that they will be sued in California court in respect to the Janvrin case [Exhibit YY].

received under that agreement.

That agreement is for all practical purpose void.

An extorted release obtained under duress by KALMAN and PERKINS themselves cannot be a defense in this case alleging their harboring of that very same duress.

**Living Designs, Inc. v. E.I. DuPont de Nemours & Co., 431 F.3d 353**

* * * It is quite another thing, however, to conclude that a person is deemed to have released a claim of which he has no knowledge, when the ignorance of such a claim is attributable to fraudulent conduct by the released party.

And also

In order to constitute duress, precluding enforcement of a release under Tennessee law, the pressure on the claimant seeking to avoid the release must be such that it would overcome the mind and will of a person of ordinary firmness. Kinnard v. Shoney's, Inc., 100 F. Supp. 2d 781 (M.D. Tenn. 2000)

## LIMITATIONS OF STATUTE

Knapp is raising a number of rationales as to the limitations of statute pertaining to KALMAN and PERKINS.

1. Conspiracy – The Janvrin, KALMAN, and PERKINS etc conspiracy is still unfolding. No statute could elapse on an unfolding conspiracy. The first indication of the secret London 200 events was uncovered in June 2005. The information was incredible and insufficient to bring an action. On July 29 2005, Perkins was interviewed for the first time on the subject and recognized the document in Exhibit E, admitted to have participated at the December 2000 meeting but did not recall details from the meeting. The series of events that followed included the revelation in 2007 [Exhibit K] that the records were destroyed, hindering discovery, the disappearance of plaintiff *Janvrin at al* from court and the hasty dissolution of the companies to defeat the execution of this court's order. All the above support the assertion that the conspiracy is still unfolding.
2. Two years from "discovery". Knapp states that the fist documents of the secret London 2000 conspiracy arrived to the Hilsenraths in June 2005 and the present litigation was filed in July 2007 thus the 2 years statute limitation was exceeded by precisely 10 days.

While no court will dismiss a case for such an argument, it is clear that the arrival of the first package of documents did not constitute the "discovery" of the facts. On July 30, 2005 the US government interviewed John PERKINS. After the Perkins interview Hilsenrath and the US government proceeded to attempt discovery of the events by making a further request for information to the Jersey Attorney General. Only in December of 2006 Equity Trust made it clear to the Jersey Attorney General that "they could not locate" the documents presented by Hilsenrath. April 2007 is the date when the clear picture of the London 2000 conspiracy was understood. It was clear at that point that the documents and records were destroyed and no further documents will be ever found to further complete the picture. Therefore on the grounds of conspiracy alone, the stature of 2 years should run from April 2007 to April 2009.

KALMAN and PERKINS actively engaged in concealment of the records. [Exhibit K]

> **Thompson v. Mt. Peak Assocs., LLC, 2006 U.S. Dist. LEXIS 36981**
> Finally, "dismissal on **statute of limitations** grounds can be granted pursuant to Fed. R. Civ. P. 12(b)(6) **[*4]** 'only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled.'" TwoRivers v. Lewis, 174 F.3d 987, 991 (9 Cir. 1999)(quoting Vaughan v. Grijalva, 927 F.2d 476, 478 (9th Cir. 1991)).

3. RICO – 4 years from discovery. Knapp argues that the RICO allegation is not sufficiently pleaded because there is no second act after London 2000, and that KALMAN and PERKINS were not involved in the second litigation filed in March 2002 – the malicious prosecution. Obviously KALMAN is not truthful to his attorney. Pursuant to Grant Brown's declaration Doc 25 of the current case, he was in charge till 2004 (see RICO section for more stages). The 4 years of the statute can either run from the first information in 2005 or from the completion of the fact finding in 2007. In either case the limitation of statute would run till 2009-2011.

4. Limitation of statute for malicious prosecution. The Janvrin malicious prosecution has ended in March 2007. No statute limitation bars Plaintiff pursuit of KALMAN and PERKINS on their malicious prosecution.

5. It is also argued that the limitation of statute in a conspiracy runs till the conspirator comes forward. KALMAN and PERKINS are still conspiring. Their conspiracy will continue till they live up to their acts. Thus inherently the statute still runs.

**United States v. Hereford, 162 Fed. Appx. 439**

As long as at least one act in furtherance of the conspiracy is committed within the limitations period, the statute of limitations is not violated. Where a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated; and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn

Withdrawal from a conspiracy is difficult to prove: A defendant is found to have withdrawn from a conspiracy where he or she makes a full confession to authorities or communicates to his co-conspirators that he has abandoned the enterprise and its goals. Merely ceasing activities on behalf of the conspiracy does not constitute withdrawal

## CONCLUSION

The evidence in this case is significant and depicts clearly the actions of Kalman and Perkins. Their execution and harboring of already decided unlawful actions are winded in details but simple in nature: Kalman and Perkins are abusing off shore secrecy to conduct unlawful and tortuous activities.

Their pattern of action was extremely harmful to plaintiffs in this action. But there is no doubt that the combination of illegal and immoral practices with the veil of secrecy offered by their firm and jurisdiction creates a pattern that repeats itself every day, every week unless noticed and punished.

In the current case the torts, the litigations, whatever document escaped the shredder are all here in California.

The Court should deny the motions to strike and to dismiss on the grounds of insufficient jurisdiction.


Dated: October 10, 2007


Respectfully submitted,

1   HANA HILSENRATH

2   Plaintiff *PRO SE*

3

4      /s/ Hana Hilsenrath

5

6   OLIVER HILSENRATH

    Plaintiff *PRO SE*

7

8      /s/ Oliver Hilsenrath