1

2

3 **Exhibit F: 1st Instance of wire fraud as part of the Janvrin**

4

5 **extortion**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Oliver Hilsenrath Family Investments Ltd

*(A Company registered in the British Virgin Islands)*

Administrative address:
P.O. Box 546
28-30 The Parade
St. Helier
Jersey
JE4 8XY
Channel Islands

Telephone:   01534 888111
Facsimile:    01534 888118

Our ref: PLT/UFL/CO857

26 September 2001

The Manager
The Royal Bank of Scotland International Limited
71 Bath Street
St. Helier
Jersey

Dear Sir

**Account No.: 1028-50214988-USD**

Please accept this letter as your authority to effect the following transfer on receipt of funds from the above-mentioned account.

| | |
|---|---|
| **Amount:** | $22,000.00 (Twenty two thousand US Dollars only) |
| **Bank:** | Yourselves |
| **Address:** | Yourselves |
| **Account Name:** | Dyke Limited |
| **Account No:** | 1028-50181249-USD |
| **Value:** | Immediately |

Please send confirmation of the above instruction in due course.

Yours faithfully

For Wesley Secretaries Limited, Secretary

JAG 00376

CONFIDENTIAL PURSUANT
TO SECTION 24 (d)
00956



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit G: 2nd Instance of wire fraud as part of the Janvrin extortion

Account Number:   1028-50181249
Date:   19/04/2001
Our Reference:   5084726

THE ROYAL BANK OF SCOTLAND
INTERNATIONAL
Jersey Branch,
PO Box 64,
71 Bath Street, St. Helier,
Jersey. JE4 8PJ.
Channel Islands.
Tel: 01534 285200. Fax: 01534 285222.
24 Hour Telephone Banking: 01534 724365.

**INSINGER TRUST COMPANY LIMITED**
**P O BOX 546**
**28-30 THE PARADE**
**ST. HELIER**
**JERSEY  JE4 8XY**

*WE CONFIRM RECEIPT OF AN INWARD PAYMENT ON 19/04/2001*

*CREDITED AMOUNT:*          USD   299,987.71

*VALUE DATE:*                 19/04/01

*LESS OUR CHARGES:*         USD        0.00

*REMITTER DETAILS:*          ICP/OLIVIU HILSENRATH

*OTHER INSTRUCTIONS:*        ICP/OLIVIU HILSENRATH

This confirmation does not require a signature

3741

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit H: 3rd Instance of wire fraud as part of the Janvrin

# extortion

```
From:        $$$
To:          "'De La Cour, Linda'" <LdelaCour@je.insinger.com>
Date:        9/12/05 2:41pm
Subject:     RE: Dyke Limited
```

Neither Cobby or I know which company the proceeds came from.


> ----------
> From:      Linda De La Cour[SMTP:LdelaCour@je.insinger.com]
> Sent:      Monday, August 06, 2001 3:45 AM
> To:        Murray, Christine M [PVTC]
> Cc:        David Haines
> Subject:   Re: Dyke Limited
>
> <<File: TEXT.htm>>
> Dear Christine
>
> thank yo for your e.mail.  Were the funds received on April 3rd the
> proceeds from  sales of shares previously held by the Company?
.>
> With kind regards,
>
>
> Linda
>
>
> >>> "Murray, Christine M [PVTC]" <christine.m.murray@rssmb.com> 08/03/01
> 04:38pm >>>
> Linda,
> the source of the funds you are inquiring about are as follows:
>
> April 3rd
> $543,864     MSD New Technologies
> $336,533     IDS Telecom Investment Group Inc.
>
> April 12th
> $70,000      JP Morgan
> this wire was credited back to your account from a previous wire sent on
> March 16th.  This was the wire that was sent to Harris Bank but went to
> the
> wrong Harris bank and we sent a second wire for $70,000 to the correct
> Harris Bank.  This is the return of the first wire request.
> Any questions please do not hesitate to call.
>
> Christine Murray
> Salomon Smith Barney
> Sales Assistant
> (212) 428-5397
> 800-445-6529x5397
> christine.m.murray@rssmb.com
>
>
> ------------------------------------------------------------
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit I: 4th Instance of wire fraud as part of the Janvrin extortion



**INSINGER *de*BEAUFORT**

The Manager
The Royal Bank of Scotland International Limited
71 Bath Street
St. Helier
Jersey

Insinger Trust Company Limited

Insinger de Beaufort House
P.O. Box 546
28-30 The Parade
St. Helier
Jersey JE4 8XY
Channel Islands
Tel. +44 (0)1534 888 111

St. Helier, 16 May 2001

OUR REFERENCE    :    PLT/MKA/CO2972

Dear Sir

**Account Name: Myriad International Limited**
**Account No: 1028-50210486-USD (Overnight fixed maturing 17 May 2001)**

Please accept this letter as your authority to effect the following transfer at maturity from the above mentioned account as follows:

Amount:             US$994,000 (Nine hundred & ninety four thousand U.S.Dollars)
Bank:               Yourselves
Address:            Yourselves
Account Name:       Dyke Limited
Account No:         1028-50181249-USD
For Value:          17.05.01 (Maturity)

Please send confirmation of the above instruction in due course.

Yours faithfully
Insinger Trust Company Limited

Authorised Signatory                    Authorised Signatory

**JAG 03530**

CONFIDENTIAL PURSUANT
TO SECTION 24 (d)
**01692**

Formerly Matheson Trust Company (Jersey) Limited
Registered in Jersey, Channel Islands, 42712

Fax +44 (0)1534 888 118
E-mail infojrstrust@je.insinger.com

1

2

3  **Exhibit J: Kalman's summary of proceeds of wire fraud as part**

4

5  **of the Janvrin extortion**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CO1280   Dyke Limited                    **Base / Source Activity Report**                    Date: 12/09/0010 Page 128 of 169C
Lr0088                                                                                        Time: 08:42:29    Page: 1

 Source  - All Currencies, - All Related Parties, Account: 5140
For All Sub Accounts, From: 13/05/2000 To: 12/09/2001, Subtotal By Related Party and Sub A/c

| Event Num | Seq | Date | Narrative | DR/CR | Source Value | Base Value | Source Balance | Base Balance |
|-----------|-----|------|-----------|-------|--------------|------------|----------------|--------------|
| Base Currency: USD From: 12/05/2000 To: 12/09/2001 | | | | | | | | |
| | | | | | | | | |
| Account: 5140 | | USD Commissions | | | | | | |
| | | 12/05/2000 | Balance Brought Forward | | | | 0.00CR | 0.00CR |
| JP238 | 2 | 30/03/2001 | Advance payment on account of settlement | CR | 377,530.12 | 377,530.12 | 377,530.12CR | 377,530.12CR |
| JP240 | 2 | 03/04/2001 | Advance payment on account of settlemen | CR | 27,436.75 | 27,436.75 | 404,966.87CR | 404,966.87CR |
| JP332 | 2 | 03/04/2001 | Advance payment on account of settlemet | CR | 543,864.00 | 543,864.00 | 948,830.87CR | 948,830.87CR |
| JP332 | 4 | 03/04/2001 | Advance payment on account of settlemet | CR | 336,533.00 | 336,533.00 | 1,285,363.87CR | 1,285,363.87CR |
| JP252 | 2 | 19/04/2001 | Advance payment on account of settlement | CR | 300,000.00 | 300,000.00 | 1,585,363.87CR | 1,585,363.87CR |
| JP268 | 2 | 17/05/2001 | Advance payment on account of settlement | CR | 994,000.00 | 994,000.00 | 2,579,363.87CR | 2,579,363.87CR |
| | | 12/09/2001 | Balance Carried Forward | | | | 2,579,363.87CR | 2,579,363.87CR |
| | | | | | | | | 2,579,363.87CR |

*** End of Report ***

3375

1

2

3

**Exhibit K: Cover of extortion by destruction of records**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

---

| | |
|---|---|
| *11th Floor, Federal Building* | *(415) 436-7200* |
| *450 Golden Gate Avenue, Box 36055* | |
| *San Francisco, California  94102-3495* | *FAX:(415) 436-7234* |

December 12, 2006

BY FEDERAL EXPRESS, EMAIL AND FACSIMILE TO 202/514-0080

Ruth Payne, Esq.
Office of International Affairs
United States Department of Justice
1301 New York Avenue N.W.
Washington, D.C.  20005

> Re:     Fourth Supplemental Request for Assistance in the Prosecution and Continuing
>            Investigation of Oliver Hilsenrath

Dear Ms. Payne:

On August 9, 2006, Paul Joseph sent a third supplemental request to Jersey regarding additional documents that Oliver Hilsenrath's prior attorney, Steve Kalar, sent to me.  Those documents (a) came from Equity Trust in Jersey, the Channel Islands, (b) were responsive to our original MLAT request dated November 10, 2003, and (c) were not produced by Equity to the Jersey authorities, and thus were not provided to us.  The documents include admissions by trust officers that they had a conflict of interest with Hilsenrath and other trust clients, characterization of the trusts as tax exempt accounts, and possible impeachment material of our main cooperating witness, Klarman.

As a result, Equity Trust reviewed its files again, and produced more documents that the Jersey authorities sent to us in November.

Following that production, Oliver Hilsenrath provided me with the enclosed court pleading. Attached to that pleading are additional documents that are responsive to our original MLAT request and were not provided by Equity Trust.  (Some of the attached documents were provided, and you can tell those documents because they bear the bates range JAG, which shows that they came from the Jersey Attorney General's Office.)

According to Oliver Hilsenrath, he has more documents that were provided in civil discovery that Equity Trust did not provide in response to the MLAT request.  As I mentioned in my third request, the documents that  he identifies are important to the investigation here, and the parties cross-examined witnesses during the depositions about topics in the documents.

1.  Description of Evidence Sought.

Therefore, I submit this fourth supplemental request for documents that we asked for in our original MLAT requests and that were not provided.  As you can see by the court pleading that Mr.

Letter to Ruth Payne, Esq.
December 12, 2006
Page 2

Hilsenrath provided, the allegation is that Equity Trust provided Mr. Hilsenrath's private
information in an attempt to give other clients of Equity an upper hand in their litigation against
Mr. Hilsenrath. Issues about those clients – according to Mr. Hilsenrath's former attorney Steve
Kalar – are relevant to Mr. Hilsenrath's defense.

Accordingly, not only should Equity Trust provide the documents (including any
additional documents), but also it should provide an explanation about why documents were not
provided in response to our previous MLAT requests.

Rebecca Boxall of the Jersey Attorney General's Office sent a supplementary notice to
Equity dated August 17, 2006. That notice sufficiently describes the documents that are
responsive to our original MLAT requests, so I do not reiterate our request here. You may also
refer to Paul Joseph's request to the Attorney General dated August 9, 2006, which reiterates all
of our requests for documents. Ms. Boxall is familiar with our request, as we have spent
substantial time coordinating with the Jersey authorities about the production of these
documents.

2. <u>Depositions</u>.

We previously conducted depositions, but – depending on how Equity Trust responds –
we may want to depose the witnesses further. I refer to the witnesses and procedures set forth in
our prior request for assistance dated April 19, 2005.

3. <u>Conclusion</u>.

Equity Trust has not provided all documents that we requested in our prior requests for
assistance. We look forward to receiving the missing information promptly and an explanation
for the omission. Because we have a January 29, 2007, trial date, this matter is urgent. We
appreciate how helpful the Jersey authorities have been, and how promptly they have been able
to respond to our requests in the past.

Very truly yours,

KEVIN V. RYAN
United States Attorney

LAUREL BEELER
Assistant United States Attorney

Enclosures



**U.S. Department of Justice**

*United States Attorney*
*Northern District of California*

---

*11th Floor, Federal Building*          *(415) 436-6765*
*450 Golden Gate Avenue, Box 36055*
*San Francisco, California 94102*        *FAX:(415) 436-7234*

April 9, 2007

Mr. Oliver Hilsenrath
822 Eastbrook Court
Danville, CA 94506

Dear Mr. Hilsenrath:

    Enclosed is a copy of a letter dated March 5, 2007, from Equity Trust in response to the letters I sent them with your exhibits, asking for the file to be reviewed again in response to our MLAT request.

                          Very truly yours,

                          KEVIN V. RYAN
                          United States Attorney

                          LAUREL BEELER
                          Assistant United States Attorney

Enclosure

# EQUITY TRUST

Equity Trust (Jersey) Limited
Equity Trust House, P.O. Box 546
28-30 The Parade, St Helier, Jersey JE4 8XY
Channel Islands

Tel    +44 (0) 1534 636211
Fax    +44 (0) 1534 636215
Email  infoje@equitytrust.com

Law Officer's Department
Morier House
St Helier
Jersey JE1 1DD

Attn. Rebecca Boxall

2 March 2007

> LAW OFFICERS DEPT.
>
> - 5 MAR 2007

Our ref     :   JEV/VLO
**Subject**     :   **Investigation of Fraud (Jersey) Law, 1991 - Oliver Hilsenrath**

Dear Ms Boxall

We refer to our letter dated 29 January 2007.

We have now completed a review of our files in relation to the documents exhibited to the Notice of Motion enclosed with your letter dated 3 January 2007, and advise as follows in further response in relation to Exhibit's E, G & H:

Exhibit E
Whilst we have been unable to confirm whether this document was produced at an earlier date in response to a Production Notice or Supplementary Notice, to the best of our knowledge and belief we believe that a copy of a version of this document (which does not contain the hand written notes at the bottom of the page) was produced in response to the Supplementary Notice dated 13 October 2005.

Exhibit G
We have been unable to locate this document on our files and therefore to the best of our knowledge we believe that the document has not been produced by Equity for this reason.

Exhibit H
We confirm that we have been unable to locate this document on our files and therefore to the best of our knowledge we believe that the document has not been produced by Equity for this reason.

Yours sincerely

Justine Every
In-house Legal Counsel
Equity Trust (Jersey) Limited

Regulated by the Jersey Financial Services Commission and registered under the Financial Services (Jersey) Law 1998
Registration No. 57583

1

2

3 **Exhibit L: Kalman Deposition by SEC**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROWN ADVOCATE: Mr Kalman, for the benefit of the tape, I am Crown Advocate Andrew Belhomme and this is an interview which is taking place under the Investigation of Fraud, Jersey Law 1991. You've been served with a notice dated 24 March 2003, requiring you to attend here today for interview. Under the law, I have to inform you that you are obliged to answer the questions which are asked of you and that includes matters in respect of which you may consider yourself to be bound by a duty of confidence. Further, I must caution you that it is a criminal offence to make any statement which you know to be false or misleading in a material particular or to recklessly make a statement which is false or misleading in a material particular during the course of this interview. Do you understand that?

MELVYN KALMAN:    I do indeed, thank you.

CROWN ADVOCATE: Thank you. Just for the benefit of the tape, if we could now, starting on my left, please, just identify ourselves?

MARK LEWIS:    Mark Lewis from Bailhache Labesse.

MELVYN KALMAN:    Melvyn Kalman, Insinger Trust Company.

REBECCA BOXALL:  Rebecca Boxall, Assistant Legal Adviser.

BRIAN HUCHRO:    Brian Huchro, US Securities & Exchange Commission, San Francisco.

MELVYN KALMAN:   First of all, I don't have any particular detailed knowledge, any

knowledge really, of Telecom Associates, its day-to-day activities.

There may very well be consulting agreements.  I wasn't involved in

any of the day-to-day activities at that time or subsequently.

The specific answer to your question, we have to sub-divide it.  Pre-

July 1999 when all(?) crimes legislation was introduced into Jersey,

so post-July 1999 we have a legal obligation, as prescribed under the

Order, to understand and know the source of money coming into a

structure, and where that money's come from, how it's been arrived at

and why it's been sent to us.  Failure to understand the source of the

money has consequences.  Before then, it was a legal -- before July

1999, to the best of my knowledge, it wasn't a legal obligation but it

was good practice to understand where the money had come from

and why it had been received and what we were supposed to do with

it.

If money comes into a structure, it can only be as a result of two

things: either the beneficial owner or somebody else lending money

to the company or it was income the company had generated in some

capacity.  It can't be anything else.  And if it's a loan into the company

we need to determine - we needed to determine at that time and we

still need to determine today - what the loan terms and conditions

were.  If it was income, we need to know what the company has done

to generate the income or what the beneficial owner may have done

to generate the income for the company and how it's to be treated

and what the obligations are of the company, what to do with this

money.

So certainly, with the best will in the world, we would ask as many

questions as we thought were reasonably required.

Kalman - 0035

the set-up form preceded the company management agreement and this company management agreement, exhibit 20, is deficient in two parts. It's deficient in the sense that it hasn't been signed by Oliver Hilsenrath and it's deficient in the sense that it hasn't been signed by any representatives from Matheson Trust Company. And because of those deficiencies I would say it's probably ineffective. That would be a question for a lawyer, should one need to ask that direct question. But based upon --

KATHLEEN BISACCIA:  But if there were transactions -- I'm sorry.

MELVYN KALMAN:  Based upon what I've been presented with, I would say David Klarman would be the sole person who can give instructions.

KATHLEEN BISACCIA:  Mm hmm.  So if there were transactions that had occurred in the Silicon Valley company, David Klarman would be the one that you would say --

MELVYN KALMAN:  He would be the driver, certainly.

KATHLEEN BISACCIA:  Okay.

MELVYN KALMAN:  The instigator.

BRIAN HUCHRO:  I think that takes care of those two exhibits.  I'll just hand those back to you.
And before we get on to the next entity, Oliver Hilsenrath/David Klarman being on that particular company management agreement's

(1.10 of silence)

BRIAN HUCHRO:         May I?

MELVYN KALMAN:        Yeah, fine.  Fire away.

BRIAN HUCHRO:         There appears to be a fair amount going on in these couple of

                     documents, so maybe we'll just start chronologically based upon the

                     dates of the documents.  Exhibit 26 is dated 28 July 2000.  If I could

                     ask you to describe that document a little bit for us, that would be

                     helpful.  Whether it's a Matheson document, that type of …

MELVYN KALMAN:        For the record, I can confirm that exhibit 26 is a memorandum

                     produced by Matheson by Mr John Perkins on 28 July 2000.  It's a

                     memorandum addressed to Celine Gimenez, David Chalmers-Hunt,

                     Peter Zajac, with a copy to myself, Melvyn Kalman.

BRIAN HUCHRO:         Do you recollect seeing this document before?

MELVYN KALMAN:        I do, indeed, recollect seeing this particular memorandum.

BRIAN HUCHRO:         Okay.  I guess I'd like to talk a little bit about the first paragraph.  It

                     seems to indicate that the author of the document, John Perkins,

                     identified a conflict of interest in that some action may be forthcoming

                     regarding the resignation as officers of -- I assume OH/DK is Oliver

                     Hilsenrath and David Klarman.  Is that a fair assumption?

MELVYN KALMAN:        Indeed.

BRIAN HUCHRO:        If you could give us a little background or colour as to what the

potential issue was.


MELVYN KALMAN:    Would it be possible to stop the tape for a moment?


BRIAN HUCHRO:        Certainly.


(buzzer on tape sounds)


This is Brian Huchro again.  We're back with our interview with Mr

Melvyn Kalman at Insinger de Beaufort after a short break.

Right before our break, Mr Kalman, I was asking -- exhibit 26 and the

first several paragraphs of that document.  There appeared to be

some indication that there was a conflict of interests between some of

your clients.  I was wondering if you could give us a little bit of

background on that?


MELVYN KALMAN:    The memorandum, exhibit No. 26, dated 28 July 2000, does indeed

state there was a conflict of interest, insofar as three corporate

entities, which were managed and administered by Matheson Trust

Company, were involved in litigation in their capacity as plaintiff

against US Wireless Corporation and its officers, and in view of the

fact that Oliver Hilsenrath was the CEO of US Wireless at the

appropriate times and David Klarman was the chief legal counsel for

US Wireless at the time, advice was taken from a local firm of lawyers

in Jersey and it was decided that we needed to exit the relationships

with Mr Klarman and Mr Hilsenrath.

BRIAN HUCHRO:        And just to be clear, are those three entities entities we've talked

about today?

MELVYN KALMAN:      They are not.

BRIAN HUCHRO:        Fair enough.  And was the relationship with David Klarman and Oliver

Hilsenrath terminated as the memorandum sets forth?

MELVYN KALMAN:      To the best of my knowledge and belief and recollection, they were

terminated.  We resigned as officers --

BRIAN HUCHRO:        Of those three entities?

MELVYN KALMAN:      No, no, of the three entities being Craiglands, Silicon Valley --

BRIAN HUCHRO:        I'm sorry, you said there's three entities that are involved in litigation.

Who did you resign from?

MELVYN KALMAN:      We resigned from any companies with which Hilsenrath and Klarman

were connected, in the sense of being beneficial owners of those

companies.  We decided to retain the relationship with the three

entities which were acting as plaintiff.

BRIAN HUCHRO:        I understand.  That clarifies it.  I do have one final question, though.  I

think earlier you mentioned that Oliver Hilsenrath is still a client of

Mathesons.  I'm just trying to understand.  You said you had resigned

from all entities.

BRIAN HUCHRO:        It's all right.

MELVYN KALMAN:       Beddows.

KATHLEEN BISACCIA:  Maybe Mark can answer?

MARK LEWIS:          Yes, it's -- under Jersey law, trustees can make an application to the

court to seek their guidance in connection with the administration of a

trust.  So if the trustee is not sure how to proceed in connection with a

particular matter he can seek the court's guidance and that's what a

Beddows application is.  It's when a trustee goes to the court and

asks for the wisdom of the court.

MELVYN KALMAN:       And it can also mean that the trustees can then be empowered to use

the trust funds, to take action, to defend action, should they deem it

appropriate.

BRIAN HUCHRO:        And do you have any knowledge of whether such an application was

filed?

MELVYN KALMAN:       I don't have any knowledge of that.  I don't know.  I suspect not,

otherwise I probably would have been told.

BRIAN HUCHRO:        Okay.  In item No. 3 on that same page it says, "Further

investigation".  The second and third sentences indicate, "It was also

agreed that HS would do further investigation in connection with the

sale of the shares of [excuse me] in US Wireless.  HS would also

check whether he had signed the original set-up forms". Do you have
any knowledge as to what the first sentence I read means regarding
the connection with the sale of shares in US Wireless? What the
concern may have been?

MELVYN KALMAN:    Huw Shepheard may very well have been concerned - and I'm
guessing, surmising - that was the vendor of the shares, whichever
entity it was, the right owner of those shares? Had they been
allocated, bought, owned correctly by the entity and therefore were
they subject -- was the entity capable of disposing of them in the open
market? Was the company being used, potentially, for insider
trading? Was there any closed period or something of that order? I
think Mr Shepheard was initially concerned whether Hilsenrath or any
of the entities were properly entitled to hold those US Wireless shares
at the time.

BRIAN HUCHRO:    You indicated, and I appreciate you saying, you were speculating.
Did you, at that time, have any concern of a similar nature regarding
Hilsenrath, or Klarman for that matter, doing some insider trading?

MELVYN KALMAN:    The simple answer is no. I did not consider insider trading, nor did I
consider that the shares had been inappropriately obtained by any of
the Hilsenrath or Klarman entities, for a number of reasons. Public
disclosure within US corporations is extensive. The shares were
often held through well-known investment houses in the States.
There had been nothing, to my knowledge, to indicate at any time that
Hilsenrath/any of his companies were not properly entitled to those
shares. At no time -- sorry, I mentioned that three of my other entities

making false statements.  Anonymity can equal confidentiality, after

all.  But nonetheless, people have obligations to make accurate

reports and reportings.

BRIAN HUCHRO:        Fair enough.  Based upon the information you know about the entities

we've talked about today, hindsight being 20/20, we're in 2003, and

whether these transactions happened in, you know, the late to early --

mid to late 1990s and early 2000.  Were there any -- again, sorry,

hindsight being 20/20, is there anything, looking back now, that

causes - again, I'm not suggesting Insinger's done anything improper

- that there were red flags that Hilsenrath and/or Klarman may have

been engaging in transactions that would be suspicious or improper

beyond the suspicious transaction report that the company filed?

MELVYN KALMAN:       Twenty/twenty hindsight's very difficult.  You know, there's lots of

knowledge --

MARK LEWIS:          That's a very difficult question for my client to answer.  It seems to me

that's not a factual question, it's a speculation about whether they've

committed offences under the laws of jurisdiction of which they've got

no knowledge, so I don't feel comfortable with that question.

BRIAN HUCHRO:        How about if I ask him in the context of those allegations, that

Hilsenrath and Klarman have been involved in improper conduct,

that's out there in the public?

MELVYN KALMAN:       Yeah.

BRIAN HUCHRO:     Is there anything that you were aware of that would support that

view?


MELVYN KALMAN:     The best way I can answer that question is that I believe I -- me and

my colleagues acted appropriately at all times, and I hear your

comments previously that Insinger are not under investigation.  We

acted in accordance with our procedures, with the -- our legal

obligations at the time, and there was nothing, then, which, up until

June 2001, when that suspicious transaction report was filed, gave us

grounds for concern.  So the answer to your question is no, there isn't

anything that springs to mind.  I think we had information and

answers to questions which we needed to ask at the time.


BRIAN HUCHRO:     Any -- we're pretty close to wrapping up here.  From a global

perspective, we've talked about a number of different things today.

Are there any either clarifying statements or additional things that

you'd like to have us go away with today that we haven't talked about,

whether it happens to be in relation to events that have happened

subsequent to Oliver's termination that relate directly to these

entities?  Again we're not asking about something that isn't related to

entities we've discussed today.


MELVYN KALMAN:     No, I think we've -- from my intimate -- my lack of intimate knowledge,

I should say, of the entities and the day-to-day activities of those

entities, I think we've pretty much covered my -- the extent of my

involvement, the extent of my knowledge on the day-to-day activities

and transactions of the entities concerned.  We've spoken about

what's going on in US Wireless at the moment and the interest I have

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit M: Perkins Deposition by US Attorney re London 2000 meeting and documents

1       Q.   And Dahan and Haruvi, they signed as CEO and
2    president of Pelican Securities & Investments and
3    Pelican Consulting; is that correct?
4       A.   Yes.
5       Q.   So apparently Matheson had been taking legal
6    action against one of its own clients since at least
7    2001; isn't that correct?
8       A.   Yes.
9       Q.   And through that entire time it was acting as a
10    trustee over Mr. Hilsenrath's trust; isn't that correct?
11       A.   I believe that was the case, yes.
12       Q.   How can that be?
13       A.   Well, the only thing I would say is that -- and
14    again, it's not trying to pass the buck, but by that
15    time Mr. Kalman had taken primary responsibility for the
16    relationship.  We'd indicated previously there was a
17    conflict of interest.  And initially we, if you like,
18    came down on the side of continuing to act for Mr. Dahan
19    and Mr. Haruvi once realizing there was a conflict.
20       Q.   And I think we've established that the attorney
21    representing the plaintiffs was Mr. Glen Westreich; is
22    that correct?
23       A.   Yes.
24       Q.   I think we've established that you met Mr. Glen
25    Westreich in early 2000 at a meeting in London, in which

468

1    yourself and certainly Mr. Kalman on the Matheson side

2    were present, and Mr. Dahan and Mr. Haruvi, they were

3    also present; isn't that right?

4        A.    That's correct.

5        Q.    And Mr. Hilsenrath did not attend that meeting.

6        A.    He did not.

7        Q.    Doesn't it appear that Insinger had a conflict

8    in that it was supporting legal action by some of its

9    clients against other of its clients?

10       A.    The way I see it, we didn't have much choice in

11   the matter.  We -- we were requested by clients to take

12   action.  They -- they, I believe, gave us sufficient

13   proof that they -- that they had a litigious action to

14   bring, and so we -- because we administered the

15   companies on their behalf, which owned the shares which

16   were the subject of the dispute, under legal advice we

17   felt we had to proceed with the action.

18       Q.    Did Matheson ever provide information to Dahan

19   or Haruvi or Westreich in relation to Oliver Hilsenrath

20   or any of his entities?

21       A.    Well, that's quite a sweeping question, any

22   information.  I don't think we gave -- I don't recall

23   giving specific information, such as has been referred

24   to before as in specific, you know, entire assets of

25   Aida Holdings.  For example, I don't think we would have

469

1    discussed anything in detail.

2        Q.    Was information about Oliver Hilsenrath

3    provided?

4        A.    I don't recall any -- anything specific.  I

5    don't really think that was the -- the subject of the

6    discussions.  The discussion was either how to recover

7    stock or options or perhaps proceeds which Mr. Dahan and

8    Mr. Haruvi thought they were entitled to.  So it was

9    really in that context.

10       Q.    Were any records relating to Oliver Hilsenrath

11   or his entities provided to any of those who attended

12   the meeting?

13       A.    Not to my recollection, no.

14       Q.    Just off the record for a second.

15             Back on the record.

16             I hand you what has been previously marked as

17   Defense Exhibit 212, which appears to be a fax to Amos

18   Bentzur, B-e-n-t-z-u-r, Attorney at Law, from Linda

19   de la Cour, Insinger de Beaufort; the subject is Aida

20   Holdings, and the date is 6 November 2000.

21       A.    Correct.

22       Q.    What does this refer to?  What attached -- what

23   attached documents are being provided to Mr. Amos

24   Bentzur?

25       A.    It says it's going to fax the attached

470

```
 1    documents in respect of the power of attorney in
 2    relation to Aida Holdings Limited.  And it goes on to
 3    say that a courier package is being forwarded to
 4    Mr. Bentzur in respect to the litigation.  And attached
 5    are documents relating to Telecom Associates, which are
 6    from the Matheson or the Equity records, stating that
 7    Mr. Hilsenrath is the client, and giving the registered
 8    and administration addresses, details of the officers,
 9    and giving the financial year-end.  Just showing the
10    issued share capital, one share of Telecom Associates.
11          Then there's a -- internal ledger print showing
12    the various nominal accounts with some balances on.
13          It looks like similar information with respect
14    to Star Anise Limited.  There's a Morgan Stanley Dean
15    Witter statement for the month ending 30th April 2000 in
16    regard to Star Anise, showing holdings and daily
17    activity.
18          There's some statements in relation to Borazon
19    Limited, showing basic company information and also
20    internal nominal ledger prints with balances on.
21    There's a statement for Borazon Limited, showing
22    relationships in regard to other entities, including
23    Aida Holdings Limited, showing the -- the bankers being
24    Matheson Bank International, and also brokerage accounts
25    with Morgan Stanley, Stuart Coleman, and Spear Leeds
```

471

1  Kellog.

2         Do you want me to keep going?

3     Q.   No, that's all right.

4         Going back to the first page, Amos Bentzur,

5  wasn't he the attorney representing Dahan?

6     A.   Well, he -- he was known to David Dahan and he

7  was certainly present at the meeting in London.

8     Q.   So although the caption says it's Aida Holdings

9  Limited, and the paragraph that refers what's being

10  forwarded seems to indicate that "Kalman has asked me to

11  fax documents relating to a power of attorney on the

12  above company," would you agree with me that much of the

13  information that is being conveyed concern other

14  entities other than Aida Holdings?

15     A.   Yes, it does.

16     Q.   And also we have seen previously numerous --

17  numerous instructions from Mr. Hilsenrath to various

18  Matheson/Insinger trust people not to disclose

19  information to Mr. Dahan.  Isn't that an accurate

20  statement?

21     A.   Yes.

22     Q.   What is going on here?

23     A.   Well, all I can say is that I did not send that

24  fax, it was Linda de la Cour, and she sent it apparently

25  on the instructions of Mr. Melvyn Kalman.  I don't

472

1    recall having seen any of this documentation before, so

2    I wasn't aware of it.

3        Q.   You have worked in and on behalf of Matheson,

4    Insinger de Beaufort, and -- and Equity for how many

5    years, sir?

6        A.   Sixteen and a half.

7        Q.   You were aware of what the responsibilities and

8    fiduciary obligations are of trust companies --

9        A.   Yes.

10       Q.   -- isn't that correct?

11           Based upon your experience and your

12   professional dealings with many clients and trust

13   companies, do you believe that your employer had a

14   conflict of interest with Mr. Hilsenrath and breached

15   its fiduciary obligations as a result of the information

16   we have shown you here today?

17       VISCOUNT SUBSTITUTE MATTHEWS:  Could I just

18   interrupt at this point.  It seems to me -- I want to

19   find out the relevance of this in relation to these

20   particular criminal proceedings, and it seems to me that

21   you're asking this client to incriminate his former

22   employer.

23       MR. BREAKSTONE:  I'll be happy to discuss this with

24   you, but it's not a relevant objection.

25           Mr. Dahan and Mr. Haruvi were primary investors

473

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Exhibit N: Judge Zimmerman tentative ruling re default against Hilsenrath

# FILED

JUN 1 4 2005

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANVRIN HOLDINGS LIMITED, CROSSGAR LIMITED, and RYBURN LIMITED,<br>    Plaintiff,<br><br>    v.<br><br>DR. OLIVER HILSENRATH, et al.,<br>    Defendants. | No. C02-1068 CW (BZ)<br><br>**CLERK'S NOTICE REGARDING TENTATIVE RULING ON PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT OLIVER HILSENRATH** |

Attached to this Clerk's Notice is a Draft Order representing a tentative ruling on plaintiff's Motion For Default Judgment Against Defendant Oliver Hilsenrath. The **June 15, 2005,** hearing remains on calendar.

Dated:    June 14, 2005

_Rose Maher_
Rose Maher - Deputy Clerk to
Magistrate Judge Bernard Zimmerman

G:\BZALL\-REFS\JANVRIN HOLDINGS\CLERKSTENTATIVERULING.NOT.wpd

# FAXED

to counsel of record 6/14/05    1

# TENTATIVE RULING

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JANVRIN HOLDINGS LIMITED, )
CROSSGAR LIMITED, and RYBURN)
LIMITED,                     )      No. C02-1068 CW (BZ)
                             )
          Plaintiffs,        )      **REPORT AND RECOMMENDATION**
                             )      **RE: PLAINTIFFS' MOTION FOR**
     v.                      )      **DEFAULT JUDGMENT AGAINST**
                             )      **DEFENDANT OLIVER HILSENRATH**
DR. OLIVER HILSENRATH, et    )
al.,                         )
                             )
          Defendants.        )
_____)

        Judge Wilken having referred the motion of plaintiffs'

Janvrin Holdings Limited, Crossgar Limited, and Ryburn Limited

(collectively "plaintiffs") for default judgment against Dr.

Hilsenrath, the Court hereby makes the following report and

recommendation.

        In March 2002, plaintiffs sued various defendants,

including Oliver Hilsenrath, the CEO and a director of U.S.

Wireless Corporation ("U.S. Wireless"), for their acts and

omissions in inducing plaintiffs to enter into a settlement

agreement under which plaintiffs released claims against U.S.

1

# TENTATIVE RULING

Wireless, Dr. Hilsenrath, and David Klarman.   On May 2, 2002,
plaintiffs filed their first amended complaint ("FAC").[1]   The
Clerk of the Court entered default against Dr. Hilsenrath on
January 14, 2004.

The settlement agreement provided for the issuance of a
specified number of shares of U.S. Wireless common stock to
Janvrin, Ryburn, and Crossgar, and required U.S. Wireless to
file a Form S-3 registration statement with the SEC.   FAC at
3.   It also provided:

> I.   U.S. WIRELESS shall pay the total sum
>       of One Million Dollars in equal parts
>       to RYBURN, CROSSGAR and JANVRIN, on
>       the following schedule: $333,333.34
>       on or before April 1, 2001;
>       $333,333.33 on or before July 1,
>       2001; and $333,333.33 on or before
>       October 1, 2001.
>
> j.   In addition to the amounts described
>       in subpart (I), on the Closing Date
>       U.S. WIRELESS shall pay the
>       Plaintiffs the total amount of
>       $500,000, with such payment to be
>       made in equal parts to RYBURN,
>       CROSSGAR, and JANVRIN. . . .

Id. at 4.   On the closing date of the settlement agreement,

---

[1]   The first amended complaint asserted the following
claims against Dr. Hilsenrath:   (1) intentional
misrepresentation, (2) negligent misrepresentation, (3) fraud
by a fiduciary, (4) breach of the fiduciary duty of loyalty (5)
breach of contract (6) violation of Rule 10b-5, and (7) joint
and several liability of management principals or materially
aiding personnel.   While plaintiffs filed a second amended
complaint which contained essentially the same causes of action
against Dr. Hilsenrath, plaintiffs suggest that it was the
first amended complaint that was served on Dr. Hilsenrath and
they rely on the first amended complaint in their motion.
See Decl. of Glen Westreich in Supp. of Mot. for Entry of
Default Against Defendant Oliver Hilsenrath, ("Westreich
Decl.") ¶ 11, Ex. A.

2

# TENTATIVE RULING

1
2  U.S. Wireless gave $500,000 to plaintiffs and also transferred
3  to them 2,132,800 shares of U.S. Wireless common stock as
4  agreed.  See FAC ¶ 61.  However, U.S. Wireless did not file
5  the Form S-3 registration statement with the SEC or "otherwise
6  attempt[] to register Plaintiffs' shares," and U.S. Wireless,
7  Dr. Hilsenrath, and Mr. Klarman failed to pay the remaining
8  $1,000,000.  See id. ¶¶ 62-63, 71.

9      In deciding whether to grant or deny a default judgment,
10  a court must first "assess the adequacy of the service of
11  process on the party against whom default is requested."
12  Board of Trustees of the N. Cal. Sheet Metal Workers Health
13  Care Plan v. Peters, No. C-00-0395 VRW, 2000 U.S. Dist. LEXIS
14  19065, at *2 (N.D. Cal. Jan. 2, 2001).  In their request for
15  entry of default, plaintiffs submitted evidence demonstrating
16  the means by which the summons and complaint were served on
17  Dr. Hilsenrath.  See Docket No. 191, Decl. of Beth Applebaum
18  Mitchell in Supp. of Mot. for Entry of Default as to Oliver
19  Hilsenrath ("Mitchell Decl.") .  That evidence reflects that
20  the summons and complaint was served on Dr. Hilsenrath at his
21  residence in Tel Aviv, Israel, on August 31, 2003.  More
22  specifically, a private investigator licensed by the Israel
23  Ministry of Justice -- after trying to serve the summons and
24  complaint on Dr. Hilsenrath three different times -- posted
25  the documents on the door of his residence.  See Appelbaum
26  Decl., Ex. A (proof of service and declaration of due
27  diligence).
28      Federal Rule of Civil Procedure 4(f) governs the adequacy

3

# TENTATIVE RULING

of service on individuals in a foreign country.[2]  Under Rule
4(f), service may be effected "by any internationally agreed
means reasonably calculated to give notice, such as those
means authorized by the Hague Convention on the Service Abroad
of Judicial and Extrajudicial Documents." Fed. R. Civ. P.
4(f).

Both the United States and Israel are signatories of the
Hague Convention on the Service Abroad of Judicial and
Extrajudicial Documents.  See 20 U.S.T. 361.  Under the
Convention, service may be effected through a request to a
central authority pursuant to the internal law of the
receiving state.  See Volkswagenwerk Aktiengesellschaft v.
Schlunk, 486 U.S. 694, 698-99 (1988) (citing Article 2).  The
Convention also allows for service of documents by means other
than a request to the central authority, such as service
through postal channels or judicial officers, provided the
state of destination does not object.  See id. (citing
Articles 8-11 and 19).  In addition, Article 19 provides: "To
the extent that the internal law of a contracting State
permits methods of transmission, other than those provided for
in the preceding articles, of documents coming from abroad,
for service within its territory, the present Convention shall
not affect such provisions." Id. (Article 19).

In its ratification of the Convention, Israel made the

_____

[2] See Fed. R. Civ. P. 4(m) (noting that 120-day period for
service of summons and complaint after filing "does not apply
to service in a foreign country pursuant to subdivision (f) or
(j)(1)").

4

# TENTATIVE RULING

following relevant declarations and reservations:

    a)    The Central Authority in Israel within the meaning of Articles 2, 6 and 18 of the Convention is: The Director of Courts, Directorate of Courts, Russian Compound, Jerusalem;

    b)    The State of Israel, in its quality as State of destination, will, in what concerns Article 10, paragraphs b) and c), of the Convention, effect the service of judicial documents only through the Directorate of Courts, and only where an application for such service emanates from a judicial authority or from the diplomatic or consular representation of a Contracting State.

_Friedman v. Israel Labour Party_, No. 96-CV-4702, 1997 WL 379181, at *3 (E.D. Penn. July 2, 1997).

The service of the summons and complaint on Dr. Hilsenrath, which consisted of a posting of these documents on the door of his residence, did not comply with the Convention. Service was not made pursuant to a request to Israel's central authority -- _i.e._, in compliance with Articles 5 and 6. Although Article 10 does contemplate service through "other competent persons," Israel's "ratification declaration . . . expressly limits the freedom of plaintiff to serve 'judicial documents directly through competent persons of the State of destination' and instead requires that alternative . . . service be effected 1) through the Directorate of Courts and 2) after a judicial or diplomatic request from the state of origin." _Friedman_, at *3. _Compare_ _Balcom v. Hiller_, 46 Cal. App. 4th 1758, 1764-65 (1996) (concluding that "a party can comply with the Convention by serving another in the United

# TENTATIVE RULING

Kingdom if service is effectuated by a competent person" such
as a process server because the United Kingdom's ratification
declaration with respect to Article 10 "merely identifies the
individuals to be used if a person wishes to serve documents
through *official* channels; it does not address 'other
competent persons of the State of destination'") (emphasis in
original).  As for Article 19, plaintiffs have not provided
any evidence as to whether Israel "permits methods of
transmission, other than those provided for in the preceding
articles, of documents coming from abroad, for service within
its territory."[3]  20 U.S.T. 361 (Article 19).  Similarly,
plaintiffs have not provided evidence demonstrating that
service on Dr. Hilsenrath was otherwise consistent with Rule
4(f)(2)(A).[4]  See Fed. R. Civ. P. 4(f)(2)(A).  Because
plaintiffs have not provided sufficient evidence demonstrating
adequate service of process on Dr. Hilsenrath, I recommend
that the motion for default judgment be denied without
prejudice.  See Friedman, at *3.

Even if service of the summons and complaint were not at
issue, it is still not clear that plaintiffs are entitled to
the judgment they seek against Dr. Hilsenrath.  A default

---

[3] See ePlus Technology, Inc. v. Aboud, 155 F. Supp. 2d
692, 699 (E.D. Va. 2001) ("[T]he word 'permits' in Article 19
must be read, in accordance with its plain meaning, to
authorize only those service methods that are explicitly
sanctioned by the law of the receiving country.").

[4] The Court does not address Article 15 of the Convention,
which discusses when a judgment may be given when a writ of
summons has been transmitted abroad for the purpose of service
and the defendant has not appeared.

6

# TENTATIVE RULING

1  judgment may be refused where the court determines no

2  justifiable claim has been alleged or that a default judgment

3  is inappropriate for other reasons. See Draper v. Coombs, 792

4  F.2d 915, 924 (9th Cir. 1986); Aldabe v. Aldabe, 616 F.2d

5  1089, 1092-1093 (9th Cir. 1980).

6      While plaintiffs asserted various claims against Dr.

7  Hilsenrath in their first amended complaint, their motion for

8  default judgment is predicated solely on the breach of

9  contract claim.  According to plaintiffs, Dr. Hilsenrath

10 breached the contract at issue -- i.e., the settlement

11 agreement -- by failing to pay the remaining $1,000,000

12 required by the agreement, and by failing to register the U.S.

13 Wireless stock with the SEC.  The problem for plaintiffs is

14 that the settlement agreement does not, on its face, require

15 Dr. Hilsenrath to pay plaintiffs any sum of money or prepare

16 and file with the SEC a registration statement.  Rather, those

17 obligations were to be carried out by U.S. Wireless.  See

18 Westreich Decl, Ex. B at 3-4 (emphasis added).  It is thus not

19 clear that Dr. Hilsenrath breached the settlement agreement.

20 However, in view of my report and recommendation

21 on the adequacy of service, I need not resolve this issue.

22     For the foregoing reasons, I recommend that plaintiffs'

23 motion for default judgment be denied without prejudice.

24 Dated:  June 14, 2005

25

26                          _____
                                Bernard Zimmerman
27                          United States Magistrate Judge

28 G:\BZALL\-REFS\JANVRIN HOLDINGS\R&R.wpd

<div align="center">7</div>

1
2
3

**Exhibit O: Judge Wilken order re Janvrin Default**

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  Glenn E. Westreich (State Bar Number: 100457)
   Beth L. Appelbaum (State Bar Number: 187460)
2  NIXON PEABODY LLP
   Two Embarcadero Center, Suite 2700
3  San Francisco, CA 94111-3996
   Telephone: (415) 984-8200
4  Facsimile: (415) 984-8300

5  Attorneys for Plaintiffs:
   JANVRIN HOLDINGS LIMITED,
6  CROSSGAR LIMITED and RYBURN LIMITED



**FILED**

MAR 1 2 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

7

8                    UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

10

11  JANVRIN HOLDINGS LIMITED, CROSSGAR          Case No.:  C02 1068 CW (BZ)
    LIMITED, and RYBURN LIMITED,
12
                        Plaintiffs,            **CASE MANAGEMENT ORDER**
13
14          vs.

15  DR. OLIVER HILSENRATH, et al.

16                      Defendants.

17  _____

    AND RELATED CROSS-CLAIMS.
18
19

20          A Case Management Conference in the above-referenced matter was held on Friday March 2,

21  2007.  Glenn E. Westreich, Nixon Peabody LLP, appeared on behalf of Plaintiffs and Counter-

22  Defendants.  Edward Donahue, Carlson Calladine & Peterson, LLP, specially appeared on behalf of

23  Nixon Peabody LLP.  Oliver Hilsenrath appeared in *Propia Persona*.

24          The Court, having ordered at the prior Case Management Conference held on February 9,

25  2007 that representatives of Plaintiffs and Cross-Defendants Janvrin Holdings Limited, Crossgar

26  Limited and Ryburn Limited appear in person on March 2, 2007 if Plaintiffs wished to proceed with

27  prosecution of this lawsuit, and no appearances having been made, orders as follows:

28          1.      The Second Amended Complaint is hereby dismissed pursuant to Rule 41(b) of the

CASE MANAGEMENT ORDER; CASE NO. C02-1068 CW (BZ)

1    Federal Rules of Civil Procedure for failure of the Plaintiffs to prosecute this litigation;

2        2.    The default of Counter-Defendants Janvrin Holdings Limited, Crossgar Limited and

3    Ryburn Limited shall be entered by the clerk pursuant to Rule 55(a) of the Federal Rules of Civil

4    Procedure.  Any application for entry of judgment against these Counter-Defendants shall be made to

5    Magistrate Judge Zimmerman on or before March 16, 2007;

6        3.    Nixon Peabody LLP is hereby permitted to withdraw as counsel for Plaintiffs and

7    Counter-Defendants Janvrin Holdings Limited, Crossgar Limited and Ryburn Limited.

8        Nixon Peabody LLP shall serve this Order on Janvrin Holdings Limited, Crossgar Limited

9    and Ryburn Limited at the last known addresses of these parties, and papers filed in this action may

10   continue to be served on Nixon Peabody LLP for forwarding purposes pursuant to Rule 11-5(b) of

11   the Local Rules of Practice in Civil Proceedings before the United States District Court for the

12   Northern District of California.

13

14   Dated: _____ **MAR 1 2 2007**

15                                     The Honorable Claudia Wilken
                                       U.S. District Court Judge
16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3      **Exhibit P: Perkins, Kalman conflict of interest**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Matheson Trust Company (Jersey) Limited

**Jardines**   A Member of the Jardine Matheson Group

Memorandum

| | | |
|---|---|---|
| To | Celine Gimenez - c.c. Melvyn Kalman, David Chalmers-Hunt, Peter Zajac | 28 July 2000 |
| From | John H Perkins | JHP/MFE/CO857 |

**Oliver Hilsenrath and David Klarman**

Having identified a potential conflict of interest the Directors, JHP and MK, have taken advice from Ogiers & Le Masurier concerning our position acting as Officers of various BVI companies, including those of which the above-named are the beneficial owners and which entities own shares in US Wireless Corporation.

As a result, we have taken the decision to resign as Officers of the OH/DK owned companies and we will cease to provide any further services, including administration address, nominee shareholders, signatories over the accounts, etc.

OH was advised of our decision during a telephone conversation on 27 July and JHP will be writing formally to OH/DK requesting them to nominate alternative officers who we will appoint in our stead. There is, however, another option and it may be that the beneficial owners will request us to close down their companies altogether and transfer the assets out.

To the best of my recollection, OH beneficially owns Borazon Limited and Oliver Hilsenrath Family Investments Limited and DK owns KS Legal Consultants Limited (and possibly Craiglands Limited?) There are also at least two other entities which were formed last year at the request of DK, namely US Wireless International Inc and another BVI company (name to be identified).

In the light of current developments, I should be grateful if Celine would ensure that all of the companies' book-keeping records are posted 100% to date and also request Corporate Department to ensure that the statutory records are in order as we will either be transferring these cases out very shortly, or possibly winding them down, as mentioned above.

At the same time, Celine please check the outstanding fees' position and advise me of the outcome.

Thanks and regards

*J. Perkins*

*Please also see attached copy faxes recently rec'd. per OH.*

*31/7/00*

1
2
3
**Exhibit R: Hana Hilsenrath declaration**
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

HANA HILSENRATH
822 Eastbrook Ct.

2

Danville, CA 94506
Telephone: 925.212.6299

3

Facsimile: 925.736.7571
Email: ohlx@sbcglobal.net

4

5

PLAINTIFF *PRO SE*

6

7

8

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

9

10

**HANA HILSENRATH AND OLIVER
HILSENRATH,**

11

**Plaintiffs,**

12

**v.**

13

**EQUITY TRUST (JERSEY) LIMITED,
ET AL**

14

15

**Defendants.**

16

**Case No. 3:07-cv-3312 CW**

**DECLARATION OF HANA HILSENRATH
IN SUPPORT OF PLAINTIFFS 'S
MOTION RE REVENGE TRUST,
JANVRIN, EQUITY TRUST, KALMAN,
PERKINS, ET AL**

**Judge: Hon. Claudia Wilken**

17

18

19

20

21

22

23

24

25

26

27

28

1    I Hana Hilsenrath declare the following to be true under penalty of perjury.

2

3    I declare that I was never an employee and was in no way involved in the business or

4    operation of US Wireless. I was at the time of the events in this declaration a homemaker and a

     mother of 4 children ages 6-14.

5

6    In or about May 2000, I received a phone call from David Dahan on my home phone in

7    Danville California.

8

9    Dahan said that he was calling me about the difficulties in selling US Wireless stock

10   related to (what he called) "JANVRIN".

11

12   Dahan stated that unless I convince my husband to allow the sale of the JANVRIN stock,

     he will have US Wireless destroyed, he threatened that my husband, Oliver, and the other

13   managers of US Wireless "will be taken care of" and that my "children will be hungry orphans in

14   the streets".

15

16   Further I have personal information and therefore declare that a number of other persons

17   related to US Wireless and their family members received similar phone calls.

18   Family members of another US Wireless executive reported to Special Agent Lori Lei

19   Johnston of the Federal Bureau of Investigation about a similar phone call from Dahan in

20   reference to the sale of stock and reported the "feeling that Dahan was physically threatening".

21

22   Upon these calls, I and the other persons that were threatened have consistently pressured

     Oliver, CEO of the company, to find a way to settle matters with these people and put an end to

23   the exposure of the company, its executives and their families to such personal and physical risk.

24

25   I further declare that while I knew that Dahan is physically threatening and extorting us, I

26   had at the time no knowledge whatsoever that our own trustees, Insinger Trust, and Kalman or

27   Perkins had any part in this scheme.

28

I only found out about their active participation, support and unlawful use of our family records in summer of 2005, when David Dahan agreed to testify in the Criminal case brought by the US government against Oliver.

I further declare that had I known that Insinger Trust, Kalman and Perkins were active participants at hurting Oliver, me, and our children, I would not have agreed to enter into a renewed trust relationship with Insinger in 2001 and placed in 2002 our very home in Israel in trust with these people.

I further declare that since 2005 I have personal knowledge of the existence of a trust called REVENGE TRUST with its only holding being Janvrin, Ryburn and Crossgar. The REVENGE TRUST was formed by Kalman and Perkins and is managed by Equity Trust.

I have inspected recent correspondence attesting that the REVENGE TRUST still exists and acts at the behest of its trustee –Equity Trust.

My conclusion from inspecting documentation and correspondence of the REVENGE TRUST is that its name and actions jointly reflect its sole purpose to harm Oliver, my family, and me.

Dated September 23, 2007,

Signed,

HANA HILSENRATH

Plaintiff *PRO SE*

_____/s/ Hana Hilsenrath_____

1

2

3

## Exhibit S: Letter US Wireless to Janvrin attorney Steve

4

5

## Glusband

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**US WIRELESS**

January 20, 2000

By Facsimile (212) 732-3232

Mr. Steven Glusband
Carter Ledyard & Milburn
2 Wall Street
New York, NY 10005

Dear Mr. Glusband:

I am in receipt of your letter of this date. This will be my final correspondence with you, or any member of your firm, regarding Janvrin Holdings Limited and David Dahan. As I have informed you before your client, David Dahan has continued to harass and threaten the CEO of this company, as well as his family. Your representation of this criminal is a disgrace to you and your firm. In addition, your threatening letters are absurd and unprofessional and fail to maintain any basis for your assertions. Our differences in approach to the practice of law, are probably a matter for the New York State Bar to review.

Regarding your request, U.S. Wireless Corporation has no obligation to respond to this request or any other request from you or your client. Your client's problems with its brokerage firm are not our concern. If a Rule 144 sale were affected in accordance with the securities laws an opinion of counsel would be issued. U.S. Wireless Corporation is under no requirement, and will not, give any opinion or assurance on a transaction that has not occurred.

It would seem that at present the only way to resolve the issues at hand is through the court system in California and/or Israel. Please advise if you are willing to receive service of process on behalf of David Dahan, Hiam Haruvi, Janvrin Holdings Limited and Ryburn Holdings Limited, for actions commenced in the United States and Israel.

Very truly yours,

David S. Klarman
Vice President and
General Counsel